# Exhibit "A"

Exhibit "A"



null / ALL
**Transmittal Number: 28122681**
**Date Processed: 12/06/2023**

# Notice of Service of Process

**Primary Contact:**      Sabrina Kania
Hiscox Inc.
5 Concourse Pkwy
Ste 2150
Atlanta, GA 30328-7107

**Electronic copy provided to:**      Legal
Valerie Martin

| | |
|---|---|
| **Entity:** | Hiscox Inc.<br>Entity ID Number  2845497 |
| **Entity Served:** | Hiscox Inc. d/b/a Hiscox Insurance Afency in California |
| **Title of Action:** | Nuggets & Carats, Inc. vs. Underwriters at Lloyd's |
| **Matter Name/ID:** | Nuggets & Carats, Inc. vs. Underwriters at Lloyd's (14945074) |
| **Document(s) Type:** | Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Orange County Superior Court, CA |
| **Case/Reference No:** | 30-2023-01362256-CU-BC-CJC |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 12/06/2023 |
| **Answer or Appearance Due:** | Other/NA |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Bohm Wildish & Matsen, LLP<br>714-384-6500 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Case 8:24-cv-00034-CJC-KES   Document 1-1   Filed 01/05/24   Page 3 of 234   Page ID #:8
Electronically Filed by Superior Court of California, County of Orange, 11/13/2023 08:00:00 AM.
30-2023-01362256-CU-BC-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By G. Ramirez, Deputy Clerk.

James G. Bohm (SBN 132430)
*jbohm@bohmwildish.com*
Joanne P. Freeman (SBN 140137)
jfreeman@bohmwildish.com
BOHM WILDISH & MATSEN, LLP
600 Anton Blvd, Suite 640
Costa Mesa, California 92626
Tel: (714) 384-6500
Fax: (714) 384-6501

Lawrence S. Eisenberg, Esq. SBN 114120
lse@lselaw.com
EISENBERG & ASSOCIATES, APC
9210 Irvine Center Drive
Irvine, California 92618
Tel:(949)733-1500
Fax: (949)753-1516

Richard O. Knapp, Esq. SBN 144654
rknapp@knapp-spurlock.com
KNAPP & SPURLOCK, LLP
3525 Hyland Ave Ste 220
Costa Mesa, CA 92626
Tel: (714) 434-9600

Attorneys for NUGGETS & CARATS, INC.

Assigned for All Purposes

Judge Thomas S McConville

C-28

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| NUGGETS & CARATS, INC., a corporation,<br><br>Plaintiffs<br><br>v.<br><br>UNDERWRITERS AT LLOYD'S, LONDON, SYNDICATE NO. 3624 SUBSCRIBING TO POLICY NO. MPL4029619.21; HISCOX INC. d/b/a/ HISCOX INSURANCE AFENCY IN CALIFORNIA; and Does 1-50<br><br>Defendants. | Case No. 30-2023-01362256-CU-BC-CJC<br><br>**COMPLAINT FOR:**<br><br>1) **BREACH OF WRITTEN CONTRACT (INSURANCE POLICY)**<br><br>2) **TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**DEMAND FOR JURY TRIAL** |

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

**INTRODUCTION**

1. Plaintiff NUGGETS & CARATS, INC. ("NUGGETS & CARATS") is a California corporation which at all times relevant herein operated two jewelry store locations in Orange County, California.

2. Defense International Corporation ("DEFENSE INTERNATIONAL") provided security guard services to NUGGETS & CARATS's jewelry store location in Laguna Niguel, California.

3. DEFENSE INTERNATIONAL, at all relevant times, had in place a Security Guards Professional Liability Insurance Policy through Defendant, the UNDERWRITERS AT LLOYD'S, LONDON, SYNDICATE NO. 3624 SUBSCRIBING TO POLICY NO. MPL4029619 ("LLOYD'S"). LLOYD'S was authorized to and was conducting business in California as an insurer, including in the County of Orange.

4. Hiscox Inc. d/b/a Hiscox Insurance Agency in California ("HISCOX PRO") is a corporation doing business in California as Hiscox Insurance Agency (with the trademark name of Hiscox Pro). HISCOX PRO was the administrator of the aforementioned insurance policy issued by LLOYD'S. HISCOX PRO's name was prominent and appeared throughout the policy and on correspondence regarding coverage, including the denial of coverage regarding the underlying loss. DEFENSE INTERNATIONAL relied on the representations that HISCOX PRO issued the insurance policy along with LLOYD's and was also the insurer.

5. On the night of Saturday, March 24, 2019, through the morning of Monday, March 25, 2019, NUGGETS & CARATS's Laguna Niguel jewelry store location was burglarized.

6. NUGGETS & CARATS sued, inter alia, DEFENSE INTERNATIONAL for negligence with respect to the burglary ("NUGGETS & CARATS' CLAIM").

7. DEFENSE INTERNATIONAL tendered the defense and indemnity of the NUGGETS & CARATS' CLAIM to LLOYD'S through the administrator of its policy and the co-insurer, HISCOX PRO.

8. LLYOD'S, through its administrator and the co-insurer, HISCOX PRO, wrongfully denied DEFENSE INTERNATIONAL's claim and wrongfully refused to provide a defense or indemnification to DEFENSE INTERNATIONAL with respect to the NUGGETS & CARATS'

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

1

COMPLAINT

1  CLAIM.

2     9.  As a result of the wrongful denial of the defense and indemnification of the NUGGETS &

3  CARATS' CLAIM, Defense International assigned to NUGGETS & CARATS its first party bad faith

4  claims against LLOYD'S and HISCOX PRO.

5  **GENERAL FACTUAL ALLEGATIONS**

6     10.  The underlying case involved a theft at the NUGGETS & CARATS jewelry store located at

7  The Center at Rancho Niguel Shopping Center in Laguna Niguel, California.  The theft occurred when

8  the perpetrators/burglars removed the power block (a large circuit breaker) from the exterior electrical

9  supply cabinet behind the NUGGETS & CARATS store, on or about Saturday night, March 24, 2019,

10  after the stores and restaurants at the shopping center had closed. This cut off the electrical power to

11  the NUGGETS & CARATS store. The perpetrators returned about 24 hours later, on Sunday night,

12  March 25, 2019, after the battery back-up to the security system was depleted and the security system

13  was disabled.  The perpetrators then broke into the NUGGETS & CARATS jewelry store through the

14  roof.  They were in the store for a number of hours between 12:00 midnight and 5:00 am and cut

15  through a large safe in order to steal approximately $2,500,000 in jewelry and diamonds.  The

16  perpetrators caused property damage to NUGGETS & CARATS property including its safes,

17  furniture, display cases, drywall, and ceiling among other things.

18     11. The theft and property damage occurred as a result of DEFENSE INTERNATIONAL's

19  negligence in providing security patrol guard services during the actual time the theft occurred and

20  before.  DEFENSE INTERNATIONAL was negligent in: (1) failing to provide a vulnerability

21  assessment which, among other things, would have identified the electrical supply cabinet as needing

22  to be secured from tampering; (2) failing to train and assess patrol guards in accordance with the

23  contract; (3) failing to advise the patrol guard to provide a 15-minute foot patrol every night; (4) failing

24  to notice, inspect and discover that the electrical supply cabinet was unlocked; (5) failing to discover

25  the rope hanging from the ceiling when the perpetrators were burglarizing the jewelry store; (6) failing

26  to notice debris scattered in the front of the store easily seen through the front plate glass windows

27  during the burglary; (7) failing to give the patrol guard adequate time to patrol each location; (8) failing

28  to notice vehicles in the rear behind the store; (9) failing to maintain constant visibility and situational

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

2

COMPLAINT

1    awareness; and, among other things, (10) failing to comply with the standard of care.

2    12. Had DEFENSE INTERNATIONAL complied with the standard of care, the burglary would

3    not have occurred.

4    **NUGGETS & CARATS SUES DEFENSE INTERNATIONAL AND LLOYD'S AND THE**

5    **CO-INSURER HISCOX PRO DENIES THE DEFENSE**

6    13. NUGGETS & CARATS original Complaint against DEFENSE INTERNATIONAL filed on

7    February 22, 2021, and the First Amended Complaint filed on April 27, 2021, were served on

8    DEFENSE INTERNATIONAL on September 20, 2021. NUGGETS & CARATS' Second Amended

9    Complaint was filed and served on April 18, 2022

10    14. The NUGGETS & CARATS' CLAIM was tendered for defense and indemnification to

11    LLOYD'S and the co-insurer HISCOX PRO through HISCOX PRO on or about November 16, 2021.

12    LLOYD'S and HISCOX PRO denied the defense and indemnification.

13    **THE INSURANCE POLICY BETWEEN DEFENSE INTERNATIONAL AND**

14    **LLOYD'S/HISCOX PRO**

15    15. A copy of DEFENSE INTERNATIONAL'S insurance policy with LLOYD's/HISCOX PRO

16    is attached hereto as **Exhibit 1**.

17    16. The Policy had a $1 million limit for Professional Liability.

18    17. The Policy provides in pertinent part that under 1.A. Bodily injury and property damage:

19    *We will pay up to the coverage limit for damages you become legally obligated to pay because of*

20    bodily injury or *property damage* to which this Coverage Part applies, provided: 1. the bodily injury

21    or property damage occurs during the policy period. [Emphasis added.]

22    18. The Policy period (1/7/2021-1/7/2022; Retroactive Date: 1/7/2019) includes the date of the

23    burglary (3/25/2019).

24    19. The Policy defines "property damage" as: "physical injury to tangible property, including. all

25    resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the

26    physical injury that cause it," or "loss of use of tangible property that is not physically injured. All

27    such loss of use will be deemed to occur at the time of the occurrence that caused it." This included

28    claims being made under the NUGGETS & CARATS' CLAIM.

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

3

COMPLAINT

**THE POLICY LIMITS DEMAND AND LLOYD'S/HISCOX PRO'S FAILURE TO ACCEPT IT**

20. Thereafter, on January 11, 2023, NUGGETS & CARATS sent a policy limits demand to LLOYD'S and HISCOX PRO, through HISCOX PRO on its own behalf and as an agent of Lloyd's, to settle all claims against DEFENSE INTERNATIONAL for the policy limits of $1 million. Attached hereto as **Exhibit 2** is a true and correct copy of the policy limits demand. The policy limits demand made it clear that DEFENSE INTERNATIONAL was negligent, the actual damages were well in excess of policy limits and that NUGGETS & CARATS incurred property damage. The offer stated it would remain open until February 10, 2022. LLOYD'S and HISCOX PRO, in bad faith, failed to accept the policy limits demand on behalf of their insured even though DEFENSE INTERNATIONAL was being sued for covered claims, DEFENSE INTERNATIONAL was negligent, and the damages were well in excess of the policy limits.

**THE ASSIGNMENT OF BAD FAITH CLAIMS**

21. Since DEFENSE INTERNATIONAL's insurance carriers, LLOYD'S and HISCOX PRO, in bad faith, denied the defense and indemnification of DEFENSE INTERNATIONAL with respect to the NUGGETS & CARATS CLAIM, and because it was likely that DEFENSE INTERNATIONAL would incur liabilities for in excess of policy limits on covered claims, DEFENSE INTERNATIONAL assigned its first-party bad faith claims (excluding punitive damages) against its insurance carriers, LLOYD's and HISCOX PRO to NUGGETS & CARATS. Attached hereto as **Exhibit 3** is a true and correct copy of the assignment.

**NUGGETS & CARATS WAS AWARDED $2,716,367.96 AGAINST DEFENSE INTERNATIONAL DURING A JUDICIAL REFERENCE**

22. Pursuant to a Judicial Reference appointment by the court on April 20, 2023, the Hon. Nathan Scott appointed the Hon. Thierry P. Colaw (Ret.), to hear and determine all issues with respect to NUGGETS & CARAT'S CLAIM against DEFENSE INTERNATIONAL. On April 25, 2023, the matter was tried before the Hon. Judge Colaw (Ret.). Judge Colaw received the testimony of five witnesses, including an expert on the standard of care of patrol guards such as the guards utilized by Defense International, and admitted into evidence 15 exhibits. Judge Colaw submitted his Statement

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

4

COMPLAINT

1  of Decision on May 1, 2023, which consisted of ten pages, awarding Nuggets & Carats damages in

2  the amount of $2,716,367.96 against Defense International. Attached hereto as **Exhibit 4** is a true and

3  correct copy of Judge Colaw's Statement of Decision.

4      23. On May 31, 2023, The Hon. Nathan Scott signed the Judgment against DEFENSE

5  INTERNATIONAL and in favor of NUGGETS & CARROTS in the amount of $2,716,367.96.

6  Attached hereto as **Exhibit 5** is a true and correct copy of the Judgment.

7  **FIRST CAUSE OF ACTION**

8  **BREACH OF CONTRACT**

9  **(NUGGETS & CARATS AGAINST DEFENDANT LLOYD'S; DEFENDANT**

10 **HISCOX PRO; AND DOES 1 - 30)**

11     24. NUGGETS & CARATS refers to all preceding paragraphs and incorporates them as if set forth

12 in full in this cause of action.

13     25. DEFENSE INTERNATIONAL suffered a loss which is covered under the terms and

14 conditions of its policy with LLOYD'S and HISCOX PRO. HISCOX PRO's name was prominent and

15 appeared throughout the policy and on correspondence regarding coverage, including the denial of

16 coverage regarding the underlying loss. DEFENSE INTERNATIONAL relied on the representations

17 that HISCOX PRO issued the insurance policy along with LLOYD's.

18     26. LLOYD'S and HISCOX PRO wrongfully and in bad faith denied coverage and a defense to

19 their insured, DEFENSE INTERNATIONAL.

20     27. DEFENSE INTERNATIONAL assigned its first party bad faith claims against its insurance

21 carriers, LLOYD'S and HISCOX PRO, to NUGGETS & CARATS.

22     28. DEFENSE INTERNATIONAL notified LLOYD'S and HISCOX PRO of the loss and made a

23 claim as required under the policy.

24     29. LLOYD'S and HISCOX PRO in bad faith, breached the policy by failing to make full or partial

25 payments, by refusing to timely extend benefits under the policy and by denying coverage and a

26 defense to their insured, DEFENSE INTERNATIONAL, and the additional misconduct addressed

27 both above and below in the Second Cause of Action, and by and requiring NUGGETS & CARATS

28 (as assignee of DEFENSE INTERNATIONAL) to seek counsel in order to obtain benefits in bad faith.

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

5
COMPLAINT

30. DEFENSE INTERNATIONAL has been damaged by having a judgment entered against it in the amount of $2,716,367.96.

## SECOND CAUSE OF ACTION

### BREACH OF THE IMPLIED COVENANT OF GOOD

### FAITH AND FAIR DEALING

### (NUGGETS & CARATS AGAINST DEFENDANT LLOYD'S; DEFENDANT HISCOX PRO; AND DOES 1 - 30)

31. NUGGETS & CARATS refers to all preceding paragraphs and incorporates them as if set forth in full in this cause of action.

32. Under California law, a covenant of good faith and fair dealing is implied into each policy of insurance. Among other duties, the covenant requires insurers to comply with applicable claim-handling rules and regulations including the Fair Claim Settlement Practices Act, to perform prompt and thorough investigation of issues supporting the insured's claim and make prompt and immediate payments when benefits are owed. The covenant of good faith and fair dealing also mandates that an insurer may not place its own financial interests above those of its insured and may not refuse to defend a claim where there is a potential for coverage under the policy.

33. LLOYD'S (and its representatives) and HISCOX PRO breached their duty of good faith and fair dealing owed to DEFENSE INTERNATIONAL (and to NUGGETS & CARATS via DEFENSE INTERNATIONAL's assignment) through the following unreasonable conduct committed without proper cause:

- Denying coverage for defense and indemnification under the Policy.
- Conducting a biased claim investigation aimed at denial rather than a full, fair and thorough claim investigation;
- Failing to diligently search for evidence to support the claim and instead focusing exclusively on evidence to defeat the claim;
- Delaying payment of the benefit due under the Policy;
- Withholding the benefit due under the Policy;
- Failing to consider DEFENSE INTERNATIONAL's interests much as its own in investigating

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

6

COMPLAINT

1    the claim;

2       • Denying the claim as a matter of company economics instead of based on the merits of the
3    claim.

4       The covenant of good faith and fair dealing imposes the following duties on the insurer: Duty
5    to defend the insured against liability lawsuits; Duty to indemnify if insured loses liability lawsuit; and
6    Duty to settle claims with merit within policy limits, which presents potential for excess exposure.

7    34.   LLOYD'S and HISCOX PRO and their representatives were aware of their superior
8    financial position to DEFENSE INTERNATIONAL.  As a result, the longer LLOYD'S and HISCOX
9    PRO unreasonably withheld benefits, the greater financial damage it would cause to DEFENSE
10   INTERNATIONAL.

11   35.   The claim handling and actions of the LLOYD'S and HISCOX PRO and their
12   representatives identified above was, by definition, "unreasonable" and in violation of the covenant of
13   good faith and fair dealing which is found within every insurance contract. As a result, NUGGETS &
14   CARATS, as the assignee of DEFENSE INTERNATIONAL, is entitled to an award of their attorney's
15   fees incurred in seeking payment of the benefits that were unreasonably withheld, pursuant to *Brandt*
16   *v. Superior Court* (1985) 37 Cal.3d 813.

17   36. Based upon information and belief, NUGGETS & CARATS alleges LLOYD'S and HISCOX
18   PRO are institutional in nature, and demonstrate a pattern and practice of issuing policies, concealing
19   their true identities, retaining counsel to enforce their interests above those required under the policy
20   and those of their insureds to violate the claim handling requirements of jurisdictions in which they
21   write coverage and to intentionally misconstrue the law and policy and to use their superior financial
22   position to deny their insureds benefits due under the policy.

23   37. LLOYD'S and HISCOX PRO's conduct described herein was undertaken by its corporate
24   officers or managing agents, who were responsible for claim supervision, daily operations,
25   communications and decisions.  This conduct was undertaken on behalf of LLOYD'S and HISCOX
26   PRO, which had knowledge of and ratified, authorized and approved the conduct.

27   38. As a result of the bad faith failure to settle within policy limits and other conduct as herein
28   alleged, DEFENSE INTERNATIONAL had a judgment entered against it in the amount of

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

7

COMPLAINT

1 | $2,716,367.96.   NUGGETS & CARROTS is also incurring attorney's fees to enforce the policy
2 | benefits that were assigned to it by DEFENSE INTERNATIONAL.

3 | **WHEREFORE,** Plaintiff **NUGGETS & CARATS** prays for judgment as follows:

4 | **FOR THE FIRST CAUSE OF ACTION FOR BREACH OF WRITTEN CONTRACT**
5 | **(INSURANCE POLICY)** against Defendants **LLOYD'S** and **HISCOX PRO:**

6 | 1.      Damages for Defendants' breach of the contractual duty to pay a covered claim under the
7 | policy and to defend, including the underlying judgment and all interest that has accrued thereon;

8 | 2.      For compensatory damages according to proof, but in an amount within the jurisdiction of
9 | this court;

10 | 3.      Special and general damages for Defendants' breach of the duty of good faith and fair
11 | dealing;

12 | 4.      For pre-judgment interest and costs of suit, according to proof.

13 | 5.      For any further relief to which Nuggets & Carats are entitled at law or equity.

14 | **FOR THE SECOND CAUSE OF ACTION FOR TORTIOUS BREACH OF THE IMPLIED**
15 | **COVENANT OF GOOD FAITH AND FAIR DEALING** against Defendants **LLOYD'S** and
16 | **HISCOX PRO:**

17 | 1.      For compensatory

18 | 2.       damages according to proof, but in an amount within the jurisdiction
19 | of this court including the underlying judgment and all interest that has accrued thereon;

20 | 3.      For pre-judgment interest and costs of suit, according to proof;

21 | ///
22 | ///
23 | ///
24 | ///
25 | ///
26 | ///
27 | ///
28 | ///

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

8
COMPLAINT

1    4.    For attorney's fees and costs of suit incurred in order to obtain the benefits owed under the

2    insurance policy, pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d 813;

3    5.    For any further relief to which NUGGETS & CARATS are entitled at law or equity.

Dated: November 10, 2023          BOHM WILDISH & MATSEN, LLP

By: _____

James G. Bohm, Esq.
Joanne P. Freeman, Esq.
Attorneys for NUGGETS & CARATS, INC.

Dated: November 10, 2023          EISENBERG & ASSOCIATES, APC

By: _____

Lawrence S. Eisenberg, Esq.
Attorneys for NUGGETS & CARATS, INC.

Dated: November 10, 2023          KNAPP & SPURLOCK, LLP

By: _____

Richard O. Knapp Esq.
Attorneys for NUGGETS & CARATS, INC.

BHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial pursuant to Section 631 of the Code of Civil Procedure.

Dated: November 10, 2023

BOHM WILDISH & MATSEN, LLP

By:

James G. Bohm
Joanne P. Freeman
Attorneys for NUGGETS & CARATS, INC.

Dated: November 10, 2023

EISENBERG & ASSOCIATES, APC

By

Lawrence S. Eisenberg, Esq
Attorneys for NUGGETS & CARATS, INC.

Dated: November 10, 2023

KNAPP & SPURLOCK, LLP

By:

Richard O. Knapp Esq.
Attorneys for NUGGETS & CARATS, INC.

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

10
COMPLAINT

# Exhibit 1

**Effective with UNDERWRITERS AT LLOYD'S, LONDON**

Administered by Hiscox Inc. d/b/a Hiscox Insurance Agency in CA License No. 0F09668
520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

**HISCOX PRO™**

# Insurance for Security Guards

## DECLARATIONS

See CA-specific Notices (D1 & D2)

| | |
|---|---|
| **Broker No.:** | US-0001421 |
| **Certificate No.:** | MPL4029619.21 |
| **Renewal of:** | MPL4029619.20 |

Bass Underwriters- Sacramento, CA
3620 Fair Oaks Blvd Ste 150
Sacramento, CA 95864-7267

**1. Named Insured:**
   **Address:**

Defense International Corporation
130 S Prospect Ave
Tustin, CA 92780

**2. Policy Period:**

**Inception Date:** 01/07/2021          **Expiration Date:** 01/07/2022
Inception date shown shall be at 12:01 A.M. (Standard Time) to Expiration date shown above at
12:01 A.M. (Standard Time) at the address of the Named Insured.

**3. General terms and**
   **conditions wording:**

WCL P0001 CW (07-19)
The General terms and conditions apply to this policy in conjunction with the specific wording
detailed in each section below.

**4. Endorsements:**

E6020.3 - War and Civil War Exclusion Endorsement, E6015.9 - Lloyd's Syndicate (3624)
Endorsement, E6017.3 - Nuclear Incident Exclusion Clause-Liability-Direct (Broad) Endorsement,
E6018.2 - Applicable Law Endorsement, E6019.1 - Service of Suit (CA), E6361.1 - Cyber
Incidents Clarification Endorsement (PL), E6049.2 - Shared Limits Endorsement, E6319.1 -
Late Night Venue Exclusion Endorsement (GL/PL), E6320.2 - Limited Assault/Battery Coverage
Endorsement (Security Guards PL/GL), E6038.3 - Anti-Stacking Endorsement (Exclusion),
E6047.1 - Notice of Cancellation to Third Party Endorsement, E9999.2 - Cap on Losses from
Certified Acts of Terrorism Endorsement, and E9997.4 - Policyholder Disclosure Notice of
Terrorism Insurance Coverage

**5. Optional Extension**
   **Period:**

12/24/36 months at 75/150/225 percent of the annual premium, for eligible coverage parts.

**6. Notification of**
   **claims to:**

Hiscox Claims
520 Madison Avenue, 32nd floor
New York, NY 10022
Fax: 212-922-9652
Email: HiscoxClaims@Hiscox.com

**Additional Notification**
**requirements:**

NONE

WCL D0001 CW (04/19)



**Effective with UNDERWRITERS AT LLOYD'S, LONDON**

Administered by Hiscox Inc. d/b/a Hiscox Insurance Agency in CA License No. 0F09668
520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

## Insurance for Security Guards

## DECLARATIONS

| 7. Policy Premium: | ▮▮▮ | Premium Allocated to TRIA: | ▮▮▮ | Administration Fee: | ▮▮▮ |
|---|---|---|---|---|---|

### Security Guards Professional Liability Claims-Made and Reported Coverage Part: WCLMPL P0008 CW (04-15)

| | |
|---|---|
| Covered Professional Services: | solely as defined in the Security Services Professional Liability Coverage Part. |
| Professional Liability (PL): | $ 1,000,000 Each Claim / $ 2,000,000 Aggregate |
| Crisis Management: | $ 25,000 Aggregate Limit (Shared Limit with PL) |
| Defense of Licensing Proceedings: | $ 10,000 Aggregate Limit (Separate Limit) |
| Subpoena Assistance: | $ 10,000 Aggregate Limit (Separate Limit) |
| Retroactive Date: | 01-07-2019 |
| Retention: | $ 10,000 |
| PL Premium: | ▮▮▮ |
| Endorsements: | NONE |

### General Liability Occurrence Coverage Part: WCL P0002 CW (10/14)

| | |
|---|---|
| General Liability (GL): | $ 1,000,000 Each Occurrence / $ 2,000,000 Aggregate |
| Products and Completed Operations: | $ 2,000,000 Each Occurrence Limit (Shared Limit with GL) |
| Personal and Advertising Injury: | $ 1,000,000 Each Claim Limit (Shared Limit with GL) |
| Damage to Premises: | $ 50,000 Any One Premise Limit (Shared Limit with GL) |
| Medical Payments: | $ 5,000 Each Person Limit (Separate Limit) |
| Retention: | $ 10,000 |
| Premium allocated to TRIA: | ▮▮▮ |
| GL Premium: | ▮▮▮ |
| Endorsements: | E6803.1 - Sexual Misconduct Exclusion Endorsement, E6805.1 - Privacy Exclusion Endorsement, E6801.3 - Hired and Non-Owned Auto Liability Endorsement, E6846.1 - Named Insured v. Named Insured Exclusion Endorsement (GL), E6810.2 - Security Services Enhancement Endorsement (GL), E6838.1 - Additional Insured - Ongoing Operations Endorsement, E6938.1 - Blanket Additional Insured Endorsement (Lessor of Leased Equipment), E6857.1 - Blanket Primary Non-Contributory Endorsement (Written Contract), E6817.1 - Additional Insured Completed Operations Coverage Endorsement, E6931.1 - Blanket Additional Insured - Mortgagees, Assignees, or Receivers, and E6850.1 - Waiver of Subrogation Endorsement (Blanket) |



**Effective with UNDERWRITERS AT LLOYD'S, LONDON**

Administered by Hiscox Inc. d/b/a Hiscox Insurance Agency in CA License No. 0F09668
520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

## Insurance for Security Guards

## DECLARATIONS

In accordance with the authorization granted to Hiscox Inc. under Contract No. B1234HisInc2020 by certain Underwriters at Lloyd's, London, whose names and the proportions underwritten by them can be ascertained by reference to the said Contract, which bears the Seal of Lloyd's Policy Signing Office and is on file at the office of the said Agency and in consideration of the premium specified herein, the said Underwriters do hereby bind themselves, each for their own part and not one for another, their heirs, executors and administrators, to insure as follows in accordance with the terms and conditions contained or endorsed hereon.

The Certificate terms and conditions contained herein or endorsed hereon and such other provisions, agreements or conditions as may be endorsed hereon or added hereto are hereby incorporated in this Certificate. No representative of the Underwriters shall have the power to waive or be deemed to have waived any provision or condition of this Certificate unless such waiver, if any, shall be written upon or attached hereto; nor shall any privilege or permission affecting the insurance under this Certificate exist or be claimed by the Insured(s) unless so written or attached.

IN WITNESS WHEREOF this Certificate has been signed at New York, New York

Authorized Representative
Kevin Kerridge
November 15, 2021
Hiscox Inc.

 **HISCOX PRO™**   **Insurance for Security Guards**

---

### A seamless integrated insurance solution for professionals.

Please read this wording, together with any **endorsements** and the declarations, very carefully. If anything is not correct, please notify **us** immediately. Please note the full extent of **your** and our rights and duties.

---

### Our promise to you

In return for the premium **you** have paid, **we** agree to insure **you** in accordance with the terms and conditions of the **policy**.

---

### Your policy documents

**Declarations Page**
This contains a summary of policy information including the limits of liability and retention amounts you have selected.

**General Terms and Conditions**
This contains terms and conditions which apply to the policy in its entirety, subject to any policy endorsements.

**Coverage Parts**
This contains terms and conditions which apply only to the coverage part in which they appear.

**Endorsements**
These documents modify the declarations page, general terms and conditions and/or coverage parts.

**Notices**
These documents provide information that may affect your coverage as required by your state.

---

### Complimentary risk management services

As a complimentary service to this policy, we are pleased to provide a free confidential risk management and loss prevention service, consisting of an initial consultation and up to 1-hour of legal services to assist you in better understanding and minimizing risks that commonly lead to the types of claims covered under this policy. If you have a question about minimizing these types of liability risks in your business, please email your question to us at riskmanagement@hiscox.com, along with your policy number. A Hiscox representative will get back to you within 1 (one) business day with a referral to a nationally recognized law firm with a practice specifically focused on your industry.

Please note that any inquiries made to this service will not constitute a notice of claim or potential claim under your policy. For all claim or potential claim matters, please follow the notification provisions in this policy. Please also note that this service is not intended to respond to questions regarding your insurance policy or coverage. For all such inquiries, please contact your agent or broker.

---

### Reporting a claim

Please inform us immediately if you have a claim or loss to report and refer to the Coverage Module claim reporting provisions for further details.

Email: hiscoxclaims@hiscox.com

---

Hiscox Inc.
520 Madison Avenue 32nd Floor
New York, NY 10022
Administered by Hiscox Inc. d/b/a Hiscox Insurance
Agency in CA License No. 0F09668

T (646) 452-2353
F (212) 922-9652
E hiscox.usa@hiscox.com
www.hiscoxbroker.com

Page 1 of 1

HPSCOVSLREN7



**HISCOX PRO™**   **General Terms and Conditions**

| | |
|---|---|
| **I. Our promise to you** | In consideration of the premium charged, and in reliance on the statements made and information provided to **us**, we will pay **covered amounts** as defined in this policy, provided **you** properly notify **us** of **claims**, **breaches**, **events**, or **occurrences**, and meet **your** obligations to **us** in accordance with the terms of this policy. |

### II. Limits of liability

Regardless of the number of Coverage Parts **you** have purchased, the maximum **we** will pay for all **covered amounts** will be as follows:

| | |
|---|---|
| A.  Coverage part limit | Each Coverage Part purchased will be subject to a **coverage part limit** (if one is stated in the Declarations), which is the maximum amount **we** will pay for all **covered amounts** under that Coverage Part, other than coverage enhancements or other items **we** have expressly agreed to pay in addition to the limit. The **coverage part limit** will be in excess of any applicable **retention**. |
| B.  Each claim limit | The Each Claim Limit identified in the Declarations is the maximum amount **we** will pay for all **covered amounts** for each covered **claim**, unless a lower sublimit is specified, in which case the sublimit is the maximum amount **we** will pay for the type of covered **claim** to which the sublimit applies. The Each Claim Limit, or any sublimit, will be in excess of any applicable **retention** and will be a part of, and not in addition to, any applicable **coverage part limit**. |
| C.  Each breach limit | The Each Breach Limit identified in the Declarations (if **you** have purchased a relevant Coverage Part) is the maximum amount **we** will pay for all **covered amounts** for each covered **breach**, unless a lower sublimit is specified, in which case the sublimit is the maximum amount **we** will pay for the type of covered **breach** or costs to which the sublimit applies. The Each Breach Limit, or any sublimit, will be in excess of any applicable **retention** and will be a part of, and not in addition to, any applicable **coverage part limit**. |
| D.  Each occurrence limit | The Each Occurrence Limit identified in the Declarations (if **you** have purchased a relevant Coverage Part) is the maximum amount **we** will pay for all **covered amounts** for each covered **occurrence**, unless a lower sublimit is specified, in which case the sublimit is the maximum amount **we** will pay for the type of covered **occurrence** to which the sublimit applies. The Each Occurrence Limit, or any sublimit, will be in excess of any applicable **retention** and will be a part of, and not in addition to, any applicable **coverage part limit**. |
| E.  General liability coverage part limits | If **you** have purchased a General Liability Coverage Part, additional rules for applying limits are contained in Section IV. Limits of liability, of that Coverage Part. |
| F.  Commercial umbrella coverage part limits | If **you** have purchased a Commercial Umbrella Coverage Part, additional rules for applying limits are contained in Section IV. Limits of liability, of that Coverage Part. |
| G.  Related claims | All related **claims**, regardless of when made, will be treated as one **claim**, and all subsequent related **claims** will be deemed to have been made against **you** on the date the first such **claim** was made. If, by operation of this provision, the **claim** is deemed to have been made during any period when **we** insured **you**, it will be subject to only one **retention** and one Each Claim Limit regardless of the number of claimants, **insureds**, or **claims** involved. |
| H.  Shared limits | If **you** have purchased more than one of the following Coverage Parts: |

1. Cyber Coverage Part;
2. Technology Professional Liability Coverage Part; or
3. Digital Media Liability Coverage Part,

then the **coverage part limits** applicable to those Coverage Parts will be shared, and any payments **we** make under one Coverage Part, other than coverage enhancements or other items **we** have expressly agreed to pay in addition to the limit, will reduce the **coverage part limits** for all Coverage Parts.

If the applicable **coverage part limits** are different, the maximum amount **we** will pay for **covered amounts** under all Coverage Parts combined, other than coverage enhancements or other items **we** have expressly agreed to pay in addition to the limits, will be the highest available **coverage**



**General Terms and Conditions**

part limit.

---

## III. Your obligations to us

**A.  Named insured responsibilities**

It will be the responsibility of the **named insured** (or, if there is more than one **named insured**, the first one listed on the Declarations) to act on behalf of all **insureds** with respect to the following:

1.  timely giving and receiving notice of cancellation or non-renewal;
2.  timely payment of premium;
3.  receipt of return premiums;
4.  timely acceptance of changes to this policy; and
5.  timely payment of **retentions**.

**B.  Your duty to cooperate**

**You** must cooperate with **us** in the defense, investigation, and settlement of any **claim, potential claim, breach, event, occurrence,** or other matter notified to **us,** including but not limited to:

1.  notifying **us** immediately if **you** receive any settlement demands or offers, and sending **us** copies of any demands, notices, summonses, or legal papers;
2.  submitting to examination and interrogation under oath by **our** representative and giving **us** a signed statement of **your** answers;
3.  attending hearings, depositions, and trials as **we** request;
4.  assisting in securing and giving evidence and obtaining the attendance of witnesses;
5.  providing written statements to **our** representative and meeting with such representative for the purpose of investigation and/or defense;
6.  providing all documents and information **we** may reasonably request, including authorizing **us** to obtain records; and
7.  pursuing **your** right of recovery from others.

**C.  Your obligation not to incur any expense or admit liability**

**You** must not make any payment, incur any expense, admit any liability, assume any obligation, or enter into any settlement negotiations or agreements without **our** prior consent. If **you** do so, it will be at **your** own cost and expense.

**D.  Your representations**

**You** warrant that all representations made and all materials submitted by **you** or on **your** behalf in connection with the **application** for this policy are true, accurate, and not misleading, and agree they were relied on by **us** and were material to **our** decision to issue this policy to **you**. If **we** learn any of the representations or materials were untrue, inaccurate, or misleading in any material respect, **we** are entitled to treat this policy as if it had never existed.

---

## IV. Optional extension period

1.  If **we** or the **named insured** cancel or non-renew this policy, then the **named insured** will have the right to purchase an optional extension period for the duration and at the percentage of the expiring premium stated in Item 5 of the Declarations. The optional extension period, if purchased, will start on the effective date of cancellation or non-renewal. However, the right to purchase an optional extension period will not apply if:

    a.  this policy is canceled by **us** for nonpayment of premium; or
    b.  the total premium for this policy has not been fully paid.

2.  The optional extension period will apply only to **claims** that:

    a.  are first made against **you** and reported to **us** during the optional extension period; and
    b.  arise from **your professional services** performed, or a **breach, data breach,** offense, or **occurrence** that takes place, on or after the **retroactive date** but prior to the

---



# HISCOX PRO™

## General Terms and Conditions

effective date of cancellation or non-renewal of this policy.

3. The additional premium will be fully earned at the inception of the optional extension period.

4. Notice of election and full payment of the additional premium for the optional extension period must be received by **us** within 30 days after the effective date of cancellation or non-renewal, otherwise any right to purchase the optional extension period will lapse.

The limits of liability applicable during any purchased optional extension period will be the remaining available **coverage part limit**. There will be no separate or additional limit of liability available for any purchased optional extension period.

The right to purchase an optional extension period will apply only to Coverage Parts **you** have purchased that include coverage written on a claims-made or loss occurring and discovered basis, and not to any Coverage Parts written on an occurrence basis.

---

**V. Other provisions affecting coverage**

The following provisions apply to all Coverage Parts **you** have purchased. If there is a conflict between any of the provisions here and a provision contained in a Coverage Part, then the provision in the Coverage Part will govern the coverage provided under that Coverage Part.

**A. Alteration and assignment**

No change in, modification of, or assignment of interest under this policy will be effective unless made by written endorsement to this policy signed by **our** authorized representative.

**B. Bankruptcy or insolvency**

**Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations under this policy.

**C. Cancellation**

1. This policy may be canceled by the **named insured** by giving written notice, which must include the date the cancellation will be effective, to **us** at the address stated in the Declarations.

2. This policy may be canceled by **us** by mailing to the **named insured** by registered, certified, or other first class mail (or by email where allowed by applicable law), at the **named insured's** address (or email address) stated in Item 1 of the Declarations, written notice which must include the date the cancellation will be effective. The effective date of the cancellation will be no less than 60 days after the date of the notice of cancellation, or ten days if the cancellation is due to nonpayment of premium.

3. The mailing (or emailing) of the notice will be sufficient proof of notice, and this policy will terminate at the date and hour specified in the notice.

4. If this policy is canceled by the **named insured**, **we** will retain the customary short rate proportion of the premium.

5. If this policy is canceled by **us**, **we** will return a pro rata proportion of the premium.

6. Payment or tender of any unearned premium by **us** will not be a condition precedent to the cancellation, but such payment will be made as soon as possible.

**D. Change in control**

If, during the policy period identified in Item 2 of the Declarations, the **named insured** consolidates with, merges into, or sells all or substantially all of its assets to any other person or entity, or any other person or entity acquires ownership or control of the **named insured**, then the **named insured** will provide **us** written notice no later than 30 days after the effective date of such change in control, together with any other information **we** may require.

**We** will not cancel this policy solely because of a change in control, but unless **you** and **we** agree in writing otherwise, after the effective date of any change in control, this policy will cover only **claims** arising from **professional services** performed, or **breaches**, **data breaches**, offenses, or **occurrences** that took place, prior to the change in control.

**E. Coverage territory**

This policy will apply to **your professional services** performed, and **breaches**, offenses, **events**, or **occurrences** that take place, anywhere in the world, provided that any action, arbitration, or other proceeding (if **you** have purchased a relevant Coverage Part) is brought within the United States, its territories or possessions, or Canada.

---



**General Terms and Conditions**

F. Estates, heirs, legal representatives, spouses, and domestic partners

In the event of an **employee's** death or disability, this policy will also apply to **claims** brought against the **employee's**:

1. heirs, executors, administrators, trustees in bankruptcy, assignees, and legal representatives; or

2. lawful spouse or lawful domestic partner;

but only:

a. for a covered **claim** arising from the scope of the **employee's** work for **you**; or

b. in connection with their ownership interest in property which the claimant seeks as recovery in a covered **claim** arising from the scope of the **employee's** work for **you.**

G. False or fraudulent claims

If any **insured** commits fraud in connection with any **claim, potential claim, breach,** offense, **event,** or **occurrence,** whether regarding the amount or otherwise, this insurance will become void as to that **insured** from the date the fraud is committed.

H. Other insurance

Any payment due under this policy is specifically excess of and will not contribute with any other valid and collectible insurance, unless such other insurance is written specifically as excess insurance over this policy. However, if **you** have purchased a General Liability Coverage Part, rules for how that Coverage Part will be treated when there is other valid and collectible insurance are contained in Section V. Other provisions affecting coverage, D. Other insurance, of that Coverage Part.

If the same **claim** or **related claims, breach, event** or **related events,** or **occurrence** is covered under more than one Coverage Part, **we** will pay only under one Coverage Part, which will be the Coverage Part that provides the most favorable coverage.

I. Subrogation

In the event of any payment by **us** under this policy, we will be subrogated to all of **your** rights of recovery to that payment.

**You** will do everything necessary to secure and preserve **our** subrogation rights, including but not limited to the execution of any documents necessary to allow **us** to bring suit in **your** name.

**You** will do nothing to prejudice **our** subrogation rights without **our** prior written consent.

Any recovery first will be paid to **you** up to the amount of any **retention you** have paid, and then to **us** up to the amount of any **covered amounts** we have paid.

J. Titles

Titles of sections of and endorsements to this policy are inserted solely for convenience of reference and will not be deemed to limit, expand, or otherwise affect the provisions to which they relate.

## VI. Definitions applicable to all Coverage Parts

The following definitions apply to all Coverage Parts **you** have purchased. If the same term is defined here and in a Coverage Part, then the definition in the Coverage Part will govern the coverage provided under that Coverage Part.

Application

means the signed application for the policy and any attachments and materials submitted with that application. If this policy is a renewal or replacement of a previous policy issued by **us, application** also includes all previous signed applications, attachments, and materials.

Coverage part limit

means the amount stated in the Declarations as the aggregate limit applicable to each Coverage Part **you** have purchased which is subject to an aggregate limit.

Covered amounts

means any amounts **we** have expressly agreed to pay under any Coverage Part **you** have purchased.

Employee

means any past, present, or future:

1. employee (including any part-time, seasonal, leased, or temporary employee or any volunteer);



## General Terms and Conditions

2.   partner, director, officer, or board member (or equivalent position); or

3.   independent contractor;

of a **named insured**, but only while in the course of their performance of work or services on behalf of or at the direction of the **named insured**.

**Named insured**          means the individual, corporation, partnership, limited liability company, limited partnership, or other entity identified in Item 1 of the Declarations.

**Policy period**          means the period of time identified in Item 2 of the Declarations, and any optional extension period, if purchased.

**Professional services**      means those services identified as Covered Professional Services under any Coverage Part on the Declarations containing such a description.

**Related claims**          means all claims that are based upon, arise out of, or allege:

1.   a common fact, circumstance, situation, event, service, transaction, cause, or origin;

2.   a series of related facts, circumstances, situations, events, services, transactions, sources, causes, or origins;

3.   a continuous or repeated act, error, or omission in the performance of **your professional services**; or

4.   the same **breach, event, occurrence,** or offense.

The determination of whether a **claim** is related to another **claim** or **claims** will not be affected by the number of claimants or **insureds** involved, causes of action asserted, or duties involved.

**Retention**          means the amount or time identified as such in the Declarations.

**Retroactive date**          means the date identified as such in the Declarations.

**We, us, or our**          means the Underwriters identified on the Declarations as issuing this policy.

**You, your, or insured**      means any individual or entity expressly described as an **insured** in any Coverage Part **you** have purchased.

# HISCOX PRO™  Security Services Professional Liability Coverage Part
## (Claims-Made and Reported)

| | |
|---|---|
| **I. What is covered** | We will pay up to the **coverage part limit** for **damages** and **claim expenses** in excess of the retention for covered **claims** against **you** alleging a negligent act, error, or omission in **your security services** performed on or after the **retroactive date**, including but not limited to: |

1.  breach of any duty of care;

2.  negligent misstatement or negligent misrepresentation;

3.  **bodily injury**;

4.  **property damage**;

5.  **third party discrimination**; or

6.  **personal and advertising injury**,

provided the **claim** is first made against **you** during the **policy period** and is reported to **us** in accordance with Section V. Your obligations.

| | | |
|---|---|---|
| **II. Coverage enhancements** | | We will also make the following payments: |
| Crisis management sublimit | A. | **We** will pay up to the limit stated in the Declarations for the reasonable and necessary fees, costs, and expenses **you** incur with **our** prior written consent for a public relations firm to assist **you** in responding to a **crisis management event**, provided the **crisis management event** occurs during the **policy period**, and it is reported to **us** in accordance with Section V. Your obligations. |
| | | No retention will apply to amounts **we** pay under this subsection A, and any payments we make will be a part of, and not in addition to, the **coverage part limit**. |
| Defense of licensing proceedings | B. | **We** will pay up to the limit stated in the Declarations for the reasonable and necessary fees, costs, and expenses incurred with **our** prior consent in the investigation, defense, or appeal of any state, federal, or other licensing board inquiry or proceeding concerning **your** eligibility or license to engage in **your security services**, provided **you** first receive notice of such inquiry or proceeding during the **policy period**, it relates to **your security services** performed on or after the **retroactive date**, and it is reported to **us** in accordance with Section V. Your obligations. |
| | | No retention will apply to amounts **we** pay under this subsection B, and such amounts will be in addition to, and not part of, the **coverage part limit**. |
| Subpoena assistance | C. | **We** will pay up to the limit stated in the Declarations for the reasonable and necessary fees, costs, and expenses incurred with **our** prior consent to respond to a subpoena arising from the performance of **your security services**, provided **you** first receive notice of such subpoena during the **policy period**, it relates to **your security services** performed on or after the **retroactive date**, and it is reported to **us** in accordance with Section V. Your obligations. |
| | | No retention will apply to amounts **we** pay under this subsection C, and such amounts will be in addition to, and not part of, the **coverage part limit**. |
| Supplemental payments | D. | **We** will pay reasonable expenses, including loss of wages and a $250 travel per diem, incurred by **you** if **we** require **you** to attend depositions, arbitration proceedings, or trials in connection with the defense of a covered **claim**, but **we** will not pay more than an aggregate of $10,000 per **claim** for such expenses, regardless of the number of **insureds**. |
| | | No retention will apply to amounts **we** pay under this subsection D, and such amounts will be in addition to, and not part of, the **coverage part limit**. |

| | |
|---|---|
| **III. Who is an insured** | For purposes of this Coverage Part, **you**, **your**, or **insured** means a **named insured**, **subsidiary**, **employee**, **independent contractor**, **joint venture**, or **additional insured**, as defined below: |



## HISCOX PRO™   Security Services Professional Liability Coverage Part
(Claims-Made and Reported)

| | |
|---|---|
| **Named insured** | means the individual, corporation, partnership, limited liability company, limited partnership, or other entity identified in Item 1 of the Declarations. |
| **Subsidiary** | means any entity of which the **named insured** has majority ownership before or as of the inception of the **policy period.** |
| **Employee** | means any past, present, or future: |

1. person employed by the **named insured** or **subsidiary** as a permanent, part-time, seasonal, leased, or temporary employee, or any volunteer; or
2. partner, director, officer, or board member (or equivalent position) of the **named insured** or **subsidiary,**

but only while in the course of their performance of **security services** on behalf of or at the direction of such **named insured** or **subsidiary.**

| | |
|---|---|
| **Independent contractor** | means any person or entity contracted by the **named insured** or **subsidiary** to perform the same **security services** as the **named insured** or **subsidiary,** but only while in the course of their performance of **security services** on behalf of or at the direction of the **named insured** or **subsidiary.** |
| **Joint venture** | means a business enterprise in which the **named insured** or **subsidiary** participates pursuant to a written agreement, but only for: |

1. **security services** performed by the **named insured** or **subsidiary;** and
2. the same percentage of covered **damages** and **claim expenses** as the percentage of the **named insured's** or **subsidiary's** participation in the joint venture.

| | |
|---|---|
| **Additional insured** | means any person or organization **you** have agreed in a written contract or agreement to add as an additional insured to a policy providing the type of coverage afforded by this Coverage Part, provided the contract or agreement: |

1. is currently in effect or becomes effective during the **policy period;** and
2. was executed before the **security services** out of which the **claim** arises were performed.

Coverage is available for **additional insureds** solely for their liability arising out of **your** negligence or of those acting on **your** behalf and not for any liability arising out of the sole negligence of the **additional insured.**

Notwithstanding anything to the contrary in the subrogation provisions in the General Terms and Conditions, **we** agree to waive any right of recovery **we** may have against any **additional insured** because of payments **we** make for any **claim** arising from **your security services** under this Coverage Part.

## IV. Defense and settlement of claims

| | |
|---|---|
| **Defense** | **We** have the right and duty to defend any covered **claim,** even if such **claim** is groundless, false, or fraudulent. |

**We** have the right to select and appoint counsel to defend **you** against a covered **claim. You** may request in writing that **we** appoint defense counsel of **your** own choice, but whether to grant or deny such a request will be at **our** sole discretion.

| | |
|---|---|
| **Settlement** | **We** have the right to solicit and negotiate settlement of any **claim** but will not enter into a settlement without **your** consent, which **you** agree not to withhold unreasonably. If **you** withhold consent to a settlement recommended by **us** and acceptable to the party who made the **claim,** the most **we** will pay for that **claim** is the sum of: |

1. the amount of **our** recommended settlement;

**HISCOX PRO™**   **Security Services Professional Liability Coverage Part
(Claims-Made and Reported)**

2.  claim expenses incurred up to the date of **our** recommendation;

3.  50% of all **claim expenses** incurred after **our** recommendation; and

4.  50% of all **damages** in excess of the settlement amount recommended by **us**.

---

## V. Your obligations

**Notifying us of claims and coverage enhancements**

**You** must give written notice to **us** of any **claim**, or any other matter covered under Section II. Coverage enhancements, as soon as possible, but in any event, no later than 60 days after the end of the **policy period**.

All such notifications must be in writing and include a copy of the **claim** or other covered matter, and must be submitted to **us** via the designated email address or mailing address identified in Item 6 of the Declarations.

**Notifying us of potential claims**

**You** have the option of notifying us of **potential claims** that may lead to a covered **claim** against **you**.

In order to do so, **you** must give written notice to **us** as soon as possible and within the **policy period**, and the notice must, to the greatest extent possible, identify the details of the **potential claim**, including identifying the potential claimant(s), the likely basis for liability, the likely demand for relief, and any additional information about the **potential claim** we may reasonably request.

The benefit to **you** of notifying us of a **potential claim** is that if an actual claim arises from the same circumstances as the properly notified **potential claim**, then we will treat that **claim** as if it had first been made against **you** on the date **you** properly notified **us** of it as a **potential claim**, even if that **claim** is first made against **you** after the **policy period** has expired.

All **potential claim** notifications must be in writing and submitted to **us** via the designated email address or mailing address identified in Item 6 of the Declarations.

**Retention**

**Our** obligation to pay **damages** and **claim expenses** under this Coverage Part is in excess of the **retention**, which **you** must pay in connection with each covered **claim**.

---

## VI. Exclusions – What is not covered

**We** will have no obligation to pay any sums under this Coverage Part, including any **damages** or **claim** expenses, for any **claim**:

**Antitrust/deceptive trade practices**

1.  based upon or arising out of any actual or alleged:

    a.  false, deceptive, or unfair trade practices;

    b.  unfair competition, impairment of competition, restraint of trade, or antitrust violations;

    c.  violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, all including as may be amended, or any similar federal, state, or local statutes, rules, or regulations in or outside the U.S.; or

    d.  deceptive or misleading advertising.

**Bodily injury to an insured**

2.  based upon or arising out of any actual or alleged physical injury, sickness, disease, death, humiliation, mental injury, mental anguish, emotional distress, suffering, or shock sustained by an **insured** or any employee of an **insured**.

**Breach of contract**

3.  based upon or arising out of any actual or alleged breach of any contract or agreement, or any liability of others that **you** assume under any contract or agreement; however, this exclusion will not apply to any liability **you** would have in the absence of the contract or agreement.

**Breach of warranty/ guarantee**

4.  based upon or arising out of any actual or alleged breach of express warranties or guarantees, except any warranty or guarantee to perform **your security services**

# HISCOX PRO™   Security Services Professional Liability Coverage Part
## (Claims-Made and Reported)

consistent with applicable industry standards or with reasonable skill or care. This exclusion will not apply to any liability **you** would have in the absence of the warranties or guarantees.

| | | |
|---|---|---|
| Criminal proceedings | 5. | brought in the form of a criminal proceeding, including but not limited to a criminal investigation, grand jury proceeding, or criminal action. |
| Employment related liability | 6. | based upon or arising out of any actual or alleged: |

    a.   obligation under any workers' compensation, unemployment compensation, employers' liability, fair labor standards, labor relations, wage and hour, or disability benefit law, including any similar provisions of any federal, state, or local statutory or common law;

    b.   liability or breach of any duty or obligation owed by **you** as an employer or prospective employer; or

    c.   harassment, wrongful termination, retaliation, or discrimination, including but not limited to adverse or disparate impact.

However, part c of this exclusion will not apply to a covered **claim** for **third party discrimination.**

| | | |
|---|---|---|
| Excluded costs and damages | 7. | to the extent it seeks or includes: |

    a.   fines, penalties, taxes, or sanctions against **you**;

    b.   overhead costs, general business expenses, salaries, or wages incurred by **you**;

    c.   the return, reduction, or restitution of fees, commissions, profits, or charges for goods provided or services rendered;

    d.   liquidated or multiple damages;

    e.   restitution, disgorgement of profits, any advantage to which **you** were not legally entitled, or unjust enrichment; or

    f.   the cost of complying with injunctive relief.

| | | |
|---|---|---|
| Excluded professional services | 8. | based upon or arising out of any actual or alleged performance of or failure to perform services as an architect, engineer, accountant, lawyer, insurance agent/broker, registered investment advisor, and/or security broker/dealer; however, this exclusion will not apply to **claims** brought against an **insured** who is an architect, engineer, accountant, lawyer, insurance agent/broker, registered investment advisor, and/or security broker/dealer if the **claim** arises out of the performance of **your security services.** |
| Excluded statutory violations | 9. | based upon or arising out of any actual or alleged violation of the following laws: |

    a.   the Securities Act of 1933;

    b.   the Securities Exchange Act of 1934;

    c.   any state blue sky or securities laws;

    d.   the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*; or

    e.   the Employee Retirement Income Security Act of 1974,

all including as may be amended, or any similar provisions of any foreign, federal, state, or local statutory or common law and any rules or regulations promulgated under such laws.

| | | |
|---|---|---|
| Failure to maintain insurance or bonds | 10. | based upon or arising out of any actual or alleged failure to procure or maintain adequate insurance or bonds. |
| Healthcare services | 11. | based upon or arising out of any actual or alleged medical malpractice or breach of any duties owed as a healthcare provider, including but not limited to the rendering of or failure to render medical services, treatment, diagnosis, or advice. |
| Improper billing | 12. | based upon or arising out of any actual or alleged inaccurate, improper, or fraudulent billings or invoices, including but not limited to a qui tam action or any action under the False Claims Act, as may be amended, or any similar provisions of any foreign, federal, state, or local statutory or common law. |



# HISCOX PRO™ Security Services Professional Liability Coverage Part (Claims-Made and Reported)

| | | |
|---|---|---|
| Insured vs. insured | 13. | brought by or on behalf of one **insured** or **affiliate** against another **insured** or **affiliate**. |
| Intellectual property | 14. | based upon or arising out of any actual or alleged infringement, use, or disclosure of any intellectual property, including but not limited to copyright, trademark, trade dress, patent, service mark, service name, title, or slogan, or any publicity rights violations, cyber squatting violations, moral rights violations, any act of passing-off, or any misappropriation of trade secret. |
| Intentional acts | 15. | based upon or arising out of any actual or alleged fraud, dishonesty, criminal conduct, or any knowingly wrongful, malicious, or intentional acts or omissions, except that: |

    a.  we will pay **claim expenses** until there is a final adjudication establishing such conduct; and

    b.  this **exclusion** will not apply to:

        (i)  otherwise covered intentional acts or omissions resulting in **personal and advertising injury**; or

        (ii)  **bodily injury** or **property damage** directly resulting from **your** performance of **security services**, including the use of reasonable force in the performance of **security services** to protect persons or property.

This **exclusion** will apply to the **named insured** or **subsidiary** only if the conduct was committed or allegedly committed by any:

    a.  partner, director, officer, or member of the board (or equivalent position) of the **named insured** or **subsidiary**; or

    b.  employee of the **named insured** or **subsidiary** if any partner, director, officer, member of the board (or equivalent position) of the **named insured** or **subsidiary** knew or had reason to know of such conduct by the employee.

This **exclusion** will apply separately to each **insured** and will not apply to any **insured** who did not commit, participate in, acquiesce to, or ratify such conduct committed by another **insured**.

| | | |
|---|---|---|
| Manufacture of goods/ products | 16. | based upon or arising out of any goods or products manufactured, sold, handled, or distributed by **you**. |
| Misappropriation of funds | 17. | based upon or arising out of the actual or alleged theft, misappropriation, commingling, or conversion of any funds, monies, assets, or property, including any client's funds, monies, assets, or property. |
| Mold | 18. | based upon or arising out of any actual, alleged, or threatened existence, growth, release, escape of, exposure to, inhalation of, or contact with mold, spores, or fungi. |
| Pollution/environmental | 19. | based upon or arising out of any actual, alleged, or threatened discharge, dispersal, release, or escape of **pollutants**, including any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **pollutants**. |
| Prior acts/notice/knowledge | 20. | based upon or arising out of any actual or alleged breach of duty or negligent act, error, or omission that: |

    a.  was committed prior to the **retroactive date**;

    b.  was the subject of any notice given under any other policy of which this policy is a renewal or replacement;

    c.  was the subject of, or is related to, any prior or pending litigation, **claim**, written demand, arbitration, administrative or regulatory proceeding or investigation, or licensing proceeding that was filed or commenced against **you** and of which **you** had notice prior to the **policy period**; or

    d.  **you** had knowledge of prior to the **policy period**, and there was a reasonable basis to believe that the act, error, or omission could result in a **claim**.

# HISCOX PRO™

## Security Services Professional Liability Coverage Part (Claims-Made and Reported)

However, if this policy is a renewal or replacement of a previous policy **we** issued that provided materially identical coverage, and is part of an unbroken chain of successive policies issued by **us**, the **policy period** referred to in paragraphs c and d, above, will be the policy period of the first such policy **we** issued.

| Privacy | 21. | based upon or arising out of any actual or alleged: |
|---|---|---|

a. unauthorized acquisition, access, use, or disclosure of, improper collection or retention of, or failure to protect any non-public personally identifiable information or confidential corporate information that is in **your** care, custody, or control; or

b. violation of any privacy law or consumer data protection law protecting against the use, collection, or disclosure of any information about a person or any confidential corporate information.

| Sexual misconduct | 22. | based upon or arising out of any actual, alleged, or threatened abuse, molestation, harassment, mistreatment, or maltreatment of a sexual nature, including the negligent employment, investigation, supervision, training, or retention of a person who commits such conduct, or the failure to report such conduct to the proper authorities. |
|---|---|---|

| Subsidiary outside control of named insured | 23. | a. | based upon or arising out of **security services** performed by or on behalf of a past or present **subsidiary** while the **named insured** does not have majority ownership or management control of it; or |
|---|---|---|---|

b. made against a **subsidiary** or anyone acting on its behalf while the **named insured** does not have majority ownership or management control of it.

| Unsolicited telemarketing | 24. | based upon or arising out of any actual or alleged violation of any federal, state, local, or foreign statutes, ordinances, or regulations relating to unsolicited telemarketing, solicitations, emails, faxes, text messages, or any other communications of any type or nature, including but not limited to the Telephone Consumer Protection Act, CAN-SPAM Act, or any "anti-spam" or "do-not-call" statutes, ordinances, or regulations. |
|---|---|---|

---

## VII. Definitions

The following definitions apply to this Coverage Part. Additional definitions are contained in Section III. Who is an insured, and in the General Terms and Conditions, Section VI. Definitions applicable to all Coverage Parts.

**Affiliate**

means any person or entity related to any **insured** through common ownership, control, or management. **Affiliate** does not include a **subsidiary**.

**Bodily injury**

means physical injury, sickness, disease, or death sustained by a person, which directly results from **your** performance of **security services**, and any resulting humiliation, mental injury, mental anguish, emotional distress, suffering, or shock.

**Claim**

means any written assertion of liability or any written demand for financial compensation or non-monetary relief.

**Claim expenses**

means the following sums incurred in excess of the **retention** and with **our** prior written consent:

1. all reasonable and necessary fees, costs, and expenses (including the fees of attorneys and experts) incurred in the investigation, defense, or appeal of a **claim**; and

2. premiums on appeal bonds, attachment bonds, or similar bond, but **we** will have no obligation to apply for or furnish any such bonds.

**Crisis management event**

means the public announcement of any of the following events which, in **your** good faith opinion, had or is reasonably likely to have an adverse impact on **your** reputation:

1. an actual or alleged negligent act, error, or omission in the performance of **your security services** on or after the **retroactive date;**

2. the death, incapacity, or criminal indictment of any partner, director, officer, or board member (or equivalent position) of the **named insured;** or

---

**HISCOX PRO™**   **Security Services Professional Liability Coverage Part (Claims-Made and Reported)**

|  |  |
|---|---|
| | 3. an **employee** was the victim of a violent crime while on the **named insured's** premises. |
| **Damages** | means the following amounts incurred in excess of the **retention**: |
| | 1. a monetary judgment or monetary award that **you** are legally obligated to pay (including pre- or post-judgment interest and awards of claimant's attorney fees); or |
| | 2. a monetary settlement negotiated by **us** with **your** consent; |
| | **Damages** includes punitive damages to the full extent they are insurable under the law of any applicable jurisdiction that most favors coverage. |
| **Personal and advertising injury** | means injury, other than **bodily injury** or **property damage**, arising out of one or more of the following offenses: |
| | 1. false arrest, detention, or imprisonment; |
| | 2. malicious prosecution; |
| | 3. wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of premises; |
| | 4. slander, libel, or defamation, or disparagement of goods, products, or services, whether in connection with **your security services** or **your** advertising of it; or |
| | 5. oral or written publication of material, whether in connection with **your security services** or **your** advertising of it, that violates a person's right of privacy. |
| **Pollutants** | means any solid, liquid, gaseous, biological, radiological, or thermal irritant or contaminant, including smoke, vapor, asbestos, silica, dust, nanoparticles, fibers, soot, fumes, acids, alkalis, chemicals, nuclear materials, germs, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed. |
| **Potential claim** | means any acts, errors, or omissions of an **insured** or other circumstances reasonably likely to lead to a **claim** covered under this policy. |
| **Property damage** | means physical damage to or destruction of any tangible property which directly results from **your** performance of **security services**, and any resulting loss of use of that property. |
| **Retention** | means the amount stated as such under the Security Services Professional Liability Coverage Part section of the Declarations. |
| **Security services** | means: |
| | 1. the services customarily performed by a security guard, watchperson, bank guard, patroller, traffic controller, or other individual employed in the private security industry, which, for purposes of this policy, means services performed in connection with guarding and protecting people, property, or other assets, or the delivery or transportation of monies, funds, or other property for or on behalf of a client of the **named insured**; or |
| | 2. any other services identified as Covered Professional Services under the Security Services Professional Liability Coverage Part section of the Declarations. |
| | **Security services** also includes the use of reasonable force in connection with the protection of people, property, or other assets, or the delivery or transportation of monies, funds, or other property, including the use of physical force, weapons, mace, firearms, stun guns, Tasers, and/or canine patrols. |
| **Third party discrimination** | means any non-physical harassment of or unlawful discrimination against a person or entity other than an **insured** or an employee of an **insured**, including any resulting violation of civil rights, but only if such harassment or discrimination directly results from **your** performance of **security services**. |
| **You, your, or insured** | means a named insured, subsidiary, **employee, independent contractor, joint venture,** or **additional insured**, as defined in Section III. Who is an insured. |

**HISCOX PRO™**   **General Liability Coverage Part (Occurrence)**

## I.  What is covered

**A.  Bodily injury and property damage**

We will pay up to the **coverage part limit** for **damages** **you** become legally obligated to pay because of **bodily injury** or **property damage** to which this Coverage Part applies, provided:

1. the **bodily injury** or **property damage** occurs during the **policy period**;

2. the **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

3. **you** have paid the applicable **retention** stated in the Declarations.

**We** will have the right and duty to defend any **claim** seeking such **damages**, as set out in Section II. Defense and supplementary payments. **We** may, at **our** discretion, investigate any **occurrence** and settle any **claim** that may result.

**B.  Personal and advertising injury**

We will pay up to the Personal and Advertising Injury Limit stated in the Declarations for **damages** **you** become legally obligated to pay because of **personal and advertising injury** to which this Coverage Part applies, provided:

1. the **personal and advertising injury** is caused by an offense arising out of **your** business operations;

2. the **personal and advertising injury** is caused by an offense committed in the **coverage territory** during the **policy period**; and

3. **you** have paid the applicable **retention** stated in the Declarations.

**We** will have the right and duty to defend any **claim** seeking such **damages**, as set out in Section II. Defense and supplementary payments. **We** may, at **our** discretion, investigate any offense and settle any **claim** that may result.

**C.  Medical payments**

Regardless of fault, **we** will pay up to the Medical Payments limit stated in the Declarations for **medical expenses** incurred by each person for **bodily injury** caused by an **accident** to which this Coverage Part applies, provided:

1. the **accident** takes place within the **coverage territory** and on premises rented to or owned by **you** or in connection with **your** business operations;

2. the **accident** occurs during the **policy period**;

3. the expenses are incurred and reported to **us** within one year of the date of the **accident**; and

4. the person who sustained such **bodily injury** submits to examination, at **our** expense, by physicians of **our** choice as often as **we** reasonably require.

## II.  Defense and supplementary payments

**A.  Claims against you**

With respect to any **claim** against **you** that **we** investigate, defend, or settle, **we** will pay:

1. **claim expenses** we incur with counsel of **our** choice to defend **you**;

2. up to $2,500 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the **bodily injury** coverage described in Section I. What is covered, A. Bodily injury and property damage, applies, but we will have no obligation to apply for or furnish any such bonds;

3. the cost of bonds to release attachments, but only for bond amounts within the applicable limit. **We** will have no obligation to apply for or furnish any such bonds;

4. reasonable expenses incurred by **you** at **our** request to assist **us** in the investigation or defense of such **claim**, including actual loss of earnings up to $1,000 a day because of time off from work;

Includes copyrighted material of Insurance
Services Offices, Inc., with its permission

**HISCOX PRO™**   **General Liability Coverage Part (Occurrence)**

5.  court costs taxed against **you** in the **claim**; however, costs do not include attorney fees or expenses;

6.  prejudgment interest awarded against **you** on that part of any judgment **we** pay. If **we** make an offer to pay the applicable limit, **we** will not pay any prejudgment interest based on the period of time after the offer; and

7.  interest on the full amount of any judgment that accrues after entry of the judgment and before **we** have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit.

B.  Claims against your indemnitee

If **we** defend a **claim** against **you**, and **your** indemnitee is also named as a party to the **claim**, **we** will also defend such indemnitee if all of the following conditions are met:

1.  the **claim** against the indemnitee seeks **damages** for which **you** have assumed the indemnitee's liability in an **insured contract**;

2.  **you** have assumed the obligation to defend or pay for the defense of the indemnitee in the same **insured contract**;

3.  this Coverage Part would apply to the liability **you** have assumed if the **claim** against the indemnitee had been made against **you**;

4.  the allegations in the **claim** and the information **we** know about the **occurrence** are such that no conflict of interest appears to exist between **your** interests and **your** indemnitee's interests;

5.  **you** and **your** indemnitee request that **we** conduct and control the defense of such indemnitee and agree **we** can assign the same counsel to defend both **you** and **your** indemnitee; and

6.  **your** indemnitee agrees in writing to:

   a.  follow the requirements of Section III, Your obligations to us, B. Your duty to cooperate, of the General Terms and Conditions;

   b.  notify any other insurer whose coverage may be available to the indemnitee and cooperate with **us** with respect to coordinating any other insurance applicable to the indemnitee; and

   c.  authorize **us** to conduct and control the defense of the indemnitee.

**Our** obligation to make any payments under this Section II ends when **we** have used up the **coverage part limit**.

No **retention** will apply to amounts **we** pay under this Section II, and such payments will be in addition to, and not part of, the **coverage part limit**.

| **III.** | **Who is an insured** | In addition to the named **insured**, other persons or organizations may qualify as **insureds**, as stated below. For purposes of this Section III only, **you** means the named **insured**. |
|---|---|---|

A.  Sole proprietorships

If **you** are an individual, **you** and **your** spouse are **insureds**, but only with respect to the conduct of a business of which **you** are the sole owner. However, if **you** die:

1.  persons or organizations having proper temporary custody of **your** property are **insureds**, but only with respect to the maintenance or use of such property and only for acts until **your** legal representative has been appointed; and

2.  **your** legal representative is an **insured**, but only with respect to his or her duties as **your** legal representatives. As such, they will assume **your** legal rights and duties under this Coverage Part.

B.  Partnerships or joint ventures

If **you** are a duly organized partnership (including a limited liability partnership) or a joint venture, **your** members, partners, and their spouses are **insureds**, but only with respect to the conduct of **your** business.

**HISCOX PRO™**   **General Liability Coverage Part (Occurrence)**

| | | |
|---|---|---|
| C. | Limited liability companies | If **you** are a duly organized limited liability company, **your** members and their spouses are **insureds**, but only with respect to the conduct of **your** business. **Your** managers are also **insureds**, but only with respect to their duties as **your** managers. |
| D. | Other organizations | If **you** are an organization (including a professional corporation) other than a partnership, joint venture, or limited liability company, **your** directors and **officers** are **insureds**, but only with respect to their duties as **your** directors or **officers**. **Your** stockholders and their spouses are also **insureds**, but only with respect to their liability as **your** stockholders. |
| E. | Trusts | If **you** are a trust, **your** trustees are **insureds**, but only with respect to their duties as **your** trustees. |
| F. | Employees | **Your** employees are **insureds**, but only while in the course and scope of their employment by **you** or while performing duties related to the conduct of **your** business. |
| G. | Volunteer workers | **Your** volunteer workers are **insureds**, but only while in the course and scope of their activities related to the conduct of **your** business performed on **your** behalf or at **your** direction. |
| H. | Real estate managers | Persons (other than **your employees**) or organizations acting as **your** real estate managers are **insureds**, but only with respect to their duties as **your** real estate managers. |
| I. | Amateur athletic participants | Any person representing **you** while participating in an amateur athletic activity **you** sponsor is an **insured**. However, no such person is an **insured** for: |

    1.  **bodily injury** to:

        a.  a co-participant, **your employee**, or **your volunteer worker** while also participating in the amateur athletic activity **you** sponsor; or

        b.  **you** or any of **your** partners, members, or **officers**; or

    2.  **property damage** to property owned, occupied, or used by; rented to; or in the care, custody, or control of:

        a.  a co-participant in the amateur athletic activity **you** sponsor, **your employee**, or **your volunteer worker**; or

        b.  **you** or any of **your** partners, members, or **officers**.

| | | |
|---|---|---|
| J. | Newly acquired or formed organizations | If there is no other similar insurance available, any organization **you** acquire or form during the **policy period**, and in which **you** have majority ownership or interest at the time of an **occurrence** or offense covered by this Coverage Part, will qualify as an **insured**. This coverage is effective on the date of acquisition or formation and is afforded only until the 180th day after **you** acquire or form the organization, or the end of the **policy period**, whichever is earlier. |

There is no coverage for the acquired or formed organization for:

    1.  **bodily injury** or **property damage** that occurred; or

    2.  **personal or advertising injury** arising out of an offense that was committed,

before **you** acquired or formed the organization.

The acquired or formed organization is an **insured** only with respect to the conduct of **your** business.

| | | |
|---|---|---|
| K. | Additional insureds | If **you** have agreed in a written contract or agreement to add them as an additional insured to a policy providing the type of coverage afforded by this Coverage Part, the following persons or organizations are **insureds**: |

    1.  Any person or organization from whom **you** lease any premises, but only with respect to liability arising out of the ownership, maintenance, or use of that part of the premises leased to **you**.

        However, there is no coverage for such additional insureds for any structural alterations, new construction, or demolition operations performed by or on behalf of the additional insured.

---

**HISCOX PRO™** General Liability Coverage Part (Occurrence)

A person or organization's status as an additional insured under this subsection 1 ends when **you** cease to be a tenant in the premises.

2. Any person or organization for whom **you** are performing operations, but only with respect to liability arising out of:

   a. **your** acts or omissions or of those acting on **your** behalf; and

   b. the performance of **your** ongoing operations for the additional insured.

   However, there is no coverage for such additional insureds for:

   a. **bodily injury, property damage**, or **personal and advertising injury** arising out of the rendering of or failure to render any professional architectural, engineering, or surveying services, including:

      (1) the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, drawings, or specifications; or

      (2) supervisory, inspection, architectural, or engineering activities; or

   b. **bodily injury** or **property damage** occurring after:

      (1) all work, including materials, parts, or equipment furnished in connection with such work, on the project (other than service, maintenance, or repairs) to be performed by or on behalf of the additional insured at the location of the covered operations has been completed; or

      (2) that portion of **your work** out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

   A person or organization's status as an additional insured under this subsection 2 ends when **your** operations for that additional insured are completed.

3. Any person or organization who sells or distributes **your products** (referred to in this subsection as "vendor"), but only with respect to **bodily injury** or **property damage** arising out of **your products** sold or distributed in the regular course of such vendor's business.

   However, there is no coverage for such additional insureds for:

   a. **bodily injury** or **property damage** for which the vendor is legally obligated to pay **damages** because of liability assumed in a contract or agreement; however, this exclusion will not apply to liability the vendor would have in the absence of such contract or agreement;

   b. any express warranty unauthorized by **you**;

   c. any physical or chemical change in the product made intentionally by the vendor;

   d. repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

   e. any failure to make inspections, adjustments, tests, or servicing the vendor has either agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the product;

   f. demonstration, installation, servicing, or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

   g. products which, after distribution or sale by **you**, have been labeled or relabeled or used as a container, part, or ingredient of any other thing by or for the vendor;

   h. **bodily injury** or **property damage** arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf; however, this exclusion will not apply to:

---

Includes copyrighted material of Insurance
Services Offices, Inc., with its permission

**HISCOX PRO™**   **General Liability Coverage Part (Occurrence)**

(1) repackaging when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

(2) demonstration, installation, servicing, or repair operations performed at the vendor's premises in connection with the sale of the product; or

(3) inspections, adjustments, tests, or servicing the vendor has either agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the product.

This insurance does not apply to any person or organization from whom **you** have acquired:

a. products;

b. any ingredient or part of any product; or

c. any container containing any products.

4. Any person or organization from whom **you** lease any equipment, but only with respect to liability arising out of **your** maintenance, operation, or use of such equipment.

A person or organization's status as an additional insured under this subsection 4 ends when the equipment lease expires, and this insurance will not apply to any **occurrence** or offense which takes place after such expiration.

5. Any other person or organization not included in 1 through 4 above, provided the contract or agreement:

a. is currently in effect or becomes effective during the **policy period**; and

b. was executed before the **bodily injury** or **property damage** occurred or the offense out of which the **personal and advertising injury** arises was committed.

Coverage is available for additional insureds solely for their liability arising out of **your** negligence or of those acting on **your** behalf and not for any liability arising out of the sole negligence of the additional insured.

Notwithstanding anything to the contrary in the other insurance provisions in the General Terms and Conditions or in this Coverage Part, the coverage available under this Coverage Part to any additional insured will be primary and non-contributory, and any other insurance available to the additional insured for the same **claim** or **occurrence** will be specifically excess of the **coverage part limit**.

Notwithstanding anything to the contrary in the subrogation provision in the General Terms and Conditions, **we** agree to waive any right of recovery **we** may have against any additional insured because of payments **we** make for injury or damage arising out of:

1. the ownership, maintenance, or use of that part of any premises leased to **you**;

2. **your** ongoing operations; or

3. **your work** done under a contract with the additional insured and included in the **products-completed operations hazard**.

The limits of liability applicable to any additional insured are either the amounts specified in the contract or agreement requiring them to be added as an additional insured, or the limits identified in the Declarations, whichever is less, and such amounts will be a part of, and not in addition to, the **coverage part limit**.

---

**IV.  Limits of liability**   The limits stated in the Declarations and the rules below will be the most **we** will pay regardless of the number of:

1. **insureds**;

2. **claims** made or brought; or

3. persons or organizations making or bringing **claims**.

---

# HISCOX PRO™   General Liability Coverage Part (Occurrence)

| | | |
|---|---|---|
| A. | Per location limit | The Per Location Limit identified in the Declarations is the most **we** will pay for all **damages** because of **bodily injury** and **property damage** occurring at each separate location where **you** perform business operations arising out of any one **occurrence**. This limit will apply only if an endorsement listing **your** separate locations is added to this Coverage Part. |
| B. | Products-completed operations limit | The Products-Completed Operations Limit identified in the Declarations is the most we will pay for all **damages** because of **bodily injury** and **property damage** included in the **products-completed operations hazard** arising out of any one **occurrence**. |
| C. | Personal and advertising injury limit | The Personal and Advertising Injury Limit identified in the Declarations is the most **we** will pay for all **damages** because of **personal and advertising injury** arising out of any one **claim**. |
| D. | Damage to premises limit | The Damage to Premises limit identified in the Declarations is the most **we** will pay for all **damages** because of **property damage** to any one premises while rented to **you** or temporarily occupied by **you** with permission of the owner. |
| E. | Elevator liability sublimit | An Elevator Liability Sublimit of $25,000 is the most we will pay for all **damages** because of **property damage** resulting from the use of an elevator at premises **you** own, rent, or occupy and arising out of any one **occurrence**. |
| F. | Medical payments limit | The Medical Payments limit identified in the Declarations is the most **we** will pay for the sum of **medical expenses** for **bodily injury** sustained by any one person covered under Section I. What is covered, C. Medical payments. |

No **retention** will apply to amounts **we** pay under Section I. What is covered, C. Medical payments, and such amounts will be in addition to, and not part of, the **coverage part limit**.

All other limits described in this Section IV will be in excess of the **retention** and will be a part of, and not in addition to, the **coverage part limit**.

## V.  Other provisions affecting coverage

| | | | |
|---|---|---|---|
| A. | Notifying us of claims, occurrences, or offenses | 1. | **You** must give written notice to **us** of any **claim** made or brought against **you** as soon as possible, including the specifics of the **claim** and the date received. |
| | | 2. | **You** must give written notice to **us** of any **occurrence** or offense which may result in a **claim** as soon as possible. To the greatest extent possible, the notice must include: |
| | | a. | how, when, and where the **occurrence** or offense took place; |
| | | b. | the names and addresses of any injured persons and witnesses; and |
| | | c. | the nature and location of any injury or damage arising out of the **occurrence** or offense. |

All such notifications must be in writing and include a copy of any **claim**, and must be submitted to **us** via the designated email address or mailing address identified in Item 6 of the Declarations.

| | | |
|---|---|---|
| B. | Retention | **Our** obligation to pay any **damages** under this Coverage Part is in excess of the **retention**, which **you** must pay in connection with each covered **occurrence** or offense. The **retention** does not apply to **claim expenses** or any other payments **we** make under Section II. Defense and supplementary payments. |
| C. | Legal action against us | No person or organization has a right under this Coverage Part: |
| | | 1. to join **us** as a party or otherwise bring **us** into a **claim** seeking **damages** from **you**; or |
| | | 2. to sue **us** on this Coverage Part unless all of its terms and conditions have been fully complied with. |

**HISCOX PRO™**   **General Liability Coverage Part (Occurrence)**

A person or organization may sue **us** to recover on an agreed settlement or final judgment against **you**, but **we** will not be liable for **damages** that are not covered under this Coverage Part or that are in excess of the applicable limits. An agreed settlement means a settlement and release of liability signed by **us**, **you**, and the claimant or claimant's legal representative.

D.   Other insurance

For purposes of this Coverage Part, the Other insurance provision in Section V. Other provisions affecting coverage, of the General Terms and Conditions is replaced by the following:

If other valid and collectible insurance is available to **you** for a **claim** **we** would otherwise cover under this Coverage Part, **our** obligations are limited as follows:

1.  Primary insurance - This Coverage Part is primary except when the Excess insurance provision below applies. If this Coverage Part is primary, **our** obligations are not affected unless any of the other insurance is also primary. Then, **we** will share with any other insurance by the method described in the Method of sharing provision below.

2.  Excess insurance - This Coverage Part is excess over any other insurance, whether primary, excess, contingent, or on any other basis:

    a.  that provides fire, extended coverage, builder's risk, installation risk, or similar coverage for **your work**;

    b.  that applies to **property damage** to premises rented to **you** or temporarily occupied by **you** with permission of the owner;

    c.  if the loss arises out of aircraft, **autos**, or watercraft (to the extent not subject to Exclusion A. 1. Aircraft, autos, or watercraft);

    d.  that is insurance available to **you** because **you** have been added as an additional insured.

    When this Coverage Part is excess, **we** have no duty to defend **you** against any **claim** if any other insurer has a duty to defend **you** against such **claim**. If no other insurer defends, **we** will undertake to do so, but **we** will be entitled to **your** rights against those other insurers.

    When this Coverage Part is excess over other insurance, **we** will pay only **our** share of the amount of loss, if any, that exceeds the sum of:

    a.  the total amount that all other insurance would pay for loss in the absence of this Coverage Part; and

    b.  the total of all deductible and self-insured amounts under all other insurance and this Coverage Part.

    **We** will share the remaining loss, if any, with any other insurance that is not described in this Excess insurance provision and was not purchased or agreed specifically to apply in excess of this Coverage Part.

3.  Method of sharing

    If all of the other insurance permits contribution by equal shares, **we** will contribute by equal shares. Under this method, each insurer contributes equal amounts until it has paid its applicable limits or none of the loss remains, whichever occurs first.

    If any other insurance does not permit contribution by equal shares, **we** will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits to the total applicable limits of all insurers.

E.   Separation of insureds

Except with respect to the limits and any rights or duties specifically assigned to the **named insured**, this Coverage Part applies separately to each **insured** against whom a **claim** is made or brought.

## VI. Exclusions – What is not covered

# HISCOX PRO™  General Liability Coverage Part (Occurrence)

**A.** **Bodily injury and property damage exclusions**

We will have no obligation to pay any sums under this Coverage Part, including any **damages** or **claim expenses**, for any **claim** for:

**Aircraft, autos, or watercraft**

1. **bodily injury** or **property damage** arising out of the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft owned or operated by or rented or loaned to **you**. Use includes operation and **loading and unloading**.

   This exclusion will apply even if the **claim** against **you** alleges negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by **you**, if the **occurrence** causing the **bodily injury** or **property damage** involved the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft owned or operated by or rented or loaned to **you**.

   However, this exclusion will not apply to:

   a. watercraft while ashore on premises owned by or rented to **you**;

   b. watercraft **you** do not own, provided it is:

      (1) less than 75 feet long; and

      (2) not being used to transport persons or property for a charge;

   c. the parking of an **auto** on, or on the ways next to, premises owned by or rented to **you**, provided the **auto** is not owned by or rented or loaned to **you**;

   d. liability assumed in an **insured contract** for the ownership, maintenance, or use of an aircraft or watercraft by others;

   e. **bodily injury** or **property damage** arising out of:

      (1) the operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to a compulsory financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

      (2) operation of the equipment described in 6.b or 6.c of the definition of **mobile equipment**; or

   f. aircraft **you** do not own. However, this Coverage Part will be excess over any other insurance that applies to such aircraft, whether primary, excess, contingent, or on any other basis, and the rules stated in Section V. Other provisions affecting coverage, D. Other insurance, 2. Excess insurance will apply.

**Damage to impaired property or property not physically injured**

2. **property damage** to **impaired property** or property that has not been physically injured arising out of:

   a. a defect, deficiency, inadequacy, or dangerous condition in **your product** or **your work**; or

   b. a delay or failure by **you** or anyone acting on **your** behalf to perform a contract or agreement in accordance with its terms and conditions.

   However, this exclusion will not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

**Damage to property**

3. **property damage** to:

   a. property **you** own, rent, or occupy, including any costs or expenses incurred by **you** or any other person or organization for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

   b. premises **you** sell, give away, or abandon, if the **property damage** arises out of any part of those premises;

   c. property loaned to **you**;

   d. personal property in **your** care, custody, or control;

---

Includes copyrighted material of Insurance Services Offices, Inc., with its permission

# HISCOX PRO™   General Liability Coverage Part (Occurrence)

    e.    that particular part of real property on which **you** or any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations; or

    f.    that particular part of any property that must be restored, repaired, or replaced because **your work** was incorrectly performed on it.

Subsections a, c, and d of this exclusion will not apply to **property damage** (other than damage by fire) to premises (including the contents of the premises) rented to **you** for seven or fewer consecutive days. However, any payments **we** make for **property damage** to such property will be subject to the Damage to Premises Limit.

Subsection b of this exclusion will not apply if the premises are **your work** and were never occupied, rented, or held for rental by **you.**

Subsections c, d, e, and f of this exclusion will not apply to liability assumed under a sidetrack agreement.

Subsection f of this exclusion will not apply to **property damage** included in the **products-completed operations hazard.**

Subsections c, d, and f of this exclusion will not apply to **property damage** arising out of the use of an elevator at premises **you** own, rent, or occupy. However, any payments **we** make for such **property damage** will be subject to the Elevator Liability Sublimit.

Subsection d of this exclusion will not apply to **property damage** to equipment **you** borrow while at a job site, but only if it is not being used by anyone to perform operations at the time of such **property damage.**

| | | |
|---|---|---|
| Damage to your product | 4. | **property damage** to **your product** arising out of it or any part of it; however, this exclusion will not apply to **property damage** arising out of the use of an elevator at premises **you** own, rent, or occupy, but any payments **we** make for such **property damage** will be subject to the Elevator Liability Sublimit. |
| Damage to your work | 5. | **property damage** to **your work** arising out of it or any part of it and included in the **products-completed operations hazard;** however, this exclusion will not apply if the damaged work or the work out of which the damage arises was performed on **your** behalf by a subcontractor. |
| Expected or intended Injury | 6. | **bodily injury** or **property damage** expected or intended from the standpoint of any **insured;** however, this exclusion will not apply to **bodily injury** or **property damage** resulting from the use of reasonable force to protect persons or property. |
| Injury to employee | 7. | a.   **bodily injury** to **your employee** arising out of and in the course and scope of employment by **you** or while performing duties related to the conduct of **your** business; or |
| | | b.   **bodily injury** to the spouse, child, parent, brother, or sister of such **employee** as a consequence of any **bodily injury** described in paragraph 7.a above. |

This exclusion will apply:

    a.    whether **you** may be liable as an employer or in any other capacity; and

    b.    to any obligation to share **damages** with or repay someone else who must pay **damages** because of any injury described in paragraphs 7.a and 7.b above.

However, this exclusion will not apply to:

    a.    liability for **damages you** assume in an **insured contract;** or

    b.    **bodily injury** arising out of and in the course and scope of domestic employment by **you,** unless benefits for such injury are in whole or in part either payable or required to be provided under any workers' compensation law.

| | | |
|---|---|---|
| Liquor liability | 8. | **bodily injury** or **property damage** for which **you** may be held liable by reason of: |
| | | a.   causing or contributing to the intoxication of any person; |

**HISCOX PRO™** General Liability Coverage Part (Occurrence)

> b. furnishing alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
>
> c. any statute, ordinance, or regulation relating to the sale, gifting, distribution, or use of alcoholic beverages.
>
> However, this exclusion will apply only if **you** are in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages.

Mobile equipment

9. **bodily injury** or **property damage** arising out of:

> a. the transportation of **mobile equipment** by an **auto** owned or operated by or loaned or rented to **you**; or
>
> b. the use of **mobile equipment** in, while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

Prior knowledge

10. **bodily injury** or **property damage** which:

> a. **you**;
>
> b. any **insured** listed in A through E of Section III. Who is an insured; or
>
> c. any **employee** authorized by **you** to give or receive notice of an **occurrence** or **claim**,

knew had occurred prior to the **policy period**.

Any continuation, change, or resumption of any such **bodily injury** or **property damage** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

**Bodily injury** or **property damage** will be deemed to be known if **you**, any **insured** listed in A through E of Section III. Who is an insured, or any **employee** authorized by **you** to give or receive notice of an **occurrence** or **claim**:

> a. reports all or any part of the **bodily injury** or **property damage** to **us** or any other insurer;
>
> b. receives a **claim** because of the **bodily injury** or **property damage**; or
>
> c. becomes aware by any other means that the **bodily injury** or **property damage** has occurred or has begun to occur.

Exclusions 1, 2, 3, 4, 5, 8, and 9 of this Section A do not apply to damage by fire to premises while rented to **you** or temporarily occupied by **you** with the owner's permission. However, any payments we make for **property damage** to such premises will be subject to the Damage to Premises Limit.

**B. Personal and advertising injury exclusions**

We will have no obligation to pay any sums under this Coverage Part, including any **damages** or **claim expenses**, for any **claim** for **personal and advertising injury**:

Breach of contract

1. based upon or arising out of any breach of contract, except an implied contract to use another's advertising idea in **your advertisement**.

Failure to conform to statements

2. based upon or arising out of the failure of goods, products, or services to conform with any statement of quality or performance made in **your advertisement**.

Insureds in media and internet type businesses

3. committed by any **insured** whose business is:

> a. advertising, broadcasting, publishing, or telecasting;
>
> b. designing or determining content of websites for others; or
>
> c. an internet search, access, content, or service provider.

However, this exclusion will not apply to **personal and advertising injury** caused by:

> a. false arrest, detention, or imprisonment;
>
> b. malicious prosecution; or

# HISCOX PRO™   General Liability Coverage Part (Occurrence)

|  |  |  |
|---|---|---|
|  | c. | the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor. |
|  |  | For purposes of this exclusion, the placing of frames, borders or links, or advertising, for **you** or others anywhere on the internet is not, by itself, considered the business of advertising, broadcasting, publishing, or telecasting. |
| Knowing violation of rights of another | 4. | caused by **you** or at **your** direction with knowledge the act would violate the rights of another and would inflict **personal and advertising injury**. |
| Material published prior to policy period | 5. | based upon or arising out of oral or written publication of material whose first publication took place prior to the **policy period**. |
| Material published with knowledge of falsity | 6. | based upon or arising out of oral or written publication of material by **you** or at **your** direction with knowledge of its falsity. |
| Unauthorized use of another's name or product | 7. | based upon or arising out of any actual or alleged unauthorized use of another's name or product in **your** email address, domain name, metatag, or any similar tactics to mislead another's potential customers. |
| Wrong description of prices | 8. | based upon or arising out of any actual or alleged wrong description of the price of goods, products, or services stated in **your advertisement**. |

**C. Medical payments exclusions**

**We** will have no obligation to pay any sums under Section I. What is covered, C. Medical payments for medical expenses for **bodily injury**:

| Athletic activities | 1. | to any person injured while practicing, instructing, or participating in any physical exercises or games, sports, or athletic contests; however, this exclusion will not apply to a person who is not an **insured** injured while participating in an amateur athletic activity **you** sponsor. |
|---|---|---|
| Injury on normally occupied premises | 2. | to any person injured on that part of any premises **you** own or rent that the person normally occupies. |
| Injury to you | 3. | to **you** or any person hired to work for or on behalf of **you** or **your** tenant; however, this exclusion will not apply to a **volunteer worker**. |
| Products-completed operations hazard | 4. | included in the **products-completed operations hazard**. |
| Workers' compensation or similar laws | 5. | to any person, whether or not **your employee**, if benefits for such **bodily injury** are payable or must be provided under any workers' compensation, disability benefits, or any similar law. |

**D. Exclusions applicable to the entire general liability coverage part**

**We** will have no obligation to pay any sums under this Coverage Part for **medical expenses**, or for any **claim**, including any **damages** or **claim expenses**, for **bodily injury**, **property damage**, or **personal and advertising injury**:

| Asbestos | 1. | based upon or arising out of the actual or alleged mining, processing, manufacturing, use, testing, ownership, sale, or removal of asbestos, asbestos fibers, or material containing asbestos; exposure to asbestos, asbestos fibers, or materials containing asbestos; or the provision of instructions, recommendations, notices, warnings, supervision, or advice given, or which should have been given, in connections with asbestos, asbestos fibers, or structures or materials containing asbestos. |
|---|---|---|
| Biological agents | 2. | based upon or arising out of: |
|  | a. | the actual, alleged, or threatened contaminative, pathogenic, toxic, or other hazardous properties of **biological agents**; or |
|  | b. | any: |

Includes copyrighted material of Insurance Services Offices, Inc., with its permission

# HISCOX PRO™ General Liability Coverage Part (Occurrence)

   (1)  request, demand, or order that **you** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effect of any **biological agents**; or

   (2)  **claim** or other proceeding by or on behalf of a governmental authority or others for the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of any **biological agents**.

**Communicable disease**   3.  based upon or arising out of the actual or alleged transmission of a communicable disease. This exclusion will apply even if the **claim** against **you** alleges negligence or other wrongdoing in the:

  a.  supervising, hiring, employing, training, or monitoring of others that may be infected with and spread a communicable disease;

  b.  testing for a communicable disease;

  c.  failure to prevent the spread of the disease; or

  d.  failure to report the disease to authorities.

**Contractual liability**   4.  for which **you** are legally obligated to pay as **damages** because of liability assumed in a contract or agreement. However, this exclusion will not apply to liability for **damages**:

  a.  **you** would have in the absence of such contract or agreement; or

  b.  assumed in an **insured contract**, provided the **bodily injury, property damage**, or **personal and advertising injury** occurs after such contract or agreement has been fully executed.

**Crime or fraud**   5.  based upon or arising out of any actual or alleged criminal or fraudulent conduct committed by **you**, at **your** direction, or with **your** consent or knowledge.

**Electronic chatrooms, bulletin boards, or websites**   6.  based upon or arising out of an electronic chatroom, bulletin board, or website **you** host, own, or over which **you** exercise control.

**Electronic data**   7.  based upon or arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

**Employment related liability**   8.  based upon or arising out of any actual or alleged:

  a.  obligation under any workers' compensation, unemployment compensation, employers' liability, fair labor standards, labor relations, wage and hour, or disability benefit law, including any similar provisions of any federal, state, or local statutory or common law;

  b.  liability or breach of any duty or obligation owed by **you** as an employer or prospective employer; or

  c.  harassment, wrongful termination, retaliation, or discrimination, including but not limited to adverse or disparate impact,

including any resulting **damages** sustained at any time by the brother, child, parent, sister, or spouse of such person as a consequence of the above.

This exclusion will apply:

  a.  whether **you** may be liable as an employer or in any other capacity; and

  b.  to any obligation to share **damages** with or repay someone else who must pay **damages** because of any of the above.

**Fair credit**   9.  based upon or arising out of any actual or alleged violation of the Fair Credit Reporting Act and/or Fair and Accurate Credit Transactions Act, both as may be amended, or any similar federal, state, or local statutes, rules, or regulations in or outside the U.S.

**HISCOX PRO**™  **General Liability Coverage Part (Occurrence)**

| | | |
|---|---|---|
| Intellectual property | 10. | based upon or arising out of any actual or alleged infringement, use, or disclosure of any intellectual property, including but not limited to copyright, trademark, trade dress, patent, service mark, service name, title, or slogan, or any publicity rights violations, cyber squatting violations, moral rights violations, any act of passing-off, or any misappropriation of trade secret. |

However, this exclusion will not apply to:

a.    the use of another's advertising idea in **your advertisement**; or

b.    infringement of copyright, trade dress, or slogan in **your advertisement.**

| | | |
|---|---|---|
| Lead | 11. | based upon or arising out of: |

a.    the actual, alleged, or threatened contaminative, pathogenic, toxic, or other hazardous properties of **lead;**

b.    any:

(1)    request, demand, or order that **you** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effect of **lead**; or

(2)    **claim** or other proceeding by or on behalf of a governmental authority or others for the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of **lead.**

| | | |
|---|---|---|
| Pollution | 12. | based upon or arising out of: |

a.    the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants:**

(1)    at or from any premises, site, or location which is or was at any time owned or occupied by or rented or loaned to **you**; however, this subsection will not apply to:

(a)    **bodily injury** if sustained within a building and caused by smoke, fumes, vapor, or soot originating from equipment that is used to heat, cool, or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants;

(b)    **bodily injury** or **property damage** for which **you** may be held liable, if **you** are a contractor and the owner or lessee of such premises, site, or location has been added to **your** policy as an additional insured with respect to **your** ongoing operations performed for that additional insured at the premises, site, or location, and such premises, site, or location is not and never was owned or occupied by or rented or loaned to any **insured** other than that additional insured; or

(c)    **bodily injury** or **property damage** arising out of heat, smoke, or fumes from a **hostile fire;**

(2)    at or from any premises, site, or location which is or was at any time used by **you** or any other person or organization for the handling, storage, disposal, processing, or treatment of waste;

(3)    which are or were at any time transported, handled, stored, disposed of, processed, or treated as waste by or for **you** or for any person or organization for whom **you** are legally liable;

(4)    at or from any premises, site, or location on which **you** or any contractor or subcontractor working directly or indirectly on **your** behalf is performing operations, if the **pollutants** are brought onto the premises, site, or location in connection with such operations by **you** or **your** contractor or subcontractor. However, this subsection will not apply to:

(a)    **bodily injury** or **property damage** arising out of the escape of fuels, lubricants, or other operating fluids necessary to perform the normal

# HISCOX PRO™   General Liability Coverage Part (Occurrence)

electrical, hydraulic, or mechanical functions necessary for the operation of **mobile equipment** or its parts, if such fuels, lubricants, or other operating fluids escape from a vehicle part designed to hold, store, or receive them. This exception will not apply if the **bodily injury** or **property damage** arises out of the intentional discharge, dispersal, or release of the fuels, lubricants, or other operating fluids or if such **fuels, lubricants, or operating fluids** are brought onto the premises, site, or location with the intent that they be discharged, dispersed, or released as part of the operations being performed by **you** or **your** contractor or subcontractor;

(b)   **bodily injury** or **property damage** sustained within a building and caused by the release of gases, fumes, or vapors from materials brought into that building in connection with operations being performed by **you** or **your** contractor or subcontractor; or

(c)   **bodily injury** or **property damage** arising out of heat, smoke, or fumes from a **hostile fire**; or

(5)   at or from any premises, site, or location on which **you** or any contractors or subcontractors working directly or indirectly **your** behalf are performing operations, if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of **pollutants**; or

b.   any:

(1)   request, demand, or order that **you** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effect of **pollutants**; or

(2)   **claim** or other proceeding by or on behalf of a governmental authority or others for the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of **pollutants**.

However, this subsection will not apply to liability for **damages** because of **property damage you** would have in the absence of such request, demand, order, **claim**, or other proceeding by or on behalf of a governmental authority.

Privacy   13.   based upon or arising out of any actual or alleged:

a.   unauthorized acquisition, access, use, or disclosure of, improper collection or retention of, or failure to protect any non-public personally identifiable information or confidential corporate information that is in **your** care, custody, or control; or

b.   violation of any privacy law or consumer data protection law protecting against the use, collection, or disclosure of any information about a person or any confidential corporate information.

Professional services   14.   based upon or arising out of **your** actual or alleged performance of or failure to perform **professional services**.

Recall of products, work, or impaired property   15.   based upon or arising out of the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of:

a.   **your product**;

b.   **your work**; or

c.   **impaired property**;

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

Silica   16.   based upon or arising out of any actual, alleged, or threatened exposure to, inhalation of, or contact with silicon dioxide, silica products, silica fibers, silica dust, any silica byproducts, or silica, whether alone or in combination with any substance, product, or material.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission

# HISCOX PRO™   General Liability Coverage Part (Occurrence)

| | | |
|---|---|---|
| Unsolicited telemarketing | 17. | based upon or arising out of any actual or alleged violation of any federal, state, or local statutes, ordinances, or regulations relating to unsolicited telemarketing, solicitations, emails, faxes, text messages, or any other communications of any type or nature, including but not limited to the Telephone Consumer Protection Act, CAN-SPAM Act, or any "anti-spam" or "do-not-call" statutes, ordinances, or regulations. |

Exclusions 8, 12, and 15 of this Section D do not apply to damage by fire to premises while rented to **you** or temporarily occupied by **you** with the owner's permission. However, any payments **we** make for **property damage** to such premises will be subject to the Damage to Premises Limit.

## VII.  Definitions

The following definitions apply to this Coverage Part. Additional definitions are contained in the General Terms and Conditions, Section VI. Definitions applicable to all Coverage Parts.

**Accident**

means a sudden and unintended event that causes **bodily injury** to a third party. This definition applies only to coverage provided under Section I. What is covered, C. Medical payments.

**Advertisement**

means a notice about **your** goods, products, or services that is published or broadcast to the general public or a specific market segment for the purpose of attracting customers or supporters. For purposes of this definition:

1. notices that are published include material placed on the internet or on other similar electronic means of communication; and

2. with regard to websites, only that part of the website that is about **your** goods, products, or services for the purposes of attracting customers or supporters is considered an advertisement.

**Auto**

means:

1. a land motor vehicle, trailer, or semi-trailer designed for travel on public roads, including any attached machinery or equipment, or

2. any other land vehicle subject to a financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, **auto** does not include **mobile equipment.**

**Biological agents**

means any:

1.   a.   bacteria;

    b.   mildew, mold, or fungi;

    c.   other microorganisms; or

    d.   mycotoxins, spores, or other byproducts of any of the foregoing;

2.   viruses or other pathogens (whether or not a microorganism); or

3.   colony or group of any of the foregoing.

**Bodily injury**

means physical injury, sickness, or disease sustained by a person, including resulting death, humiliation, mental injury, mental anguish, emotional distress, suffering, or shock, at any time. All such resulting injury will be deemed to occur at the time of the physical injury, sickness, or disease that caused it.

**Claim**

means any:

1. written assertion of liability;

2. written demand for **damages**; or

3. civil proceeding seeking **damages**,

for **bodily injury**, **property damage**, or **personal and advertising injury** to which this Coverage Part applies. This includes an arbitration proceeding or any other alternative dispute resolution proceeding in which such **damages** are sought and to which **you** submit with **our** consent.

Includes copyrighted material of Insurance
Services Offices, Inc., with its permission

**HISCOX PRO™** **General Liability Coverage Part (Occurrence)**

| | |
|---|---|
| **Claim expenses** | means all reasonable and necessary fees, costs, and expenses (including the fees of attorneys and experts) incurred in the investigation, defense, or appeal of a **claim**. |
| **Coverage territory** | means anywhere in the world, but this Coverage Part will apply only to a **claim** brought in the United States, its territories or possessions, or Canada. |
| **Damages** | means any monetary amount **you** are ordered to pay by a court, or by an arbitrator in an arbitration to which we have consented. |
| | However, **damages** does not include any civil, regulatory, or criminal fines, restitution, disgorgement, sanctions, taxes, or penalties, including those imposed by any federal, state, or local governmental authority, or any multiple, punitive, or exemplary damages. |
| | **Damages** because of **bodily injury** includes care, loss, or services, or death resulting at any time from the **bodily injury**. |
| **Employee** | means any person employed by **you**, including any **leased worker**, but does not include a **temporary worker**. |
| **Hostile fire** | means a fire that becomes uncontrollable or breaks out from where it was intended to be. |
| **Impaired property** | means tangible property, other than **your product** or **your work**, that cannot be used or is less useful because: |

1. it incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate, or dangerous; or

2. **you** have failed to fulfill the terms or conditions of a contract or agreement;

if such property can be restored to use by:

1. the repair, replacement, adjustment, or removal of **your product** or **your work**; or

2. **your** fulfilling the terms or conditions of the contract or agreement.

**Insured contract** means:

1. a contract for the lease of premises, but not any portion of the lease that indemnifies any person or organization for damage by fire to premises while rented to **you** or temporarily occupied by **you** with permission of the owner;

2. a sidetrack agreement;

3. an easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

4. an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

5. an elevator maintenance agreement; or

6. any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for such municipality) in which **you** assume the tort liability of another to pay **damages** sustained by a third party to which this Coverage Part would apply. Tort liability means liability that would be imposed by law in the absence of any contract or agreement.

However, an insured contract does not include that part of any contract or agreement:

1. that indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations on or within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass, or crossing;

2. that indemnifies an architect, engineer, or surveyor for **damages** arising out of:

   a. preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, field orders, change orders, designs, or specifications; or

   b. giving or failure to give directions or instructions, if that is the primary cause of the injury or damage; or

---

**HISCOX PRO™**   General Liability Coverage Part (Occurrence)

|  |  |
|---|---|
| | 3. under which an **insured** who is an architect, engineer, or surveyor assumes the liability for injury or damage arising out of the **insured's** rendering of or failure to render professional services of any kind. |
| **Lead** | means the element lead in any form, including its use or presence in any alloy, compound, byproduct, or other material waste. Waste includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed. |
| **Leased worker** | means any person leased to **you** by a labor leasing firm to perform duties related to the conduct of **your** business. However, **leased worker** does not include a **temporary worker**. |
| **Loading or unloading** | means the handling of property: |

1. after it is moved from the place where it is accepted for movement into or onto an aircraft, **auto**, or watercraft;

2. while it is in or on an aircraft, **auto**, or watercraft; or

3. while it is being moved from an aircraft, **auto**, or watercraft to the place where it is finally delivered.

**Loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, **auto**, or watercraft.

**Medical expenses**   means reasonable expenses for necessary:

1. first aid administered at the time of an accident;

2. medical, surgical, x-ray, and dental services, including prosthetic devices; and

3. ambulance, hospital, professional nursing, and funeral services.

**Mobile equipment**   means any of the following types of land vehicles, including any attached machinery or equipment:

1. bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

2. vehicles maintained for use solely on or next to premises owned by or rented to **you**;

3. vehicles that travel on crawler treads;

4. vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    a. power cranes, shovels, loaders, diggers, or drills; or

    b. road construction or resurfacing equipment such as graders, scrapers, or rollers;

5. vehicles not described in 1, 2, 3, or 4 above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    a. air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or

    b. cherry pickers and similar devices used to raise or lower workers; or

6. vehicles not described in 1, 2, 3, or 4 above maintained primarily for purposes other than the transportation of persons or cargo. However, **mobile equipment** does not include self-propelled vehicles with the following types of permanently attached equipment:

    a. equipment designed primarily for:

        (1) snow removal;

        (2) road maintenance, but not construction or resurfacing; or

        (3) street clearing or cleaning;

    b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; or

**HISCOX PRO™**  **General Liability Coverage Part (Occurrence)**

|   |   |
|---|---|
| | c.   air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment. |
| | Instead, vehicles described in a, b, or c above will be considered **autos.** |
| **Occurrence** | means an accident arising out of **your** business operations, including continuous or repeated exposure to substantially the same general harmful conditions. |
| **Officer** | means a person holding any of the officer positions created by an organization's charter, constitution, by-laws, or any other similar governing documents. |
| **Personal and advertising injury** | means injury, including consequential **bodily injury,** arising out of one or more of the following offenses: |

1. false arrest, detention, or imprisonment;

2. malicious prosecution;

3. the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

4. oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

5. oral or written publication, in any manner, of material that violates a person's right to privacy;

6. the use of another's advertising idea in **your advertisement;** or

7. infringement of copyright, trademark, trade dress, or slogan in **your advertisement.**

| **Pollutants** | means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, dust, nanoparticles, fibers, soot, ash, fumes, acids, alkalis, chemicals, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed. |
|---|---|
| **Products-completed operations hazard** | 1.   includes all **bodily injury** and **property damage** taking place away from premises owned, occupied by, loaned, or rented to **you** and arising out of **your product** or **your work,** except: |

    a.   products that are still in **your** physical possession; or

    b.   work that has not yet been completed or abandoned. However, **your work** will be deemed completed at the earliest of the following times:

        (1)   when all of the work called for in **your** contract or agreement has been completed;

        (2)   when all of the work to be performed at the site has been completed, if **your** contract or agreement calls for work at more than one site; or

        (3)   when that part of the work completed at a site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be treated as completed; and

  2.   does not include **bodily injury** or **property damage** arising out of:

    a.   the transportation of property, unless the injury or damage results from a condition in or on a vehicle not owned or operated by or loaned or rented to **you** and that condition was created by the **loading or unloading** of that vehicle by **you;** or

    b.   the existence of tools, uninstalled equipment, or abandoned or unused materials.

| **Professional services** | means professional services customarily provided by an architect, engineer, surveyor, physician, surgeon, dentist, or other healthcare provider, accountant, insurance agent/broker, investment advisor, securities broker/dealer, or attorney, or any other services identified as Covered Professional Services in the Declarations. |
|---|---|

**HISCOX PRO™** **General Liability Coverage Part (Occurrence)**

| | |
|---|---|
| **Property damage** | means: |
| | 1.  physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or |
| | 2.  loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the **occurrence** that caused it. |
| | Tangible property does not include any software, data, or other information in electronic form. |
| **Retention** | means the amount stated as such under the General Liability Coverage Part section of the Declarations. |
| **Temporary worker** | means a person who is furnished to **you** to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions. **Temporary worker** does not include **leased worker**. |
| **Volunteer worker** | means a person who is not **your employee**, and who donates his or her work and acts at **your** direction and within the scope of duties determined by **you**, and is not paid a fee, salary, or other compensation by **you** or anyone else for their work performed for **you**. |
| **You, your, or insured** | means the **named insured** and any other person or organization expressly described as an **insured** in Section III. Who is an insured. |
| **Your product** | 1.  means any: |
| |     a.  goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by: |
| |         (1)  **you**; |
| |         (2)  others trading under **your** name; or |
| |         (3)  a person or organization whose assets or business **you** have acquired; and |
| |     b.  containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products; |
| | 2.  includes: |
| |     a.  representations or warranties made at any time with respect to the durability, fitness, performance, quality, or use of **your product**; and |
| |     b.  the providing of or failure to provide instructions or warnings; and |
| | 3.  does not include vending machines or other property loaned or rented to or located for the use of others but not sold. |
| **Your work** | 1.  means: |
| |     a.  work or operations performed by **you** or on **your** behalf; and |
| |     b.  materials, parts, or equipment furnished in connection with such work or operations; and |
| | 2.  includes: |
| |     a.  representations or warranties made at any time with respect to the durability, fitness, performance, quality, or use of **your work**; and |
| |     b.  the providing of or failure to provide instructions or warnings. |



## Endorsement 1

NAMED INSURED: Defense International Corporation

**E6020.3 War and Civil War Exclusion Endorsement**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Terms and Conditions are amended as follows:

This policy does not apply to and we will have no obligation to pay any sums under this policy, including any **damages, claim expenses**, or other **covered amounts**, for any **claim, event, or occurrence** directly or indirectly occasioned by, happening through, or in consequence of:

1.   war, invasion, acts of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military, or usurped power; or

2.   confiscation, nationalization, requisition, destruction of, or damage to property by or under the order of any government, public, or local authority.

However, this exclusion will not apply to coverage under the General Liability Coverage Part (if purchased) for damage by fire to premises while rented to **you** or temporarily occupied by **you** with the owner's permission. Any payments we make for **property damage** to such premises will be subject to the Damage to Premises Limit.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 1 | Processed Date: | 01/06/2021 |

Hiscox Inc.

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

<u>Endorsement 2</u>

NAMED INSURED: Defense International Corporation

<u>E6015.9 Lloyd's Syndicate (3624) Endorsement</u>

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

The Underwriters referred to in the Declarations are identified as follows:

Proportion Percent: 100%
Syndicate: 3624
Contract #: B1234HISINC2021
Binder Registration Date: September 14, 2020
Authorization Date: December 22, 2005

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 2 | Processed Date: | 01/06/2021 |

Hiscox Inc.

*Kevin Kerridge (signature)*

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

**Endorsement 3**

NAMED INSURED: Defense International Corporation

**E6017.3 Nuclear Incident Exclusion Clause-Liability-Direct (Broad) Endorsement**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

We will have no obligation to pay any sums under this policy, including any **damages**, **claim expenses**, or other **covered amounts**, for any **claim**, **event**, or **occurrence**:

A.   Under any liability coverage, for injury, sickness, disease, death, or destruction:

    1.   for which **you** are also insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for exhaustion of its limit of liability; or

    2.   resulting from the **hazardous properties** of **nuclear material** and with respect to which:

        a.   any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, as amended; or

        b.   **you** are, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.   Under any Medical Payments coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief, for expenses incurred with respect to bodily injury, sickness, disease, or death resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.

C.   Under any liability coverage, for injury, sickness, disease, death, or destruction resulting from the **hazardous properties** of **nuclear material**, if:

    1.   the **nuclear material** is at any **nuclear facility** owned or operated by **you** or on **your** behalf, or has been discharged or dispersed from such a facility;

    2.   the **nuclear material** is contained in **spent fuel** or **waste** which is or was at any time possessed, handled, used, processed, stored, transported, or disposed of by **you** or on **your** behalf; or

    3.   the injury, sickness, disease, death, or destruction arises out of the furnishing by **you** of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to injury to or destruction of property at such **nuclear facility**.

As used in this endorsement:

**Hazardous properties** includes radioactive, toxic, or explosive properties;

**Nuclear material** means **source material**, **special nuclear material**, or **byproduct material**;

**Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**Source material**, **special nuclear material**, and **byproduct material** have the meanings given them in the Atomic Energy Act of 1954, as amended;

**Spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor**;

**Waste** means any waste material:



## HISCOX PRO™

---

**Endorsement 3**

NAMED INSURED: Defense International Corporation

1. containing **byproduct material**; and
2. resulting from the operation by any person or organization of any **nuclear facility** included in paragraph 1 or 2 of the definition of **nuclear facility**;

**Nuclear facility** means:

1. any any **nuclear reactor**;
2. any any equipment or device designed or used for:
   a. separating the isotopes of uranium or plutonium;
   b. processing or utilizing **spent fuel**; or
   c. handling, processing, or packaging **waste**;
3. any equipment or device used for the processing, fabricating, or alloying of **special nuclear material**, if at any time the total amount of such material in **your** custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or
4. any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of **waste**.

**Nuclear facility** includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

With respect to injury to or destruction of property, "injury" or "destruction" includes all forms of radioactive contamination of property.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 3 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

_Kerridge_

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

**Endorsement 4**

NAMED INSURED: Defense International Corporation

**E6018.2 Applicable Law Endorsement**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

This policy is subject to the applicable state law to be determined by the court of competent jurisdiction as determined by the provisions of the Service of Suit Endorsement to this policy.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 4 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge

WCL E6018 CW (07/13)



**HISCOX PRO™**

---

**Endorsement 5**

NAMED INSURED: Defense International Corporation

**E6019.1 Service of Suit Endorsement (California)**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

In the event **we** fail to pay any amount claimed to be due under this policy, **we** agree to submit to the jurisdiction of a Court of competent jurisdiction within the United States at **your** request. Nothing in this clause is intended to constitute a waiver of **our** right to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any state in the United States.

Service of process in any suit against **us** may be made on:

Compliance Department
Hiscox Insurance Agency
101 California Street, Suite 4350
San Francisco, CA 94111

In any suit instituted against **us**, **we** agree to abide by the final decision of such Court, or in the event of an appeal, of any Appellate Court.

The above named are authorized to accept service of process on **our** behalf in any such suit and will enter a general appearance on **our** behalf in the event such suit is instituted.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, **we** designate the Superintendent, Commissioner, or Director of Insurance, or other officer specified for that purpose in the statute, as **our** agent for service of process in any action, suit, or proceeding instituted by **you** or on **your** behalf, or any other beneficiary under this policy, and designate the above named as the person to whom such agent is authorized to mail process.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 5 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge

WCL E6019 CA (05/13)



**HISCOX PRO™**

---

**Endorsement 6**

NAMED INSURED: Defense International Corporation

**E6361.1 Cyber Incidents Clarification Endorsement (PL)**
In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

I.    The professional liability Coverage Part is amended as follows:

In Section VI. Exclusions – What is not covered, the "Privacy" exclusion is deleted in its entirety and replaced with the following:

Privacy and cyber incidents    PR-1.    based upon or arising out of any actual or alleged:

a.    unauthorized acquisition, access, use, or disclosure of, improper collection or retention of, or failure to protect any non-public personally identifiable information or confidential corporate information that is in **your** care, custody, or control;

b.    violation of any privacy law or consumer data protection law protecting against the use, collection, or disclosure of any information about a person or any confidential corporate information;

c.    total or partial damage to, loss, corruption, deterioration, destruction, or alteration of, or the inability or impaired ability to access or manipulate any electronic data, software, electronic databases, computers, or any part of a computer system or network;

d.    denial of service or delay, disruption, impairment, failure, or outage of any part of a computer system or network;

e.    unauthorized or unlawful access to any electronic data or any part of a computer system or network, including through the transmission of any malicious code, such as a computer virus, worm, logic bomb, malware, spyware, Trojan horse, or other fraudulent or unauthorized computer code; or

f.    threat, hoax, or demand relating to subparts a through e above.

II.    The General Liability Coverage Part (if purchased) is amended as follows:

In Section VI. Exclusions – What is not covered, D. Exclusions applicable to the entire general liability coverage part, the "Privacy" exclusion is deleted in its entirety and replaced with the following:

We will have no obligation to pay any sums under this Coverage Part for **medical expenses**, or for any **claim**, including any **damages** or **claim expenses**, for **bodily injury**, **property damage**, or **personal and advertising injury**:

Privacy and cyber incidents    PR-1.    based upon or arising out of any actual or alleged:

a.    unauthorized acquisition, access, use, or disclosure of, improper collection or retention of, or failure to protect any non-public personally identifiable information or confidential corporate information that is in **your** care, custody, or control;

---



HISCOX PRO™

---

**Endorsement 6**

NAMED INSURED: Defense International Corporation

b.  violation of any privacy law or consumer data protection law protecting against the use, collection, or disclosure of any information about a person or any confidential corporate information;

c.  denial of service or delay, disruption, impairment, failure, or outage of any part of a computer system or network;

d.  unauthorized or unlawful access to any electronic data or any part of a computer system or network, including through the transmission of any malicious code, such as a computer virus, worm, logic bomb, malware, spyware, Trojan horse, or other fraudulent or unauthorized computer code; or

e.  threat, hoax, or demand relating to subparts a through d above.

This exclusion will apply even if the **claim** against **you** alleges negligence or other wrongdoing in the:

i.  failure to prevent any cyber incident listed in subparts a through d above or any resulting **property damage, bodily injury, or personal and advertising injury;** or

ii.  failure to report any cyber incident listed in subparts a through d above to the authorities.

III.  The Technology Professional Liability Coverage Part (if purchased) is amended as follows:

In Section VII, Definitions, the definitions of "**Breach of contract**", "**Indemnity**", and "**Negligence**" are deleted in their entirety and replaced with the following:

| | |
|---|---|
| **Breach of contract** | means the unintentional breach of a written contract with **your client**, including an unintentional breach resulting from a cyber incident **you** sustain that prevents or impedes **your** performance of **technology services.** |
| **Indemnity** | means an indemnification obligation owed by **you** to a **client** under a written contract. |
| | However, **indemnity** does not include any obligation owed by **you** under a written contract, including a client services agreement, regarding an actual or suspected data breach of personally identifiable information or confidential corporate information that is held or transmitted in any form. |
| **Negligence** | means any: |

1.  negligent act, error, or omission;

2.  breach of any duty to use reasonable care; or

3.  negligent misrepresentation,



**HISCOX PRO™**

---

**Endorsement 6**

NAMED INSURED: Defense International Corporation

including any of the above that results:

a. from a cyber incident **you** sustain which prevents or impedes **your** performance of **technology services**; or

b. in a cyber incident impacting **your client**; however, this subsection b will not include an actual or suspected data breach sustained by **your client**.

IV. In the event that there is a conflict between this Endorsement and any other term or condition in another endorsement attached to and forming a part of this policy with respect to coverage for any **claim** or other covered matter, we will apply the terms or conditions that are more favorable to **you** for such **claim** or other covered matter.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 6 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

**Endorsement 7**

NAMED INSURED: Defense International Corporation

**E6049.2 Shared Limits Endorsement**

[ ] Professional Liability
[ ] General Liability

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

Solely with respect to the Coverage Parts selected above, the following is added to the end of Section II. Limits of liability of the General Terms and Conditions:

SL-A.    Shared limits    The **coverage part limits** applicable to each Coverage Part will be shared, and any payments we make under any one Coverage Part, other than coverage enhancements or other items **we** have expressly agreed to pay in addition to the limit, will reduce the **coverage part limits** for all Coverage Parts.

If the **coverage part limit** applicable to each Coverage Part is different, the maximum amount we will pay for **covered amounts** under all Coverage Parts combined, other than coverage enhancements or other items **we** have expressly agreed to pay in addition to the limits, will be the highest of the applicable **coverage part limits**.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 7 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge

WCL E6049 CW (07/14)



**HISCOX PRO™**

---

**Endorsement 8**

NAMED INSURED: Defense International Corporation

**E6319.1 Late Night Venue Exclusion Endorsement (GL/PL)**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part and the Professional Liability Coverage Part are amended as follows:

I.     The following exclusion is added to the end of Section VI. Exclusions – What is not covered of the Professional Liability Coverage Part and

    LN-1.   based upon or arising out of the performance of **security services** for or at:

        a.     any venue that operates as a bar, night club, lounge, or gentleman's club;

        b.     any restaurant that ceases serving food and primarily serves alcoholic beverages during specified hours of operation; or

        c.     any restaurant that bars entry to patrons below the legal drinking age.

        However, part b of this of this exclusion will not apply to **security services** performed at any such restaurant during hours of operation when food is being served. Part c of this exclusion will not apply to **security services** performed at any such restaurant during hours of operation when entry is not restricted by age.

II.    The following exclusion is added to the end of Section VI. Exclusions – What is not covered, D. Exclusions applicable to the entire general liability coverage part of the General Liability Coverage Part:

    LN-1.   based upon or arising out of the performance of **security services** for or at:

        a.     any venue that operates as a bar, night club, lounge, or gentleman's club;

        b.     any restaurant that ceases serving food and primarily serves alcoholic beverages during specified hours of operation; or

        c.     any restaurant that bars entry to patrons below the legal drinking age.

        However, part b of this of this exclusion will not apply to **security services** performed at any such restaurant during hours of operation when food is being served. Part c of this exclusion will not apply to **security services** performed at any such restaurant during hours of operation when entry is not restricted by age.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 8 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

<u>**Endorsement 9**</u>

NAMED INSURED: Defense International Corporation

<u>**E6320.2 Limited Assault/Battery Coverage Endorsement (Security Guards PL/GL)**</u>

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

Solely with respect to any **claims** made against **you** arising out of or resulting from:

1. any actual, threatened, or alleged assault or battery;
2. the failure of any **insured** or anyone else for whom any **insured** is or could be held legally liable to prevent or suppress any assault or battery;
3. the failure of any **insured** or anyone else for whom any **insured** is or could be held legally liable to render or secure medical treatment necessitated by any assault or battery;
4. the rendering of medical treatment by any **insured** or anyone else for whom any **insured** is or could be held legally liable that was necessitated by any assault or battery;
5. the negligent:
   a. employment;
   b. investigation;
   c. supervision;
   d. training; or
   e. retention,
   of a person for whom any **insured** is or ever was legally responsible and whose conduct would be excluded by any of subsections 1. through 4. above; or
6. any other cause of action or **claim** arising out of or resulting from any of the above,

the limits stated below, and not the limits shown in the Declarations, will apply, regardless of which Coverage Part is implicated. For the purposes of this endorsement, the terms "assault" and "battery" do not include sexual assault and battery.

Assault/battery Sublimit: $1,000,000 each **occurrence**/$2,000,000 in the aggregate, which will be a part of, and not in addition to, both the General Liability and Professional Liability **coverage part limits**.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 9 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

WCL E6320 CW (04/20)

Page 1 of 2

HPSENSLREN72



**HISCOX PRO™**

---

**Endorsement 9**

NAMED INSURED: Defense International Corporation

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

**Endorsement 10**

NAMED INSURED: Defense International Corporation

**E6038.3 Anti-Stacking Endorsement (Exclusion)**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

This policy will not apply to, and **we** will have no obligation to pay any **covered amounts** for any **claim** or **related claims**, **event**, or **occurrence** covered by this policy which is also covered by another policy issued by **us** or by a related company.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 10 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

*[signature]*

Authorized Representative
Kevin Kerridge


# HISCOX PRO™

---

### Endorsement 11

NAMED INSURED: Defense International Corporation

#### E6047.1 Notice of Cancellation to Third Party Endorsement

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Terms and Conditions are amended as follows:

The following is added to the end of Section V. Other provisions affecting coverage, subsection C. Cancellation:

7.  In the event this policy is cancelled or non-renewed, we will use our best, commercially reasonable efforts to notify the party listed below within 30 days at the below address:

    Western National Property Management Att: Risk Management
    8 Executive Circle, Irvine CA 92614

    The failure to notify the party listed above will not negate or otherwise delay the effectiveness of the cancellation or non-renewal of this policy.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 11 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

### Endorsement 12

NAMED INSURED: Defense International Corporation

### E9999.2 Cap on Losses from Certified Acts of Terrorism Endorsement

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE FEDERAL TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

The following is hereby added to the Policy and shall apply to all coverage:
With respect to any one or more "act of terrorism", the Company will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

The term "act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the federal Terrorism Risk Insurance Act for an "act of terrorism" include the following:

1   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

1   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to the pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

All other terms and conditions remain unchanged.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 12 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |



**HISCOX PRO™**

---

**Endorsement 12**

NAMED INSURED: Defense International Corporation

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

**Endorsement 13**

NAMED INSURED: Defense International Corporation

**E9997.4 Policyholder Disclosure Notice of Terrorism Insurance Coverage**

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. *As defined in Section 102(1) of the Act:* the term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is $170.00, and does not include any charges for the portion of losses covered by the United States government under the Act.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND MAY BE SUBJECT TO A $100 BILLION CAP THAT MAY REDUCE MY COVERAGE AND I HAVE BEEN NOTIFIED OF THE PORTION OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Policyholder/Applicant's Signature: _____

Print Name: _____ Date: _____

Insurance Company: _____

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 13 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

INT E9997 CW (01/15)

Page 1 of 2

HPSENSLREN72



---

**Endorsement 13**

NAMED INSURED: Defense International Corporation

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

<u>**Endorsement 14**</u>

NAMED INSURED: Defense International Corporation

<u>**E6803.1 Sexual Misconduct Exclusion Endorsement**</u>

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

The following exclusion is added to the end of Section VI. Exclusions – What is not covered, D. Exclusions applicable to the entire general liability coverage part:

Sexual misconduct     SM-1.     based upon or arising out of any actual, alleged, or threatened abuse, molestation, harassment, mistreatment, or maltreatment of a sexual nature, including the negligent employment, investigation, supervision, training, or retention of a person who commits such conduct, or the failure to report such conduct to the proper authorities.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 14 | Processed Date: | 01/06/2021 |

Hiscox Inc.

Authorized Representative
Kevin Kerridge

WCLGL E6803 CW (05/13)

Page 1 of 1

HPSENSLREN72



HISCOX PRO™

---

**Endorsement 15**

NAMED INSURED: Defense International Corporation

**E6805.1 Privacy Exclusion Endorsement**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

The following exclusion is added to Section VI. Exclusions – What is not covered, D. Exclusions applicable to the entire general liability coverage part:

| Privacy | PR-1. | based upon or arising out of any actual, alleged: |
|---|---|---|
| | | a. unauthorized acquisition, access, use, or disclosure of, improper collection of, or failure to protect any non-public personally identifiable information or confidential corporate information that is in your care, custody, or control; or |
| | | b. violation of any privacy law or consumer data protection law protecting against the use, collection, or disclosure of any information about a person or any confidential corporate information. |

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 15 | Processed Date: | 01/06/2021 |

Hiscox Inc.

*[signature]*

Authorized Representative
Kevin Kerridge

WCLGL E6805 CW (09/13)

Page 1 of 1

HPSENSLREN72



HISCOX PRO™

---

**Endorsement 16**

NAMED INSURED: Defense International Corporation

**E6801.3 Hired and Non-Owned Auto Liability Endorsement (Occurrence)**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

I.     The coverage provided under Section I. What is covered, A. Bodily injury and property damage applies to:

Hired auto liability     **bodily injury** or **property damage** arising out of the maintenance or use of a **hired auto** by **you** or **your employees** in the course of **your** business, provided the **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory** and occurs during the **policy period.**

Non-owned
auto liability     **bodily injury** or **property damage** arising out of the use of any **non-owned auto** in **your** business by any person, provided the **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory** and occurs during the **policy period.**

II.     With respect to the coverage provided by this Endorsement only, in Section VI. Exclusions – What is not covered, A. Bodily injury and property damage exclusions, the following exclusions are deleted in their entirety:

A.     exclusion 1. Aircraft, autos, or watercraft;

B.     exclusion 2. Damage to impaired property or property not physically injured;

C.     exclusion 3. Damage to property;

D.     exclusion 4. Damage to your product;

E.     exclusion 5. Damage to your work; and

F.     exclusion 9. Mobile equipment,

and replaced with the following:

Aircraft or watercraft HNOA-1.     **bodily injury** or **property damage** arising out of the ownership, maintenance, use, or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to **you.** Use includes operation and **loading and unloading.**

This exclusion will apply even if the **claim** against **you** alleges negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by **you,** if the **occurrence** causing the **bodily injury** or **property damage** involved the ownership, maintenance, use, or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to **you.**

However, this exclusion will not apply to:

a.     watercraft while ashore on premises owned by or rented to **you;**

b.     watercraft **you** do not own, provided it is:

(1)     less than 75 feet long; and

(2)     not being used to transport persons or property for a charge;

c.     liability assumed in an **insured contract** for the ownership, maintenance, or use of an aircraft or watercraft by others; or

d.     aircraft **you** do not own. However, this Coverage Part will be excess over any other insurance that applies to such aircraft, whether primary, excess, contingent, or

---

WCLGL E6801 CW (05/19)



# HISCOX PRO™

---

### Endorsement 16

NAMED INSURED: Defense International Corporation

on any other basis, and the rules stated in Section V. Other provisions affecting coverage, D. Other insurance, 2. Excess insurance will apply.

Property damage    HNOA-2.    **property damage** to:

    a.    property owned or being transported by, or rented or loaned to **you**; or

    b.    property in **your** care, custody, or control.

III.   With respect to the coverage provided by this Endorsement only, Section III. Who is an insured is deleted in its entirety and replaced with the following:

    A.   The following are **insureds**:

       1.   **you**;

       2.   any other person using a **hired auto** with **your** permission;

       3.   with respect to a **non-owned auto**:

          a.    **your** partners or **officers**; or

          b.    **your employees**,

          but only while such **non-owned auto** is being used in **your** business; and

       4.   any other person or organization, but only for their liability because of acts or omissions of an **insured** under 1, 2, or 3 above.

    B.   The following are not **insureds**:

       1.   any person engaged in the business of his or her employer with respect to:

          a.    **bodily injury** to any co-**employee** injured in the course of employment;

          b.    **bodily injury** to the spouse, child, parent, brother, or sister of that co-**employee** as a consequence of any **bodily injury** described in a above; or

          c.    to any obligation to share **damages** with or repay someone else who must pay **damages** because of a or b above;

       2.   **your** partner or **officer** for any **auto** owned by such partner, **officer**, or a member of his or her household;

       3.   any person while employed in or otherwise engaged in duties in connection with an **auto business**, other than an **auto business you** operate;

       4.   the owner or lessee (of whom **you** are a sublessee) of a **hired auto**, the owner of a **non-owned auto**, or any agent or employee of any such owner or lessee; or

       5.   any person or organization for the conduct of any current or past partnership or joint venture that is not shown as a **named insured** in the Declarations.

IV.   With respect to the coverage provided by this Endorsement only, Section V. Other provisions affecting coverage, D. Other insurance is deleted in its entirety and replaced with the following:

    D.   Other insurance    This insurance is specifically excess of and will not contribute with any primary insurance covering the **hired auto** or **non-owned auto**.

V.   With respect to the coverage provided by this Endorsement only, the following additional definitions apply:

    **Auto business**    means the business or occupation of selling, repairing, servicing, storing, or parking **autos**.



## HISCOX PRO™

---

**Endorsement 16**

NAMED INSURED: Defense International Corporation

| | |
|---|---|
| **Hired auto** | means any **auto you** lease, hire, rent, or borrow. This does not include any **auto you** lease, hire, rent, or borrow from any of **your employees**, partners, **officers**, or members of their households. |
| **Insured** | means the **named insured** and any other person or organization expressly described as an **insured** in this Endorsement. |
| **Non-owned auto** | means any **auto you** do not own, lease, hire, rent, or borrow which is used in connection with **your** business. This includes **autos** owned by **your employees**, partners, **officers**, or members of their households, but only while used in **your** business or **your** personal affairs. |

VI.   With respect to the coverage provided by this Endorsement only, the definition of "**You, your,** or **insured**" is deleted in its entirety and replaced by the following:

**You or your**      means the **named insured.**

VII.   With respect to the coverage provided by this Endorsement only, Section IV. Limits of liability is amended to include the following:

HNOA-A.   The HNOA Limit stated below is the most **we** will pay for all **damages** because of **bodily injury** and **property damage** covered by this Endorsement and arising out of any one **occurrence**.
**You** must pay the HNOA Retention stated below in connection with any payment **we** make under this Endorsement, and any payments **we** make will be a part of, and not in addition to, the **coverage part limit.**

HNOA-B.   The HNOA Retention stated below applies to each **claim** for **damages** sustained by any one person because of:

1.   **bodily injury;**
2.   **property damage;** or
3.   **bodily injury** and **property damage** combined,

as the result of any one **occurrence.**
If **damages** are claimed for care, loss of services, or death resulting at any time from **bodily injury**, a separate HNOA Retention will apply to each person making a **claim** for such **damages.**

| | |
|---|---|
| HNOA Limit: | $1,000,000 |
| HNOA Retention: | $2,500 |

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 16 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

<u>**Endorsement 17**</u>

NAMED INSURED: Defense International Corporation

<u>**E6846.1 Named Insured v. Named Insured Exclusion Endorsement (GL)**</u>

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

The following exclusion is added to the end of Section VI. Exclusions – What is not covered, D. Exclusions applicable to the entire general liability coverage part:

Named insured vs. named insured    II-1.    brought by or on behalf of one **named insured** against another **named insured**.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 17 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge

Page 1 of 1

HPSENSLREN72



**HISCOX PRO™**

---

**Endorsement 18**

NAMED INSURED: Defense International Corporation

**E6810.2 Security Services Enhancement Endorsement (GL)**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

I.  Section I. What is covered, A. Bodily injury and property damage is deleted in its entirety and replaced with the following:

    A. Bodily injury and property damage

1. We will pay up to the **coverage part limit** for damages you become legally obligated to pay because of **bodily injury** or **property damage** to which this Coverage Part applies, provided:

    a. the **bodily injury** or **property damage** occurs during the **policy period**;

    b. the **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

    c. you have paid the applicable **retention** stated in the Declarations.

2. We will pay up to the Lost Key Limit identified below for **damages you** become legally obligated to pay because of the loss or mysterious disappearance of any keys entrusted to or in the possession, care, custody, or control of the **named insured** or any of the **named insured's employees**; provided:

    a. such loss or mysterious disappearance is not caused either directly or indirectly by any misappropriation, secretion, conversion, infidelity, or other act of dishonesty on **your** part;

    b. we will only be obligated to pay that portion of any **damages** which represents the actual cost of:

        (1) any lost key;

        (2) adjustment of locks to accept any new key; or

        (3) installation and replacement of new locks, if necessary; and

    c. you have paid the Lost Key Retention identified below.

3. We will pay up to the Security Services Limit identified below for **damages you** become legally obligated to pay because of **bodily injury** or **property damage** directly resulting from **your** performance of **security services**, provided:

    a. the **bodily injury** or **property damage** occurs during the **policy period**;

    b. the **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

    c. you have paid the Security Services Retention identified below.

We will have the right and duty to defend any **claim** seeking **damages** covered under this subsection A, as set out in Section II. Defense and supplementary payments. We may, at **our** discretion, investigate any **occurrence** and settle any **claim** that may result.

II.  Section I. What is covered, C. Medical payments is deleted in its entirety and replaced with the following:

    C. Medical payments

1. Regardless of fault, **we** will pay up to the Medical Payments Limit stated in the Declarations for **medical expenses** incurred by each person for **bodily injury** caused by an **accident** to which this Coverage Part applies, provided:


HISCOX PRO™

---

**Endorsement 18**

NAMED INSURED: Defense International Corporation

        a.    the **bodily injury** is caused by an **occurrence** that takes place in the **coverage territory** during the **policy period**;

        b.    the **accident** occurs during the **policy period**;

        c.    the expenses are incurred and reported to **us** within one year of the date of the **accident**; and

        d.    the person who sustained such **bodily injury** submits to examination, at **our** expense, by physicians of **our** choice as often as **we** reasonably require.

    2.    Regardless of fault, **we** will pay up to the Post-Incident First Aid Limit identified below for expenses **you** incur to administer first aid to each person because of **bodily injury** directly resulting from **your** performance of **security services**; provided:

        a.    the **bodily injury** takes place within the **coverage territory**; and

        b.    the expenses are incurred immediately after the incident that caused the **bodily injury** and reported to us within one year of the date of such incident.

III.    The following is added to Section III. Who is an insured:

    IC-A.    Independent contractor    **Your independent contractors** are **insureds**, but only while in the course of their performance of **security services** on behalf of or at the direction of the **named insured**.

IV.    In Section IV. Limits of liability, F. Medical payments limit is deleted in its entirety and replaced with the following:

    F.    Medical payments limit    The Medical Payments Limit identified in the Declarations is the most **we** will pay for the sum of **medical expenses** for **bodily injury** sustained by any one person covered under Section I. What is covered, C. Medical payments, paragraph 1.

V.    The following is added to Section IV. Limits of liability:

    SS-A.    Security services limits    The Post-Incident First Aid Limit described below is the most **we** will pay for all expenses **you** incur to administer first aid to any one person covered under Section I. What is covered, C. Medical payments, paragraph 2.

        The Lost Key Limit described below is the most **we** will pay for all **damages** because of **property damage** covered under Section I. What is covered, A. Bodily injury and property damage, paragraph 2 arising out of any one **occurrence**.

        The Security Services Limit described below is the most **we** will pay for all **damages** because of **bodily injury** and **property damage** covered under Section I. What is covered, A. Bodily injury and property damage, paragraph 3 arising out of any one **occurrence**.

        No **retention** will apply to amounts **we** pay under Section I. What is covered, C. Medical payments, paragraph 2.

        All other limits described in this Endorsement will be in excess of the applicable **retention**, and any payments **we** make under this Endorsement will be a part of, and not in addition to, the **coverage part limit**.

VI.    In Section VI. Exclusions – What is not covered, A. Bodily injury and property damage exclusions, exclusions 3 and 6 are deleted in their entirety and replaced with the following:

    Damage to property    3.    **property damage** to:

        a.    property **you** own, rent, or occupy, including any costs or expenses incurred by **you** or any other person or organization for repair, replacement, enhancement, restoration, or



HISCOX PRO™

---

**Endorsement 18**

NAMED INSURED: Defense International Corporation

maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b.  premises **you** sell, give away, or abandon, if the **property damage** arises out of any part of those premises;

c.  property loaned to **you**;

d.  that particular part of real property on which **you** or any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations; or

e.  that particular part of any property that must be restored, repaired, or replaced because **your work** was incorrectly performed on it.

Subsections a, and c of this exclusion will not apply to **property damage** (other than damage by fire) to premises (including the contents of the premises) rented to **you** for seven or fewer consecutive days. However, any payments **we** make for **property damage** to such property will be subject to the Damage to Premises Limit.

Subsection b of this exclusion will not apply if the premises are **your work** and were never occupied, rented, or held for rental by **you**.
Subsections c, d, and e of this exclusion will not apply to liability assumed under a sidetrack agreement.

Subsection e of this exclusion will not apply to **property damage** included in the **products-completed operations hazard**.

Subsections c and e of this exclusion will not apply to **property damage** arising out of the use of an elevator at premises **you** own, rent, or occupy. However, any payments **we** make for such **property damage** will be subject to the Elevator Liability Sublimit.

Subsections c and d of this exclusion will not apply to **property damage** covered under Section I. What is covered, A. Bodily injury and property damage, subsection 2. However, any payments **we** make for such **property damage** will be subject to the Lost Key Limit identified below.

Expected or intended Injury    6.    **bodily injury** or property damage expected or intended from the standpoint of any **insured**.

This exclusion will not apply to **bodily injury** or **property damage**:

a.  resulting from the use of reasonable force in the performance of **security services** to protect persons or property; or

b.  directly resulting from **your** performance of **security services**.

However, any payments **we** make for such **bodily injury** or **property damage** will be subject to the Security Services Limit.

VII.    The following exclusions are added to the end of Section VI. Exclusions – What is not covered, D. Exclusions applicable to the entire general liability coverage part:

Misappropriation/ mishandling of funds    SS-1.    based upon or arising out of the actual or alleged theft, **forgery**, misappropriation, commingling, or conversion of any funds, monies, assets, or property, including any client's funds, monies, assets, or property or the inability or failure to pay, collect, or safeguard funds.

WCLGL E6810 CW (10/19)



# HISCOX PRO™

<u>**Endorsement 18**</u>

NAMED INSURED: Defense International Corporation

      Independent contractors IC-1.     brought by or on behalf of any **independent contractor**.

VIII.    The following definitions are added to the end of Section VII. Definitions:

| | |
|---|---|
| **Independent contractor** | means any person or entity contracted by the **named insured** or **acquired entity** to perform the same **security services** as the **named insured** or **acquired entity**. |
| **Security services** | means the services customarily performed by a security guard, watchperson, bank guard, patroller, traffic controller, or other individual employed in the private security industry, which, for purposes of this policy, means services performed in connection with guarding and protecting people, property, or other assets, or the delivery or transportation of monies, funds, or other property for or on behalf of a client of the **named insured**. |

                            **Security services** also includes the use of reasonable force in connection with the protection of people, property, or other assets, or the delivery or transportation of monies, funds, or other property, including the use of physical force, weapons, mace, firearms, stun guns, Tasers, and/or canine patrols.

| | |
|---|---|
| Lost Key Limit: | $ Each Occurrence |
| Lost Key Retention: | $ |
| Security Services Limit: | $ Each Occurrence |
| Security Services Retention: | $ |
| Post-Incident First Aid Limit: | $ Each Person |

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 18 | Processed Date: | 01/06/2021 |

Hiscox Inc.

Authorized Representative
Kevin Kerridge

Page 4 of 4
HPSENSLREN72



HISCOX PRO™

---

**Endorsement 19**

NAMED INSURED: Defense International Corporation

**E6838.1 Additional Insured — Ongoing Operations Endorsement**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

### SCHEDULE

Any entity(ies) or person(s) at any location required by written contract to be included for coverage as an additional insured.

I.     Section III. Who is an insured; K. Additional insureds, is amended to include as an additional insured the entity(ies) or person(s)shown in the Schedule above, but only with respect to liability arising out of:

    a.    **your** acts or omissions or of those acting on **your** behalf; and

    b.    the performance of **your** ongoing operations for the additional insured.

II.    However, there is no coverage for such additional insureds for:

    a.    **bodily injury, property damage,** or **personal and advertising injury** arising out of the rendering or failure to render any professional architectural, engineering, or surveying services, including:

        (1)    the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, drawings, or specifications; or

        (2)    supervisory, inspection, architectural, or engineering activities.

    b.    **bodily injury** or **property damage** occurring after:

        (1)    all work, including materials, parts, or equipment furnished in connection with such work, on the project (other than service, maintenance, or repairs) to be performed by or on behalf of the additional insured at the location of the covered operations has been completed; or

        (2)    that portion of **your work** out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

    A person's or organization's status as an additional insured under this Section II ends when **your operations** for that additional insured are complete.

III.   The limits of liability applicable to any additional insured are either the amounts specified in the contract or agreement requiring them to be added as an additional insured, or the limits identified in the Declarations, whichever is less, and such amounts will be a part of, and not in addition to, the **coverage part limit.**

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 19 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |



**HISCOX PRO™**

---

**Endorsement 19**

NAMED INSURED: Defense International Corporation

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

**Endorsement 20**

NAMED INSURED: Defense International Corporation

**E6938.1 Blanket Additional Insured Endorsement (Lessor of Leased Equipment)**
In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

**SCHEDULE**

All persons or entities required by written contract to be added as an additional insured.

Section III. Who is an insured, K. Additional insureds is amended to include as additional insureds any person or organization listed in the Schedule above, but only with respect to **your** liability for **bodily injury, property damage, or personal and advertising injury** resulting from **your** maintenance, operation, or use of any equipment leased by **you** from such additional insureds.

However, there is no coverage for such additional insureds for **bodily injury, property damage, or personal and advertising injury** arising out of the sole negligence of the additional insured.

A person or organization's status as an additional insured under this Endorsement ends when the equipment lease expires, and this insurance will not apply to any **occurrence** or offense which takes place after such expiration.

The coverage afforded to the additional insured(s) listed above is subject to all of the terms and conditions of Section III. Who is an insured, K. Additional insureds.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 20 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



---

**Endorsement 21**

NAMED INSURED: Defense International Corporation

**E6857.1 Blanket Primary Non-Contributory Endorsement (Written Contract)**
In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

Where the **named insured** is required by a written contract to provide insurance that is primary and non-contributory with respect to any insurance carried by the other party to the contract, and the written contract requiring so is executed by the **named insured** before any **occurrence** or offense, this Coverage Part will be primary with respect to any **claim** or **occurrence** which is covered under both policies, but only if and to the extent required by such written contract.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 21 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



**HISCOX PRO™**

---

<u>Endorsement 22</u>

NAMED INSURED: Defense International Corporation

<u>**E6817.1 Additional Insured Completed Operations Coverage Endorsement**</u>

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

In Section III. Who is an Insured, K. Additional insureds, subsection 2 is deleted in its entirety and replaced with the following:

2.  Any person or organization for whom **you** are performing operations, but only with respect to liability arising out of:

    a.  **your** acts or omissions or of those acting on **your** behalf; and

    b.  the performance of **your** ongoing operations for the additional insured.

    However, there is no coverage for such additional insureds for **bodily injury**, **property damage**, or **personal and advertising injury** arising out of the rendering of or failure to render any professional architectural, engineering, or surveying services, including:

    a.  the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, drawings, or specifications; or

    b.  supervisory, inspection, architectural, or engineering activities.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 22 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

*[signature]*

Authorized Representative
Kevin Kerridge

WCLGL E6817 CW (07/14)



HISCOX PRO™

---

**Endorsement 23**

NAMED INSURED: Defense International Corporation

**E6931.1 Blanket Additional Insured – Mortgagees, Assignees, or Receivers**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

I.    Section III. Who is an insured, K. Additional insureds, is amended to include as an additional insured any mortgagee, assignee, or receiver with an interest in premises owned, maintained, or used by **you**, but only with respect to their liability as a mortgagee, assignee, or receiver and arising out of **your** ownership, maintenance, or use of such premises.

      However, the coverage provided under this Endorsement will not apply to any structural alterations, new construction, or demolition operations performed for, by, or on behalf of the additional insured(s) described above.

II.   The coverage afforded to the additional insured(s) listed in the Schedule above applies only to the extent permitted by law.

III.  A person or organization's status as an additional insured under this Endorsement ends when **you** cease to own, maintain, or use the premises in which the mortgagee, assignee, or receiver has an interest.

IV.   If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

      1.    required by the contract or agreement; or

      2.    available under the applicable limits stated in the Declarations,

      whichever is less.

V.    This Endorsement will not increase the applicable limits stated in the Declarations.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 23 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



# HISCOX PRO™

---

**Endorsement 24**

NAMED INSURED: Defense International Corporation

**E6850.1 Waiver of Subrogation Endorsement (Blanket)**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Coverage Part is amended as follows:

Notwithstanding anything to the contrary in the subrogation provision in the General Terms and Conditions, **we** agree to waive any right of recovery **we** may have against any person(s) or entity(ies) with whom **you** have agreed in a written contract or agreement to waive **your** rights of recovery, provided such contract or agreement was executed before the **bodily injury** or **property damage** occurred or the offense out of which the **personal and advertising injury** was committed.

**We** agree to waive such rights of recovery **we** may have against any person(s) or entity(ies) only because of payments **we** make for injury or damage arising out of **your** ongoing operations or **your work** done under contract for such person(s) or entity(ies) and included in the **products-completed operations hazard.**

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/07/2021 | Certificate No.: | MPL4029619.21 |
| Endorsement No: | 24 | Processed Date: | 01/06/2021 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge

## IMPORTANT NOTICE:

1.     The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.

2.     The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.

3.     The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.

4.     The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.

5.     Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.

6.     For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on

the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.

7.    California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance:    www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.

8.    If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.

**D-2 (Effective January 1, 2020)**



**HISCOX**

# ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE

Hiscox is committed to complying with the U.S. Department of Treasury Office of Foreign Assets Control (OFAC) requirements. OFAC administers and enforces economic sanctions policy based on Presidential declarations of national emergency. OFAC has identified and listed numerous foreign agents, front organizations, terrorists, and narcotics traffickers as Specially Designated Nationals (SDN's) and Blocked Persons. OFAC has also identified Sanctioned Countries. A list of Specially Designated Nationals, Blocked Persons and Sanctioned Countries may be found on the United States Treasury's web site http://www.treas.gov/offices/enforcement/ofac/.

Economic sanctions prohibit all United States citizens (including corporations and other entities) and permanent resident aliens from engaging in transactions with Specially Designated Nationals, Blocked Persons and Sanctioned Countries. Hiscox may not accept premium from or issue a policy to insure property of or make a claim payment to a Specially Designated National or Blocked Person. Hiscox may not engage in business transactions with a Sanctioned Country.

A Specially Designated National or Blocked Person is any person who is determined as such by the Secretary of Treasury.

A Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States.

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy may be rendered void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

(1) Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to US economic trade sanctions;

(2) Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country government, where any action in connection with such claim or suit is prohibited by US economic or trade sanctions;

(3) Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to US economic or trade sanctions;

(4) Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country government, where any activities related to such property are prohibited by US economic or trade sanctions; or

(5) Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to US economic or trade sanctions.

Please read your Policy carefully and discuss with your broker/agent or insurance professional. You may also visit the US Treasury's website at http://www.treas.gov/offices/enforcement/ofac/.



## Terrorism Risk Insurance Act Notice

Section 50.5(d) of the United States Treasury Department's regulations with respect to the Terrorism Risk Insurance Act of 2002 (TRIA) as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2015 states that hybrid policies that include both TRIA and non-TRIA lines of business may be considered nonprogram coverage if the premium attributable to the lines subject to TRIA is less than 25% of the total premium charged for the policy. Since the premium allocated to the TRIA line(s) of business is less than 25% of your total premium, TRIA coverage is not being offered with your policy. If you should have any questions or further concerns on this matter please contact us at US_Helpdesk_RFL@hiscox.com or via telephone at 914-273-7400.



**HISCOX**                    **ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE**

Hiscox is committed to complying with trade and economic sanctions. To that end:

I.   No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, Australia, United Kingdom or United States of America.

II.  The U.S. Department of Treasury Office of Foreign Assets Control (OFAC) administers and enforces economic sanctions policy based on Presidential declarations of national emergency. OFAC has identified and listed numerous foreign agents, front organizations, terrorists, and narcotics traffickers as Specially Designated Nationals (SDN's) and Blocked Persons. OFAC has also identified Sanctioned Countries. A list of Specially Designated Nationals, Blocked Persons and Sanctioned Countries may be found on the United States Treasury's web site http://www.treas.gov/offices/enforcement/ofac/.

Economic sanctions prohibit all United States citizens (including corporations and other entities) and permanent resident aliens from engaging in transactions with Specially Designated Nationals, Blocked Persons and Sanctioned Countries. Hiscox may not accept premium from or issue a policy to insure property of or make a claim payment to a Specially Designated National or Blocked Person. Hiscox may not engage in business transactions with a Sanctioned Country.

A Specially Designated National or Blocked Person is any person who is determined as such by the Secretary of Treasury.

A Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States.

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy may be rendered void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

(1)   Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to US economic trade sanctions;

(2)   Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country government, where any action in connection with such claim or suit is prohibited by US economic or trade sanctions;

(3)   Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to US economic or trade sanctions;

(4)   Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country government, where any activities related to such property are prohibited by US economic or trade sanctions; or

(5)   Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to US economic or trade sanctions.



**ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE**

Please read your Policy carefully and discuss with your broker/agent or insurance professional.  You may also visit the US Treasury's website at http://www.treas.gov/offices/enforcement/ofac/.

 **HISCOX**

**Policyholder Notice
Complaints or Comments**

Any complaints or comments may be sent:

- By Mail to:

  Legal Department
  Hiscox USA
  520 Madison Avenue, 32nd Floor
  New York, NY 10022; or

- By Email to:

  us_helpdesk_rfl@hiscox.com



## CONFORMITY NOTICE

**HISCOX**

(This does not amend, extend, or alter the coverages or any other provisions contained in your policy)

Whenever the symbol "$" is used in this policy, it shall mean United States Dollars (USD).



# HISCOX PRO™

| Security Services<br>Coverage and Claims Information | Tailor-made<br>Solutions |

## Professional Liability

**Coverage Highlights:**
- ✓ Industry specific form tailored for security services, including the use of firearms and guard dogs
- ✓ Available on claims made or occurrence basis
- ✓ Contingent Bodily Injury and Property Damage coverage included up to the full limit
- ✓ Personal and Advertising Injury as well as Third Party Discrimination included up to the full limit
- ✓ Blanket Additional Insured coverage included
- ✓ Blanket Waiver of Subrogation for Additional Insureds included
- ✓ Crisis Management sublimit included
- ✓ 50/50 cooperation clause included
- ✓ Coverage included for subsidiaries, joint ventures, and independent contractors
- ✓ Duty to defend policy

**Claims Scenarios:**
- The owner of an office building hired a security company to provide guard services. There was a rash of burglaries in the building during the contract period. The tenants file a lawsuit for damage to their property and the building owner sues for loss of income, as tenants are not renewing their leases due to poor security.
- A security guard was directing traffic out of a parking garage. A driver was exiting the garage and drove his car into traffic based on the guard's signal to proceed. The car was struck by an oncoming vehicle and the driver sued the security firm for bodily injury and property damage.

## General Liability

**Coverage Highlights:**
- ✓ Available on claims made or occurrence basis
- ✓ Coverage for Bodily Injury/Property Damage resulting from general business operations
- ✓ Blanket Additional Insured coverage included
- ✓ Blanket Waiver of Subrogation for Additional Insureds included
- ✓ Assault & Battery Coverage included
- ✓ Lost Key Coverage included
- ✓ No fault Med Pay coverage included, outside of limits
- ✓ Hired/Non-Owned Automobile Liability coverage available
- ✓ Employee Benefits Liability coverage available

**Claims Scenarios:**
- A security guard loses the master keys to an office complex. The complex's property manager sues the security firm for the cost to replace all of the locks and keys.
- A retail security guard detains a shopper he suspects of shoplifting in order to wait for police to arrive. The police determine the person did not steal any merchandise. The shopper sues the security firm for personal injury, including false arrest, mental anguish and bodily injury from being restrained.

## Privacy / Data Breach

**Coverage Highlights:**
- ✓ First party data breach coverage, third party privacy liability and third party network security liability covered
- ✓ Regulatory defense, fines/penalties, and compensatory awards, PCI fines/penalties/assessments, computer forensics, notification costs, and credit or ID protection costs standard coverage up to $2M, with additional limits available
- ✓ Expert breach response assistance with 24/7 access to a law firm and team of breach response service providers
- ✓ Sublimit for crisis management and public relations costs

**Claims Scenarios:**
- Sensitive information, including social security numbers, was compromised when a security firm's computer system was hacked. The company was required to notify all of the affected employees and provide credit monitoring services.
- At a physician's office, patient medical records were stolen by a disgruntled employee of the security company. The physician sued the security company for costs relating to notifying affected patients and protecting their privacy and identity.

## Crime

**Coverage Highlights:**
- ✓ Employee theft, forgery or alteration, inside and outside the premises loss, computer funds transfer loss, and theft of clients' property are covered exposures
- ✓ Claims expense sublimit available

**Claims Scenarios:**
- A security guard is accused of stealing tools and equipment from a construction site he was hired to guard.
- The controller of a security firm forged company checks and deposited them in an account for his own personal benefit.

# Exhibit 2



LAW OFFICES
**LAWRENCE S. EISENBERG & ASSOCIATES** A PROFESSIONAL CORPORATION

email: lse@lselaw.com
website: www.lselaw.com

9210 Irvine Center Drive
Irvine, California 92618

phone: (949) 753-1500
fax: (949) 753-1516

January 11, 2023

**SENT VIA EMAIL ONLY:**
**Yaminah.Williams@Hiscox.com and**
**sara.clayton@Hiscox.com**

Ms. Yaminah Williams                          Ms. Sara Clayton, Esq.
Complex Claims Specialist                      Senior Complex Claims Specialist
Hiscox Pro Insurance Company                   Hiscox Pro Insurance Company

Re:   <u>Hassine/Nuggets & Carats, Inc. v. Defense International Corporation</u>
      Hiscox Pro Reference No.: 110003110
      Hiscox Pro Certificate No.: MPL 4029619.21
      Your Insured: Defense International Corporation

Dear Ms. Williams and Ms. Clayton:

Please be advised that I previously exchanged emails with Ms. Williams on November 16, 2021, regarding the claim presented against your insured, Defense International Corporation. The emails confirm that Defense International had been served with the Summons and Complaint on behalf of our clients, Hassine/Nuggets & Carats.

Since that time, a Second Amended Complaint was filed and served on Defense International on April 18, 2022. Discovery has been conducted in this case which has confirmed the negligence on behalf of Defense International and sets forth the extensive damages sustained by Plaintiffs.

At this time, this letter constitutes our policy limits demand on behalf of Plaintiffs Hassine/Nuggets & Carats. The applicable Security Guards Professional Liability Policy carries policy limits of **$1,000,000**.

As confirmed in the prior email exchange on November 16, 2021, the original Complaint filed on February 22, 2021 and the First Amended Complaint filed on April 27, 2021, were served on Defense International on September 20, 2021. The claim was submitted to Hisccox Pro which is confirmed in your November 16, 2021 email (See **Exhibit 1**: Copy of November 16, 2021 emails). Plaintiffs' Second Amended Complaint was filed and served on April 18, 2022 (See **Exhibit 2** attached).

Member: CA, NY, MA & WA State Bar
American Board of Trial Advocates

Ms. Yaminah Williams/Ms. Sara  Clayton, Esq.
Complex Claims Specialist
Hiscox Pro Insurance Company
Re: Hassine/Nuggets & Carats v. Defense International Corporation
January 11, 2023
Page 2

With regard to the damages sustained by Plaintiffs, this information has previously been provided in verified discovery and the following documentation is attached hereto: See **Exhibit 3**: Nuggets & Carats Itemized List of Property Loss in the sum of $1,828,742.07; and the invoice for the replacement safe in the sum of $10,402.50 (See **Exhibit 4** attached hereto).

It is a foregone conclusion that the damages sustained by Plaintiffs are well in excess of the $1,000,000.00 policy limits. This policy limits demand will remain open up through and including **February 10, 2022.**

Please confirm receipt of this correspondence and advise regarding Plaintiffs' demand at your earliest opportunity.

Yours very truly,

LAWRENCE S. EISENBERG

LSE/tak
Enclosures

Electronically Filed by Superior Court of California, County of Orange, 04/18/2022 12:17:00 PM.
30-2021-01185591-CU-PO-WJC - ROA # 209 - DAVID H. YAMASAKI, Clerk of the Court By Randi Baker, Deputy Clerk.

1  Lawrence S. Eisenberg, Esq.  SBN 114120
   EISENBERG & ASSOCIATES, APC
2  9210 Irvine Center Drive
   Irvine, California  92618
3  Telephone: (949)753-1500
   Facsimile: (949)753-1516
4  Email: lse@lselaw.com

5  Attorneys for Plaintiffs SAM HASSINE, BRIAN HASSINE and NUGGETS & CARATS, INC.

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

10

| 11 | SAM HASSINE, BRIAN HASSINE and NUGGETS & CARATS, INC., | ) CASE NO. 30-2021-01185591-CU-PO-CJC |
|---|---|---|
| 12 | | ) [Assigned for all purposes to the Hon. Nathan Scott - Department W02] |
| | Plaintiffs, | ) |
| 13 | | ) DATE COMPLAINT FILED: February 22, 2021 |
| 14 | vs. | ) TRIAL DATE: No Date Set |
| 15 | BUIE-AREA M, LLC, a California Limited Liability Company; BUIE STODDARD | ) **PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES FOR:** |
| 16 | PROPERTIES, LLC, a California Limited Liability Company; BUIE STODDARD | ) 1.  Negligence against Landlord |
| 17 | GROUP LLC, a California Limited Liability Company (Doe 3); PACIFIC WEST ASSET | ) Defendants and Defendant Pacific West; |
| 18 | MANAGEMENT CORPORATION, a California Corporation; DEFENSE | ) 2.  Breach of Lease Contract against Landlord Defendants; |
| 19 | INTERNATIONAL CORPORATION (Doe 4); UNIVERSAL BUILDING MAINTENANCE | ) 3.  Plaintiffs as Third-Party Beneficiaries for Breach of Contract against |
| 20 | LLC dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5) and DOES 6 through 100, Inclusive, | ) Defendant Pacific West; |
| 21 | | ) 4.  Negligence against Defendant Defense International Corporation (Doe 4); |
| 22 | Defendants. | ) 5.  Plaintiffs as Third-Party Beneficiaries for Breach of Contract against |
| 23 | | ) Defendant Defense International Corporation (Doe 4); |
| | AND ALL RELATED CROSS-ACTIONS. | ) 6.  Negligence against Defendant Universal |
| 24 | | ) Building Maintenance LLC dba Allied Universal Janitorial Services (Doe 5); |
| 25 | | 7.  Plaintiffs as Third-Party Beneficiaries for Breach of Contract against |
| 26 | | Defendant Universal Building Maintenance LLC dba Allied Universal |
| 27 | | Janitorial Services (Doe 5). |
| 28 | | |

-1-

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES

1    COMES NOW Plaintiffs SAM HASSINE, BRIAN HASSINE and NUGGETS & CARATS,

2    INC. and for causes of action against Defendants, and each of them, hereby complain and allege as

3    follows:

4    ## GENERAL ALLEGATIONS

5    1.    At all times mentioned herein, Plaintiffs SAM HASSINE and BRIAN HASSINE

6    were and are individuals and residents of the County of Orange, State of California, and the owners

7    and operators of NUGGETS & CARATS, INC., a retail jewelry store doing business in the City of

8    Laguna Niguel, County of Orange, State of California.

9    2.    At all times mentioned herein, Defendant BUIE-AREA M, LLC, was a California

10   Limited Liability Company duly organized and existing under the laws of the State of California with

11   its principal place of business in the County of Orange, State of California, which owned and

12   operated a commercial retail shopping center in the City of Laguna Niguel, County of Orange, State

13   of California (aka THE CENTER AT RANCHO NIGUEL SITE I).  Plaintiffs are informed and

14   believe, and thereupon allege that on or about August 18, 2015, a Certificate of Merger was filed

15   with the California Secretary of State such that THE CENTER AT RANCHO NIGUEL SITE I LLC

16   was merged into Defendant BUIE-AREA M, LLC.

17   3.    At all times mentioned herein, Defendant BUIE STODDARD PROPERTIES, LLC,

18   was a California Limited Liability Company duly organized and existing under the laws of the State

19   of California, with its principal place of business in the County of Orange, State of California.

20   Plaintiffs are informed and believe, and thereupon allege, that Defendant BUIE STODDARD

21   PROPERTIES, LLC was the manager of the landlord of the Center at Rancho Niguel Site I prior to

22   and on the date of the subject incident on or about March 23-25, 2019. (See **Exhibit 1** attached

23   hereto: LEASE AGREEMENT, FIFTH AMENDMENT, Pgs. 1- 4.)

24   4.    At all times mentioned herein, Defendant BUIE STODDARD GROUP LLC (Doe 3),

25   was a California Limited Liability Company duly organized and existing under the laws of the State

26   of California, with its principal place of business in the County of Orange, State of California.

27   5.    At all times mentioned herein, Defendant PACIFIC WEST ASSET MANAGEMENT

28   CORPORATION (hereinafter "PACIFIC WEST") , was a corporation duly organized and existing

-2-

1   under the laws of the State of California, with its principal place of business in the County of Orange,

2   State of California.

3         6.    At all times mentioned herein, Plaintiffs are informed and believe, and thereupon

4   allege, that Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4), was a corporation

5   duly organized and existing under the laws of the State of California, with its principal place of

6   business in the County of Orange, State of California.

7         7.    At all times mentioned herein, Plaintiffs are informed and believe, and thereupon

8   allege, that Defendant UNIVERSAL BUILDING MAINTENANCE LLC dba ALLIED

9   UNIVERSAL JANITORIAL SERVICES (Doe 5) is a business entity, with a principal place of

10   business in the County of Orange.

11         8.    At all times mentioned herein, the acts and omissions complained of herein occurred

12   with regard to certain commercial real property commonly known as 28241 Crown Valley Parkway,

13   Suite E, in the City of Laguna Niguel, County of Orange, State of California.

14         9.    Plaintiffs are informed and believe, and thereupon allege, that each of the Defendants

15   designated herein as DOES 6 through 100, were responsible negligently, wrongfully, or in some

16   other actionable manner, for the events and happenings herein referred to which proximately caused

17   the damages to Plaintiffs as hereinafter alleged, either through said Defendants own negligence or

18   through the conduct of its agents, servants, employees or representatives in some other capacity.

19         10.    Plaintiffs are further informed and believe, and thereupon allege, that at all times

20   mentioned herein, each of the Defendants, including Defendant DOES 6 through 100, Inclusive, and

21   each of them, were the agents, servants, employees, representatives and/or joint venturers of their

22   co-Defendants and were, as such acting within the course, scope and authority of said agency,

23   services, employment, representation and/or joint venture in that each and every Defendant, as

24   aforesaid when acting as principal, was negligent in the selection and hiring of each and every other

25   Defendant as an agent, servant, employee, representative and/or joint venturer.

26

27         11.    Plaintiffs are further informed and believe, and thereupon allege, that at all times

28   mentioned herein, each of the Defendants, including Defendant DOES 6 through 100, inclusive, and

-3-

1   each of them, were the agents, servants, employees, representatives of each of the remaining

2   Defendants and were at all times material hereto acting within the authorized course and scope of

3   said agency, service, employment and/or representation, and/or that all of said acts, conduct and

4   omissions were subsequently ratified by their respective principals and the benefits thereof accepted

5   by such principals. The following Doe Amendments have been filed regarding Defendants that are

6   parties in this case: DOE 3 is BUIE STODDARD GROUP LLC, a California Limited Liability

7   Company; DOE 4 is DEFENSE INTERNATIONAL CORPORATION and DOE 5 is UNIVERSAL

8   BUILDING MAINTENANCE LLC dba ALLIED UNIVERSAL JANITORIAL SERVICES.

9   ## FIRST CAUSE OF ACTION

10   **[Negligence Against BUIE-AREA M LLC; BUIE STODDARD PROPERTIES, LLC;**

11   **BUIE STODDARD GROUP LLC (Doe 3) (hereinafter "LANDLORD DEFENDANTS")**

12   **and PACIFIC WEST ASSET MANAGEMENT CORPORATION**
**(hereinafter "PACIFIC WEST")]**

13   12.   Plaintiffs reallege and incorporate by reference each of the allegations of Paragraphs

14   1 through 11, above as though fully set forth herein.

15   13.   On or about December 27, 1988, and subsequently in extensions and renewals on or

16   about March 1, 1995 ("First Amendment"); January 2000 ("Second Amendment"); April 22, 2005

17   ("Third Amendment"); April 13, 2010 ("Fourth Amendment"); and on January 21, 2015 ("Fifth

18   Amendment"), Plaintiffs and THE CENTER AT RANCHO NIGUEL SITE I LLC; BUIE-AREA M,

19   LLC, a California Limited Liability Company; BUIE STODDARD  PROPERTIES, LLC, a

20   California Limited Liability Company; BUIE STODDARD GROUP LLC (Doe 3), a California

21   Limited Liability Company, and DOES 1 through 50, and each of them, (hereinafter "LANDLORD

22   DEFENDANTS") entered into a written lease agreement for certain commercial retail premises

23   commonly known as 28241 Crown Valley Parkway, Suite E, in the City of Laguna Niguel, County

24   of Orange, State of California (hereinafter "LEASED PROPERTY") for use by Plaintiffs as a retail

25   jewelry store, wherein highly valuable jewelry, diamonds and merchandise would be stored

26   overnight between days of regular business operations, and the LANDLORD DEFENDANTS would

27   have duties and obligations to their tenants, including the Plaintiffs, under the terms of the lease

28   (hereinafter "LEASE SERVICES"). Plaintiffs are informed and believe, and thereupon allege, that

-4-

the LANDLORD DEFENDANTS, owned and operated the commercial retail shopping center (aka THE CENTER AT RANCHO NIGUEL SITE I) in the City of Laguna Niguel, County of Orange, State of California, at which property the Plaintiffs leased commercial retail premises ("LEASED PROPERTY") in which to operate their retail jewelry store.

14. At all times mentioned herein, Defendants PACIFIC WEST ASSET MANAGEMENT CORPORATION (hereinafter "PACIFIC WEST") and DOES 91 through 100, were commercial property managers and agents of the LANDLORD DEFENDANTS and had custody and control over THE CENTER AT RANCHO NIGUEL SITE I and its appurtenances necessary and indispensable to provide LEASE SERVICES, including the maintenance and security of the premises for the operation of Plaintiffs' retail jewelry business including, but not limited to, the electrical infrastructure which included an electrical supply cabinet affixed to the exterior of THE CENTER AT RANCHO NIGUEL SITE I containing the electrical service panel, power blocks and related equipment through which Plaintiffs received electrical power to the commercial retail space they leased ("LEASED PROPERTY").

15. Pursuant to well-settled law enunciated, *inter alia*, in *North American Chem. Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774; *Perry v. Robertson* (1988) 201 Cal.App.3d 333, 340; *Roscoe Moss Co. v. Jenkins* (1942) 55 Cal.App.2d 369, 376; *Kuitems v. Covell* (1951) 104 Cal.App.2d 482, 485, accompanying the foregoing agreements for LEASE SERVICES were common law duties imposed upon the Defendants to perform the services called for therein with due care, skill, reasonable expedience, and faithfulness, a negligent failure to observe any of which constitutes an actionable tort.

16. At all times herein mentioned, the LANDLORD DEFENDANTS and Defendant PACIFIC WEST ASSET MANAGEMENT CORPORATION knew and were aware that any disabling, defect, nonfunction, disturbance, and/or interruption of the electrical infrastructure including the service panel, power blocks and related equipment contained within the electrical supply cabinet attached to the exterior of THE CENTER AT RANCHO NIGUEL SITE 1, from which Plaintiffs' LEASED PROPERTY received necessary and essential electrical service, would

-5-

deprive Plaintiffs of the proper functioning of their alarm and security equipment, which would leave Plaintiffs exposed to foreseeable theft and burglary by third parties at their LEASED PROPERTY of the valuable jewelry, diamonds and merchandise stored in the premises during times when the retail operations had ceased after regular business hours.

17.     Prior to and on or about March 23-25, 2019, the LANDLORD DEFENDANTS, and Defendant PACIFIC WEST, and DOES 91 through 100, and each of them, failed to use due and reasonable care and/or any care or scant care in regard to their performance of the LEASE SERVICES, in that they negligently, carelessly, recklessly, willfully, wantonly, and tortiously maintained and failed to safeguard the electrical infrastructure, which included the electrical supply cabinet affixed to the exterior of THE CENTER AT RANCHO NIGUEL SITE I, containing the electrical service panel, power blocks and related equipment associated with providing electrical service to Plaintiffs' LEASED PROPERTY, which was in an unsecured or insufficiently secured manner from foreseeable third party vandalism and sabotage, in that certain thieves and burglars were left able to, and as a direct and legal consequence of Defendants' negligence, did open the unsecured or insufficiently secured doors to the electrical supply cabinet and removed the power block for Suite E from the exterior electrical cabinet at THE CENTER AT RANCHO NIGUEL SITE I, which was unsecured or insufficiently secured by the LANDLORD DEFENDANTS and Defendant PACIFIC WEST, and each of them. This disabled and rendered the alarm and security equipment non-functioning, which had been installed by Plaintiffs on and in the LEASED PROPERTY. This exposed the LEASED PROPERTY to break-in and theft of substantial amounts of valuable jewelry, diamonds and merchandise.  The blatant failure of the LANDLORD DEFENDANTS and Defendant PACIFIC WEST to safeguard, protect and adequately secure the electrical infrastructure discussed herein constituted gross negligence.

18.     As a direct and legal result of the aforementioned gross negligence of the LANDLORD DEFENDANTS and Defendant PACIFIC WEST,  and each of them, prior to and on or about March 23-25, 2019, after the electrical power block to Suite E had been removed by said thieves and burglars, thereby rendering the alarm and security equipment installed by Plaintiffs on

-6-

and in the LEASED PROPERTY disabled and non-functioning, said thieves and burglars proceeded to unlawfully break into the LEASED PROPERTY and removed a substantial amount of jewelry, diamonds and merchandise valued in excess of $1.8 million.

19.     At all times herein mentioned, Defendants PACIFIC WEST and DOES 91 through 100, had a duty to use due care in their performance of LEASE SERVICES, including the management, maintenance and security of THE CENTER AT RANCHO NIGUEL SITE I in ways so as to not unreasonably injure and/or damage and/or interfere with Plaintiffs' retail jewelry business operated on and in the LEASED PROPERTY.

20.     As a direct and legal result of the aforementioned negligence and/or gross negligence of the LANDLORD DEFENDANTS, PACIFIC WEST and DOES 91 through 100, and each of them, Plaintiffs have suffered damages in the form of the loss of jewelry, diamonds and merchandise valued in excess of $1.8 million.

## SECOND CAUSE OF ACTION

**[Breach of Lease Contract Against Landlord Defendants and DOES 91 through 100]**

21.     Plaintiffs reallege and incorporate by reference each of the allegations of Paragraphs 1 through 20, inclusive of the First Cause of Action as though fully set forth herein.

22.     True and correct copies of the relevant aforementioned portions of the LEASE AGREEMENT for Plaintiffs' LEASED PROPERTY is attached hereto as **Exhibit 1** and incorporated by reference herein.

23.     Implied in the aforementioned written agreements, was a covenant of good faith and fair dealing whereby each of the contracting parties covenanted and agreed that they would do nothing to deprive the other of the fruits and benefits of those contracts and agreements.

24.     At all times mentioned herein, Plaintiffs have performed all the terms, conditions, and covenants required on their part to be performed under the aforementioned agreements, except for those terms, conditions, and covenants which were waived, excused, and/or discharged.

25.     By failing to take reasonable and necessary actions to safeguard, protect and secure the electrical infrastructure, service panel and power blocks contained in the exterior electrical

-7-

supply cabinet at THE CENTER AT RANCHO NIGUEL SITE I, upon which Plaintiffs' alarm and security services indispensably relied on for the viable conduct of its retail jewelry business at the LEASED PROPERTY, the LANDLORD DEFENDANTS materially breached the terms of the aforementioned lease agreements, and the covenants of good faith and fair dealing implied therein.

26.    As a direct result of the aforementioned material breaches by the LANDLORD DEFENDANTS, of the aforementioned written agreements, Plaintiffs have suffered compensatory damages in the form of the loss of jewelry, diamonds and merchandise valued in excess of $1.8 million.

27.    Paragraph 28 of the aforementioned lease agreement (contained in **Exhibit 1** attached hereto) states that: "If either party hereto shall file any action or bring any proceeding against the other party arising out of this Lease or for the declaration of any rights hereunder, the prevailing party therein shall be entitled to recover from the other party, all costs and expenses, including reasonable attorney's fees, incurred by the prevailing party as determined by the court. If either party ("secondary party") without its fault is made a party to litigation instituted by or against the other party, the primary party shall pay to the secondary party all costs and expenses, including reasonable attorney's fees, incurred by the secondary party in connection therewith." As a direct and legal result of this lease provision, Plaintiffs are entitled to recover their reasonable attorney's fees and costs and expenses as against the LANDLORD DEFENDANTS incurred in bringing this action pursuant to California Civil Code §1717.

## THIRD CAUSE OF ACTION

**[Plaintiffs as Third-Party Beneficiaries for Breach of Contract against Defendant PACIFIC WEST ASSET MANAGEMENT CORPORATION]**

28.    Plaintiffs reallege and incorporate by reference each of the allegations of Paragraphs 1 through 20, above as though fully set forth herein.

29.    On or about August 27, 2015, Defendant PACIFIC WEST and the LANDLORD DEFENDANTS entered into a written Management Agreement, a copy of which is attached as **Exhibit 2** and incorporated by reference herein.

-8-

30.     By the terms of the Management Agreement contract, the LANDLORD DEFENDANTS appointed Defendant PACIFIC WEST as their sole and exclusive agent to manage the property upon the terms and conditions provided in the Management Agreement. Defendant PACIFIC WEST accepted the appointment and agreed to furnish the services of its organization as the commercial property manager and agents for the management of the premises, which included the THE CENTER AT RANCHO NIGUEL SITE I in Laguna Niguel, County of Orange, State of California. The Management Agreement was made for the benefit of the Plaintiffs in that Defendant PACIFIC WEST was authorized to, and contracted to, preserve the premises and provide the management, maintenance and operation of the premises including the common areas of the retail shopping center, which included to safeguard, protect and adequately secure the electrical supply cabinet that housed the electrical infrastructure which provided necessary and essential electrical service to Plaintiffs' alarm and security system that Plaintiffs' LEASED PROPERTY required in order to operate their retail jewelry store at the THE CENTER AT RANCHO NIGUEL SITE I.

31.     Implied in the aforementioned Management Agreement, was a covenant of good faith and fair dealing whereby the contracting parties covenanted and agreed that they would perform based on the terms and conditions of the agreement which included to safeguard, protect and secure Plaintiffs' leased property and the electrical infrastructure that provided electrical power to the Plaintiffs' retail jewelry store.

32.     By failing to take reasonable and necessary actions to safeguard, protect and secure the electrical infrastructure, service panel and power blocks contained in the exterior electrical supply cabinet at THE CENTER AT RANCHO NIGUEL SITE I, upon which Plaintiffs' alarm and security system indispensably relied on for the viable conduct of its retail jewelry business at the LEASED PROPERTY, Defendant PACIFIC WEST materially breached the terms of the aforementioned Management Agreement, and the covenants of good faith and fair dealing implied therein.

33.     As a direct result of the aforementioned material breaches by Defendant PACIFIC WEST, of the aforementioned Management Agreement, Plaintiffs as third-party beneficiaries of that

-9-

Management Agreement have suffered compensatory damages in the form of the loss of jewelry, diamonds and merchandise valued in excess of $1.8 million.

### FOURTH CAUSE OF ACTION

**[Negligence against Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4)]**

34.     Plaintiffs reallege and incorporate by reference each of the allegations of Paragraphs 1 through 11, above as though fully set forth herein.

35.     At all times mentioned herein, Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) was a security patrol service retained by Defendant BUIE-AREA M, LLC to provide nightly patrol services at THE CENTER AT RANCHO NIGUEL SITE I. The patrol guards were to provide foot patrols at the various retail stores and restaurants located at THE CENTER AT RANCHO NIGUEL SITE I. The patrol services were retained to protect the property of the LANDLORD DEFENDANTS and the LEASED PROPERTY of the tenants including the Plaintiffs herein, such that the patrol guards were required to maintain constant visibility while on duty and provide a visible deterrent with regard to property crimes including larceny, burglary, criminal tampering, trespass and criminal trespass.

36.     On or about March 23-25, 2019, Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) failed to use due and reasonable care, and/or any care or scant care, in regard to their performance of the security patrol services, in that they negligently, carelessly, recklessly, willfully, wantonly, and tortiously performed said services such that certain thieves and burglars were able to obtain access to the exterior electrical cabinet and remove the electrical power block for Suite E, thereby disabling and rendering the alarm and security equipment nonfunctioning which had been installed by Plaintiffs on and in the LEASED PROPERTY, which exposed the LEASED PROPERTY to break-in and theft of substantial amounts of valuable jewelry, diamonds and merchandise. The blatant failure of Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) to safeguard, protect and secure the subject common areas and LEASED PROPERTY discussed herein constituted general negligence and/or gross negligence.

///

-10-

37.     As a direct and legal result of the aforementioned general negligence and/or gross negligence of Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4), prior to and on or about March 23-25, 2019, after the electrical power block to Suite E had been removed by said thieves and burglars, and the alarm and security equipment installed by Plaintiffs on and in the LEASED PROPERTY was consequently disabled and rendered non-functioning, said thieves and burglars proceeded to unlawfully break into Plaintiffs' LEASED PROPERTY and removed a substantial amount of jewelry, diamonds and merchandise valued in excess of $1.8 million, which comprises the compensatory damages suffered by Plaintiffs.

## FIFTH CAUSE OF ACTION

**[Plaintiffs as Third-Party Beneficiaries for Breach of Contract against Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4)]**

38.     Plaintiffs reallege and incorporate by reference each of the allegations of Paragraphs 1 through 11 and 35 through 37, above as though fully set forth herein.

39.     On or about January 17, 2017, the Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) and the LANDLORD DEFENDANTS entered into a written Service Contract, a copy of which is attached as **Exhibit 3** and incorporated by reference herein. By the terms of the Service Contract, the LANDLORD DEFENDANTS as the owner and Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4), as the contractor, agreed that Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) shall perform the services set forth in the Service Contract, including but not limited to, providing nightly security patrol services and other related services at THE CENTER RANCHO NIGUEL SITE I in Laguna Niguel, County of Orange, State of California. The Service Contract was made for the benefit of the Plaintiffs in that Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) was retained to provide nightly patrol services, maintain constant visibility, provide protection of property and provide a visible deterrent for property crimes including larceny, burglary, criminal tampering, trespass and criminal trespass in the common areas of the subject premises and Plaintiffs' LEASED PROPERTY. This included providing nightly security patrol services in the common areas of the retail shopping center, which

-11-

included the electrical supply cabinet that housed the electrical infrastructure, which provided necessary and essential electrical service to Plaintiffs' alarm and security system and Plaintiffs' LEASED PROPERTY in order to operate their retail jewelry store.

40.   Implied in the aforementioned service contract was a covenant of good faith and fair dealing whereby Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) covenanted and agreed that they would perform their services in good faith and with fair dealing based on the terms and conditions of the agreement which included to safeguard, protect and secure Plaintiffs' LEASED PROPERTY.

41.   By failing to take reasonable and necessary actions to safeguard, protect and secure the electrical infrastructure, service panel and power blocks contained in the exterior electrical supply cabinet at THE CENTER AT RANCHO NIGUEL SITE I, upon which Plaintiffs' alarm and security system indispensably relied on for the viable conduct of its retail jewelry business at the LEASED PROPERTY, Defendant DEFENSE INTERNATIONAL CORPORATION materially breached the terms of the aforementioned Service Contract, and the covenants of good faith and fair dealing implied therein.

42.   As a direct result of the aforementioned material breaches by Defendant DEFENSE INTERNATIONAL CORPORATION (Doe 4) of the aforementioned Service Contract, Plaintiffs as third-party beneficiaries of that Service Contract have suffered compensatory damages in the form of the loss of jewelry, diamonds and merchandise valued in excess of $1.8 million.

## SIXTH CAUSE OF ACTION

### [Negligence against Defendant UNIVERSAL BUILDING MAINTENANCE LLC dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5)]

43.   Plaintiffs reallege and incorporate by reference each of the allegations of Paragraphs 1 through 11, above as though fully set forth herein.

44.   At all times mentioned herein, Defendant UNIVERSAL BUILDING MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5) was a janitorial service retained by Defendant BUIE-AREA M, LLC to provide day porter services from 7:00 a.m. to 7:00 p.m., seven days per week, at THE CENTER AT RANCHO NIGUEL SITE I.

-12-

1   The day porter duties included, but were not limited to, policing all sidewalks and walkways around

2   the property and behind the buildings, which included the common area behind the NUGGETS &

3   CARATS jewelry store where the exterior electrical supply cabinet was located. Plaintiffs are

4   informed and believe, and thereupon allege, that Defendant UNIVERSAL BUILDING

5   MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5) had keys to the

6   common area doors and locked areas and they were required to make sure these areas were locked

7   and secured. This included the electrical supply cabinet that housed the electrical infrastructure,

8   which provided necessary and essential electrical service to Plaintiffs' alarm and security system and

9   the Plaintiffs' LEASED PROPERTY in order to operate their retail jewelry store.

10       45.   On or about March 23-25, 2019, Defendant UNIVERSAL BUILDING

11   MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5) failed to use due

12   and reasonable care and/or any care or scant care in regard to their performance of the janitorial and

13   day porter services, in that they negligently, carelessly, recklessly, willfully, wantonly, and tortiously

14   performed said services such that certain thieves and burglars were able to obtain access to the

15   exterior electrical cabinet and remove the electrical power block for Suite E, thereby disabling and

16   rendering the alarm and security equipment nonfunctioning, in the LEASED PROPERTY, which

17   exposed the LEASED PROPERTY to break-in and theft of substantial amounts of valuable jewelry,

18   diamonds and merchandise. The blatant failure of Defendant UNIVERSAL BUILDING

19   MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5) to make sure the

20   electrical supply cabinet located in the subject common area was locked and secured constituted

21   general negligence and/or gross negligence.

22       46.   As a direct and legal result of the aforementioned general negligence and/or gross

23   negligence of Defendant UNIVERSAL BUILDING MAINTENANCE dba ALLIED UNIVERSAL

24   JANITORIAL SERVICES (Doe 5), prior to and on or about March 23-25, 2019, after the electrical

25   power block to Suite E had been removed by said thieves and burglars, and the alarm and security

26   equipment on and in the LEASED PROPERTY was consequently disabled and rendered non-

27   functioning, said thieves and burglars proceeded to unlawfully break into Plaintiffs' LEASED

28

-13-

1    PROPERTY and removed a substantial amount of jewelry, diamonds and merchandise valued in

2    excess of $1.8 million, which comprises the compensatory damages suffered by the Plaintiffs.

3                              **SEVENTH CAUSE OF ACTION**

4    **[Plaintiffs as Third-Party Beneficiaries for Breach of Contract against**
     **Defendant UNIVERSAL BUILDING MAINTENANCE LLC dba**
5    **ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5)]**

6         47.    Plaintiffs reallege and incorporate by reference each of the allegations of Paragraphs

7    1 through 11, and 44 through 46, above as though fully set forth herein.

8         48.    On or about August 3, 2018, Defendant UNIVERSAL BUILDING MAINTENANCE

9    dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5) and Defendant BUIE-AREA M,

10   LLC entered into a written Service Contract, a copy of which is attached as **Exhibit 4** and

11   incorporated by reference herein. By the terms of the Service Contract, Defendant BUIE-AREA M,

12   LLC as the owner and Defendant UNIVERSAL BUILDING MAINTENANCE dba ALLIED

13   UNIVERSAL JANITORIAL SERVICES (Doe 5), as the contractor, agreed that Defendant

14   UNIVERSAL BUILDING MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES

15   (Doe 5) shall perform the services set forth in the Service Contract, including but not limited to,

16   providing janitorial and day porter services from 7:00 a.m. to 7:00 p.m., seven days per week, at

17   THE CENTER RANCHO NIGUEL SITE I in Laguna Niguel, County of Orange, State of California.

18   The Service Contract was made for the benefit of the Plaintiffs in that Defendant UNIVERSAL

19   BUILDING MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5) was

20   retained to provide janitorial and day porter services and to perform duties which included, but were

21   not limited to, policing all sidewalks and walkways around the property and behind the buildings,

22   which included the common area behind the NUGGETS & CARATS jewelry store where the

23   exterior electrical supply cabinet was located. Plaintiffs are informed and believe, and thereupon

24   allege, that Defendant UNIVERSAL BUILDING MAINTENANCE dba ALLIED UNIVERSAL

25   JANITORIAL SERVICES (Doe 5) had keys to the common area doors and locked areas and they

26   were required to make sure these areas were locked and secured. This included the electrical supply

27   cabinet that housed the electrical infrastructure, which provided necessary and essential electrical

28

                                        -14-

1   service to Plaintiffs' alarm and security system and the Plaintiffs' LEASED PROPERTY in order
2   to operate their retail jewelry store.

3       49.    Implied in the aforementioned Service Contract was a covenant of good faith and fair
4   dealing whereby Defendant UNIVERSAL BUILDING MAINTENANCE dba ALLIED
5   UNIVERSAL JANITORIAL SERVICES (Doe 5) covenanted and agreed that they would perform
6   their services based on the terms and conditions of the agreement which included to make sure the
7   subject electrical supply cabinet located in the common area was locked and secured.

8       50.    By failing to take reasonable and necessary action to make sure that the electrical
9   supply cabinet was locked and secure, which contained the electrical infrastructure, service panel and
10  power blocks, upon which Plaintiffs' alarm and security system indispensably relied on for the viable
11  conduct of its retail jewelry business at the LEASED PROPERTY, Defendant UNIVERSAL
12  BUILDING MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES (Doe 5)
13  materially breached the terms of the aforementioned Service Contract and the covenants of good
14  faith and fair dealing implied therein.

15      51.    As a direct result of the aforementioned material breaches by Defendant
16  UNIVERSAL BUILDING MAINTENANCE dba ALLIED UNIVERSAL JANITORIAL SERVICES
17  (Doe 5) of the aforementioned Service Contract, Plaintiffs as third-party beneficiaries of the Service
18  Contract have suffered compensatory damages in the form of the loss of jewelry, diamonds and
19  merchandise valued in excess of $1.8 million, which comprises the compensatory damages suffered
20  by the Plaintiffs.

21      WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as
22  follows:

23  **PRAYER**

24      1.    For compensatory damages in a sum in excess of $1.8 million, according to proof at
25  trial;

26      2.    For interest and prejudgment interest at the legal rate from date of loss of March 25,
27  2019;

28

-15-

3.      For reasonable attorney's fees and costs and expenses against the LANDLORD DEFENDANTS, ONLY;

4.      For costs of suit; and

5.      For such other and further relief as the Court may deem proper and just.

DATED:  April 12, 2022                    EISENBERG & ASSOCIATES, APC


By: _____
      LAWRENCE S. EISENBERG
      Attorneys for Plaintiffs
      SAM HASSINE, BRIAN HASSINE and
      NUGGETS & CARATS, INC.

-16-

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES

**EXHIBIT 1**

## FIFTH AMENDMENT TO LEASE
### (Center at Rancho Niguel, Site 1)

This FIFTH AMENDMENT TO LEASE, ( "Amendment") is made and entered into as of *January 31*, 2015, by and between CENTER AT RANCHO NIGUEL SITE I LLC, a Delaware limited liability company ("Landlord"); and SAM HASSINE, an individual doing business as "Nuggets & Carats" ("Tenant"), with reference to the facts set forth below.

### RECITALS

A.      Landlord's predecessor, Rancho Niguel Commercial I, a California general partnership ("**Original Landlord**"), and Sam Hassine and Humberto Da Silva, in their individual capacities doing business as "Nuggets and Carats" ("**Original Tenant**") entered into that certain Standard Shop Lease dated December 27, 1988 ("**Original Lease**"), as amended by that certain Extension of Term of Lease letter dated March 1, 1995 ("**First Amendment**"), as further amended by that Second Amendment to Lease dated about January, 2000, ("**Second Amendment**"), as amended by that certain Third Amendment to Lease dated April 22, 2005 ("**Third Amendment**"), and as further amended by that certain Fourth Amendment to Lease dated April 13, 2010 ("**Fourth Amendment**") covering approximately 1,504 square feet of real property at 28241 Crown Valley Parkway, Suite E, Laguna Niguel, California 92677 ("**Premises**"), located in the shopping center commonly know as the "Center at Rancho Niguel, Site 1" (the "**Shopping Center**"). The Original Lease, First Amendment, Second Amendment, Third Amendment, Fourth Amendment and this Amendment are hereinafter collectively referred to as the "**Lease**."

B.      Buie-Area M, Ltd., a California limited partnership ("**Buie M**") succeeded to the interest of Original Landlord. On July 15, 2005 Buie M assigned its interest in the Lease to Buie-Area M LLC, a California limited liability company which in-turn assigned its interest in the lease to Landlord on October 19, 2005 as part of a refinancing of the Shopping Center.

C.      Humberto Da Silva was removed as a tenant party in conjunction with the First Amendment.

D.      The Term of the Lease commenced July 11, 1989 and is scheduled to expire on February 28, 2015. Tenant has either exercised or has expressed interest in exercising its option to extend the Term of the Lease; and in connection with extending the Term of the Lease, the parties have agreed to amend certain provisions of the Lease, all as more fully set forth in this Amendment.

E.      Capitalized terms not otherwise defined in this Amendment shall have the meanings set forth in the Lease.

NOW, THEREFORE, in consideration of the mutual terms and conditions set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as set forth below.

### AGREEMENT

1.      <u>Extension of Lease Term</u>. Notwithstanding anything to the contrary in the Lease: (i) the Term of the Lease is extended so that it expires at 11:59 p.m. on February 28, 2025; and

(ii) Tenant shall be granted one (1) option to extend the Term for a period of five (5) years pursuant to the terms and conditions set forth in Paragraph 3 below.

    2.    <u>Monthly Minimum Rent</u>.  Monthly Minimum Rent shall be the following during the following periods of the Term:

| Months | Monthly Minimum Rent |
|---|---|
| March 1, 2015 through February 29, 2016 | $4,963.20 |
| March 1, 2016 through February 28, 2017 | $5,062.46 |
| March 1, 2017 through February 28, 2018 | $5,163.71 |
| March 1, 2018 through February 28, 2019 | $5,266.98 |
| March 1, 2019 through February 29, 2020 | $5,372.32 |
| March 1, 2020 through February 28, 2021 | $5,533.49 |
| March 1, 2021 through February 28, 2022 | $5,699.49 |
| March 1, 2022 through February 28, 2023 | $5,870.47 |
| March 1, 2023 through February 29, 2024 | $6,046.58 |
| March 1, 2024 through February 28, 2025 | $6,227.98 |

For the calendar year 2015, Common Area Rent payable pursuant to the Lease in addition to Minimum Rent is estimated to be $1,142.20 per month.

    3.    <u>Option to Extend Term</u>.  The Addendum to the Lease entitled "Option to Extend" is hereby deleted in its entirety and replaced with the terms and conditions of this Paragraph. Provided Tenant is not in default under any of the terms and conditions of the Lease at the time a notice is given and on the last day of the Term, as it may have been extended previously, and provided the Lease is in effect at the time a notice is given and on the last day of the Term, as it may have been extended previously, Tenant shall have one (1) option to extend the Term for a period of five (5) years. Tenant shall exercise its option to extend, if at all, by delivering to Landlord irrevocable written notice of its exercise at least one hundred eighty (180) days prior to the expiration of the then current Term, as it may have been extended previously.  If Tenant fails so to exercise its option to extend, Tenant's option to extend as provided in this Paragraph shall be void and of no further force or effect. Provided Tenant exercises its option to extend the Term in accordance with this Paragraph, all terms, covenants and conditions of the Lease shall remain unmodified and in full force and effect, except monthly Minimum Rent shall be adjusted to the following during the following periods of such extended Term:

·2·



| Months | Monthly Minimum Rent |
|---|---|
| March 1, 2025 through February 28, 2026 | $6,414.82 |
| March 1, 2026 through February 28, 2027 | $6,607.26 |
| March 1, 2027 through February 29, 2028 | $6,805.48 |
| March 1, 2028 through February 28, 2029 | $7,009.64 |
| March 1, 2029 through February 28, 2030 | $7,219.93 |

4.   <u>Tenant Improvements and Condition of Premises</u>. Tenant has been and is currently in possession of the Premises. Tenant has informed Landlord that Tenant wishes to complete certain improvements at the Premises including, but not limited to, the installation of new showcases, and flooring, ceiling and lighting fixtures. All such work shall be performed in compliance with the provisions of the Lease governing alterations and shall be performed in accordance with all applicable federal, state and local laws, rules, regulations and code requirements. Upon completion of the work described in this Section, and upon Tenant delivering to Landlord: (i) copies of paid invoices or other evidence that Tenant has paid all of the costs and expenses of the work, and (ii) copies of all unconditional lien releases from Tenant's contractors, Landlord shall reimburse Tenant for the costs and expenses of the work, subject to a maximum reimbursement of $30,080.00.

5.   <u>No Offset</u>.  As of the date of this Amendment, Tenant certifies, represents and warrants that (a) Landlord is not in default or breach in the performance of any covenant, agreement, term, provision or condition contained in the Lease; (b) Tenant has no knowledge of any facts or circumstances which, with delivering notice or passing time, would constitute a default or breach by Landlord in the performance of any covenant, agreement, term, provision or condition contained in the Lease; and (c) Tenant has no complaints, claims or causes of action against Landlord in connection with the Lease, the Premises or the Shopping Center.

6.   <u>Confidentiality</u>.  Tenant shall keep confidential and shall not disclose to any other person or entity this Amendment or any of the terms and conditions of this Amendment or the Lease. Any such disclosure by Tenant to any third party could have a significant and detrimental effect upon either or both of the parties. A violation of this provision shall constitute a material, non-curable breach of the Lease which shall entitle Landlord to terminate the Lease.

7.   <u>Submission</u>.  The submission of this Amendment to Tenant, Tenants agent or attorney for review or signature does not constitute an offer to Tenant.  This Amendment shall have no binding force or effect until it is signed and delivered by both Landlord and Tenant. Each party shall bear its own costs and expenses (including attorneys' fees and costs) in connection with negotiating and entering into this Amendment.

8.   <u>Effect of Amendment</u>.  As amended by this Amendment, the Lease remains in full force and effect.



IN WITNESS WHEREOF, the parties have signed and entered into this Amendment as of the date first set forth above.

Landlord:  CENTER AT RANCHO NIGUEL SITE I LLC,
a Delaware limited liability company

By: Buie Stoddard Properties LLC,
a California limited liability company,
its Manager

By: _____

Its: _____

By: _____

Its: _____

Tenant:  SAM HASSINE, an individual
doing business as "Nuggets & Carats"

By: _____
Sam Hassine

4



Pre-Completion Lease
September 2, 1988

STANDARD SHOP LEASE FORM

THE CENTER AT RANCHO NIGUEL
PHASE I

RANCHO NIGUEL COMMERCIAL I,
a California general partnership

"LANDLORD"

SAM HASSINE & HUMBERTO DA SILVA
DBA: NUGGETS & CARATS

"TENANT"

Address:_____

Suite Number: _____

THIS LEASE IS NOT
IN EFFECT UNTIL DULY
SIGNED BY OWNER AND
TENANT.

Post-It™ brand fax transmittal memo 7671 # of pages ▶ 2
To _____ From _____
Co. Nuggets & Carats Co. Bill
Dept. _____ Phone # Karl Meat  833 3025
Fax # 458 2777 Fax # ext 394

<u>INDEX</u>

<u>PARAGRAPH</u>                                                      <u>PAGE</u>

     Basic Lease Provisions.....................  i

1.   PREMISES...........................................  1
2.   BUSINESS RIGHTS AND RESTRICTIONS...................  1
3.   TERM...............................................  1
4.   RENT...............................................  4
5.   COMMON AREA........................................  5
6.   TAXES..............................................  8
7.   UTILITIES..........................................  9
8.   REPAIRS AND ALTERATIONS............................ 11
9.   INSURANCE.......................................... 11
10.  DAMAGE AND RESTORATION............................. 13
11.  FLOOR AREA DEFINED................................. 16
12.  EMINENT DOMAIN..................................... 16
13.  INDEMNITY; WAIVER.................................. 17
14.  OPERATION OF BUSINESS.............................. 18
15.  SIGNS AND ADVERTISING.............................. 19
16.  LIENS.............................................. 19
17.  RIGHT OF ACCESS.................................... 20
18.  DELAYING CAUSES.................................... 20
19.  ASSIGNMENT AND SUBLETTING.......................... 20
20.  NOTICES............................................ 20
21.  SURRENDER OF POSSESSION............................ 22
22.  QUIET ENJOYMENT.................................... 22
23.  SUBORDINATION...................................... 23
24.  OFFSET STATEMENT................................... 23
25.  DEFAULT............................................ 24
26.  INSOLVENCY......................................... 24
27.  REMEDIES CUMULATIVE................................ 26
28.  ATTORNEY'S FEES.................................... 26
29.  WAIVER OF DEFAULT.................................. 26
30.  NO PARTNERSHIP..................................... 27
31.  SUBTENANCIES....................................... 27
32.  SUCCESSORS......................................... 27
33.  REMOVAL OF TENANT'S PROPERTY....................... 27
34.  EFFECT OF CONVEYANCE............................... 27
35.  LANDLORD'S DEFAULT; NOTICE TO LENDER............... 28
36.  CONSENT............................................ 28
37.  INTERPRETATION..................................... 28
38.  LENDER APPROVAL.................................... 28
39.  ENTIRE INSTRUMENT.................................. 29
40.  EASEMENTS.......................................... 29
41.  SALE BY LANDLORD................................... 29
42.  ADDENDUM........................................... 29
43.  WARRANTIES AND REPRESENTATIONS..................... 29

<u>EXHIBITS</u>

"A"    Site Plan
"A-1"  Site Plan Portion
"B"    Construction and Acceptance of Premises
"C"    Sign Criteria
"D"    Rules and Regulations
"E"    Guaranty of Lease

### LEASE AGREEMENT

Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the premises hereinafter described on the terms and conditions set forth in this Lease Agreement (hereinafter called this "Lease").

### Basic Lease Provisions

The words and figures set forth in Paragraphs A to O, inclusive, are part of this Lease wherever appropriate reference is made thereto, unless they are expressly modified elsewhere in this Lease.

A.  **Date:**    As of _____, 19____.

B.  **Landlord:**

RANCHO NIGUEL COMMERCIAL I, a California general partnership.

C.  **Tenant:**

Sam Hassine and Humberto DaSilva
_____

C-1  **Guarantor:**
_____

D.  **Tenant's Trade Name:**

Nuggets & Carats

E.  Rancho Niguel Commercial Center, Phase I:  The property particularly described and depicted on the Site Plan marked Exhibit "A", located at:

County: Orange;    State: California.

Address of Store Premises (if available) or nearest Streets:

Greenfield

F.  **Premises:**  The area shown by outline on Exhibits "A" and "A-1", containing the following approximate measurements:

Frontage: _____20.9  20'-0" _____ feet

Depth: _____75'2½" _____ feet

Floor Area: _____1,504 _____ approx. sq.ft.

-i-

Proposed Lot (Parcel) shown on Site Plan (hereinafter sometimes referred to as "Parcel" or "Proposed Parcel"):

_____

G.  Use of Premises:

_____Retail sale or repair of jewelry. *_____

_____

and for no other use or purpose.

H.  Term: _Five (5) years with one (1) five (5) year option__ years
         (see Amendment)
    Commencement Date:  To be determined under Paragraph 3.1(a).

    Expiration Date:   To be determined under Paragraph 3.1(a).

I.  Minimum Rent:  $__3,008.00_____ per month for Year 1.
    Year 2=$3,384.00 per month

J.  Security Deposit:  $__3,008.00__

K.  Prepaid Rent:  $__3,008.00  _To be paid when key_
    _is delivered to tenants_
    as rent in advance for _____
    month(s) of the lease term hereof.

L.  Percentage Rent Rate: _5% for Sales_____%
                          3% for Repairs

M.  Landlord's Address for Notices:

              Rancho Niguel Commercial I
              c/o The Buie Corporation
              29982 Ivy Glenn Drive, Suite 100
              Laguna Niguel, California 92677
              Attention:  Michael E. Lierman

N.  Tenant's Address and Phone Number for Notices:

              Nuggets & Carats
              27742 Santa Margarita Pkwy.
              Mission Viejo, California  92691
              (714) 458-2777

O.  Tenant's Resident Address and Phone Number:

              Sam Hassine
              28571 Rancho Grande
              Laguna Niguel, California 92677
              (714) 643-9263



*"USE PROTECTION:  During the term of this lease, provided Tenant
is not in default under any of the terms and conditions of this
lease, Landlord agrees not to lease space or to consent to any
assignment or subletting within Proposed Parcels 2,4 or 5 as
identified in the Easement With Covenants and Restrictions
Affecting Land described in Article 5,7 herein to any other tenant
who conducts a business within said parcel which would be commonly
described as that of a full-line jewelry store including watch
sales and repair; provided however Tenant acknowledges that other
tenants within these parcels may sell jewelry and related
merchandise as accessory items which are incidental to their
primary business."



1.   **PREMISES.**

1.1  **Construction.**  The improvements leased to Tenant shall be constructed pursuant to Exhibit "B".

1.2  **Location.**  The parties acknowledge that Exhibit "A" describes the perimeter of the shopping center before the dedications or grant of easements for highways, streets and public ways.  Exhibit "A" sets forth a proposed general layout of the shopping center, and shall not be deemed a representation by Landlord that the shopping center shall be constructed as indicated thereon or that any tenants or occupants designated by name or nature of business thereon shall conduct business in the shopping center during the term of this Lease; and Landlord may prior to commencement of construction of the Premises, and thereafter from time to time, in its sole discretion increase, decrease, alter, modify or change the number, locations and dimensions of the buildings, the premises therein, driving lanes, driveways, walkways, parking places and other improvements shown on Exhibit "A", and Landlord reserves the right to make additions and alterations to all buildings constructed in the shopping center.  The parties shall signify their approval by signing or initialing Exhibits "A" and "B" and they are hereby made a part of this Lease.  References to "this Lease" include all exhibits and matters incorporated by reference as part of this Lease.  Tenant understands and acknowledges that Landlord may subdivide the entire shopping center of which the Premises are a part.  In such event, Tenant agrees to cooperate with Landlord in seeking all such required governmental approvals and agrees to immaterial boundary changes to the Premises if required to create a separate legal lot or parcel comprising the Premises.

1.3  **Condition of Premises.**  Occupancy of the Premises by Tenant shall be deemed acceptance thereof by Tenant, and shall be deemed conclusive to establish that these Premises are in good and satisfactory condition as of such occupancy.

1.4  **Exhibits.**  The following drawings and special provisions are attached hereto as exhibits and made a part of this Lease:

|  |  |  |
|---|---|---|
| Exhibit "A" | – | Site Plan; |
| Exhibit "A-1" | – | Site Plan Portion; |
| Exhibit "B" | – | Construction and Acceptance of Premises; |
| Exhibit "C" | – | Sign Criteria; |
| Exhibit "D" | – | Rules and Regulations; |
| Exhibit "E" | – | Guaranty of Lease. |

2.   **BUSINESS RIGHTS AND RESTRICTIONS.**

2.1  **Use.**  The Premises shall be used solely for the use set forth in Paragraph G and for no other purpose or use whatsoever.

2.2  **Restrictions.**  Tenant shall not, without Landlord's prior written consent:  (a) conduct any auction or bankruptcy sale; (b) conduct any fire sale except as a result of a fire on the Premises; (c) conduct any close-out sale except at the expiration of the lease term; (d) sell any so-called "surplus", "Army and Navy", or "secondhand" goods, as those terms are generally used at this time and from time to time hereafter, on or from the

-1-

Premises; (e) permit anything to be done on the Premises which will in any way obstruct, interfere with or infringe on the rights of other occupants of the shopping center described on Exhibit "A"; (f) cause, maintain or permit any nuisance on the Premises or cause or permit any waste to be committed on the Premises; (g) bring or keep on the Premises or permit any act thereon which is prohibited by any law, statute, ordinance or governmental regulation now in force or hereinafter enacted or promulgated, or which is prohibited by any standard form of fire insurance policy; or (h) violate any provision of any covenants, conditions and restrictions of record affecting the Premises, whether entered into prior to or subsequent to the date of this Lease.

2.3  Non-Competition.  Neither Tenant nor any person who controls or is controlled by Tenant shall own, operate or become interested in a similar business within a radius of three (3) miles in any direction from the closest boundary of the shopping center.  As used in this Lease, the word "person" means any natural person or persons in individual or representative capacities and any entity or entities of any kind whatsoever, including, without limitation, corporations, partnerships and associations, or any combination of persons and entities.  Without limiting Landlord's remedies, in the event Tenant violates this covenant, Landlord may, at its option and for so long as Tenant is operating such other business, include "gross sales" of such other business in the gross sales transacted from the Premises for the purpose of computing percentage rent due hereunder.

2.4  Hazardous Materials.  Tenant hereby makes the following covenants regarding hazardous materials:

(a)  Tenant shall at all times and in all respects comply with all federal, state and local laws, ordinances and regulations, including, but not limited to, the Federal Water Pollution Control Act ,(33 U.S.C. §1251, et seq.), Resource Conservation & Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000f et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), the Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response of Compensation and Liability Act (42 U.S.C. §9601, et seq.), California Health & Safety Code (§25100 et seq., §39000 et seq.), California Safe Drinking Water & Toxic Enforcement Act of 1986 (California Health & Safety Code §25249.5, et seq.), California Water Code (§13000 et seq.), and other comparable state laws ("Hazardous Materials Laws"), relating to industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, disposal or transportation of any oil, flammable explosives, asbestos, urea formaldehyde, radioactive materials or waste, or other hazardous, toxic, contaminated or polluting materials, substances or wastes, including, without limitation, any "hazardous substances", "hazardous wastes", "hazardous materials" or "toxic substances" under any such laws, ordinances or regulations (collectively, "Hazardous Materials").

(b)  Tenant shall, at its own expense, pro-cure, maintain in effect and comply with all conditions of any and all permits, licenses, and other governmental and regulatory approvals required for Tenant's use of the Premises, including, without limitation, discharge

-2-

of (appropriately treated) materials or wastes into or through any sanitary sewer serving the Premises.  Except as discharged into the sanitary sewer in strict accordance and conformity with all applicable Hazardous Materials Laws, Tenant shall cause any and all Hazardous Materials removed from the Premises to be removed and transported solely by duly licensed haulers to duly licensed facilities for final disposal of such materials and wastes.  Tenant shall in all respects handle, treat, deal with and manage any and all Hazardous Materials in, on, under or about the Premises in total conformity with all applicable Hazardous Materials Laws and prudent industry practices regarding management of such Hazardous Materials.  Upon expiration or earlier termination of the lease term, Tenant shall cause all Hazardous Materials to be removed from the Premises and transported for use, storage or disposal in accordance with and compliance with all applicable Hazardous Materials Laws.  Tenant shall not take any remedial action in response to the presence of any Hazardous Materials in or about the Premises or any building, nor enter into any settlement agreement, consent decree or other compromise in respect to any claims relating to any Hazardous Materials in any way connected with the Premises or any building, without first notifying Landlord of Tenant's intention to do so and affording Landlord ample opportunity to appear, intervene or otherwise appropriately assert and protect Landlord's interest with respect thereto.

(c)  Tenant shall immediately notify Landlord in writing of:  (i) any enforcement, cleanup, removal or other governmental or regulatory action instituted, completed or threatened pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant, the Premises or any building relating to damage, contribution, cost recovery compensation, loss or injury resulting from or claimed to result from any Hazardous Materials; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials in or removed from the Premises or any building, including any complaints, notices, warnings or asserted violations in connection therewith.  Tenant shall also supply to Landlord as promptly as possible, and in any event within five (5) business days after Tenant first receives or sends the same, with copies of all claims, reports, complaints, notices, warnings or asserted violations, relating in any way to the Premises, any building or Tenant's use thereof.  Tenant shall promptly deliver to Landlord copies of hazardous waste manifests reflecting the legal and proper disposal of all Hazardous Materials removed from the Premises.

(d)  Tenant shall indemnify, defend (by counsel reasonably acceptable to Landlord), protect, and hold Landlord and each of Landlord's partners, employees, agents, attorneys, successors and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses or expenses (including attorneys' fees), or death of or injury to any person or damage to any property whatsoever, arising

-3-

from or caused in whole or in part, directly or indi-
rectly, by (i) the presence in, on, under or about the
Premises or any building, or discharge in or from the
Premises or any building, of any Hazardous Materials;
(ii) Tenant's use, analysis, storage, transportation,
disposal, release, threatened release, discharge or
generation of Hazardous Materials to, in, on, under,
about or from the Premises or any building; or (iii)
Tenant's failure to comply with any Hazardous Materials
Law.    Tenant's obligations hereunder shall include,
without limitation, and whether foreseeable or unfore-
seeable, all costs of any required or necessary repair,
cleanup or detoxification or decontamination of the
Premises or any building, or the preparation and imple-
mentation of any closure, remedial action or other
required plans in connection therewith, and shall sur-
vive the expiration or earlier termination of the lease
term.    For purposes of the release and indemnity provi-
sions hereof, any acts or omissions of Tenant, or by
employees, agents, assignees, contractors or subcon-
tractors of Tenant or others acting for or on behalf of
tenant (whether or not they are negligent, intentional,
willful or unlawful) shall be strictly attributable to
Tenant.

        (e)  If at any time it reasonably appears to
Landlord that Tenant is not maintaining sufficient
insurance or other means of financial capacity to enable
Tenant to fulfill its obligations to Landlord hereunder,
whether or not then accrued, liquidated, conditional or
contingent, Tenant shall procure and thereafter maintain
in full force and effect such insurance or other form
of financial assurance, with or from companies or
persons and in forms reasonably acceptable to Landlord,
as Landlord may from time to time reasonably request.

3.    TERM.

    3.1   Duration.

        (a)  The term of this Lease shall be for the
period of years set forth in Paragraph H, commencing on
the earlier of (i) the date which is one hundred twenty (120) days
after Landlord, or Landlord's architect, notifies Tenant
that the Premises are ready for occupancy; or (ii) the
date which Tenant shall open the Premises for business.
Tenant agrees to execute a certificate confirming the
Commencement Date and the Expiration Date, which certif-
icate shall be initialed by Landlord and attached to and
incorporated in this Lease.   If the term commences on
other than the first day of a month, the term of this
Lease shall be extended by the number of days remaining
in the first calendar month of occupancy.   For example,
if the term commences on September 21, then the term
shall be extended by ten (10) days.

        (b)  Notwithstanding any provision in this
Lease to the contrary, all terms and conditions of this
Lease shall be in full force and effect upon delivery
of possession of the Premises by Landlord to Tenant,
exclusive of Paragraphs 4, 5.6, 6.2, 14(a), 14(b) and





-4-

14(c), which Paragraphs shall become effective upon the commencement of the term of this Lease.

**3.2 Cancellation.** If for any reason whatsoever the term of this Lease has not commenced within two (2) years after the execution of this Lease, this Lease shall be automatically deemed cancelled and shall have no further force or effect.

**3.3 Security Deposit.** Upon signing this Lease, Tenant shall deposit with Landlord the sum set forth in Paragraph J as security for the faithful performance of obligations relating to rent, repairs or cleaning. This security deposit shall not constitute payment of the last month's rent hereunder. If on the expiration of the term, or any extension thereof, Tenant shall have fully performed all of Tenant's obligations hereunder then the security deposit, without interest, shall be returned to Tenant less the cost to repair damage to the Premises caused by Tenant, normal wear and tear excepted. Landlord shall have the right to, but need not, apply the deposit to any payment in the making of which Tenant shall be in default hereunder, and if Landlord does so apply the deposit Tenant shall, upon demand, immediately deposit with Landlord an amount of cash equal to the amount so applied so that Tenant shall at all times have on deposit with Landlord the amount herein specified as security.

**4. RENT.**

**4.1 Amount.** Tenant shall pay Landlord without prior demand, deduction, set-off, counterclaim or offset during the lease term the rent provided in this Paragraph 4.1 and all other additional sums as provided in Paragraphs 5, 6, 7, 8 and 9 herein at the address set forth in Paragraph M. All sums of money required to be paid pursuant to the terms of this Lease are defined as "rent", whether or not the same are designated as such elsewhere in this Lease.

(a) Tenant shall pay to Landlord fixed minimum rent at the monthly rate provided in Paragraph I, payable on the first day of each month during the term, except for the amounts set forth in Paragraphs J and K which shall be prepaid upon signing this Lease.

(b) Fixed minimum rent shall be adjusted upward but not downward every year ("adjustment date") beginning on the first day of the month next following the passage of the initial twenty-four (24) calendar months of the lease term and on the first day of such month for each successive year thereafter of the lease term. The adjustment shall be calculated by referring to the Consumer Price Index - Los Angeles-Anaheim-Riverside-All Urban Consumers - All Items - Base 1982-1984 = 100 ("CPI") as published by the United States Department of Labor, Bureau of Labor Statistics. The Base Period Index shall be the CPI for the calendar month which is four (4) months prior to the month of the Commencement Date as determined under the provisions of Paragraph 3.1. The Base Period Index shall be compared with the CPI (the "Comparison Index") for the same calendar month which is four (4) months prior to the adjustment date. If the Comparison Index is higher than the Base Period Index, then the fixed minimum rent payable by Tenant hereunder shall be increased by the identical percent-



-5-

age increase of the Comparison Index over the Base Period Index. (By way of illustration only, if Tenant's commencement date was August 15, 1988, then the Base Period Index is that for May 1988 [assume 130], and the Base Period Index shall be compared with the Comparison Index for May 1989 [assume 136], and because the Comparison Index for May 1989 is 4.61% higher, the rent commencing on September 1, 1989 shall be 4.61% higher.) Notwithstanding the foregoing, each annual increase in fixed minimum rent which is to commence on an adjustment date under this Paragraph 4.1(b) shall neither be less than _four_ percent (_4_%) nor greater than _eight_ percent (_8_%) of the fixed minimum rent for the year immediately preceding the adjustment date.

(c) In addition to fixed minimum rent and payment of all other charges which are to be paid by Tenant under this Lease, Tenant shall pay to Landlord as percentage rent based on gross sales (as hereinafter defined) for each lease year, an amount equal to the percentage rate provided in Paragraph L multiplied by (i) the gross sales for each lease year during the lease term, less (ii) the fixed minimum rent actually paid during said lease year. Percentage rent shall be payable quarterly as provided in Paragraph 4.5.

(d) If Tenant shall fail to pay any monthly installment of fixed minimum rental or any other sums under this Lease when due, a late charge equal to ten percent (10%) of the monthly installment of fixed minimum rental and/or other sums shall be assessed to reimburse Landlord for costs relating to collecting and accounting for said late payment(s).

4.2 **First Partial Month.** If the Commencement Date occurs on a day other than the first day of a calendar month:

(a) Fixed minimum rent for the first partial month shall be prorated on the basis which the number of days of the term of this Lease in such month bears to 30, and as so prorated shall be paid on the Commencement Date.

(b) Tenant's gross sales for the first partial month shall be included as gross sales for the first lease year of this Lease, and the daily minimum rent provided in Paragraph 4.2(a) shall be deducted in computing the percentage rent payable for that lease year.

4.3 **Lease Year.**

(a) "Lease year" shall mean that period of twelve (12) or less consecutive months which ends on December 31st of each year and which falls within the term of this Lease and the period from the last December 31st during the term to and including the last day of the term.

(b) Each lease year shall constitute a separate accounting period for the purpose of computing percentage rent, and gross sales for any one lease year shall not be carried forward or carried back into any other.

-6-

4.4  <u>Gross Sales</u>.

(a)  "Gross sales" means (i) the entire amount
charged for the full price at the time of the initial
transaction for all merchandise sold or delivered or
services rendered by Tenant, (ii) the gross amount
received or charged by Tenant for merchandise sold or
services rendered pursuant to orders received by tele-
phone, mail, house-to-house or by other canvassing and
attributable to the Premises whether or not filled
elsewhere, and (iii) all gross income of Tenant from any
operations in, at, from or through the use of the
Premises.  The term "Tenant" as used in this Paragraph
4.4 includes the named Tenant and any subtenants,
licensees or concessionaires, or any other person or
firm conducting business in, at, from or through the use
of the Premises.

(b)  There shall be excluded from gross sales
or deducted therefrom if previously included:  (i) cash
refunded or credit allowed on merchandise returned by
customers, (ii) sales taxes, excise taxes or other
similar taxes, and (iii) sales of fixtures, equipment
or property which are not stock-in-trade.

4.5  <u>Report and Payment of Percentage Rent</u>.

(a)  Within twenty (20) days after the end of
each calendar quarter which falls within the lease term,
Tenant shall deliver to Landlord a written statement
certifying gross sales during said calendar quarter.
At the same time, Tenant shall pay to Landlord the
amount, if any, that the percentage rate of gross sales
exceeds the amounts of fixed minimum rent actually paid
by Tenant during said period.  The statement shall be
certified to be correct by Tenant or by an officer or
partner of Tenant.  If Landlord so elects, Landlord can
require and Tenant agrees to provide a copy of Tenant's
sales tax report to the State of California or any other
governmental agency.

(b)  Within ninety (90) days after the expira-
tion of each lease year, Landlord shall (i) compute
percentage rent so that the total percentage rent to be
paid by Tenant for said lease year will be that which
is provided in Paragraph 4.1(c), and (ii) notify Tenant
of the amount so computed.  Within ten (10) days after
delivery of such notice, Tenant shall pay to Landlord
any percentage rent then due or Landlord shall refund
to Tenant the amount of any overpayment, as the case may
be.  The failure of Landlord to compute and deliver the
percentage rent within the time provided shall not cause
a waiver of the amount due, if any, pursuant to said
computation, nor shall Tenant's obligation to pay any
amount due within the ten (10) days thereafter be
extended thereby.

4.6  <u>Records</u>.  Tenant shall keep and preserve and shall
require its subtenants, licensees and concessionaires to keep and
preserve, in the county in which the Premises are located, for a
period of not less than three (3) years after the delivery to
Landlord of Tenant's certified statement for the last calendar

-7-

quarter of each lease year, complete, accurate and customary records of all amounts received during each lease year in the Premises. However, in the case of a controversy concerning the amount of percentage rent payable hereunder, Tenant shall keep and preserve said records until the controversy has ended. Landlord shall be entitled at reasonable times during business hours, personally or through duly authorized agents, at its own expense, to inspect and make copies of such records, together with any other documents bearing directly on Tenant's gross sales hereunder.

   4.7  Audit.  Landlord shall be entitled to have an audit made of the amount received by Tenant from business transacted in the Premises, whether or not included in "gross sales", for a prior lease year. If the audit discloses that any statements for the period audited are inaccurate, adjustment shall be made upon notice as provided in Paragraph 4.5(b). If the audit further discloses that Tenant has understated percentage rent by three percent (3%) or more, Tenant shall immediately pay the cost of the audit.

   5.  COMMON AREA.

   5.1  Definition.  The common area is all areas within the shopping center except the "Building Areas" designated as such on the Site Plan.

   5.2  Original Construction.  The original construction of common area improvements shall be completed by Landlord and shall not be charged to Tenant.  Areas designated as Building Areas on Exhibit "A" need not be improved but shall be kept in clean and level condition.

   5.3  Use.  During the lease term, Tenant, its subtenants, concessionaires, licensees, invitees, customers and employees shall have the non-exclusive right to use the common area in common with Landlord, other owners of portions of the shopping center, other tenants, and their respective subtenants, concessionaires, licensees, invitees, customers and employees subject to the provisions of this Lease.

   5.4  Maintenance.  Subject to reimbursement by Tenant pursuant to Paragraph 5.6, Landlord shall pay and be responsible for maintaining or causing to be maintained all improvements on the common area in good and sanitary order, condition and repair, including making replacements where necessary, and in compliance with all governmental requirements, including, without limitation: (a) managing; (b) cleaning and removing rubbish and dirt; (c) labor, payroll taxes, materials and supplies; (d) all utility services utilized in connection therewith, including sewer service fees; (e) maintaining, repairing, replacing and reserving for replacement, and remarking paved and unpaved surfaces, curbs, directional and other signs, landscaping, lighting facilities, drainage and other similar items; (f) all premiums on compensation, casualty, public liability, property damage and other insurance on the common area; (g) rental cost for or straight-line depreciation on tools, machinery and equipment used in connection with the above; (h) all real property and personal property taxes and assessments levied or assessed against the common area; (i) the cost of all janitors, gardeners, security personnel and equipment performing services on the common area; and (j) any regulatory fee or surcharge or similar imposition imposed by

-8-

governmental requirements based upon or measured by the number of parking spaces or the areas devoted to parking in the common area. Landlord shall be entitled to a management fee equal to four percent (4%) of the total rent payable hereunder including any percentage rent payable and any other charges payable as rent hereunder.

5.5  Records.  Landlord shall keep or cause to be kept accurate records showing in detail all expenses incurred for such maintenance.  These records shall, upon reasonable request, be made available during business hours at the offices of Landlord for inspection by Tenant. .

5.6  Tenant's Contribution.  Tenant shall pay to Landlord on the first day of each month, Tenant's pro rata share of the amount of all expenses described in Paragraph 5.4 based either on (a) the amount of such expenses actually incurred during the billing period, or (b) equal periodic installments which have been estimated in advance by Landlord for a particular calendar year, in which event, Landlord shall, within sixty (60) days after the end of such year, adjust the estimated expenses to reflect the expenses incurred for such year.  Tenant's pro rata share shall be equal to the ratio which Tenant's floor area bears to the total floor area of all buildings in the shopping center.

5.7  Operation and Control.  The common area shall be operated and controlled as provided in the Easement With Covenants and Restrictions Affecting Land dated  November 10, 1988  and recorded on  November 15, 1988  at Instrument  No.  88-587344  in the Office of the County Recorder of Orange County, California, as it may from time to time be amended.

5.8  Employee Parking.  Landlord may designate from time to time what part of the common area, if any, shall be used for vehicle parking by Tenant, employees of owners and employees of tenants, occupants and licensees.  No Tenant or employee of any such owner, tenant, occupant or licensee shall use any part of the common area for parking except such area or areas as may be so designated.  The right to use such area may be revoked, or the area may be redesignated, at any time by Landlord.

5.9  Obstructions.  No fence, wall, structure, division, rail or obstruction shall be placed, kept, permitted or maintained upon the common area or any part thereof by Tenant; nor shall the sale, display, advertising, promotion or storage of merchandise of any business activities of any kind whatsoever be conducted therein without Landlord's prior written consent; nor shall any person use the common area for solicitations, demonstrations or any other activities that would interfere with the conduct of business in the shopping center or which might tend to create civil disorder or commotion.

6.  TAXES.

6.1  Personal Property Taxes.  Tenant shall pay before delinquency all license fees, public charges, property taxes and assessments on the furniture, fixtures, equipment and other property of or being used by Tenant at any time situated on or installed in the Premises.

-9-

6.2  **Real Property Taxes.**

(a)  Tenant shall pay as additional rent before delinquency or, if Landlord elects, on a monthly prorated basis, any and all real property taxes and general or special assessments, and installments thereof (including any tax on rent which is substituted in whole or in part of real property taxes or assessments and any license fee imposed by a local governmental body of the collection of rent, and excluding federal and state income taxes), which shall, during the lease term, be levied or assessed against all or any portion of the Premises or imposed on Landlord.  Said real property taxes and assessments for the first and last lease years hereunder shall, if necessary, be prorated and apportioned between Landlord and Tenant to coincide with the commencement and expiration of the lease term.

(b)  Tenant shall be liable only for that portion of the taxes and assessments attributable to the Premises, including the Parcel of which it is a part, based upon individual assessment valuations (prorations) supplied by the County Assessor.  Said proration shall be conclusive upon both parties unless the parties otherwise mutually agree in writing.  In the absence of a proration supplied by the County Assessor or a written agreement by the parties, Tenant's share shall be determined by multiplying the amount payable set forth in the tax bill by a fraction in which the numerator is the floor area of Tenant's Premises and the denominator is the floor area of all premises included in the tax bill, whether occupied or not.

(c)  If the Premises are separately billed pursuant to a segregation, Tenant shall, at Landlord's election, pay as additional rent the amount of such taxes and assessments directly to the tax collector.  If the Premises are not separately assessed or Landlord does not elect to have Tenant pay directly, Tenant shall pay Tenant's share of such taxes and assessments to Landlord within ten (10) days after delivery of Landlord's written statement therefor.  Each party shall furnish the other upon written request, evidence of payment of such taxes and assessments.

(d)  Anything herein contained to the contrary notwithstanding, Tenant shall have the right in good faith, at its sole cost and expense, to contest the amount or legality of any said real property taxes and assessments on or attributable to the Premises, including the right to apply for the reduction thereof; provided, however, Tenant shall prosecute any such contest with due diligence and shall, forthwith upon the final determination thereof, pay the amount of said real property taxes and assessments on or attributable to the Premises as so determined, together with any interest, penalties, costs and charges which may be payable in connection therewith.  In the event of such contest, Tenant shall post such security or take such other measures as Landlord may require to free Landlord's title of the lien of such taxes and assessments.

-10-

6.3  **Business Taxes**.  Tenant shall pay (a) all special taxes and assessments or license fees now or hereafter levied, assessed or imposed by law or ordinance, by reason of the use of the Premises for the specific purposes set forth in this Lease, and (b) any tax, assessment, levy or charge assessed on the rent paid under this Lease.

7.  **UTILITIES**.

Commencing with the delivery of possession of the Premises to Tenant by Landlord, Tenant shall pay as additional rent before delinquency all charges for common metered water, gas, heat, air cooling, electricity, power, telephone, sewer service fees and other utility services used on or serving the Premises during the lease term.  In the absence of water being separately metered to the Premises, Tenant's share shall be determined by multiplying the amount payable set forth in the water bill by a fraction in which the numerator is the floor area of Tenant's Premises and the denominator is the floor area of all occupied premises included in the water bill.  Sewer service fees shall be paid pursuant to Paragraph 5.4 above.  Nothing contained in this Lease shall limit Landlord in any way from granting or using easements on, across, over and under the shopping center for the purpose of providing utility services.  In no event shall Landlord be responsible for damages to Tenant occasioned by the interruption of utility services to Tenant and/or the Premises, nor shall rent be offset as a result of any such interruption.  In the event Tenant has an unusually high water use, Landlord may, in its sole discretion, cause Tenant, at Tenant's expense, to place a submeter for separately metering water use to its Premises; in which event Tenant shall pay for water use in the amount shown by its separate water meter.

8.  **REPAIRS AND ALTERATIONS**.

8.1  **Tenant Obligations**.  Paragraph 8.1(a) generally describes those items Tenant shall be responsible for performing and for which Tenant shall pay.  Paragraph 8.1(b) generally describes those items Landlord shall be responsible for performing and for which Tenant shall pay its pro rata share (determined under Paragraph 8.1(c)).

(a)  Tenant shall, at Tenant's sole cost and expense, at all times be responsible for keeping the Premises (including the interior of the Premises (including exposed interior walls), exterior entrances, all glass and show window moldings) and all equipment, facilities, fixtures, partitions and doors (including electrical, lighting fixtures and tubes, plumbing and plumbing fixtures, and, subject to Landlord's right to retain a maintenance service company pursuant to Paragraph 8.1(b), the heating, ventilating and air conditioning system ("HVAC system"), but excluding leaks around ducts or other parts of the plumbing or HVAC systems which protrude through the roof) repaired, maintained, replaced or added to in good order, and in sanitary and safe condition and repair, and in accordance with all governmental requirements and insurance requirements.  The repair of any leaks around ducts or other parts of the plumbing or HVAC systems which protrude through the roof shall be performed by Landlord

-11-

and paid by Tenant pursuant to Paragraph 8.1(b); pro-
vided, however, notwithstanding the provisions of
Paragraph 8.1(b), Tenant shall pay the total cost of the
repair of any leaks in the roof caused by Tenant or
Tenant's employees, agents or invitees.  Any other work
involving protrusion through the roof shall be governed
by Paragraph 8.3.  If Tenant refuses or neglects to
maintain the Premises as required under this Paragraph
8.1(a), and to the reasonable satisfaction of Landlord
as soon as reasonably possible after written demand
(except that no written demand shall be required in
situations Landlord reasonably determines are emer-
gencies), Landlord may perform such repairs without
liability to Tenant for any loss or damage that may
occur to Tenant's property or business by reason there-
of.  Upon the completion of any such repair or upon the
completion by Landlord of a structural repair caused in
whole or in part by the negligent acts or omissions of
Tenant, Tenant shall pay Landlord's costs for making
such repairs plus ten percent (10%) for overhead upon
presentation of the bill therefor.  Such bills shall
include interest as described in Paragraph 25.5 below
on the cost so reflected from fifteen (15) days after
the date of the billing until the date paid by Tenant.

(b)  Subject to reimbursement by Tenant
pursuant to this Paragraph 8.1(b), Landlord shall pay
and be responsible for (i) normal maintenance and
inspection of the roof; (ii) repair and replacement of
non-structural portions of the roof; (iii) normal
maintenance and inspection, repair and replacement of
any fire sprinkler system; (iv) periodic painting of
the exterior of the Premises; and (v) repair of any
leaks around ducts or other parts of the plumbing or
HVAC systems which protrude through the roof.  Landlord
may elect to retain a maintenance service company or
companies to perform the maintenance, inspections,
repairs and replacements for which Landlord is respon-
sible pursuant to this Paragraph 8.1(b).  In addition,
Landlord may elect to retain a maintenance service
company to perform normal maintenance, inspections and
repair on the HVAC system.  Tenant shall pay to Landlord
on the first day of each month its pro rata share
(determined under Paragraph 8.1(c)) of the cost of the
maintenance, inspections, repairs and replacements for
which Landlord is responsible to perform or retains a
maintenance service company to perform pursuant to this
Paragraph 8.1(b).  Notwithstanding any other provisions
of this Lease, Landlord may from time to time repair the
exterior walls of the Premises at Tenant's expense as
additional rent, and the same shall be paid by Tenant
on a Parcel Allocation (defined in Paragraph 8.1(c))
basis.

(c)  For the purpose of Paragraph 8.1(b),
Tenant's pro rata share shall be determined by multi-
plying the amount payable for the maintenance, inspec-
tions, repairs and replacements by a fraction the
numerator of which is the net floor area of Tenant's
Premises and the denominator of which is the net floor
area of all Buildings included within the Proposed

-12-

Parcel of which the Premises are a part ("Parcel Alloca-
tion").

8.2 **Landlord Obligations.** Landlord shall, at Land-
lord's sole cost and expense, be responsible for maintaining,
repairing and replacing the structural portions of the building
in which the Premises are located, including, but not limited to,
the structural portions of the roof, bearing walls and founda-
tions. Maintenance of structural portions shall not include
responsibility for periodic painting, the cost of and respon-
sibility for which shall be governed by Paragraph 8.1(b) above.
Landlord shall not be liable for any failure to make such repairs
or to perform any maintenance unless such failure shall persist
for an unreasonable time after written notice of the need for such
repair or maintenance has been given to Landlord by Tenant.
Except as hereinafter specifically provided, there shall be no
abatement of rent and no liability of Landlord by reason of any
injury to or interference with Tenant's business arising from the
making of any repairs, replacements, alterations or improvements
under this Paragraph 8.2 or under Paragraph 8.1(b), in or to any
portion of the building or the Premises, or in, or to fixtures,
appurtenances and equipment therein.

8.3 **Alterations.** Following completion of the construc-
tion of Tenant's initial improvements, Tenant shall not make any
alterations, changes or improvements (collectively, "Alterations")
in or to the interior or exterior of the Premises without the
prior written consent of Landlord. Notwithstanding the preceding
sentence, any interior Alterations which may affect the HVAC
system or cause or involve penetration or protrusion through the
roof of the building must receive Landlord's prior written consent
and shall be accomplished by Landlord's contractor at Tenant's
sole cost and expense. Tenant shall be liable for any consequen-
tial damages as a result of Alterations under this Paragraph 8.3.
If, following completion of the construction of Tenant's initial
improvements, Landlord is required to review plans for any Altera-
tions, Tenant shall pay to Landlord a fee to cover the cost of
such review, but not to exceed $300. All Alterations shall
conform to all applicable governmental ordinances and regulations,
and, except Tenant's trade fixtures, shall become part of the
realty upon installation thereof.

9.    **INSURANCE.**

9.1 **Use Rate.** Tenant shall not carry any stock of
goods or do anything in or about the Premises which will in any
way tend to increase insurance rates on the building in which the
Premises are located. In no event shall Tenant carry on any
activities which would invalidate any insurance coverage thereon.
Tenant shall pay on demand any increase in premiums that may be
charged because of Tenant's use or activities or vacating or
otherwise failing to occupy the Premises, but this provision shall
not be deemed to limit in any respect Tenant's obligations under
Paragraph 14.

9.2 **Liability Insurance.**

(a) Tenant shall, at all times, at its sole
expense, maintain in full force a policy or policies of
comprehensive liability insurance issued by one or more
insurance carriers insuring against liability for injury
to or death of persons and loss of or damage to property
occurring in or on the Premises and any portion of the

-13-

common area which is subject to Tenant's exclusive control.  Said liability insurance shall be in an amount of not less than $1,000,000 combined single limit for bodily and personal injury and property damage, which amount shall be changed periodically to reflect inflation and insurance industry-recommended coverage.

(b)  Landlord shall, at all times, at its sole expense, subject to reimbursement from Tenant, maintain in full force a policy or policies of comprehensive liability insurance issued by one or more insurance carriers, insuring against liability for injury to or death of persons and loss of or damage to property occurring in or on the common area, except any portion thereof subject to Tenant's exclusive control.  Said liability insurance shall be in amount of not less than $1,000,000 combined single limit for bodily and personal injury and property damage, which amount shall be changed periodically to reflect inflation and insurance industry-recommended coverage.

9.3  **Workers' Compensation Insurance.**  Tenant shall at all times maintain workers' compensation insurance in compliance with California law.

9.4  **Fire Insurance.**

(a)  Landlord shall pay for and shall maintain in full force and effect at all times a standard form of extended coverage endorsement and a standard form of lender's loss payable endorsement, issued to the holder or holders of a mortgage or deed of trust secured in whole or in part by the Proposed Parcel, in an amount equal to the full replacement cost (without deduction for depreciation) of the Premises (excluding, at Landlord's sole option, malicious mischief, special extended coverage, earthquake and sprinkler leakage coverage), and rental insurance equal to fixed minimum rent for up to one year.  Tenant shall reimburse Landlord for premiums incurred by Landlord for such insurance within ten (10) days after delivery to Tenant of Landlord's statement therefor or, if Landlord elects, on a monthly prorated basis.  If such insurance covers premises in addition to Tenant's Premises, Tenant's share of the premiums shall be based on the premium allocation made by the insurance carrier; and if the carrier does not make such allocation, then on the basis which the floor area of Tenant's Premises bears to the total floor area covered by such insurance.

(b)  Tenant shall pay for and shall maintain in full force and effect at all times, a standard form policy or policies of fire, extended coverage and vandalism, and rental value insurance with standard form of extended coverage endorsement covering all exterior glass, whether plate or otherwise, and all interior glass and stock in trade, trade fixtures, equipment and other personal property located in the Premises and used by Tenant in connection with its business, and shall pay for and shall maintain in full force and effect during the term of this Lease blanket contractual liability

-14-

insurance to cover the indemnity requirements of Para-
graph 13.1.

9.5  **Waiver of Subrogation.**  Each party ("insured")
hereby waives its entire right of recovery against the other
party, the other party's officers, directors, agents, represen-
tatives, employees, successors and assigns with respect to any
loss or damage, including consequential loss or damage, to the
insured's property caused or occasioned by any peril or perils
(including negligent acts) covered by any policy or policies
carried by the insured.

9.6  **General Requirements.**

(a)  All policies of insurance required to be
carried hereunder by Tenant shall be written by compa-
nies satisfactory to Landlord, licensed to do business
in California, and with a Best's rating of A-X or
better.

(b)  Each policy of public liability insurance
required to be carried under Paragraphs 9.2(a) and (b)
shall be primary and non-contributing with the insurance
carried by the other party, except for automobile lia-
bility insurance carried by the other party, and shall
be excess over such automobile liability insurance.

(c)  Each policy required under Paragraphs
9.2(a) and (b) shall expressly include, severally and
not collectively, as named or additionally named insured
thereunder, the other party and any person or firm
designated by the other party and having an insurable
interest hereunder (hereinafter called "additional
insured") as their respective interests may appear.

(d)  Said insurance shall not be subject to
cancellation or reduction in coverage except upon at
least thirty (30) days' prior written notice to each
additional insured.  The policies of insurance or duly
executed certificates evidencing them, together with
satisfactory evidence of the payment of premiums there-
on, shall be deposited with each additional insured at
the commencement of the term and not less than thirty
(30) days prior to the expiration of the term of such
coverage.  If the primary insured fails to comply with
this requirement, any additional insured may obtain such
insurance and keep it in effect, and the primary insured
shall pay to the additional insured the premium cost
thereof upon demand with interest from date of payment
by the additional insured to the date of repayment by
the primary insured.

9.7  **Blanket Insurance.**  Each party shall be entitled
to fulfill its insurance obligations hereunder by maintaining a
so-called "blanket" policy or policies of insurance in such form
as to provide by specified endorsement coverage not less than that
which is required hereunder for the particular property or inter-
est referred to herein.

-15-

10. **DAMAGE AND RESTORATION.**

10.1 **Duty to Restore.** If the improvements on the Premises or the shopping center are partially or totally damaged by fire or other casualty so as to become partially or totally untenantable, which damage is insured against under any policy of fire and extended coverage insurance then covering the damaged improvements, this Lease shall not terminate and said improvements shall be rebuilt by Landlord with due diligence at Landlord's expense (provided that Landlord owns the Proposed Parcel on which the damaged improvements are located and that said insurance proceeds shall be assigned for such purpose) unless Landlord elects to terminate this Lease as provided in Paragraph 10.2.

10.2 **Election to Terminate.** If the improvements on the Premises or the Proposed Parcel of which the Premises are a part, whether or not the Premises are a part of the damage, are damaged by an insured casualty to the extent of at least twenty-five percent (25%) of their replacement cost (cost to repair or replace at the time of loss without deduction for physical depreciation) during the term of this Lease other than during the last three (3) years of said term, or to the extent of at least ten percent (10%) thereof during the last three (3) lease years of said term, or to any extent by an uninsured cause at any time during the lease term, or by an insured or uninsured cause during any extension or renewal of the lease term, Landlord shall, within not more than ninety (90) days after such damage, notify Tenant of Landlord's election to terminate this Lease or to restore the improvements on the Premises and such portion of the improvements in the balance of the Proposed Parcel as in Landlord's sole discretion is necessary to create an economically feasible commercial unit. If Landlord elects to repair or restore the damaged improvements, then with respect to the Premises, Landlord and Tenant each shall restore them in the same manner and to the same extent as if the work was done by each of them in the original construction and fixturizing of the improvements, and the damaged improvements in the balance of said Proposed Parcel shall likewise be restored to the extent required in the preceding sentence. If Landlord elects not to restore as aforesaid, this Lease shall terminate effective as of the date of such damage upon the giving of notice of election by Landlord as aforesaid. If Landlord elects to restore or fails to give notice of its election as aforesaid, then this Lease shall remain in full force and effect.

10.3 **Rent Adjustment.** If this Lease is not terminated as provided in this Paragraph 10, then during the period of repair and restoration, the fixed minimum rent shall be reduced by that proportion which the floor area rendered unusable as a result of such damage bears to Tenant's total floor area before such damage.

11. **FLOOR AREA DEFINED.**

"Floor area" means (a) as to each building or part thereof within the Proposed Parcel, including Tenant's Premises, the actual number of square feet of ground floor space measured to the exterior faces of exterior walls and to the center of party walls, including columns, stairs, elevators and escalators, excluding exterior ramps and loading docks, and (b) the actual number of square feet of any area in the Proposed Parcel exclusively used by a particular tenant, measured from the exterior faces of outside walls, fences or boundary markers.

## 12. EMINENT DOMAIN.

**12.1 Definition.** If there is any taking of or damage to all or any part of the shopping center or any interest therein because of the exercise of the power of eminent domain or inverse condemnation, whether by condemnation proceedings or otherwise, or any transfer of any part thereof or any interest therein made in avoidance thereof (all of the foregoing being hereinafter referred to as "taking") before or during the term hereof, the rights and obligations of the parties with respect to such taking shall be as provided in this Paragraph 12.

**12.2 Total Condemnation.** If there is a taking of all of the Premises, this Lease shall terminate as of the date determined under Paragraph 12.5.

**12.3 Partial Condemnation.** If twenty-five percent (25%) or more of the floor area of Tenant's Premises shall be taken, either party shall be entitled to terminate this Lease, or if twenty-five percent (25%) or more of the floor area of all buildings in the shopping center shall be taken, whether Tenant's Premises are taken or not, Landlord shall be entitled to terminate this Lease, and the terminating party shall give the other party written notice of such election not later than thirty (30) days after the date Landlord delivers notice to Tenant that possession or title to the portion of the Premises taken has vested in the condemnor. If neither party gives such notice or less than twenty-five percent (25%) of the floor area of either Tenant's Premises or buildings in the shopping center shall be taken, this Lease shall remain in full force and effect and rent shall be adjusted as provided in Paragraph 12.7.

**12.4 Common Area.** If twenty-five percent (25%) or more of the common area within a radius of 400 feet from the main entrance to the Premises shall be taken, either party shall be entitled to elect to terminate this Lease, and the terminating party shall give the other party written notice of such election not later than thirty (30) days after the date Landlord delivers notice to Tenant that possession or title to said portion of the common area taken has vested in the condemnor. If neither party gives such notice or more than seventy-five percent (75%) of said portion of the common area will be available after such taking, this Lease shall remain in full force and effect. In no event shall Tenant have the right to terminate this Lease if Landlord provides additional common area which, when combined with the remaining common area, provides a common area which is at least seventy-five percent (75%) as large as said portion of the common area before the taking.

**12.5 Termination Date.** If this Lease is terminated in accordance with provisions of this Paragraph 12, such termination shall become effective as of the date on which title or physical possession of the condemned portion is taken, whichever is earlier.

**12.6 Repair and Restoration.** If this Lease is not terminated as provided in this Paragraph 12, Landlord shall at its sole expense restore with due diligence the remainder of the improvements occupied by Tenant so far as practicable to a complete unit of like quality, character and condition as that which existed immediately prior to the taking, provided that the scope of the work shall not exceed the scope of the work to be done by

-17-

Landlord originally in the construction of the Premises, and
further provided that Landlord shall not be obligated to expend
an amount greater than that which was awarded to Landlord for such
taking.

12.7  Rent Adjustment.  If this Lease is not terminated
as provided in this Paragraph 12, the fixed minimum rent shall be
reduced by that proportion which the floor area taken from the
Premises bears to the total floor area of the Premises immediately
before the taking.

12.8  Award.  The entire award of compensation in such
proceedings, whether for a total or partial taking or for diminu-
tion in the value of the leasehold or for the fee shall belong to
and be the property of Landlord; provided that Tenant shall be
entitled to recover from the condemnor such compensation as may
be separately awarded by the condemnor to Tenant or recoverable
from the condemnor by Tenant in its own right for the taking of
trade fixtures and equipment owned by Tenant (meaning personal
property, whether or not attached to real property, which may be
removed without injury to the Premises) and for the expense of
removing and relocating them.

13.  INDEMNITY; WAIVER.

13.1  Indemnity.  Tenant shall indemnify and save Land-
lord harmless from and against any and all liens, claims, demands,
actions, causes of action, obligations, penalties, charges,
liability, damages, loss, cost or expense, including reasonable
attorney's fees for the defense thereof, arising from or connected
with the conduct or management of the business conducted by Tenant
on the Premises, or any liability, damages, loss, cost or expenses
arising from or connected with Tenant's use of computers on the
Premises, including loss of electric power, or any portion of the
common area which is under the exclusive control of Tenant (the
Premises and such portion of the common area which is under the
exclusive control of Tenant being referred to as "Tenant's Prem-
ises" in Paragraphs 13.1 and 13.2), or the use or occupancy of
Tenant's Premises, or from any breach or default on the part of
Tenant in the performance of any covenant or agreement on the part
of Tenant to be performed pursuant to the terms of this Lease, or
from violations of or non-compliance with any governmental
requirements or insurance requirements, or from any acts or
omissions of Tenant or any person upon Tenant's Premises by
license or invitation of Tenant or occupying Tenant's Premises or
any part thereof under Tenant.

13.2  Waiver.  All property kept, stored or maintained
on Tenant's Premises shall be so kept, stored or maintained at
the sole risk of Tenant; and except in the case of Landlord's
gross negligence or willful misconduct, Landlord shall not be
liable, and Tenant waives all claims against Landlord, for damages
to persons or property sustained by Tenant or by any other person
or firm resulting from the building in which the Premises are
located or by reason of Tenant's Premises or any equipment located
therein becoming out of repair, or through the acts or omissions
of any persons present in the shopping center or renting or
occupying any part of the shopping center, or for loss or damages
resulting to Tenant or its property from burst, stopped or leaking
sewers, pipes, conduits or plumbing fixtures, or for interruption
of any utility services, or from any failure of or defect in any
electric line, circuit or facility, or any other type of improve-

-18-

ment or service on or furnished to Tenant's Premises or resulting from any accident in, on, or about Tenant's Premises or the building in which the Premises are located.

14. **OPERATION OF BUSINESS.**



Tenant shall continuously and uninterruptedly, subject only to Paragraph 18, during the entire lease term: (a) remain open for business at least five (5) days each week and at least eight (8) hours each day; (b) adequately staff its store with sufficient employees to handle the maximum business and carry sufficient stock of merchandise of such amount, character and quality to accomplish this purpose; (c) keep the display windows and exterior signs, if any, well lighted during the hours from sundown to 10:30 p.m.; (d) keep the Premises and exterior and interior portions of windows, doors and all other glass or plate glass fixtures in a neat, clean, sanitary and safe condition; (e) warehouse, store or stock only such merchandise as Tenant intends to offer for sale at retail; (f) use for office or other non-selling purposes only such space as is reasonably required for Tenant's business; (g) refrain from burning any papers or refuse of any kind in the shopping center; (h) store in the area designated by Landlord all trash and garbage in neat and clean containers so as not to be visible to members of the public shopping in the shopping center; (i) observe and promptly comply with all governmental requirements and insurance requirements affecting the Premises or any part of the common area which is under Tenant's exclusive control and promulgated during the term of this Lease; and (j) not use or suffer or permit to be used the Premises or any part thereof for any use other than the use set forth in Paragraph G or in any manner which will constitute a nuisance or unreasonable annoyance to the public, to other occupants of the shopping center or to Landlord, or that will injure the reputation of the shopping center, or for any extra hazardous purpose, or in any manner that will impair the structural strength of the building of which the Premises are a part. *Provided, however, that Tenant shall always be open on Saturday.



15. **SIGNS AND ADVERTISING.**

15.1 **Interior.** Tenant may, at its own expense, erect and maintain upon the interior sales areas of the Premises all signs and advertising matter customary and appropriate in the conduct of Tenant's business, subject to Landlord's right to remove any signs or advertising matter which violate Paragraph 14(j). Tenant shall not affix or maintain upon the glass panes and supports of the show windows and doors, or within twelve (12) inches of the show windows and doors, any signs, advertising placards, names, insignia, trademarks, descriptive material or any other such like item or items, except such as shall have first received the written approval of Landlord as to size, type, color, location, copy, nature and display qualities.

15.2 **Exterior.** Tenant must, at its own expense, erect an exterior sign on its store fascia, subject to Landlord's written approval of said sign and in accordance with Landlord's sign criteria. Tenant shall use Landlord's designated exclusive sign contractor to design, install and fabricate Tenant's sign. Except for those signs and advertising devices which are (a) provided for in approved plans and specifications, or a scale sign drawing submitted by Tenant and approved in writing by Landlord, and (b) which comply with governmental requirements, Tenant shall not erect, place, paint or maintain in or on the Premises, any

-19-

sign, exterior advertising medium or any other object of any kind whatsoever, whether an advertising device or not, visible or audible outside the Premises. Nor shall Tenant change the color, size, location, composition, wording or design of any sign or advertisement on the Premises that may have been theretofore approved by Landlord and governmental authorities without the prior written approval of Landlord and said authorities.  Tenant shall, at its own expense, maintain and keep in good repair all installations, signs and advertising devices which it is permitted by Landlord to maintain, and shall pay all charges required to keep them in good repair.  Tenant must secure sign contracts within thirty (30) days after signing this Lease.  Failure to do so is a breach of this Lease.  Tenant's sign must be installed and operating concurrent with its opening for business.  Tenant's sign shall be deemed real property once installed. *Except an alarm system which is to be designed per insurance carrier's specifications, rated AAA with an exterior alarm bell in front of the premises.

16.    **LIENS.**

        Tenant shall keep the Premises and the shopping center free of any liens or claims of lien arising from any work performed, material furnished or obligations incurred by Tenant in connection with the Premises.  If Tenant disputes the correctness or validity of any claim of lien, Tenant shall, within ten (10) days after written notice from Landlord, record such bond as will release said property from the lien claimed.

    17.    **RIGHT OF ACCESS.**

        Landlord and its authorized agents and representatives shall be entitled to enter the Premises at all reasonable times for the purposes of:  inspecting them, making the repairs which Landlord is obligated to make under this Lease, curing a default of Tenant, posting any notice provided by law that relieves a Landlord from responsibility for the acts of a tenant, exhibiting the Premises to prospective buyers, tenants or lenders, and posting ordinary signs advertising the Premises for sale or for lease during the last one hundred eighty (180) days of the term or any extended term hereof.

    18.    **DELAYING CAUSES.**

        If either party is delayed in the performance of any covenant of this Lease because of any of the following causes (referred to elsewhere in this Lease as a "delaying cause"): acts of the other party, action of the elements, war, riot, labor disputes, inability to procure or general shortage of labor or material in the normal channels of trade, delay in transportation, delay in inspections, or any other cause beyond the reasonable control of the party so obligated, whether similar or dissimilar to the foregoing, financial inability excepted, then such performance shall be excused for the period of the delay and the period for such performance shall be extended for a period equivalent to the period of such delay, except that the foregoing shall in no way affect Tenant's obligation to pay the fixed minimum rent or any other amount payable hereunder, or the length of term of this Lease.

    19.    **ASSIGNMENT AND SUBLETTING.**

        19.1    **Consent Required.**  Notwithstanding anything to the contrary contained in this Lease, Tenant shall not assign this Lease or any interest herein or sublet, license, grant any conces-

-20-

sion or otherwise give permission to anyone other than Tenant to use or occupy all or any part of the Premises without the prior written consent of Landlord. Any attempted assignment, subletting, license or concession agreement or change of ownership without Landlord's written consent shall be void and confer no rights upon any third person. Without in any way limiting Landlord's right to refuse to give such consent for any other reason or reasons, Landlord reserves the right to refuse to give such consent if in Landlord's reasonable business judgment (a) the quality of merchandising operation is or may be in any way adversely affected during the term of the Lease; (b) the financial worth as adjusted for inflation of the proposed new Tenant is less than that of the Tenant executing this Lease or of Tenant and Tenant's Guarantor, as the case may be; (c) the transferee is not of a character or is not engaged in a business which is in keeping with the standards of Landlord for the Premises or the shopping center; (d) the operation of the transferee's business will interfere with or be in conflict with any lease of any other tenant in the shopping center; or (e) the purpose for which the transferee intends to use the Premises is in violation of the Lease or other requirements of the shopping center. Landlord shall require a reasonable payment, including attorney's fees, to cover its handling charges for each assignment or sublease it is requested to approve. The sale, assignment, transfer or disposition, whether for value, by operation of law, gift, will or intestacy, of (i) twenty-five percent (25%) or more of the issued and outstanding stock of Tenant if Tenant is a corporation; or (ii) the interest of any general partner, joint venturer, associate or co-tenant, if Tenant is a partnership, joint venture, association or co-tenancy, shall be deemed an assignment of this Lease under this Paragraph.

19.2   **General Conditions.**  In the event of any assignment of this Lease, Tenant shall remain primarily liable on its covenants under this Lease unless released in writing by Landlord. In the event of any assignment or sublease, the assignee or sublessee shall agree in writing to perform and be bound by all of the covenants of this Lease required to be performed by Tenant. Tenant agrees that any options to extend the term of this Lease are not assignable and further agrees that Tenant cannot exercise any option to extend the term of this Lease if a sublessee is in possession of the Premises at the time of the exercise of the option. If Tenant should receive compensation, whether by lump sum or increased rent, for an assignment or sublease of this Lease in an amount greater than the fixed minimum rent and additional rent being paid by Tenant at the time of the assignment or sublease, Tenant agrees to pay to Landlord fifty percent (50%) of such increase. In addition, Landlord shall have the right to modify the percentage rent due and payable hereunder, provided that such percentage rent is reasonable and customarily charged for a similar business of the assignee of like size, volume and type within a like shopping center in a similar location. If Landlord so elects during the term of this Lease, Landlord can require, and Tenant consents to, assignee or sublessee paying the minimum rent, additional rent and/or Landlord's portion of the above-mentioned increase directly to Landlord.

19.3   **Requirements.**  If Tenant desires at any time to assign this Lease or to sublet the Premises or any portion thereof, it shall notify Landlord of its desire to do so and shall submit in writing to Landlord (a) the name of the proposed subtenant or assignee; (b) the nature of the proposed subtenant's or

-21-

assignee's business to be carried on in the Premises; (c) the terms and provisions of the proposed sublease or assignment; and (d) such reasonable financial information as Landlord may request concerning the proposed subtenant or assignee. Any request for Landlord's approval of a sublease or assignment shall be accompanied with a check in such reasonable amount as Landlord shall advise for the cost of review and/or preparation of any documents relating to such proposed transfer.

19.4 **Election**. At any time within fifteen (15) days after Landlord's receipt of the information specified in Paragraph 19.3 above, Landlord may by written notice to Tenant elect to either (a) sublease the Premises or the portion thereof as shall be specified in said notice upon the same terms as those offered to the proposed subtenant or assignee, as the case may be; or (b) terminate this Lease as to the portion (including all) of the Premises so proposed to be subleased or assigned, with a proportionate abatement in the rent payable hereunder. If Landlord does not exercise any option set forth in this Paragraph 19.4 within said fifteen (15) day period, Tenant may, within ninety (90) days after the expiration of said fifteen (15) day period, enter into a valid assignment or sublease of the Premises or portion thereof upon the terms and conditions described in the information required to be furnished by Tenant to Landlord pursuant to Paragraph 19.3 above, or other terms not less favorable to Tenant subject, however, to Landlord's consent as provided in Paragraph 19.1.

20. **NOTICES**.

Whenever, under this Lease, provision is made for notice or demand, it shall be in writing and signed by or on behalf of the party giving the notice or making the demand and served by personal delivery or by registered or certified mail or by telegraph. If served by registered or certified mail, it shall be deposited in the United States mail, postage prepaid, with return receipt requested, addressed to the party to whom such notice or demand is to be given at the address stated in Paragraph M or N as the case may be, and shall be conclusively deemed served on the date indicated on the return receipt and if the receipt is not returned, then forty-eight (48) hours after mailing. If served by telegraph, service to the addressee shall be conclusively deemed made as confirmed by the telegraphic agency making delivery. The address of either party may be changed for the purpose of this Paragraph or Paragraph 4.1 by written notice to the other party.

21. **SURRENDER OF POSSESSION**.

21.1 **Surrender**. At the expiration of the tenancy created hereunder, whether by lapse of time or otherwise, Tenant shall surrender the Premises broom clean and in good condition and repair.

21.2 **Holding Over**.

(a) If Tenant holds the Premises after the expiration of the term hereof with the consent of Landlord, expressed or implied, such holding over shall, in the absence of a written agreement on the subject, be deemed to have created a tenancy for month to month, terminable on thirty (30) days' written notice by either

-22-

party to the other, at a minimum monthly rental equal
to 1/6th of the total of minimum rental paid by Tenant
to Landlord during the immediately preceding twelve (12)
month period, and otherwise subject to all terms of this
Lease, including the payment of percentage rental and
all other charges payable by Tenant hereunder.  Nothing
contained in this subparagraph shall be construed as
consent to such holding over.

      (b)   If Tenant fails to surrender the Premises
upon the termination of this Lease, Tenant shall indem-
nify and hold harmless Landlord from loss or liability
resulting from such failure, including, without limiting
the generality of the foregoing, any claims made by any
succeeding tenant arising out of such failure.

      21.3   **Entry by Landlord.**  Landlord reserves, and shall
at any and all times have, the right to enter the Premises during
business hours to inspect the same, to submit said Premises to
prospective purchasers or tenants, to post notices of non-respon-
sibility, to repair the Premises and any portion of the building
of which the Premises are a part that Landlord may deem necessary
or desirable, without abatement of rent, and may for that purpose
erect scaffolding and other necessary structures where reasonably
required by the character of the work to be performed, always
providing that the entrance to the Premises shall not be unreason-
ably blocked thereby, and further providing that the business of
Tenant shall not be interfered with unreasonably.  Tenant hereby
waives any claim for damages or for any injury or inconvenience
to or interference with Tenant's business, any loss of occupancy
or quiet enjoyment of the Premises, and any other loss occasioned
thereby.  Landlord shall have the right to use any and all means
which Landlord may deem proper in an emergency to obtain entry to
the Premises without liability to Tenant, except for any failure
to exercise due care for Tenant's property, and any entry to the
Premises obtained by Landlord by any of said means, or otherwise,
shall not under any circumstances be construed or deemed to be a
forcible or unlawful entry into, or a detainer of, the Premises
or an eviction of Tenant from the Premises or any portion thereof.

22.   **QUIET ENJOYMENT.**

      Subject to the provisions of this Lease and conditioned
upon performance of all of the provisions to be performed by
Tenant under this Lease, Landlord shall secure to Tenant during
the lease term the quiet and peaceful possession of the Premises
and all rights and privileges appertaining thereto.

23.   **SUBORDINATION.**

      Tenant agrees that this Lease, at Landlord's option,
shall be subordinated to any mortgage(s) or trust deed(s) that
may hereafter be placed upon said Premises and to any advances to
be made thereunder, any interest thereon, and all renewals,
replacements and extensions thereof, provided that such mortgagees
or beneficiaries request such subordination and agree in writing
to recognize this Lease in the event of foreclosure if Tenant is
not in default.  Tenant shall execute and deliver, without cost
to Landlord, whatever instruments may be required to effect such
subordination and return the same to Landlord within five (5) days
after receipt thereof.  Tenant shall at any time hereafter, on the
request from Landlord, execute any instruments, leases or other

-23-

documents that may be required to render Tenant's interest hereunder subordinate to the lien of any such mortgage(s) or deed(s) of trust and the failure of Tenant to execute any such instrument, lease or other document shall constitute a default hereunder. If Tenant fails to deliver such subordination within said five (5) day period, Tenant hereby appoints Landlord as Tenant's attorney in fact for the purpose of completing, executing and delivering the subordination to the person or persons requesting it.

24.  **OFFSET STATEMENT.**

Tenant shall, at any time and from time to time within ten (10) days after written request therefor by Landlord, deliver a certificate to Landlord or to any proposed mortgagee, trust deed beneficiary, purchaser or successor in interest, certifying the commencement and expiration date of the lease term and that this Lease is then in full force and effect and setting forth the amount and nature of modifications, defenses or offsets, if any, claimed by Tenant. If Tenant fails to deliver such certificate within said ten (10) day period, Tenant hereby appoints Landlord as Tenant's attorney in fact for the purpose of completing, executing and delivering the certificate to the person or firm requesting it.

25.  **DEFAULT.**

25.1  **Notice and Remedies.**  In the case of Tenant's failure to pay rent or to perform any of Tenant's other obligations under this Lease, or any part thereof, when due or called for hereunder, Tenant shall have a period of three (3) days after service of written notice by Landlord specifying the nature of Tenant's default within which to cure such defaults, provided that if the nature of a non-monetary default is such that it cannot be fully cured within said three (3) day period, Tenant shall have such additional time as may be reasonably necessary to cure such default so long as Tenant proceeds promptly after service of Landlord's notice and proceeds diligently at all times to complete said cure. Tenant agrees that a notice served in accordance with the provisions of California Code of Civil Procedure §§1159, et seq., will be deemed compliance with the notice requirements of this Paragraph. If Tenant fails to comply with the foregoing provisions, Tenant shall be deemed to be in breach of this Lease, and Landlord with or without further notice or demand of any kind may, at its option:

(a)  Terminate Tenant's right to possession of the Premises because of such breach and recover from Tenant all damages allowed under §1951.2 of the California Civil Code, including, without limitation, the worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of the award exceeds the amount of such rental loss for the same period that Tenant proves could be reasonably avoided; or

(b)  Not terminate Tenant's right to possession because of such breach, but continue this Lease in full force and effect; and in that event (i) Landlord may enforce all rights and remedies under this Lease and under the provisions of §1951.4 of the California Civil Code, including the right to recover the rent and all other charges due hereunder as such rent and other

-24-

charges become due hereunder, and (ii) Tenant may assign its interest in this Lease with Landlord's prior written consent, which consent shall not be unreasonably with-held.

25.2  **Tenant's Property**.  In the event of default, all of Tenant's property shall remain on the Premises and in that event, and continuing during the length of said default, Landlord shall have the right to take the exclusive possession of Tenant's property and to use it rent or charge free, until all defaults are cured or, at Landlord's option, to require Tenant forthwith to remove any or all of Tenant's property; and if Tenant fails to do so, Landlord may remove any such property and place such property in storage in a public warehouse at the cost and risk of Tenant.

25.3  **Notice of Termination**.  No re-entry or reletting of the Premises shall be construed as an election by Landlord to terminate Tenant's right to possession of this Lease unless a written notice of such intention is given by Landlord to Tenant; and notwithstanding any such reletting without such termination, Landlord may at any time thereafter elect to terminate Tenant's right to possession and this Lease in the event that at such time Tenant remains in default hereunder.

25.4  **Waiver of Notice; Performance by Landlord**.  Not-withstanding any provision of this Paragraph 25, (a) if Tenant is required to comply with any governmental requirement, Tenant shall not be entitled to notice of default from Landlord and right to cure beyond the period within which such compliance may be required by such governmental requirement; or (b) if this Lease expressly provides that this Lease may be terminated effective on service of notice, Tenant shall be entitled to cure its default only if the right to cure is required by law; or (c) if in Land-lord's judgment the continuance of any default by Tenant for the full period of notice provided for herein will jeopardize the Premises or the rights of Landlord, Landlord may, with or without notice, elect to perform those acts in respect to which Tenant is in default for the account and at the expense of Tenant.  If by reason of such default by Tenant, Landlord is compelled to pay or elects to pay any sum of money, including, but without limitation, reasonable attorney's fees, such sum or sums so paid by Landlord, with interest thereon from the date of such payment at the rate provided in this Lease, shall be due from Tenant to Landlord on the first day of the month next following such payment by Land-lord.

25.5  **Interest**.  Any sum accruing to Landlord under the terms and provisions of this Lease which shall not be paid when due shall bear interest at the rate provided below from the date the same becomes due and payable by the terms and provisions of this Lease until paid, unless otherwise specifically provided in this Lease.  The interest rate which shall apply shall be the lesser of (a) the discount rate charged by the San Francisco Federal Reserve Bank plus five (5) percentage points, or (b) the highest rate allowed by applicable law.

25.6  **Other Remedies**.  Nothing contained in this Lease shall limit Landlord to the remedies set forth in this Paragraph 25, and particularly those which are set forth in Paragraph 25.1; and upon Tenant's default, Landlord shall be entitled to exercise any right or remedy then provided by law, including, but not

without limitation, the right to obtain injunctive relief and the right to recover all damages caused by Tenant's default in the performance of any of its obligations under this Lease.

26. **INSOLVENCY.**

26.1 **Breach of Lease.** The filing of any petition by or against Tenant under any chapter of the United States Bankruptcy Code, or any successor statute thereto, or the adjudication of Tenant as a bankrupt or insolvent, or the obtaining of an order for relief under the United States Bankruptcy Code, or the appointment of a receiver or trustee to take possession of all or substantially all of the assets of Tenant, or a general assignment by Tenant for the benefit of creditors, or any other action taken or suffered by Tenant under any state or federal insolvency or bankruptcy act, shall constitute a default under and breach of this Lease by Tenant, regardless of Tenant's compliance with the other provisions of this Lease; and Landlord at its option by written notice to Tenant may exercise all rights and remedies provided for in Paragraph 25, including the termination of this Lease, effective on service of such notice, without the necessity of further notice under Paragraph 25.

26.2 **Operation of Law.** Neither this Lease, nor any interest herein, nor any estate created hereby, shall pass by operation of law under any state or federal insolvency or bankruptcy act to any trustee, receiver, assignee for the benefit of creditors or any other person whatsoever without the prior written consent of Landlord. Any purported transfer in violation of the provisions of this Paragraph 26.2 shall constitute a default under and breach of this Lease, regardless of Tenant's compliance with the other provisions of this Lease; and Landlord at its option by written notice to Tenant may exercise all rights and remedies provided for in Paragraph 25, including the termination of this Lease, effective on service of such notice without the necessity of further notice under Paragraph 25.

26.3 **Non-Waiver.** The acceptance of rent at any time and from time to time by Landlord from Tenant as debtor in possession or from a transferee of the type mentioned in Paragraph 26.2, shall not preclude Landlord from exercising its rights under this Paragraph 26 at any time hereafter.

27. **REMEDIES CUMULATIVE.**

The various rights, elections and remedies of Landlord and Tenant contained in this Lease shall be cumulative, and no one of them shall be construed as exclusive of any of the others, or of any right, priority or remedy allowed or provided for by law.

28. **ATTORNEY'S FEES.**

If either party hereto shall file any action or bring any proceeding against the other party arising out of this Lease or for the declaration of any rights hereunder, the prevailing party therein shall be entitled to recover from the other party, all costs and expenses, including reasonable attorney's fees, incurred by the prevailing party as determined by the court. If either party ("secondary party") without its fault is made a party to litigation instituted by or against the other party, the primary party shall pay to the secondary party all costs and

-26-

expenses, including reasonable attorney's fees, incurred by the secondary party in connection therewith.

29. **WAIVER OF DEFAULT.**

The waiver by either party of any default in the performance by the other of any covenant contained herein shall not be construed to be a waiver of any preceding or subsequent default of the same or any other covenant contained herein. The subsequent acceptance of rent or other sums hereunder by Landlord shall not be deemed a waiver of any preceding default other than the failure of Tenant to pay the particular rental or other sum or portion thereof so accepted, regardless of Landlord's knowledge of such preceding default at the time of acceptance of such rent or other sum.

30. **NO PARTNERSHIP.**

Landlord shall not in any way or for any purpose be deemed a partner, joint venturer or member of any joint enterprise with Tenant.

31. **SUBTENANCIES.**

The voluntary or other surrender of this Lease by Tenant or a mutual cancellation of this Lease shall not effect a merger and shall, at Landlord's option, terminate all existing subtenancies or operate as an assignment to Landlord of any or all of such subtenancies.

32. **SUCCESSORS.**

This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their successors. The term "successors" is used herein in its broadest possible meaning and includes, but is not limited to, every person succeeding to any interest in this Lease or the Premises of Landlord or Tenant herein whether such succession results from the act or omission of such party. Every covenant and condition of this Lease shall be binding upon all permitted assignees, subtenants, licensees and concessionaires of Tenant.

33. **REMOVAL OF TENANT'S PROPERTY.**

Upon expiration of the term of this Lease or upon any earlier termination thereof, Tenant shall remove at its own expense all trade fixtures, equipment, merchandise and personal property (collectively called "Tenant's property") which were installed by Tenant or any subtenant, concessionaire or licensee in or upon the Premises; but if Tenant is in default, Tenant shall not remove Tenant's property unless notified by Landlord to do so. In case of any injury or damage to the building or any portion of the Premises resulting from the removal of Tenant's property, Tenant shall promptly pay to Landlord the cost of repairing such injury or damage. Tenant shall complete such removal by the time provided in the first sentence of this Paragraph 33 unless prevented from so doing by a delaying cause, or Landlord may, at Landlord's option, retain any or all of Tenant's property; and title thereto shall thereupon vest in Landlord without the execution of documents of sale or conveyance by Tenant, or Landlord may remove any or all items of Tenant's property from the Premises and dispose of them in any manner Landlord sees fit, and Tenant shall

pay upon demand to Landlord the actual expense of such removal and
disposition together with interest from the date of payment by
Landlord until repayment by Tenant.

### 34.  EFFECT OF CONVEYANCE.

If during the term of this Lease, Landlord conveys its
interest in the Premises or this Lease, then from and after the
effective date of such conveyance, Landlord shall be released and
discharged from any and all further obligations and responsibili-
ties under this Lease except those already accrued of which
Landlord has notice at the time of conveyance.

### 35.  LANDLORD'S DEFAULT; NOTICE TO LENDER.

35.1  Landlord's Default.  In the case of a default by
Landlord, Landlord shall commence promptly to cure such default
immediately after receipt of written notice from Tenant specify-
ing the nature of such default and shall complete such cure within
thirty (30) days thereafter, provided that if the nature of such
default is such that it cannot be cured within said thirty (30)
day period, Landlord shall have such additional time as may be
reasonably necessary to complete its performance so long as
Landlord has proceeded with diligence after receipt of Tenant's
notice and is then proceeding with diligence to cure such default.

35.2  Notice to Lender.  Whenever Tenant is required to
serve notice on Landlord of Landlord's default, written notice
shall also be served at the same time upon the mortgagee under
any first or second mortgage or beneficiary under any first or
second deed of trust.  Such mortgagee or beneficiary shall have
the periods of time within which to cure Landlord's defaults as
are provided in Paragraph 35.1, which periods shall commence to
run ten (10) days after the commencement of the periods within
which Landlord must cure its defaults under Paragraph 35.1.  In
this connection any representative of the mortgagee or beneficiary
shall have the right to enter upon the Premises for the purpose
of curing Landlord's default.  Such mortgagee or beneficiary shall
notify Landlord and Tenant in the manner provided by Paragraph 20
of the address of such mortgagee or beneficiary to which such
notice shall be sent, and the agreements of Tenant hereunder are
subject to prior receipt of such notice.

### 36.  CONSENT.

In consideration of each covenant made elsewhere under
this Lease wherein one of the parties agrees not to unreasonably
withhold its consent or approval, the requesting party hereby
releases the other and waives all claims for any damages arising
out of or connected with any alleged or claimed unreasonable
withholding of consent or approval.

### 37.  INTERPRETATION.

The captions by which the paragraphs of this Lease are
identified are for convenience only and shall not affect the
interpretation of this Lease.  Wherever the context so requires,
the singular number shall include the plural, the plural shall
refer to the singular, the neuter gender shall include the mascu-
line and feminine genders.  If there is more than one signatory
hereto as Tenant, the liability of such signatories shall be joint
and several.  If any provision of this Lease shall be held to be

-28-

invalid by a court, the remaining provisions shall remain in effect and shall in no way be impaired thereby.

38. **LENDER APPROVAL.**

Landlord and Tenant hereby agree that this Lease and all of Landlord's obligations hereunder are expressly conditioned upon review and approval of this Lease by Landlord's construction and permanent lender(s). This condition is expressly for the sole benefit of Landlord and may be waived by Landlord by written notice from Landlord to Tenant.

39. **ENTIRE INSTRUMENT.**

It is understood that there are no oral agreements between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. This Lease cannot be modified in any respect except by a writing executed by Landlord and Tenant.

40. **EASEMENTS.**

This Lease is made expressly subject to:

(a) Any conditions, covenants, conditions and restrictions and/or easements of record on the Premises and/or the shopping center, including the Easement With Covenants and Restrictions Affecting Land referred to in Paragraph 5.7 above; and

(b) Any easements for utilities or ingress and egress which now or hereafter may be placed of record by Landlord for purposes of the common benefit of the occupants of the shopping center. Tenant agrees to execute such documents necessary to subordinate its interest hereunder to such easements.

41. **SALE BY LANDLORD.**

The Premises and/or Landlord's interest under this Lease may be freely sold or assigned by Landlord and, in the event of any such sale or assignment, the covenants and obligations of Landlord herein shall be binding on each successive "landlord" and its successors and assigns, only during their respective periods of ownership.

42. **ADDENDUM.**

The Addendum, consisting of _____2_____ page(s) with paragraph(s) numbered consecutively __44__ through_____, inclusive, is attached hereto and is by this reference incorporated herein.

43. **WARRANTIES AND REPRESENTATIONS.**

(a) Landlord and Landlord's real estate brokers make no warranty or representation with respect to any other tenants or owners which may or may not construct

-29-

improvements, occupy or conduct business within the shopping center, and Tenant hereby acknowledges and agrees that it is not relying on any warranty or representation relating thereto in entering into this Lease.

(b)  Landlord specifically disavows any oral representations made by or on behalf of its employees, agents and independent contractors, and Tenant hereby acknowledges and agrees that it is not relying and will not rely on any oral representations in entering into this Lease.

LANDLORD:                                  TENANT:

RANCHO NIGUEL COMMERCIAL I, a              SAM HASSINE & HUMBERTO DA SILVA
  California general partnership             DBA: Nuggets & Carats

By_____(SEE ATTACHED)_____                By_____

By_____                By_____

Date:_____, 19__.                Date:____12/12____, 19__

-30-

RANCHO NIGUEL COMMERCIAL I,
a California General Partnership

BY: RANCHO NIGUEL PLAZA, LTD.,
    a California Limited Partnership

    BY: THE BUIE CORPORATION,
        a California Corporation, General Partner

        BY: _____
        ITS: _____

        BY: _____
        ITS: _____


BY: HOME CAPITAL CORPORATION,
    a California Corporation

    BY: _____
    ITS: _____

    BY: _____
    ITS: _____


STATE OF CALIFORNIA    )
COUNTY OF ORANGE       )

    On this _____ day of _____, 19__,
before me, _____, the undersigned, a
Notary Public in and for said State, personally appeared
_____, personally known to me (or proved
to me on the basis of satisfactory evidence) to be the
_____, and _____,
personally known to me (or proved to me on a basis of
satisfactory evidence) to be the _____
of THE BUIE CORPORATION, the corporation that executed the
within instrument and known to me to be the persons who
executed the within instrument on behalf of said corporation,
said corporation being known to me to be the general partner
of RANCHO NIGUEL PLAZA, LTD., a California limited
partnership, the partnership that executed the within
instrument said partnership being known to me to be one of
the general partners of RANCHO NIGUEL COMMERCIAL I, a
California general partnership, and acknowledged to me that
such corporation executed the same as such partner, that such
named partnership executed the same.

WITNESS my hand and official seal.


_____
Notary Public

1

STATE OF CALIFORNIA        )
COUNTY OF _____    )

On _____, before me, the undersigned, a Notary Public in and for said State, personally appeared _____ and _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons who executed the within instrument as _____ President and _____ Secretary, on behalf of HOME CAPITAL CORPORATION, a California corporation, the corporation therein named, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors, said corporation being known to me to be one of the partners of RANCHO NIGUEL COMMERCIAL I, a California general partnership, the partnership that executed the within instrument, and acknowledged to me that such corporation executed the same as such partner and that such partnership executed the same.

WITNESS my hand and official seal.

                              _____
                              Notary Public


STATE OF CALIFORNIA  )
COUNTY OF _____  )

On _____, before me, the undersigned, a Notary Public in and for said State, personally appeared _____ and _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons who executed the within instrument as _____ President and _____ Secretary, on behalf of _____, the corporation therein named, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

                              _____
                              Notary Public


STATE OF CALIFORNIA )
COUNTY OF _ORANGE_  )

On _12 Dec 1988_, before me the undersigned, a Notary Public in and for said State, personally appeared _Sam Bassine & Humberto Da Silva_ personally known to me to be the person(s) whose name(s) subscribed to the within instrument and acknowledged that _they_ executed the same.

WITNESS my hand and official seal.

                              _____
                              Notary Public

OFFICIAL SEAL
FAY M. ROBERTS
Notary Public-California
ORANGE COUNTY
My Comm. Exp. Aug. 24, 1990

2

**EXHIBIT 2**

## PACIFIC WEST ASSET MANAGEMENT CORPORATION
## MANAGEMENT AGREEMENT

This agreement is dated for reference purposes as of August 27, 2015, and is by and between the "Owner(s)" reflected in Exhibit A attached hereto ("Owner") and Pacific West Asset Management Corporation ("Pacific West" or "Manager").

### Section 1   APPOINTMENT OF PACIFIC WEST ASSET MANAGEMENT

**1.1   Appointment and Acceptance.** Owner hereby appoints Pacific West as sole and exclusive Agent of Owner to manage the property upon the terms and conditions provided herein. Pacific West accepts the appointment and agrees to furnish the services of its organization for the management of the Premises; and Owner agrees to pay all reasonable and documented expenses in connection with those services.

**1.2   Description of Premises.** The property to be managed by Pacific West under this agreement (the "Premises") is located at the "Premises" reflected in Exhibit A attached hereto, consisting of the land, buildings, and other improvements. The Premises will be referred to using the "Owner" entity name reflected on Exhibit A.

**1.3   Term.** The term of this Agreement shall be on a month to month basis effective August 27, 2015.

### Section 2   BANK ACCOUNTS

The various bank accounts established under this Agreement shall at all times be established in Owner's name but under Pacific West's control. Pacific West's designees shall be the only parties authorized to draw upon such accounts. No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Pacific West.

**2.1   Operating Account(s).** Pacific West shall establish a separate account in the name of the "Owner(s)" reflected in Exhibit A attached hereto, Pacific West Asset Management Corporation as Agents for Operating Account, separate and apart from Pacific West's corporate accounts, for the deposit of receipts collected as described herein, in a bank or other institution whose deposits are insured by the federal government. Such depository shall be selected by Pacific West. However, Pacific West shall not be liable in the event of bankruptcy or failure of a depository. Funds in the Operating Account remain the property of Owner subject to disbursement of expenses by Pacific West as described in this Agreement.

**2.2   Fidelity Bond.** Pacific West shall cause all personnel who handle or are responsible for the safekeeping of any monies of Owner to be covered by a fidelity bond in the amount of $500,000 with a company determined by Pacific West. Such bond shall be obtained by Pacific West at Pacific West's expense. Evidence of said bond shall be given to Owner.

### Section 3   COLLECTION OF RENTS AND OTHER RECEIPTS

**3.1   Special Charges.** For the credit to Owner's account, Pacific West may collect from tenants any or all of the following: an administrative charge for late payment of rent, a charge for returned or non-negotiable checks, a credit report fee, and any other charges provided for in the leases, Pacific West shall account to Owner for such charges.

**3.2   Security Deposits.** Pacific West shall collect, deposit, and disburse tenants' security deposits in accordance with the terms of each tenant's lease. Pacific West shall pay tenants interest upon such security deposits only if required by law to do so; otherwise, any interest earned on tenant security deposits shall be deposited by Pacific West to the Operating Account. Pacific West shall comply with all applicable state or local

1

laws concerning the responsibility for security deposits and interest, if any.

## Section 4      DISBURSEMENT FROM OPERATING (AND/OR) RESERVE ACCOUNT(S)

**4.1      Operating Expenses.**   From the Operating (and/or) Reserve Account(s), **Pacific West** is hereby authorized to pay or reimburse itself for all expenses and costs of operating the Premises and for all other sums due **Pacific West** under this Agreement, including without limitation **Pacific West's** compensation under Section 16.

**4.2      Debt Service.**  Owner shall give **Pacific West** advance written notice of at least thirty (30) days if Owner desires **Pacific West** to make any additional monthly or recurring payments (such as mortgage indebtedness, taxes, or special assessments, or fire, steam boiler, or other insurance premiums) out of the proceeds from the Premises.

**4.3      Net Proceeds.**   To the extent that funds are available, and after maintaining any cash contingency reserves at Owner's request, **Pacific West** shall transmit cash balances to Owner periodically, as follows: a distribution at month-end of all funds available, minus any Owner-directed contingency reserve balance. Distribution shall be made as directed by Owner, via check or wire transfer.  Owner shall bear all costs associated with transmittal of its distribution.

## Section 5      Pacific West NOT REQUIRED TO ADVANCE FUNDS

In the event that the balance in the Operating (and/or) Reserve Account(s) is at any time insufficient to pay disbursements due and payable under paragraph 4.1 and 4.2 above, Owner shall, immediately upon notice, remit to **Pacific West** sufficient funds to cover the deficit and replenish the Contingency Reserve. In no event shall **Pacific West** be required to use its own funds to pay such disbursements.  Nor shall **Pacific West** be required to advance any monies to Owner, to the Security Deposit Account, or to the Operating (and/or) Reserve Account(s).

## Section 6      FINANCIAL AND OTHER REPORTS

By the tenth (10th) day of each month, **Pacific West** shall furnish Owner with a statement of cash receipts and disbursements from the operation of the Premises during the previous month.  In addition, **Pacific West** shall, on a mutually acceptable schedule, prepare and submit to Owner such other reports as agreed on by both parties, to include:

   1.  A comparison of the reported month and year-to-date amount of actual cash transactions to the management and operations budget approved by Owner (the "Approved Budget"); explanations of monthly and year-to-date variations.

   2.  A monthly report representing a tenant rent roll containing at least the following information for each leasable space in the Premises (whether leased or vacant):

        a. Tenant name or designated vacant space;
        b. Rent rates and concessions given;
        c. Rent collected;
        d. Lease commencement and termination dates;
        e. Square footage leased;
        f. Delinquency report.
        g. Budget versus Accrual

2

Notwithstanding the foregoing, Owner acknowledges and agrees that **Pacific West** shall not be responsible for conducting space/Premises audits to confirm the actual square footage/occupancy, unless requested in writing by Owner, in which event Owner shall pay the cost thereof (if done by an independent entity) or **Pacific West's** reasonable additional charge therefore, to be agreed upon in advance by Owner and **Pacific West**.

**6.1     Owner's Right To Audit.** Owner shall have the right to request periodic audits of all applicable accounts managed by **Pacific West**, and the cost of such audit(s) shall be paid by Owner.

## Section 7     LEASE ENFORCEMENT

**Enforcement Of Leases.** **Pacific West** is authorized to institute, in Owner's name, all legal actions or proceedings for the enforcement of any lease term, for the collection of rent or other income from the Premises, or for the evicting or dispossessing of tenants or other persons from the Premises. **Pacific West** is authorized to sign and serve such notices, as **Pacific West** deems necessary for lease enforcement, including the collection of rent or other income. **Pacific West** is authorized, subject to Owner's approval, when expedient, to settle, compromise, and release such legal actions or suits or reinstate such tenancies. Any monies for such settlements paid out by **Pacific West** shall not exceed $1,000 without prior approval by Owner. Attorneys' fees, filing fees, court costs, and other necessary expenses incurred in connection with such actions and not recovered from tenants shall be paid out of the Operating (and/or) Reserve Account(s) or reimbursed directly to **Pacific West** by Owner. **Pacific West** may select the attorney of its choice to handle such litigation subject to Owner's approval.

## Section 8     INDEPENDENT CONTRACTORS

**Pacific West's Authority To Hire.** **Pacific West** is authorized to hire, supervise, discharge, and pay for all management, maintenance, and operation of the Premises. **Pacific West** will retain independent contractors only, not employees, to provide maintenance, janitorial and HVAC services on the premises.

## Section 9     MAINTENANCE AND REPAIR

**Pacific West** is authorized to make or cause to be made, through contracted services or otherwise, all ordinary repairs and replacements reasonably necessary to preserve the Premises, and all repairs and alterations required to comply with lease requirements, governmental regulations, or insurance requirements. **Pacific West** is also authorized to decorate the Premises and to purchase or rent, on Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms, and other items necessary for the management, maintenance, or operation of the Premises subject to Owner's prior approval. Such maintenance and decorating expenses shall be paid out of the Operating (and/or) Reserve Account(s). This section applies except where decorating and/or maintenance are at tenants' expense as stipulated in a lease.

**9.1     Approval For Exceptional Maintenance Expense.** The expense to be incurred for any one item of maintenance, alteration, refurbishing, or repair shall not exceed the sum of One Thousand Dollars ($1,000), unless such expense is specifically authorized by Owner, or is incurred under such circumstances as **Pacific West** shall reasonably deem to be an emergency. In an emergency where repairs are immediately necessary for the preservation and safety of the Premises, or to avoid the suspension of any essential service to the Premises, or to avoid danger to life or property, or to comply with federal, state, or local law, such emergency repairs shall be made by **Pacific West** at Owner's expense without prior approval, but Owner will be immediately notified.

## Section 10     CONTRACTS, UTILITIES AND SERVICES

**Pacific West** is authorized to negotiate contracts for nonrecurring items of expense, not to exceed One Thousand Dollars ($1,000) unless approved by Owner, and to enter into agreements in Owner's name for all necessary repairs, maintenance, minor alterations, and utility services. **Pacific West** shall, in Owner's name and at Owner's expense, make contracts on Owner's behalf for electricity, gas, telephone, fuel, or water, and such other services

PWAM 0014

as **Pacific West** shall deem necessary or prudent for the operation of the Premises. All utility deposits shall be the Owner's responsibility, except that **Pacific West** may pay same from the Operating (and/or) Reserve Account(s) at Owner's request.

## Section 11   RELATIONSHIP OF PACIFIC WEST TO OWNER

The relationship of the parties to this Agreement shall be that of principal and agent, and all duties to be performed by **Pacific West** under this Agreement shall be for and on behalf of Owner, in Owner's name, and for Owner's account. In taking any action under this Agreement, **Pacific West** shall be acting only as an independent contractor and agent of Owner and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring **Pacific West** to bear any portion of losses arising out of or connected with the ownership or operation of the Premises. Nor shall **Pacific West** at any time during the period of this Agreement be considered an employee of Owner. Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement, except that **Pacific West** is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement.

## Section 12   SAVE HARMLESS

Owner shall indemnify, defend, and save **Pacific West** harmless from all loss, damage, cost, expense (including attorney's fees), liability, or claims arising, resulting, sustained, or incurred by **Pacific West** in connection with its performance of acts of **Pacific West** or its agents, employees, or contractors under this Agreement, including without limitation any claims for personal injury or property damage occurring in, on, or about the Premises, except in case of gross negligence or willful misconduct of **Pacific West**. Payment is not a condition precedent to recovery under this indemnity.

## Section 13   PROPERTY & LIABILITY INSURANCE

Owner shall obtain and keep in force adequate property insurance against physical damage (e.g. fire with extended coverage endorsement, boiler and machinery, loss of rents, etc.) to the premises and against liability for loss, damage, or injury to property or persons which might arise out of the occupancy, management, operation, or maintenance of the Premises. All policies of insurance provided for herein shall be issued by insurance companies with a general policyholder's rating of not less than A- and a financial rating not less than Class VIII as rated in the most current available "Best Insurance Reports." Such liability insurance shall be an "occurrence based" policy (not a "claims made" policy). The amount of such bodily injury, property damage, and public liability insurance shall carry a combined limit of $2,000,000. Any deductible required under such insurance policies shall be Owner's expense. All public liability, property damage and other casualty insurance policies shall be written as primary policies, not contributing with, and not in excess of coverage which **Pacific West** may carry. **Pacific West** including its directors, officers, employees and agents (hereinafter referred to as "**Pacific West Parties**") shall be covered as an additional insured on all liability insurance maintained with respect to the Premises. If any action or proceeding is brought against **Pacific West** or any of the **Pacific West Parties** by reason of any such claim, upon notice from **Pacific West**, Owner shall defend the same at Owner's expense by counsel reasonably satisfactory to **Pacific West**. Owner agrees to furnish **Pacific West** with certificates evidencing such insurance or with duplicate copies of such policies within ten (10) days of the date of this Agreement. If Owner fails to do so, **Pacific West** may, but shall not be obligated to, place said insurance and charge the cost thereof to the Operating (and/or) Reserve Account(s). Said policies shall provide that notice of default or cancellation shall be sent to **Pacific West** as well as Owner and shall require a minimum of thirty (30) days' written notice to **Pacific West** before any cancellation of or changes to said policies. Owner shall furnish **Pacific West** with renewals or binders of any such policy at least thirty (30) days prior to the expirations thereof. The insurance or maintenance of insurance by the Owner shall not be deemed or construed to release, limit, waive or discharge the Owner from any obligation imposed by this contract.

4

PWAM 0015

Should Owner decide to insure their property under the **Pacific West** master insurance policy, Owner agrees and understands that coverage will cease immediately upon termination of this Management Agreement. **Pacific West** and its insurer(s) maintain the right to issue or request cancellation or amendment of the insurance coverage upon Owner's failure to comply with any loss control recommendation and/or any increase in any hazard or exposure on the Premises. **Pacific West** will attempt to notify Owner within thirty (30) days of any material change or cancellation of coverage. **Pacific West** is not responsible for the adequacy of coverage terms, conditions, deductibles or policy limits. **Pacific West** and its insurers reserve the right not to offer the master insurance policy or its renewal to Owner. At Owner's request a copy of the policy's coverage terms and conditions will be made available to the Owner. Owner may terminate its participation in the **Pacific West** master insurance policy at any time.

Manager shall obtain and maintain from each commercial tenant a Certificate of Insurance evidencing tenant compliance with insurance provisions of their respective leases or month-to-month tenancy agreements. Manager shall only utilize independent contractors engaged to perform services who are insured, and provide evidence of policies of commercial general liability insurance with limits of not less than $2,000,000 combined single limit per occurrence for Bodily Injury, Personal Injury, and Property Damage Insurance.

### Section 14       PACIFIC WEST ASSUMES NO LIABILITY

**Pacific West** assumes no liability for any acts or omissions of Owner, or any previous owners of the Premises, or any previous management or other agent of either. **Pacific West** assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any lease or otherwise. Nor does **Pacific West** assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect. Any such regulatory violations or hazards discovered by **Pacific West** shall be brought to the attention of Owner by **Pacific West** in writing promptly upon discovery, and Owner shall be fully responsible for correction or elimination thereof, and shall undertake to correct or remediate the same promptly upon receipt of notice.

### Section 15       OWNER RESPONSIBLE FOR ALL EXPENSES OF LITIGATION

Owner shall pay all expenses incurred by **Pacific West**, including, but not limited to, reasonable attorneys' fees and **Pacific West's** costs and time, and any liability, fines, penalties or the like, in connection with any claim, proceeding, or suit involving an alleged violation by **Pacific West** or Owner, or both, of any law pertaining to fair employment, fair credit reporting, environmental protection, rent control, taxes, or fair housing, including, but not limited to, any law prohibiting or making illegal discrimination on the basis of race, sex, creed, color, religion, national origin, or mental or physical handicap, provided, however, that Owner shall not be responsible to **Pacific West** for any such expenses in the event **Pacific West** is finally adjudged to have personally, and not in a representative capacity, violated any such law. Nothing contained in this Agreement shall obligate **Pacific West** to employ legal counsel to represent the Owner in any such proceeding or suit.

**15.1    Fees For Legal Advice.** Owner shall pay reasonable expenses incurred by **Pacific West** in obtaining legal advice regarding compliance with any law affecting the Premises or activities related to them. If such expenditure also benefits others for whom **Pacific West** acts in a similar capacity, Owner agrees to pay an apportioned amount of such expense.

### Section 16       PACIFIC WEST'S COMPENSATION AND EXPENSES

As compensation for the services provided by **Pacific West** under this Agreement and expenses incurred, Owner shall pay **Pacific West** as follows:

5

## 16.1    For Management Services.

The management fee shall be ___based upon the "Monthly Management Fee" reflected on Exhibit A attached hereto,___ and shall be calculated based on the total monthly rents from the Premises, payable on the first day of the subsequent month for the duration of this Agreement. Payments due **Pacific West** for periods of less than a calendar month shall be prorated over the number of days for which compensation is due. The percentage amount set forth above shall be based upon the total gross receipts from the Premises during the preceding month. The term "gross receipts" shall be deemed to include all rents and other income and charges from the normal operation of the Premises, including without limitation all contributions or reimbursements for common area maintenance, insurance, utilities, real estate taxes, or other pass-throughs actually collected from tenants but excluding amounts specified in Section 16.2 below. Gross receipts shall not be deemed to include security deposits, NSF checks or insurance proceeds arising out of fire or other casualty losses and items of a similar nature.

**16.2    Court Appearances.** Owner shall pay to **Pacific West** One Hundred Dollars ($100.00) per hour for any court appearance made on behalf or Owner.

**16.3    Reimbursements.** Owner agrees to reimburse **Pacific West** for photocopying, scanning, telephone usage and postage expenses actually incurred in and directly related to the management of the Premises. Owner agrees to reimburse Pacific West $10.00 of each returned check fee it collects, to be applied to bank fees associated with each returned check. The balance of each returned check fee shall be retained by Owner.

**16.4    Leasing and Renewals.** Owner shall pay **Pacific West** for negotiating Owner-accepted leases and month-to-month tenancy agreements with tenants. It is agreed that a commission shall be paid to **Pacific West** in connection with renewals of leases of one and three quarters percent (1.75%) of the value of the lease consideration. Commissions will be paid on the first five years of the extended term only. National tenants are excluded from this Agreement.

## Section 17    REPRESENTATIONS

Owner represents and warrants that Owner has full power and authority to enter this Agreement; that there are no written or oral agreements affecting the Premises other than tenant leases, copies of which have been furnished to **Pacific West**; that there are no recorded easements, restrictions, reservations, or rights of way which adversely affect the use of the Premises for the purposes intended under this Agreement; that to the best of Owner's knowledge, the property is zoned for the intended use; that all leasing and other permits for the operation of the Premises have been secured and are current; that the building and its construction and operation do not violate any applicable statutes, laws, ordinances, rules, regulations, orders, or the like (including, but not limited to, those pertaining to hazardous or toxic substances); that the building does not contain any petroleum, asbestos, urea, formaldehyde, radon, mold, or other toxic or hazardous substance; and that no unsafe condition exists. These representations and warranties shall be deemed continuously made during the term of this Agreement, and Owner shall give notice to **Pacific West** immediately upon learning that any such representation and warranty is incorrect.

## Section 18    STRUCTURAL CHANGES

Owner expressly withholds from **Pacific West** any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owner other than expenses related to exercising the express powers vested in **Pacific West** through this Agreement. However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Premises or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Premises, or to comply with any applicable federal, state, or local laws, regulations, or ordinances,

6

are authorized pursuant to paragraph 9.1 of this Agreement, and **Pacific West** shall notify Owner appropriately.

## Section 19    BUILDING COMPLIANCE

**Pacific West** does not assume and is given no responsibility for compliance of the Premises or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law, or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owner promptly or forward to Owner promptly any complaints, warnings, notices, or summonses received by **Pacific West** relating to such matters. Owner represents and warrants that the Premises and all such equipment comply with all such requirements, and Owner authorizes **Pacific West** to disclose the ownership of the Premises to any such officials and agrees to indemnify and hold **Pacific West**, its representatives, servants, and employees, harmless of and from loss, cost, expense, and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes, or regulations.

## Section 20    TERMINATION

**20.1    Termination By Either Party Without Cause.** This Agreement may be terminated by either Owner or **Pacific West**, with or without cause, upon the giving of thirty (30) day's written notice.

**20.2    Termination For Cause.** Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to paragraph 20.3 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

(a) Breach of Agreement. (i) - Ten (10) days after receipt of notice of a monetary default, if and to the extent the same is not cured within such ten (10) day period, (ii) Thirty (30) days after the receipt of notice by either party to the other specifying in detail a material breach of this Agreement, if such breach has not been cured within said thirty (30) day period; or if such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach have not commenced, and such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured. However, the breach of any obligation of either party hereunder to pay any monies to the other party under the terms of this Agreement shall be deemed to be curable within thirty (30) days.

(b) Failure to Act, Etc. In the event that any insurance required of Owner is not maintained without any lapse, or it is alleged or charged that the Premises, or any portion thereof, or any act or failure to act by Owner/Pacific West, its agent and employees with respect to the Premises, fails to comply with any law or regulation, or any order or ruling of any public authority, and Owner/Pacific West, in its sole discretion, considers that the action or position of Owner/Pacific West or its representatives with respect thereto may result in damage or liability to Owner/Pacific West, or disciplinary proceeding with respect to Owner/Pacific West's license, then notwithstanding the provisions of Section 20.2(a) above, Owner/Pacific West shall have the right to terminate this Agreement at any time by written notice to the other of its election to do so, which termination shall be effective upon the service of such notice. Such termination shall not release the indemnities of Owner/Pacific West set forth herein.

(c) Excessive Damage. Upon the destruction of or substantial damage to the Premises by any cause, or the taking of all or a substantial portion of the Premises by eminent domain, making it impossible or impracticable to continue operation of the Premises.

(d) Inadequate Insurance. If **Pacific West** deems that the liability insurance obtained by Owner per section 13 is not reasonably satisfactory to protect its interest under this Agreement, and if Owner and **Pacific West** cannot

PWAM 0018

agree as to adequate insurance, Owner/**Pacific West** shall have the right to cancel this Agreement upon service of notice to Owner.

**20.3    Owner Responsible For Payments.**  Upon termination of or withdrawal from this Agreement, Owner shall assume the obligations of any contract or outstanding bill executed by **Pacific West** in accordance with this Agreement for and on behalf of Owner shall be solely responsible for payment of all unpaid bills.  In addition, Owner shall furnish **Pacific West** security, in an amount satisfactory to **Pacific West**, against any obligations or liabilities which **Pacific West** may have properly incurred on Owner's behalf in accordance with this Agreement. **Pacific West** may withhold funds for sixty (60) days after the end of the month in which this Agreement is terminated, in order to pay bills previously incurred but not yet invoiced and to close accounts.  **Pacific West** shall deliver to Owner, within sixty (60) days after the end of the month in which this Agreement is terminated, any balance of monies due Owner or of tenant security deposits, or both, which were held by **Pacific West** with respect to the Premises, as well as a final accounting reflecting the balance of income and expenses with respect to the Premises as of the date of termination or withdrawal, and the originals (or copies where originals are unavailable) of all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Premises.

**20.4    Sale Of Premises.**  In the event that the Premises are sold by Owner during the period of this Agreement, upon transfer of ownership, this Agreement shall terminate.

## Section 21    INDEMNIFICATION SURVIVES TERMINATION

All representations and warranties of the parties contained herein shall survive the termination of this Agreement. All provisions of this Agreement that require Owner to have insured or to defend, reimburse, or indemnify **Pacific West** shall survive any termination; and if **Pacific West** is or becomes involved in any proceeding or litigation by reason of having been Owner's representative, such provision shall apply as if this Agreement were still in effect.

## Section 22    HEADINGS

All headings and subheadings employed within this Agreement and in the accompanying List of Provisions are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## Section 23    FORCE MAJEURE

Any delays in the performance of any obligation of either party under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, terrorist acts, natural disasters, strikes, labor disputes, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of either party, and any time periods required for performance shall be extended accordingly.

## Section 24    COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Owner and **Pacific West** with respect to the management and operation of the Premises and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owner and **Pacific West** relating to the Premises covered by this Agreement.  No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owner and **Pacific West**. Except as otherwise provided herein, any and all amendments, additions, or deletions to this Agreement shall be null and void unless approved by Owner and **Pacific West** in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants, or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, in entering into and executing this

8

Agreement, has relied upon no warranties, representations, covenants, or agreements, express or implied, to such party, other than those expressly set forth herein.

## Section 25    RIGHTS CUMULATIVE; NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## Section 26    APPLICABLE LAW AND PARTIAL INVALIDITY

The execution, interpretation, and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of California. If any part of this Agreement shall be declared invalid or unenforceable, Pacific West shall have the option to terminate this Agreement by notice to Owner.

## Section 27    NOTICES

Any notices, demands, consents, reports and communications necessary or provided for under this Agreement shall be in writing signed by the party making the same and shall be delivered to the following addresses, or to such other addresses as Owner and Pacific West individually may specify in writing, pursuant to "Exhibit A" attached hereto.

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office. Such notices or other communication may also be delivered personally, or by any receipted method or means permitted by law. For purposes of this Agreement, notices delivered personally shall be deemed to have been "given" or "delivered" upon personal delivery thereof. All notices sent by mail, or any means other than personal delivery, shall be deemed to have been "given" or "delivered" effective forty-eight (48) hours after having been deposited in the United States mails as provided herein.

## Section 28    AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

PWAM 0020

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have affixed or caused to be affixed their respective signatures on the dates reflected below:

"Owner"

**Buie – Area M LLC**
**a California limited liability company**

By: Buie Area M Management, LLC
a Delaware limited liability company

By: _____ 8·25·15
                        Date

Its: _____ VP

By: _____
                        Date

Its: _____ SVP/CFO

"Pacific West"

**Pacific West Asset Management Corporation,**
**a California Corporation**

By: _____ 8/24/15
Theresa Louis, CPM          Date

Its: _____ President

By: _____ 8/24/15
Bill Lekas, CPM          Date

Its: _____ CFO & Broker

10

# EXHIBIT "A"
## Management Agreement Dated August 27, 2015

**OWNER:**     Buie – Area M LLC

**ADDRESS FOR NOTICES:**

**Manager:**

Pacific West
Asset Management Corporation
3191 Airport Loop Dr., Bldg. D
Costa Mesa, CA 92626
Tel: (714) 433-7300
Fax: (714) 433-7330
Email:  TLouis@pacificwest.cc

**Owner:**

Buie – Area M LLC
28281 Crown Valley Parkway
Suite 200
Laguna Niguel, CA 92677-1488
Tel: 949-582-4000
Fax: 949-582-7036
Email: Forella@buiestoddardgroup.com

**TAX ID#:**     33-0209381

**PREMISES:**   Site 1: 28021-28261 Crown Valley Pkwy., Laguna Niguel, CA 92677
Site 4: 28121-28141 Crown Valley Pkwy., Laguna Niguel. CA 92677

**MANAGEMENT
FEE:**          Two and one-half percent (2.5%)

*Manager Initials:*

*Owner Initials:*

11

PWAM 0022

**EXHIBIT 3**

# SERVICE CONTRACT

Date: 01/17/2017

Contract #: 150-012017

Owner:

Buie Area M, LLC (Site1)

c/o Pacific West Asset Management Corp.,
PO Box 19068
Irvine, CA 92623-9068

Contractor:

Defense International

Address:
22855 Savi Ranch Parkway, Suite A
Yorba Linda, CA  92887

Owner and Contractor agree as of the above date that contractor shall perform the services set forth below at the location, within the time and for the compensation specified, subject to the terms and conditions attached hereto.

Description of Work and Materials to Be Furnished:
Nightly Security Patrol Service and other related services as more fully described in Exhibit "A" attached hereto and incorporated.

Time of Service:  Work is authorized to commence upon execution of this contract and receipt of the prescribed Insurance requirements attached hereto, evidencing the foregoing insurance and which names Buie Area M, LLC _____ (Owner) and Owner's Agent, Pacific West Asset Management Corporation as additional insured.

Location of Service:  28201,28211,28221,28231,28241,28251,28261 Crown Valley Prkwy, Laguna Niguel CA

Compensation: Five Hundred _____ Dollars ($ 500.00 _____ ) payable only as prescribed by Section 13.

Invoices:  Please show above contract number and items subject to sales tax or use tax.  Equipment rental invoice must be supported by original and duplicate or work tickets.  Send invoices in triplicate to: Buie Area M, LLC (Site1)

c/o Pacific West Asset Management Corporation
PO Box 19068
Irvine, CA 92623-9068

ACCEPTED:
Contractor:
Defense International

By: _Omar McKinney_____

By: _Chaz McKinney_____
            (Print or Type Name)
Title:  CEO
License #  PPO  17353

AUTHORIZED:
Owner:
Buie Area M, LLC (Site1)

By: PACIFIC WEST ASSET MANAGEMENT CORPORATION, a California corporation

By: _Megan Dodson_____

By: Megan Dodson
            (Print or Type Name)
Authorized Agent for Owner

Service Contract
Page 1 of 3

## TERMS AND CONDITIONS

1. The compensation specified on the front hereof takes into account all taxes, wages, costs of any type and profit that are incidental to Contractor's performance of the services unless applicable law specifically provides for direct payment by Owner. Unless otherwise stated on the front hereof, Contractor shall submit its statement Owner upon completion of the services. The statement shall be accompanied by such supporting documents as requested by Owner. Owner shall pay Contractor by check mailed within twenty (20) business days of receipt of the statement and supporting documents.

2. Unless otherwise stated on the front hereof, contractor shall provide all materials, equipment and labor required for the prompt completion of the services. Contractor shall perform the services as an independent contractor and shall comply with all applicable laws and forms of authorizations, take all required or appropriate safety precautions and, to the extent work is performed on Owner's premises, abide by all company operating rules and governmental safety regulations. The equipment provided for the services shall be in first class operating condition and the material provided shall be suitable for the services. Contractor guarantees that the product of the services shall be free of defects for a period of one year after the date services are completed and agrees to correct promptly any such defect at its expense; Contractor makes no other warranty expressed or implied regarding the services. Contractor shall transfer ownership to Owner of all copyrights, inventions, discoveries and improvements resulting from contractor's services.

3. Contractor shall indemnify and save harmless Buie Area M, LLC _____ (Owner) and **Pacific West Asset Management Corporation** and the employees of any of them ("Indemnitees") from and against any and all loss, damage, injury and liability for injury to or death of any person (including an employee of contractor or an Indemnitee) or for loss of or damage to property (including the property of an Indemnitee) or for loss or damage arising from attachments, liens or claims of materialmen or laborers, or patent infringement, including claims and reasonable attorney's fees relating to any of the foregoing, resulting from contractor's performance of this Contract. Such indemnity shall apply whether or not an indemnity was or is claimed to be passively, concurrently or actively negligent and regardless of whether liability without fault is imposed or sought to be imposed on one or more of the indemnities. This indemnity shall not apply to the extent that it is void or otherwise unenforceable under applicable law in effect on or validly retroactive to the date of this Contract, and shall not apply where such loss, damage injury, liability, or claim is the result of the gross negligence or intentional misconduct of an Indemnitee. The Indemnitees' rights to indemnification under the foregoing shall be independent of rights under the insurance to be provided under Section 4.

4. (a)   Contractor shall, at its expense, maintain the following insurance coverages:

      A.   Worker's compensation Insurance in compliance with State requirements;

      B.   Employer's liability Insurance in the minimum amount of $1,000,000.00;

      C.   Commercial general liability insurance in the minimum amount of $1,000,000.00 combined single limit covering both bodily injury, personal injury and property damage including broad form contractual liability coverage for Contractor's indemnification as provided for in this Agreement; coverage shall be on an occurrence form;

      D.   Commercial automobile liability insurance in the minimum amount of $1,000,000.00 combined single limit for bodily injury and property damage if automobiles are used in the performance of Contractor's obligations hereunder;

Service Contract
Page 2 of 5

PWAM 0032

E.   Non-occupational and disability Insurance, if required by the State the State of California;

F. Excess liability insurance in the minimum amount of $5,000,000 combined single limit covering bodily injury, personal injury, property damage and automobile liability (if Contractor's automobiles are used in the performance of Contractor's obligations hereunder). **NOTE:  THIS LIMIT MAY BE REQUIRED DEPENDING ON THE SCOPE OF THE WORK**

All such insurance shall be issued by Companies licensed to do business in the State of California, having a Best's rating of not less than A-VIII, and otherwise satisfactory to Owner. All of such policies shall be on an "occurrence basis" and name Owner, Pacific West Asset Management Corporation including their directors, officers, employees, and representatives as additional insureds under Contractor's general liability, automobile liability and excess liability insurance policies. Certificates in customary form, evidencing that premiums for the foregoing insurance have been paid, shall be delivered by Contractor to Agent with Contractor's execution of this Agreement and prior to Contractor performing any services hereunder. If applicable within thirty (30) days prior to expiration of such insurance similar updated certificates shall be delivered by Contractor evidencing the renewal of such insurance, together with evidence satisfactory to Owner of the payment of the premium. All certificates of insurance must contain a definite provision that if the policies of insurance evidenced by such certificates are canceled or changed during the periods of coverage as stated therein, in such a manner as to effect the coverage afforded by such policies, written notice will be mailed to Owner by certified mail and return receipt requested at least thirty (30) days prior to such cancellation or change.

(b)   Contractor shall procure an appropriate clause in, or endorsement on, each of its policies for all forms of property damage insurance covering the Contractor's personal property, materials and/or equipment whereby the insurer waives subrogation or consents to a waiver of the right of recovery against Owner or its Agent, Pacific West Asset Management Corp., and having obtained such waiver of subrogation or waiver of right of recovery, Contractor hereby agrees that it will not make any claim against or seek to recover from Owner or its Agent, Pacific West Asset Management Corp. for any loss or damage to property of the type covered by such insurance.

(c)   Contractor's insurance obtained pursuant to this agreement shall be deemed primary insurance to any insurance policy which Owner and/or its Agent, Pacific West Asset Management Corp. may obtain for their own benefit, which policy shall be deemed excess or secondary, and not contributing with insurance obtained by Contractor

5.   Owner, at any time and for any reason, may terminate the services, in whole or in part, by the giving of notice to Contractor, and in such event Owner shall pay Contractor the percentage of the compensation specified in this Contract which is proportionate to the services provided to the date of termination, less damages incurred as a result of contractor's default, if any. Neither the services nor money due, contractor hereunder shall be assigned, subcontracted or transferred in whole or part by Contractor, voluntarily or by operation of law, except with the prior written consent of Owner, and any attempt to do so without such consent shall be void. Upon sale or lease by Owner of the facility at which services hereunder are rendered, Owner's rights hereunder may be freely assigned to Owner's purchaser or lessee without the consent or approval of Contractor.

6.   Contractor and its subcontractors and vendors shall maintain true and complete records in connection with the services and all transactions related thereto and shall retain all such records for at least 24 months after the end of the calendar year in which the services are performed. In the event costs are to be reimbursed under this Contract, Owner may from time to time and at any time during the

Service Contract
Page 3 of 5

PWAM 0033

foregoing period of record retention make an audit of all records of contractor and its subcontractors and vendors.

7. Except as otherwise expressly provided herein, neither Contractor nor any director, employee or agent of contractor, its subcontractors or vendors, shall give to or receive from any director, employee or agent of Owner or any affiliate any gift or entertainment of significant value or any commission, fee or rebate in connection with this Contract. In addition, neither Contractor nor any director, employee or agent of Contractor or any affiliate who is not acting as a representative of Owner or its affiliate without prior written notification thereof to Owner. Any representatives authorized by Owner may audit any and all records of Contractor and any subcontractor or vendor for the sole purpose of determining whether there has been compliance with this Section.

8. Contractor agrees and covenants that none of its employees or employees of its subcontractors who provide services to Owner pursuant to this Agreement are unauthorized aliens as defined in the Immigration Reform and Control Act of 1986.

9. The following applies to any person who engages in the business contract in the capacity of a contractor within California.
   A.     Contractors are required by law to be licensed and regulated by the Contractor's state License Board. Any questions concerning a contractor may be referred to the Registrar, contractor's State License Board, 3132 Bradshaw Road, Sacramento, California 95826.

10. Upon sale of the Project, Center, or Property, Owner may terminate this contract upon ten (10) days written notice. This Agreement is assignable to any new owner of the Project, Center or Property without Contractor's consent.

11. Contractor represents and warrants that it and its agents, servants, employees, and anyone else acting on behalf will not store, dispose, produce, use, transport or manufacture any toxic or hazardous waste or materials as defined or regulated by local, state or federal law on the Premises or any portion of the Center. In the event contractor or any of its agents, servants, employees, or anyone else acting on behalf of Contractor violates the foregoing provision Contractor shall indemnify, defend and hold Owner harmless from any damage, claim injury, cost or liability arising therefrom or related thereto, including all costs of clean-up, attorney's fees and court costs. The clean-up and disposal of such waste or materials shall be performed in accordance with all applicable laws, rules, regulations and ordinances. The foregoing notwithstanding, Owner in Owner's sole and absolute discretion may elect, by written notice to Contractor to perform the clean-up and disposal of such waste or materials from the Premises and/or the Center. In such event, Contractor shall pay to Owner the actual cost of same upon receipt from Owner of Owner's written invoice therefor.

~~12. COMPLETION TIME:  All construction work is to be completed by _____, 20___.  Work to commence upon Contractor's receipt of a fully-executed contract.  Owner shall deliver the Contract to Contractor on or before _____, 20___.  If Owner shall not be able to deliver a fully executed Contract as set forth above, it will entitle the Contractor to cancel the Contract and cancellation shall be Contractor's sole remedy for any delay.  In the event the improvements are not completed within the specified day, liquidated damages of $200.00 a day will be billed to the Contractor and deducted from final compensation.~~

~~Acknowledgement of receipt of contract _____  Date: _____~~

Service Contract
Page 4 of 5

13. PAYMENTS: The compensation specified on the front hereof takes into account all taxes, wages, materials, costs of any type and profit that are incidental to Contractor's performance of the services unless applicable law specifically provides for direct payment by Owner. Further, the Owner in its sole discretion may withhold up to ten percent (10%) of the invoice if it determines this is necessary. Any withheld amounts shall be paid to the Contractor upon satisfactory completion of the work. Unless otherwise stated on the front hereof, Contractor shall submit its statement to Owner and a Conditional Waiver and Release Upon Final Payment document for work performed upon completion of the services, together with a Conditional Waiver and Release Upon Final Payment from any subcontractor or material supplier who has provided a Preliminary Notice to Owner and/or its Agent, Pacific West Asset Management Corp.. Any progress payment request shall be accompanied with a statement for detailing the work completed and a Conditional Waiver and Release Upon Progress Payment document.

Owner shall pay Contractor by check within twenty (20) business days of receipt of the statement and supporting documents. Owner reserves the right to make payments in the form of joint checks payable to Contractor and any Subcontractor and/or Material Supplier should Owner deem appropriate.

14. AGREEMENTS: This contract sets forth the entire agreement between the parties regarding the services and no other representations or agreements shall be effective unless in writing, containing specific reference to this Contract and signed by Owner or Owner's Agent and Contractor representatives.

15. SUBCONTRACTORS & MATERIAL SUPPLIERS:  Contractor represents that the following persons or entities shall be the sole subcontractors or materials suppliers used by Contractor in performance of this Contract. If, for any reason, Contractor shall use any different persons or entities as subcontractors or materials suppliers, Contractor agrees to provide written notice to Owner of such changes within five (5) business days of such substitution or addition.

Subcontractor/Material Supplier Name & Phone          Work/Supplies provided

_____          _____
_____          _____
_____          _____
_____          _____
_____          _____

Attach a separate sheet if necessary.

*Exhibit "A"*



Building a Better Tomorrow by Securing Today

INITIALS _____

## PacificWest

Crown Valley Pkwy| Laguna Niguel, Ca 92677

Title: Vehicle Patrol Bid Proposal/Locations Below

| | | |
|---|---|---|
| 1 | **Unarmed Courtesy Patrol Service/One Stop Nightly (Monday-Sunday)**<br>*- Patrol presence between the Hours of 7pm-6am/7 days a week*<br>*Officer will provide a 15-minute foot patrol per stop*<br>*28201, 28211, 28221, 28231, 28241, 28251 & 28261*<br><br><br>*Included:*<br>*-GPS tracking on patrol vehicles to ensure performance*<br>*-DAR (Daily Activity Report) Emailed daily at Clients request*<br>*-Parking enforcement (Tow & Citations) pictures with documentation*<br>*-Photographic evidence for property records of any damage*<br>*-Incident Reports regarding property emergencies* | **FIXED** |
| | MONTHLY TOTAL | $500.00 |

**\*Overtime, Emergency and Holiday Pay Included**

Defense International | 22855 Savi Ranch Parkway, Suite A, Yorba Linda, CA 92887
Office (714)646-9145 | Fax (714)646-9207
defenseic.com | Info@defenseic.com



PWAM 0036

Exhibit "A"



Building a Better Tomorrow by Securing Today

INITIALS _____

Duties and Responsibilities:

A more detailed post order and duties and responsibilities checklist will be created upon contract signage

- Guard to ticket and tow illegally parked cars in the parking areas

- Per rules and regulations of property, illegally parked cars are to be towed

- While on duty, patrol guards are required to maintain constant visibility and reach ability

- While patrolling, guards need to monitor and give detailed reports of all suspicious individuals and activities

- Guards are required to report all property damage, i.e. broken sprinklers, leaks, light outages, safety hazards, etc.

*Defense International reassess, retests and retrains guards every 90 days to ensure we are providing the highest quality of service.*



PWAM 0038

# Exhibit "A"



**Building a Better Tomorrow by Securing Today**

INITIALS _____

## Vehicle Patrol Schedule

|  | SUN | MON | TUES | WED | THURS | FRI | SAT |
|---|---|---|---|---|---|---|---|
| 9:00 AM |  |  |  |  |  |  |  |
| 10:00 AM |  |  |  |  |  |  |  |
| 11:00 AM |  |  |  |  |  |  |  |
| 12:00 PM |  |  |  |  |  |  |  |
| 1:00 PM |  |  |  |  |  |  |  |
| 2:00 PM |  |  |  |  |  |  |  |
| 3:00 PM |  |  |  |  |  |  |  |
| 4:00 PM |  |  |  |  |  |  |  |
| 5:00 PM |  |  |  |  |  |  |  |
| 6:00 PM |  |  |  |  |  |  |  |
| 7:00 PM |  |  |  |  |  |  |  |
| 8:00 PM |  |  |  |  |  |  |  |
| 9:00 PM |  |  |  |  |  |  |  |
| 10:00 PM |  |  |  |  |  |  |  |
| 11:00 PM |  |  |  |  |  |  |  |
| 12:00 AM |  |  |  |  |  |  |  |
| 1:00 AM |  |  |  |  |  |  |  |
| 2:00 AM |  |  |  |  |  |  |  |
| 3:00 AM |  |  |  |  |  |  |  |
| 4:00 AM |  |  |  |  |  |  |  |
| 5:00 AM |  |  |  |  |  |  |  |
| 6:00 AM |  |  |  |  |  |  |  |
| 7:00 AM |  |  |  |  |  |  |  |
| 8:00 AM |  |  |  |  |  |  |  |



**1 Hour Vehicle Patrol Schedule**



PWAM 0037

# Exhibit "A"



**Building a Better Tomorrow by Securing Today**

## AGREEMENT FOR SECURITY SERVICE

INITIALS _____

This agreement for Professional Security Services (the "Agreement"), effective _____, is by and between DEFENSE INTERNATIONAL, a domestic business corporation licensed by the California State Department, Division of Licensing Services, as Watch guard, Patrol agency with its principal office at 22855 Savi Ranch Parkway, Suite A, CA 92887, and Buie Area M, LLC.

WHEREAS, Client finds that DEFENSE INTERNATIONAL is willing to perform Security Guard work hereinafter described in accordance with provisions of this Agreement; and

WHEREAS, Client finds that DEFENSE INTERNATIONAL is qualified to perform the work, all relevant factors considered, and that such performance will be in furtherance of Client's business.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and intending to be legally bound, the parties hereto agree as follows:

1.    **SERVICES**
         (1.a)    DEFENSE INTERNATIONAL shall provide the following ("Services") to the Client only: The protection of property of the client within the established area(s) of, not including adjacent property, sidewalks, streets, wooded areas, residences, establishments, or businesses, or other areas not specifically indicated in this agreement. The designated areas shall be listed in an attached "Exhibit A" The terms "protection of property", shall in no way be construed to suggest that DEFENSE INTERNATIONAL is responsible for incidents that occur, which upon acting in good faith, the DEFENSE INTERNATIONAL security guard performs his or her duties as outlined in this contract and according to DEFENSE INTERNATIONAL General Orders, and the incident occurs as a result of an unforeseen circumstance, or upon the reliance by a third party, not covered by this agreement, that DEFENSE INTERNATIONAL is responsible for the protection of his or her life or property or any other duties contained in this agreement to the client. DEFENSE INTERNATIONAL employees will not perform any duties not contracted for. Further that this agreement is solely for the mutual benefit of the parties who enter into it.

         Nothing shall be construed to suggest that DEFENSE INTERNATIONAL, its employees, agents, or security guards are compelled, required, contracted, or willing to protect the life or lives or property of persons unless specifically listed in this agreement.
         (1.b)    The terms "protection of property" shall include the listed property in "Exhibit A". The duties of the DEFENSE INTERNATIONAL security guard regarding the protection of property include and are limited to:
         (1.c)    Providing a visible deterrent for property crimes and crime against the client, which include criminal mischief, making graffiti, larceny, burglary, criminal tampering, trespass, and criminal trespass, misapplication of property. The terms are limited to the property of the client, so long as the property is located within the geographical area of the items listed in "Exhibit A".

---

Defense International | 22855 Savi Ranch Parkway, Suite A, Yorba Linda, CA 92887
Office (714)646-9145 | Fax (714)646-9207
defenseic.com | info@defenseic.com



PWAM 0039

# Exhibit "A"

**Building a Better Tomorrow by Securing Today**

INITIALS _____

(1.d)    While on duty, guards are required to maintain constant visibility and reachability. While patrolling, guards need to monitor and give detailed reports of all suspicious individuals and activities.

Other duties and responsibilities to be added and determined by client:

> See duties and responsibilities listed on page 2 of bid.

(1.e)    Alerting the proper law enforcement authority of the incident immediately. Nothing shall be construed to suggest that DEFENSE INTERNATIONAL, its employees, agents, or security guards are compelled, required, contracted, or willing to protect the life or property of persons not specifically listed in this agreement.

DEFENSE INTERNATIONAL will provide security guards with the qualifications described in section 3 of this agreement

2.    **PAYMENT AND INVOICING TERMS**

(2.a)    <u>Payment for Services</u>: DEFENSE INTERNATIONAL will be paid as follows: The client shall, upon receiving an invoice from DEFENSE INTERNATIONAL, make payments in the agreed manner by company check - Payable to DEFENSE INTERNATIONAL.

(2.b)    DEFENSE INTERNATIONAL will bill the client a fixed rate of $500.00 per month, depending on service as agreed by the client and DEFENSE INTERNATIONAL.

**INVOICING & LATE PAYMENT POLICY**

(2.c)    Invoiced will be submitted monthly by DEFENSE INTERNATIONAL for payment by the Client. Payment is due 30 days from the date of invoice. The client shall be liable for late payment charges from payments received more than 30 days from the due date. If your account has any unpaid invoices overdue more than 30 days, you will be notified and DEFENSE INTERNATIONAL may opt to discontinue service. Failure to pay any invoice within 45 days of the due date will result in account termination without further notice. Non-payment of any invoice does not release the client from any amount due at the time of termination. All amounts due plus late charges, if any, will be referred to an outside collection agency and law firm for collection.

---

Defense International | 22855 Savi Ranch Parkway, Suite A, Yorba Linda, CA 92887
Office (714)646-9145 | Fax (714)646-9207
defenseic.com | Info@defenseic.com



PWAM 0040

# Exhibit "A"

Building a Better Tomorrow by Securing Today

INITIALS _____

**3.     STANDARD OF CARE**

DEFENSE INTERNATIONAL warrants that its services shall be performed by personnel possessing competency consistent with applicable industry standards, who are both licensed by the Department of State, have prior appointment for employment at DEFENSE INTERNATIONAL, been subject to a comprehensive character background investigation, personal interview, submitted to fingerprint screening, screened for sex offended status, department of corrections check, and a pre-employment drug screening. No other representation, express or implied, and no warranty or guarantee are included or intended in this Agreement, or in any report, opinion, deliverable, work product, document or otherwise. THIS SECTION SETS FORTH THE ONLY WARRANTIES PROVIDED BY YOUR COMPANY CONCERNING THE SERVICES AND RELATED WORK PRODUCT. THIS WARRANTY IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT, TITLE OR OTHERWISE.

**4.     TERM AND TERMINATION**

**Term and Termination**

This agreement commences on the effective date and, shall continue with the set agreed upon term and pricing for 1 year, unless terminated earlier pursuant by the either of the parties. This agreement may be terminated anytime by either party upon thirty (30) days' prior written notice.

---

Defense International | 22855 Savi Ranch Parkway, Suite A, Yorba Linda, CA 92887
Office (714)646-9145 | Fax (714)646-9207
defenseic.com | Info@defenseic.com

PWAM 0041

# Exhibit "A"



Building a Better Tomorrow by Securing Today

INITIALS _____

**Exhibit "A"**

**Geographical Area or Responsibility:**

**Location of Site(s):**
Laguna Niguel Ca, 92677



Defense International | 22855 Savi Ranch Parkway, Suite A, Yorba Linda, CA 92887
Office (714)646-9145 | Fax (714)646-9207
defenseic.com | Info@defenseic.com



**EXHIBIT 4**

# SERVICE CONTRACT

Date: 08/03/2018

Owner:

Buie Area M, LLC (Site 1)

c/o Pacific West Asset Management Corp.,
PO Box 19068
Irvine, CA 92623-9068

Contract #: 150-082018

Contractor:

Allied Universal Janitorial

Address:
1815 E. Wilshire Avenue
Santa Ana, CA 92705

Owner and Contractor agree as of the above date that contractor shall perform the services set forth below at the location, within the time and for the compensation specified, subject to the terms and conditions attached hereto.

**Description of Work and Materials to Be Furnished:**
Monthly Day Porter and Golf Cart Services and other related services as more fully described in Exhibit "A" attached hereto and incorporated

**Time of Service:** Work is authorized to commence upon execution of this contract and receipt of the prescribed Insurance requirements attached hereto, evidencing the foregoing insurance and which names Buie Area M, LLC _____ (Owner) and Owner's Agent, Pacific West Asset Management Corporation as additional insured.

**Location of Service:** 28201-28261 Crown Valley Parkway, Laguna Niguel CA 92677

**Compensation:** Three Thousand & Sixty-Six Dollars and Fifty Cents _____ Dollars ($ 3,066.50 _____ ) payable only as prescribed by Section 13.

**Invoices:** Please show above contract number and items subject to sales tax or use tax. Equipment rental invoice must be supported by original and duplicate or work tickets. Send invoices **in triplicate** to:
Buie Area M, LLC (Site 1)

c/o Pacific West Asset Management Corporation
PO Box 19068
Irvine, CA 92623-9068

**ACCEPTED:**
Contractor:
Allied Universal Janitorial

By: _____
By: Devin Saman  MARK E. OLIVAS
(Print or Type Name)
Title: VP of Sales  PRESIDENT
License # _____

**AUTHORIZED:**
Owner:
Buie Area M, LLC (Site 1)

By: PACIFIC WEST ASSET MANAGEMENT CORPORATION, a California corporation

By: _____
By: Dawn Luesse, Property Manager
(Print or Type Name)
Authorized Agent for Owner

Service Contract
Page 1 of 5

PWAM 0058

## TERMS AND CONDITIONS

1. The compensation specified on the front hereof takes into account all taxes, wages, costs of any type and profit that are incidental to Contractor's performance of the services unless applicable law specifically provides for direct payment by Owner. Unless otherwise stated on the front hereof, Contractor shall submit its statement Owner upon completion of the services. The statement shall be accompanied by such supporting documents as requested by Owner. Owner shall pay Contractor by check mailed within twenty (20) business days of receipt of the statement and supporting documents.

2. Unless otherwise stated on the front hereof, contractor shall provide all materials, equipment and labor required for the prompt completion of the services. Contractor shall perform the services as an independent contractor and shall comply with all applicable laws and forms of authorizations, take all required or appropriate safety precautions and, to the extent work is performed on Owner's premises, abide by all company operating rules and governmental safety regulations. The equipment provided for the services shall be in first class operating condition and the material provided shall be suitable for the services. Contractor guarantees that the product of the services shall be free of defects for a period of one year after the date services are completed and agrees to correct promptly any such defect at its expense; Contractor makes no other warranty expressed or implied regarding the services. Contractor shall transfer ownership to Owner of all copyrights, inventions, discoveries and improvements resulting from contractor's services.

3. Contractor shall indemnify and save harmless Buie Area M, LLC _____ and Pacific West Asset Management Corporation and the employees of any of them ("Indemnitees") from and against any and all loss, damage, injury and liability for injury to or death of any person (including an employee of contractor or an Indemnitee) or for loss of or damage to property (including the property of an Indemnitee) or for loss or damage arising from attachments, liens or claims of materialmen or laborers, or patent infringement, including claims and reasonable attorney's fees relating to any of the foregoing, resulting from contractor's performance of this Contract. Such indemnity shall apply whether or not an indemnity was or is claimed to be passively, concurrently or actively negligent and regardless of whether liability without fault is imposed or sought to be imposed on one or more of the indemnities. This indemnity shall not apply to the extent that it is void or otherwise unenforceable under applicable law in effect on or validly retroactive to the date of this Contract, and shall not apply where such loss, damage injury, liability, or claim is the result of the gross negligence or intentional misconduct of an Indemnitee. The Indemnitees' rights to indemnification under the foregoing shall be independent of rights under the insurance to be provided under Section 4.

4.   (a)   Contractor shall, at its expense, maintain the following insurance coverages:

      A. Worker's compensation Insurance in compliance with State requirements;

      B. Employer's liability Insurance in the minimum amount of $1,000,000.00;

      C. Commercial general liability insurance in the minimum amount of $1,000,000.00 combined single limit covering both bodily injury, personal injury and property damage including broad form contractual liability coverage for Contractor's indemnification as provided for in this Agreement; coverage shall be on an occurrence form;

      D. Commercial automobile liability insurance in the minimum amount of $1,000,000.00 combined single limit for bodily injury and property damage if automobiles are used in the performance of Contractor's obligations hereunder;

Service Contract
Page 2 of 5

PWAM 0059

E.  Non-occupational and disability Insurance, if required by the State the State of California;

F. Excess liability insurance in the minimum amount of $5,000,000 combined single limit covering bodily injury, personal injury, property damage and automobile liability (if Contractor's automobiles are used in the performance of Contractor's obligations hereunder). NOTE: THIS LIMIT MAY BE REQUIRED DEPENDING ON THE SCOPE OF THE WORK

All such insurance shall be issued by Companies licensed to do business in the State of California, having a Best's rating of not less than A-VIII, and otherwise satisfactory to Owner. All of such policies shall be on an "occurrence basis" and name Owner, Pacific West Asset Management Corporation including their directors, officers, employees, and representatives as additional insureds under Contractor's general liability, automobile liability and excess liability insurance policies. Certificates in customary form, evidencing that premiums for the foregoing insurance have been paid, shall be delivered by Contractor to Agent with Contractor's execution of this Agreement and prior to Contractor performing any services hereunder.  If applicable within thirty (30) days prior to expiration of such insurance similar updated certificates shall be delivered by Contractor evidencing the renewal of such insurance, together with evidence satisfactory to Owner of the payment of the premium.  All certificates of insurance must contain a definite provision that if the policies of insurance evidenced by such certificates are canceled or changed during the periods of coverage as stated therein, in such a manner as to effect the coverage afforded by such policies, written notice will be mailed to Owner by certified mail and return receipt requested at least thirty (30) days prior to such cancellation or change.

(b)  Contractor shall procure an appropriate clause in, or endorsement on, each of its policies for all forms of property damage insurance covering the Contractor's personal property, materials and/or equipment whereby the insurer waives subrogation or consents to a waiver of the right of recovery against Owner or its Agent, Pacific West Asset Management Corp., and having obtained such waiver of subrogation or waiver of the right of recovery, Contractor hereby agrees that it will not make any claim against or seek to recover from Owner or its Agent, Pacific West Asset Management Corp. for any loss or damage to property of the type covered by such insurance.

(c)  Contractor's insurance obtained pursuant to this agreement shall be deemed primary insurance to any insurance policy which Owner and/or its Agent, Pacific West Asset Management Corp. may obtain for their own benefit, which policy shall be deemed excess or secondary, and not contributing with insurance obtained by Contractor

5.  Owner, at any time and for any reason, may terminate the services, in whole or in part, by the giving of notice to Contractor, and in such event Owner shall pay Contractor the percentage of the compensation specified in this Contract which is proportionate to the services provided to the date of termination, less damages incurred as a result of contractor's default, if any. Neither the services nor money due, contractor hereunder shall be assigned, subcontracted or transferred in whole or part by Contractor, voluntarily or by operation of law, except with the prior written consent of Owner, and any attempt to do so without such consent shall be void. Upon sale or lease by Owner of the facility at which services hereunder are rendered, Owner's rights hereunder may be freely assigned to Owner's purchaser or lessee without the consent or approval of Contractor.

6.  Contractor and its subcontractors and vendors shall maintain true and complete records in connection with the services and all transactions related thereto and shall retain all such records for at least 24 months after the end of the calendar year in which the services are performed. In the event costs are to be reimbursed under this Contract, Owner may from time to time and at any time during the

Service Contract
Page 3 of 5

PWAM 0060

foregoing period of record retention make an audit of all records of contractor and its subcontractors and vendors.

7. Except as otherwise expressly provided herein, neither Contractor nor any director, employee or agent of contractor, its subcontractors or vendors, shall give to or receive from any director, employee or agent of Owner or any affiliate any gift or entertainment of significant value or any commission, fee or rebate in connection with this Contract. In addition, neither Contractor nor any director, employee or agent of Contractor or any affiliate who is not acting as a representative of Owner or its affiliate without prior written notification thereof to Owner. Any representatives authorized by Owner may audit any and all records of Contractor and any subcontractor or vendor for the sole purpose of determining whether there has been compliance with this Section.

8. Contractor agrees and covenants that none of its employees or employees of its subcontractors who provide services to Owner pursuant to this Agreement are unauthorized aliens as defined in the Immigration Reform and Control Act of 1986.

9. The following applies to any person who engages in the business contract in the capacity of a contractor within California.
   A.    Contractors are required by law to be licensed and regulated by the Contractor's state License Board. Any questions concerning a contractor may be referred to the Registrar, contractor's State License Board, 3132 Bradshaw Road, Sacramento, California 95826.

10. Upon sale of the Project, Center, or Property, Owner may terminate this contract upon ten (10) days written notice. This Agreement is assignable to any new owner of the Project, Center or Property without Contractor's consent.

11. Contractor represents and warrants that it and its agents, servants, employees, and anyone else acting on behalf will not store, dispose, produce, use, transport or manufacture any toxic or hazardous waste or materials as defined or regulated by local, state or federal law on the Premises or any portion of the Center. In the event contractor or any of its agents, servants, employees, or anyone else acting on behalf of Contractor violates the foregoing provision Contractor shall indemnify, defend and hold Owner harmless from any damage, claim injury, cost or liability arising therefrom or related thereto, including all costs of clean-up, attorney's fees and court costs. The clean-up and disposal of such waste or materials shall be performed in accordance with all applicable laws, rules, regulations and ordinances. The foregoing notwithstanding, Owner in Owner's sole and absolute discretion may elect, by written notice to Contractor to perform the clean-up and disposal of such waste or materials from the Premises and/or the Center. In such event, Contractor shall pay to Owner the actual cost of same upon receipt from Owner of Owner's written invoice therefor.

12. COMPLETION TIME:  All construction work is to be completed by _____, 20___.  Work to commence upon Contractor's receipt of a fully executed contract.  Owner shall deliver the Contract to Contractor on or before _____, 20___.  If Owner shall not be able to deliver a fully executed Contract as set forth above, it will entitle the Contractor to cancel the Contract and cancellation shall be Contractor's sole remedy for any delay.  In the event the improvements are not completed within the specified day, liquidated damages of $200.00 a day will be billed to the Contractor and deducted from final compensation.

Acknowledgement of receipt of contract _____  Date: _____

Service Contract
Page 4 of 5

13. PAYMENTS: The compensation specified on the front hereof takes into account all taxes, wages, materials, costs of any type and profit that are incidental to Contractor's performance of the services unless applicable law specifically provides for direct payment by Owner.  Further, the Owner in its sole discretion may withhold up to ten percent (10%) of the invoice if it determines this is necessary. Any withheld amounts shall be paid to the Contractor upon satisfactory completion of the work. Unless otherwise stated on the front hereof, Contractor shall submit its statement to Owner and a Conditional Waiver and Release Upon Final Payment document for work performed upon completion of the services, together with a Conditional Waiver and Release Upon Final Payment from any subcontractor or material supplier who has provided a Preliminary Notice to Owner and/or its Agent, Pacific West Asset Management Corp..  Any progress payment request shall be accompanied with a statement for detailing the work completed and a Conditional Waiver and Release Upon Progress Payment document.

Owner shall pay Contractor by check within twenty (20) business days of receipt of the statement and supporting documents.  Owner reserves the right to make payments in the form of joint checks payable to Contractor and any Subcontractor and/or Material Supplier should Owner deem appropriate.

14. AGREEMENTS:  This contract sets forth the entire agreement between the parties regarding the services and no other representations or agreements shall be effective unless in writing, containing specific reference to this Contract and signed by Owner or Owner's Agent and Contractor representatives.

15. SUBCONTRACTORS & MATERIAL SUPPLIERS:  Contractor represents that the following persons or entities shall be the sole subcontractors or materials suppliers used by Contractor in performance of this Contract. If, for any reason, Contractor shall use any different persons or entities as subcontractors or materials suppliers, Contractor agrees to provide written notice to Owner of such changes within five (5) business days of such substitution or addition.

Subcontractor/Material Supplier Name & Phone          Work/Supplies provided

_____          _____
_____          _____
_____          _____
_____          _____

Attach a separate sheet if necessary.

PWAM 0062

# Exhibit "A"



## JANITORIAL SERVICES

1815 E. Wilshire Ave., Suite 912
Santa Ana, Ca 92705

## JOB COST SHEET
### for
### Pacific West Asset Management Corporation

### CONTACT INFORMATION

| | |
|---|---|
| Contact Name | Dawn Luesse |
| Company Name | Pacific West Asset Management Corporation |
| Address | 3191 Airport Loop Dr., Suite D |
| City, State, Zip | Costa Mesa, CA 92626 |
| Phone Number | (714) 433-7300 x 222 |
| Email Address | dluesse@pacificwest.cc |
| Date | 7/26/2018 |

### BUILDING INFORMATION

| | |
|---|---|
| Property Name | The Center at Rancho Niguel |
| Address of Subject Property(s) | 28281 Crown Valley Pkwy. |
| City, State, Zip | Laguna Niguel, CA 92677 |

### DAY PORTER SERVICES

| Cost per Month | Day Porter | Golf Cart |
|---|---|---|
| Site 1 | $2,934 | $132.50 |

\* Cost includes day porter services from 7 am to 7 pm, 7 days per week.

PWAM 0063

# Exhibit "A"

## CLEANING SPECIFICATIONS

### DAY PORTER SPECIFICATIONS

**The Center at Rancho Niguel**
28281 Crown Valley Pkwy., Laguna Niguel, CA 92677
Site 1, 2, 3, 4

The day porter hours to be 7 am to 7 pm seven days per week.  The duties of the day porter shall be, but not limited to, the following:

1. Police all sidewalks and walkways around property and behind buildings daily and pick up trash.
2. Inspect parking lot and pick up trash.
3. Clean ashtrays and sand urns twice a day.
4. Empty and clean trash receptacles.
5. Sweep entrances and walkways at least daily or as needed
6. Sweep stairwells and landings as needed
7. Wipe store front window mullions and remove cobwebs throughout property as needed
8. Wipe/dust common area mailboxes
9. Clean outside signage weekly or as needed
10. Police trash enclosures for dumped items and trash on ground and notify management
11. Remove all debris from landscaped areas as needed
12. Scrub common area walkways monthly and spot clean at food areas as needed.
13. Pick up trash and dust hand rails where applicable
14. Notify management of any damage or graffiti in and around property.
15. Notify management of any water running in landscaping or ponding in parking lot
16. Respond to all calls placed by management
17. High dusting twice a month
18. Check the back stairways on Site 1 to the building where the owners are every single day.
19. All the planters along the main side walk of the retail to wipe down as needed.
20. Check on a daily basis and clean all the furniture along the sidewalks, benches and tables, excluding the Tokyo Joe's patio.
21. Check the bottom knobs on the chairs and replace as needed.
22. Report any clogged storm drains
23. Clean the blade signs as needed.
24. Focus on the food areas
25. Check the back sidewalk and staircase of the Movie Theatre at least twice a week and report homeless.
26. Walk vacant spaces weekly, flush toilets, clean if necessary and report anything out of the ordinary such as leaks, bad smells, etc. Remove any stickers on windows or mail/flyers left under door.

1   VSTATE OF CALIFORNIA, COUNTY OF ORANGE:

2   I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 9210 Irvine Center Drive, Irvine, California

3   92618.

4   On April 18, 2022, I served the foregoing documents described as: **PLAINTIFFS' SECONDED AMENDED COMPLAINT FOR DAMAGES** on the interested parties in this action by placing the original or a true copy thereof enclosed in a sealed envelope addressed as follows:

5

6   SEE ATTACHED LIST OF PARTIES

7   [   ]   BY MAIL

8   [   ]   I caused such envelope to be deposited in the mail at Irvine, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the

9       U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or

10      postage meter date is more than one day after date of deposit for mailing an affidavit.

11  [   ]   BY PERSONAL SERVICE

12      I caused such envelope to be delivered on _____ by hand to:

13  [   ]   BY FACSIMILE   Executed on _____ at Irvine, California.

14  [ X ]   BY EMAIL Executed on April 18, 2022 at Irvine, California

15  [   ]   BY eService

16  [   ]   STATE:  I declare under penalty of perjury under the laws of the State of California that

17      the foregoing is true and correct.

18  [   ]   FEDERAL: I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

19

20      _____

21      TAMMY A. KATZ

22

23

24

25

26

27

28

PROOF OF SERVICE

1  Sam Hassine, et al. v. Center at Rancho Niguel Site I LLC, et al.
   (OCSC Case#.: 30-2021-01185591-CU-PO-CJC)

2

3                         **LIST OF PARTIES:**

4  **Attorneys for Defendants: Buie-Area M, LLC; Buie Stoddard Properties, LLC; Buie**
   **Stoddard Group LLC (Doe 3) and Pacific West Asset Management Corp.:**

5

6  Talon Powers, Esq.
   Sabrina D. Johnson, Esq.
7  HECHT SOLBERG ROBINSON GOLDBERG & BAGLEY LLP
   600 West Broadway, Suite 800
8  San Diego, CA 92101
   Tel: (619)239-3444 ext. 1122    Fax: (619)232-6828
   Email: tpowers@hechtsolberg.com
9  Email: sjohnson@hechtsolberg.com
   Email: dcoviello@hechtsolberg.com

10

11 **Attorneys for Defendants: Buie-Area M, LLC; Buie Stoddard Properties, LLC; Buie**
   **Stoddard Group LLC (Doe 3) and Pacific West Asset Management Corp.:**

12 Mark Vranjes, Esq.
   Jeffrey Frederick Manzi, Esq.
13 Grimm Vranjes Greer Stephan & Bridgman LLP
   750 B Street, Suite 1200
14 San Diego, CA 92101
   Tel: (619)231-8802
15 Fax: (619)233-6039
   Email: mvranjes@gvgllp.com
16 Email: jmanzi@gvgllp.com

17 **Attorneys for Defendant Defense International Corporation (Doe 4):**

18 Corine Zygelman, Esq.
   Murchison & Cumming LLP
19 801 S. Grand Avenue, Ninth Floor
   Los Angeles, CA 90017
20 Tel: (213)630-1080    Fax: (213)623-6336
   Email: CZygelman@murchisonlaw.com
21 Email: Maguayo@murchisonlaw.com

22 **Attorneys for Defendant: Universal Building Maintenance, LLC dba Allied Universal**
   **Janitorial Services, erroneously served as Allied Universal Janitorial (Doe 5):**

23

24 Gregory K. Lee, Esq.
   Carl J. Basile, Esq.
   Daniel H. Lee, Esq.
25 Wilson Elser Moskowitz Edelman & Dicker LLP
   555 S. Flower Street, Suite 2900
26 Los Angeles, CA 90071-2407
   Main: (213)443-5100    Fax: (213)443-5101
27 Email: Gregory.Lee@wilsonelser.com
   Email: Carl.Basile@wilsonelser.com
28 Email: Daniel.Lee@wilsonelser.com
   Email: Diana.Navarro@wilsonelser.com

---

# Exhibit 3

## **ASSIGNMENT OF ACTION IN EXCHANGE FOR COVENANT NOT TO EXECUTE**

THIS IS AN AGREEMENT BETWEEN:

SAM HASSINE, BRIAN HASSINE and NUGGETS & CARATS, INC., (hereinafter jointly referred to as "NUGGETS & CARATS")  and

DEFENSE INTERNATIONAL CORPORATION (hereinafter referred to as "DEFENSE INTERNATIONAL").

## **RECITALS**

1.      A lawsuit alleging negligence and damages has been filed by NUGGETS & CARATS against DEFENSE INTERNATIONAL, being Case No. 30-2021-01185591-CU-PO-CJC, in the Superior Court of the State of California, County of Orange, entitled SAM HASSINE, BRIAN HASSINE and NUGGETS & CARATS, INC., Plaintiffs vs. DEFENSE INTENATIONAL CORPORATION, et al., Defendants.  Said lawsuit has not yet come to trial.

2.      At the time of the incident of the subject of this lawsuit, DEFENSE INTERNATIONAL was insured under Security Guards Professional Liability Policy, Certificate No. MPL4029619.21 issued by Hiscox Pro Insurance Company, with policy limits of $1,000,000.00 each claim.

3.      Hiscox Pro notified DEFENSE INTERNATIONAL that they were declining coverage and refusing to provide a defense regarding this case on December 6, 2021. As such, Hiscox Pro, the insurer for DEFENSE INTERNATIONAL has rejected and refused to settle NUGGET & CARATS' claims for the policy limits aforesaid, and, in fact, has refused to defend DEFENSE INTERNATIONAL in this matter.

4.      NUGGETS & CARATS is claiming damages in said lawsuit in excess of $1,800,000.00.

5.      On January 11, 2023, NUGGETS & CARATS submitted an offer in writing to settle all claims against DEFENSE INTERNATIONAL and dismiss said lawsuit for the $1,000,000.00 policy limits. Hiscox Pro responded on January 20, 2023 to the policy limits demand of NUGGETS & CARATS and indicated by email as follows: "Hiscox must respectfully reject your demand (of NUGGETS & CARATS), as coverage was declined for this matter and we have closed our file."

6.      The parties hereto believe said offer was fair and reasonable in light of the damages claimed by NUGGETS & CARATS and the evidence regarding DEFENSE INTERNATIONAL'S responsibility for causing such damages.

7.      The parties hereto further believe that if this case goes to trial there is a substantial probability that NUGGETS & CARATS will recover a judgment against DEFENSE

INTERNATIONAL for more than $1,000,000.00, in which event, DEFENSE INTERNATIONAL would be liable for the full amount of the judgment.

8.     The parties hereto believe that Hiscox Pro's rejection to provide a defense and refusal to settle with NUGGETS & CARATS, was unreasonable in light of the factors stated above, and that such refusal has breached Hiscox Pro's obligations to DEFENSE INTERNATIONAL under the liability insurance policy aforesaid, including without limitation, its implied covenant of good faith and fair dealing, in respect to settling claims against DEFENSE INTERNATIONAL, within the available policy limits so as to avoid the risk of a judgment in excess of the applicable policy limits.

9.     To facilitate the purposes of this Agreement, DEFENSE INTERNATIONAL agrees: (a) to provide NUGGETS & CARATS with copies of all documents and correspondence between DEFENSE INTERNATIONAL and Hiscox Pro regarding the claim involved in the above-described litigation; (b) to waive attorney-client privilege with the attorneys retained by DEFENSE INTERNATIONAL, related to Hiscox Pro's refusal to defend DEFENSE INTERNATIONAL in said litigation, and to provide copies of all correspondence to and from said attorneys; and (c) to provide NUGGETS & CARATS, upon request, with all documents and information relevant to prosecution of the claims described above.

10.     It is in the mutual interests of the parties hereto to transfer their rights and to assume obligations to each other as hereinafter provided.

## AGREEMENT

### NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

11.     The recitals set forth above in Paragraphs 1 through 10 are acknowledged and understood to be true and correct, except where stated on information and belief.

12.     NUGGETS & CARATS retains the right to litigate the above-described civil action against DEFENSE INTERNATIONAL through trial to determine the amount of damages, if any, to which they are entitled against DEFENSE INTERNATIONAL.  At their discretion, NUGGETS & CARATS may utilize a stipulated judgment or proceed to prosecute an uncontested trial on the issue of damages to a neutral arbitrator or judicial referee.  Such an award may then be presented to the Superior Court in order to obtain a judgment. Any such judgment obtained is hereby assigned to NUGGETS & CARATS.

13.     However, nothing in this Agreement obligates NUGGETS & CARATS to do so, nor precludes the settling of their claims hereafter with DEFENSE INTERNATIONAL.

14.     In the event the case goes to trial or other procedure by which NUGGETS & CARATS otherwise obtains a judgment against DEFENSE INTERNATIONAL, in consideration of the undertakings by DEFENSE INTERNATIONAL in this Agreement, NUGGETS & CARATS HEREBY COVENANTS AND AGREES NOT TO CAUSE A LEVY or WRIT OF EXECUTION upon such judgment against any asset or property of DEFENSE INTERNATIONAL, or their successors in interest.

15.     NUGGETS & CARATS further agrees not to file such judgment for recordation in any recorder's office or in the office of the Secretary of State, so that it shall not appear as a lien of record against any real or property interests of DEFENSE INTERNATIONAL.

16.     NUGGETS & CARATS further agrees to execute any additional documents reasonably required by DEFENSE INTERNATIONAL from time to time hereafter to reflect the fact that any such judgment obtained by NUGGETS & CARATS shall not be enforceable against the assets or properties of DEFENSE INTERNATIONAL.

17.     In consideration of NUGGETS & CARATS' covenants and undertakings herein, DEFENSE INTERNATIONAL HEREBY AGREES TO PAY TO NUGGETS & CARATS THE SUM OF **$5,000.00** AND ASSIGNS, TRANSFERS AND CONVEYS TO NUGGETS & CARATS all claims and causes of action DEFENSE INTERNATIONAL may now have or hereafter acquire against DEFENSE INTERNATIONAL's insurer, Hiscox Pro, based on Hiscox Pro's failure and refusal to settle with NUGGETS & CARATS and provide a defense to DEFENSE INTERNATIONAL, their insured, as hereinabove recited. This would exclude any claims for punitive damages, but include the judgment rendered and the costs of defense, including, but not limited to attorney's fees and litigation costs and expenses incurred by DEFENSE INTERNATIONAL. Additional consideration received by DEFENSE INTERNATIONAL includes the dismissal of the Cross-Complaint filed against them by Buie-Area M LLC and Pacific West Asset Management Corporation. In addition, DEFENSE INTERNATIONAL agrees not to pursue any and all potential claims against all co-defendants in this case, including but not limited to, Buie-Area M LLC, Pacific West Asset Management Corporation and Universal Building Maintenance LLC dba Allied Universal Janitorial Services.

18.     Any lawsuit or proceeding to enforce the rights assigned to NUGGETS & CARATS shall be instituted and maintained by NUGGETS & CARATS in their own name and at their own expense. DEFENSE INTERNATIONAL, by their Chief Executive Officer, agrees to testify in said action to the facts recited above, and further agrees to execute any additional documentation reasonably required by NUGGETS & CARATS to evidence, establish or enforce the rights assigned hereby.

19.     NUGGETS & CARATS accepts the aforesaid assignment with the understanding that DEFENSE INTERNATIONAL makes no warranty or representation as to the validity of the claims or causes of action against Hiscox Pro; and with the further understanding that the invalidity of such claims or causes of action shall not affect NUGGETS & CARAT'S covenants and obligations under this Agreement.

20.     Each of the Parties to this Agreement are to bear their own attorney's fees and costs incurred in connection with the preparation and execution of this Agreement, exclusive of the enforcement of this Agreement.

21.     If any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions shall nevertheless be enforced to the full extent permitted by law.

22.     This Agreement shall not be construed against the Party preparing it, but shall instead be construed as if the Parties jointly prepared this Agreement, and any uncertainty or ambiguity shall not be interpreted against any one party.

23.     This Agreement may be signed in several counterparts and signatures received by fax or email shall be deemed as if they were originals.

3 of 4

IN WITNESS THEREOF, THE PARTIES HAVE EXECUTED THIS AGREEMENT
THIS ___6th___ DAY OF _March_____, 2023.

_____
DEFENSE INTERNATIONAL CORPORATION by Chaz McKinney, CEO

_____
SAM HASSINE, individually, and on behalf of NUGGETS & CARATS INC.

_____
BRIAN HASSINE

✗ March 6, 2023 - See Attached Acknowledgement -
YFlores

4 of 4

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Orange_____ )

On __March 6, 2023__ before me, Yvonne Flores, Notary Public
(insert name and title of the officer)

personally appeared __Chaz Mathew McKinney__
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

YVONNE FLORES
COMM. # 2409160
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. JULY 21, 2026

**Larry Eisenberg**

| | |
|---|---|
| **From:** | Evelyn Molina <emolina@defenseic.com> on behalf of Evelyn Molina |
| **Sent:** | Thursday, August 24, 2023 11:48 AM |
| **To:** | Larry Eisenberg; Chaz Mckinney |
| **Subject:** | Re: Nuggets & Carats Assignment Agreement |
| **Attachments:** | Addendum to Assignment Agreement.pdf |

Here you go.

**Thank you,**
**Evelyn Molina**
**Defense International Corporation**
**PPO 017352**
**Office (714) 646-9145**
**Fax (657) 900-2417**

Have You Heard?
Defense International is presenting opportunities to join our referral program.
Our Way Of Saying... Thank You!

*DISCLAIMER:*
*The information contained in this communication is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message or any action taken in reliance on it is strictly prohibited. If you have received this communication in error, please notify us immediately.*

**ADDENDUM TO**
**ASSIGNMENT OF ACTION IN EXCHANGE FOR COVENANT NOT TO EXECUTE**

THIS IS AN ADDENDUM TO THE ASSIGNMENT AGREEMENT DATED MARCH 6, 2023, BETWEEN:

SAM HASSINE, BRIANE HASSINE and NUGGETS & CARATS, INC., (hereinafter jointly referred to as "NUGGETS & CARATS") and

DEFENSE INTERNATIONAL CORPORATION (hereinafter referred to as "DEFENSE INTERNATIONAL").

NUGGETS & CARATS and DEFENSE INTERNATIONAL shall be jointly referred to as "THE PARTIES."

**RECITALS**

1.      On March 6, 2023, THE PARTIES entered into an ASSIGNMENT OF ACTION IN EXCHANGE FOR COVENANT NOT TO EXECUTE (hereinafter referred to as "ORIGINAL ASSIGNMENT").

2.      NUGGETS & CARATS now seeks to pursue an action to recover on its judgment from DEFENSE INTERNATIONAL's insurer in accordance with the terms of the ORIGINAL ASSIGNMENT.

3.      In entering into the ORIGINAL ASSIGNMENT, it was the intent of THE PARTIES that DEFENSE INTERNATIONAL assign, transfer and convey to NUGGETS & CARATS all claims and causes of action that DEFENSE INTERNATIONAL had or thereafter acquired against DEFENSE INTERNATIONAL's insurer under Security Guards Professional Liability Policy, Certificate No. MPL4029619.21 based on DEFENSE INTERNATIONAL's insurer's failure and refusal to settle with NUGGETS & CARATS and provide a defense to DEFENSE INTERNATIONAL (excluding any claims for punitive damages, but including the judgment rendered, the costs of defense, attorney's fees and litigation costs and expenses incurred by DEFENSE INTERNATIONAL). This is made clear by the identification of the specific policy in Paragraph 2 of the ORIGINAL ASSIGNMENT and the assignment against the insurer of that policy in Paragraph 17 of the ORIGINAL ASSIGNMENT.

4.      The ORIGINAL ASSIGNMENT correctly identified the policy-- Security Guards Professional Liability Policy, Certificate No. MPL4029619.21— and referenced the insurer as Hiscox Pro Insurance Company. Hiscox Pro served as the point of contact, representing itself as the insurer and issued all claim determinations. In fact, it now appears Hiscox Pro may be the administrator and the actual insurer/underwriter may have been The Underwriters at Lloyd's, London, Syndicate no. 3624. It is the intent of this document to clarify that the ORIGINAL ASSIGNMENT assigned all claims against whomever the insurer was under Security Guards Professional Liability Policy, Certificate No. MPL4029619.21 whether it be Hiscox Pro, Lloyd's, London, Syndicate no. 3624 or some other company.

**AGREEMENT**

**NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:**

5.      The recitals set forth above in Paragraphs 1 through 4 are acknowledged and understood to be true and correct, except where stated on information and belief.

6.      The Parties want to clarify that the ORIGINAL ASSIGNMENT was intended to include and hereby does include an assignment of claims against the insurer under Security Guards Professional Liability Policy, Certificate No. MPL4029619.21 whether that insurer be Hiscox Pro Insurance Company, The Underwriters at Lloyd's, London, Syndicate no. 3624 or any other company or entity.

IN WITNESS THEREOF, THE PARTIES HAVE EXECUTED THIS AGREEMENT THIS _24th_ DAY OF AUGUST, 2023.

_Chaz McKinney_
_____
DEFENSE INTERNATIONAL CORPORATION by Chaz McKinney, CEO

_____
SAM HASSINE, individually, and on behalf of NUGGETS & CARATS, INC.

_____
BRIAN HASSINE

P. 2 of 2

# Exhibit 4

HON. THIERRY PATRICK COLAW (RET.)
Judicate West
1851 East First Street
Suite 1450
Santa Ana, CA 92705
Tel: (714) 834-1340
Fax: (714) 834-1344

Referee/Special Master

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| NUGGETS & CARATS, INC., | ) |
| | ) CASE NO. 30-2021-01185591 |
| Plaintiff, | ) STATEMENT OF DECISION |
| | ) |
| vs. | ) |
| DEFENSE INTERNATIONAL | ) (Judicate West Case No.: A302138) |
| CORPORATION, et al., | ) |
| | ) |
| Defendant. | ) |

## 1. Introduction:

This civil case concerns a burglary of a jewelry store called Nuggets & Carats, Inc., in Laguna Niguel California 25 March of 2019. The case is not a criminal case against the perpetrators of the crime, it is a negligence case against the security company, Defense International Corporation ("Defense" or "Defense International") that failed to prevent the burglary.

The Honorable Nathan Scott Judge of the Orange County Superior Court issued an Order in this case on or about 20 April 2023 that read in pertinent part:

*"The court appoints the Hon. Thierry Colaw (ret.) to hear and determine all issues in this action and report a statement of decision to the court within 20 days of the hearing's conclusion. (See Code Civ. Proc., § 638.)"*

A trial was promptly set by the Referee Superior Court Judge Thierry Patrick Colaw (Ret.) for 25 April 2023. In the trial on that date Judge Colaw (Ret.), acting on the court's order, took oral testimony under oath from live witnesses, heard and viewed video deposition testimony, and received documents into evidence pursuant to the California Evidence Code. The matter was taken under submission for further review and study of the written evidence in preparation for the Decision.

What follows herein is the Statement of Decision and Award of the Referee after considering and weighing of all of the evidence.

## 2.  The Hearing Procedure:

The evidentiary hearing took place at Judicate West's Santa Ana offices.

Witnesses were called including:

    (1) Brian Hassine,

    (2) Sam Hassine,

    (3) Russell Haring, Patrol Guard/Former Employee of Defense International (via video deposition),

    (4) Scott DeFoe, an On Scene Security and Security Patrol Guard Expert,

///

///

///

(5) Ronnie Yesharim, CEO of Exotic International, Inc., a diamond and precious metal wholesaler.

The witnesses were duly sworn and examined by Mr. Lawrence S. Eisenberg, Esq., and Mr. James G. Bohm, Esq., for Plaintiff Nuggets & Carats, Inc.

The following numbered exhibits were received in evidence: Exhibits Nos. 1-8, and 10-15 (No. 9 was duplicative).

## 3. **Summary of the Case:**

This case concerns a theft at the Nuggets & Carats, Inc.'s jewelry store located at The Center at Rancho Niguel Shopping Center in Laguna Niguel, California. (See Ex. 2: Site Plan.) The Center at Rancho Niguel is owned and operated by Buie-Area M, LLC and commercially managed by Pacific West Asset Management Corporation. Defendant Defense International Corporation ("Defense") was the security guard company that provided patrol guard services at the shopping center where Plaintiff Nuggets & Carats was a tenant. Nuggets & Carats has been a tenant since 1988, which was 31 years as of the date of the theft on March 25, 2019; (and 35 years to the present time). The theft occurred when the perpetrators/burglars removed the power block (a large circuit breaker) from the exterior electrical supply cabinet behind the Nuggets & Carats store, on or about Saturday night, March 24, 2019, after the stores and restaurants at the shopping center had closed. (See Exhibit 3: Photographs of electrical storage cabinet and the power block removed.) This cut off the electrical power to the Nuggets & Carats store. The perpetrators returned about 24 hours later, on Sunday night, March 25, 2019, after the battery back-up to the security system was depleted and the security system was disabled. The perpetrators then broke into the Nuggets & Carats jewelry store through the roof. They were most

likely in the store for a number of hours between 12:00 midnight and 5:00 am, since they had to cut through a large safe in order to steal in excess of $1,800,000 in jewelry and diamonds.

4. **Factual Findings Based On The Testimony & Evidence Received:**

The following was based in part on the testimony of the highly qualified and credible Security Expert Scott DeFoe (see Ex. 11 C.V. of DeFoe), the testimony of Patrol guard Russell Haring, and Mr. Brian Hassine.

The conduct and actions of Defense International Corporation and their employee Patrol Guard, Russell Haring, were negligent and below the standard of care in the following respects:

a.     Defense signed the Service Contract with Buie-Area M, LLC (owner-operator of The Center at Rancho Niguel) on 1/17/2017 (see Ex. 4: Service Contract).  Defense International did not provide a risk and vulnerability assessment regarding the shopping center premises. This was especially required regarding Nuggets & Carats, which was a high-risk target as the only jewelry store in the center.  Such an assessment should have identified the electrical supply cabinet as providing the electrical power to the tenants' retail locations, which needed to be secured from tampering (see Ex. 3: Photographs).

b.     Defense International failed to train and assess patrol guards in accordance with the terms of the contract. They did not "reassess, retest or retrain" the patrol guard (Russell Haring) every 90 days as stated in Ex. A of the contract (see p. PWAM 0038). Mr. Haring testified in his deposition that this did not occur.

c.     The Patrol guard was **not** advised that he was required to provide a 15-minute foot patrol every night (See Ex. 4: Ex. A, p. 0036).  He was

trained for a few days in a ride-along with another Patrol guard who did not tell him about the 15-minute foot patrol requirement. He never was given a copy of the contract or Ex. A to review. Mr. Haring testified in his deposition that he would only perform a drive through for 5-7 minutes at Site 1, where Nuggets & Carats was located (See Ex. 2: Site Plan). He would only perform a foot patrol if he was advised at the beginning of his shift that homeless vagrants were in the area or if he saw suspicious activity.

d.   Patrol guard Haring failed to notice, inspect, and discover that the electrical supply cabinet was unlocked on 3/25/2019 (or at any time prior to the break-in and theft).

e.   Patrol guard Haring failed to conduct an adequate foot-patrol in compliance with the contract and standard of care on 3/25/2019, at 2:50 a.m. when he did his patrol at Site 1, where Nuggets & Carats was located (see Daily Activity Report, Ex. 5). If the foot patrol had been done in accordance with the standard of care, a reasonable patrol guard should have seen various anomalies or clues such as rope hanging from the ceiling in the Nuggets & Carats store, debris, items scattered on the floor in the front of the store easily seen through the front plate glass windows. The view into the store was unobstructed; there were no shades, blinds, drapes, or shutters obstructing a view of the store interior. Patrol guard Haring should have then reported what would have been easily seen with his flashlight view of the interior to the Orange County Sheriff's Department who had jurisdiction over the area (see Exhibits 10 & 14: Photographs submitted in evidence).

f.   Defense did not give patrol guard Haring an adequate amount of time during his shift to perform what should have been done. The

requirement that Defense had him patrol 15 to 18 separate geographical locations each night and drive 200 miles in an 8-hour shift (from approximately 9:00/10:00 p.m. to about 5:30/6:00 a.m.) was unreasonable in scope for the time allotted and below the standard of care (see Ex. 6: Declaration of Russell Haring).

g.   The failure of Patrol guard Haring to see the perpetrators, or signs of a burglary in the Nuggets & Carats store (*i.e.*- rope hanging from the ceiling where perpetrators broke in, the destruction and access hole cut through the ceiling) when the patrol was allegedly performed at 2:50 am was negligent and below the standard of care.  This was during the time period that the perpetrators were in the Nuggets & Carats store, while the burglary was in progress.  The perpetrators had to be in the store for a number of hours between approximately 12 midnight and 6:00 am on 3/25/2019, since it took time to cut into the large 6 foot safe and drag the smaller safe out the back door into a waiting van or vehicle (see Exs. 10 & 14 Photographs).

h.   The failure of Patrol guard Haring to notice vehicle(s) in the rear area behind the Nuggets & Carats store during the subject patrol was negligent and below the standard of care.  Patrol guard Haring testified that he thought the Ralphs grocery store was open 24 hours when it actually closed at 1:00 a.m. This would cause him to think that cars behind the stores were not suspicious but present since Ralphs was open for business and deliveries.

i.   Defense International did not provide a security radio to contact their dispatch in the event of an emergency; patrol guard Haring had to rely on a cell phone. There was no spotlight on the security vehicle (a Toyota Corolla); the patrol guard had to use his personal flashlight.

Mr. Haring testified that he would use his flashlight and look in each storefront. If he had done so, he would have seen the clues that there was a burglary in progress at Nuggets & Carats.

j.   The alleged GPS tracking on the Defense vehicles (See Ex. 4; Ex. A, p. 0036) would not verify that the patrol guard was actually performing the patrol at the specific required locations including the individual retail stores at The Center at Rancho Niguel.  GPS tracking would only potentially confirm driving in the area.

k.   Defense International and Patrol guard Haring were not even aware that there had been a burglary on 3/25/2019 until well after the occurrence; this was apparently a security company that was not doing its job; they were just billing the client for sub-standard performance.

l.   Defense International did not provide a duties and responsibilities checklist to Patrol guard Haring.  He should have been specifically advised that the Nuggets & Carats jewelry store was the highest risk location in the shopping center.

m.   Defense International would have Patrol guard Haring write-up his logs at the end of each shift when they returned to the Tustin, CA office (about 20 miles from The Center at Rancho Niguel).  This would result in inaccurate Daily Activity Reports.

n.   The break-in and theft at Nuggets & Carats took place in two stages. On Saturday night, 3/24/2019, after the stores and restaurants had closed, the perpetrators first removed the power block (circuit breaker) from the electrical supply cabinet that provided electric power to Nuggets & Carats.  The power block was clearly marked that it was for Suite 5E (Nuggets & Carats); (see Ex. 3 Photographs).  The perpetrators then returned about 24 hours later, after midnight in the

early morning hours of Monday, 3/25/2019, after the battery backup
to the Nuggets & Carats security system was depleted and they broke
into the store through the roof.  The perpetrators were on the premises
over a time period spanning about 30 hours.

o.    The Patrol guard was negligent for not "maintaining constant
visibility" required in Ex. A of the contract (See Ex. 4; p. PWAM
0038). This was a failure to be alert and comply with "situational
awareness" which is "knowing what is going on around you."  There
had to be noise generated from the burglary activity in the Nuggets &
Carats store when Patrol guard Haring was performing his patrol.

p.    It was clearly foreseeable that the failure to comply with the standard
of care resulted in the burglary of Nuggets & Carats that took place on
3/25/2019.

q.    It is probable that the burglary of Nuggets & Carats would have been
thwarted if Defense International and Patrol guard Haring had complied with
the standard of care.

**Testimony Of Brian Hassine, Owner-Operator Of The Nuggets &
Carats Store:**

a.    Brian Hassine, a certified gemologist, ran the Nuggets & Carats Inc. store
at The Center at Rancho Niguel.  Nuggets & Carats was a tenant at the
Laguna Niguel, CA location since 1988.  His brother, Sam Hassine, a
certified gemologist, ran the second Nuggets & Carats store in Mission
Viejo, CA.  He was very credible.

b.    Brian Hassine knew that there was a Patrol guard that patrolled the
shopping center every night.  He relied on them to perform their job and
keep a proper lookout of his store and the entire shopping center in
general.

c. Brian Hassine knew there was an electrical supply cabinet in the area behind his store. He had no responsibility to check on it and other than a general understanding that it was part of the electrical infrastructure, he did not know the specifics of what it contained. He did not see locks on the cabinet doors until they were installed after the 3/25/2019 theft.

d. Brian Hassine had an alarm & security system installed in the Nuggets & Carats store. He and his employees followed all the security system procedures and turned on the alarm every night when they left and they locked the front and back door. He specifically turned on the security system when he closed the store on Saturday, 3/23/2019. The store was not open on Sunday, 3/24/2019. It was his custom, habit, and strictly followed procedure to always put all the jewelry, diamonds and merchandise in the two safes before they locked up each night.

e. Based on all of the documents and testimony, there was no evidence of any comparative fault attributed to Nuggets & Carats, Inc., its owners or employees regarding this matter.

**7. Damages:**

Based upon the testimony and exhibits including particularly the damage testimony of Brian Hassine, Sam Hassine, Ronnie Yesharim, and including especially the Exhibits Nos. 7, 8, 10, 12 (Calculation of Prejudgment Interest), 14, and 15 (Costs Memo), the damages are found to be as follows:

a. Total Property Loss:        $2,439,444.00

(Including merchandise [Ex. 8] and small miscellaneous diamonds and stones, $200,000 and lost profit of $400,000 confirmed by testimony of Sam Hassine)

Less Prior Settlements:   ($275,000.00)

Subtotal:              $2,164,444.00

STATEMENT OF DECISION

b. Prejudgment Interest:      $522,234.00

c. Recoverable Costs:         $29,689.96


**Total Damage Award: $2,716,367.96**


**6. Summary and Disposition:**

(a) Was Defendant Defense International Corporation negligent?

**Yes.**

(b) Was that negligence a legal cause of harm and damage to Plaintiff Nuggets & Carats, Inc.?

**Yes.**

(c) What is the total amount of damages sustained by Nuggets & Carats, Inc.?

**$2,716,367.96 (Two Million, Seven-Hundred Sixteen Thousand, Three Hundred Sixty-Seven U.S. Dollars, and Ninety-Six Cents.)**

---

All exhibits will be destroyed within 30 days of entry of this Award.


Date: May 1, 2023

_Thierry Patrick Colaw_

Hon. Thierry Patrick Colaw (Retired)

Judicial Referee

### PROOF OF SERVICE

### In Re Nuggets & Carats, Inc., et al.
**JW Case No.: A302138**

I, the undersigned, an employee of Judicate West, located at 1851 E. First Street, Suite 1600, Santa Ana, CA 92705 declare under penalty of perjury that I am over the age of eighteen (18) and not a party to this matter or proceeding.

On May 1, 2023, I served the foregoing documents, described as:

### STATEMENT OF DECISION

to the following parties:

### SEE ATTACHED MAILING LIST

**( x ) BY E-MAIL** I caused the above-referenced document to be transmitted via electronic mail (e-mail) to the parties as listed on this Proof of Service

**(   ) BY ELECTRONIC FILING** I caused such document to be sent via electronic service by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at www.onelegal.com.

**(   ) BY FASCIMILE** I caused the above-referenced document to be transmitted via facsimile to the parties as listed on this Proof of Service. The document was transmitted by facsimile transmission and the transmission was reported as complete and without error.

**(   ) BY PERSONAL SERVICE** I personally delivered the documents to the persons at the address (es): by leaving the documents at the person (s) office, in an envelope or package clearly labeled to identify the person(s) being served, with a receptionist or an individual in charge of the office.

**(   ) BY UNITED STATES PARCEL SERVICE** I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit with postage thereon fully prepaid at Santa Ana, California in the ordinary course of business

**(x ) STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**(   ) FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **May 1, 2023**, at Santa Ana, California

_Laura Finley_
Laura Finley
Judicate West



**JUDICATE WEST**
Alternative Dispute Resolution

*Results Beyond Dispute℠*

**Santa Ana Office**
1851 East First Street
Ste 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

## Case Contact List

as of Monday, May 1, 2023

**JW Case #: A302138**

*Case Caption: In Re Nuggets & Carats, Inc., et al.*

James G. Bohm, Esq.
Bohm Wildish & Matsen, LLP
600 Anton Blvd.
Suite 640
Costa Mesa, CA 92626
Phone: (714) 384-6500   Fax: (714) 384-6501
Email: jbohm@aol.com
Representing Nuggets & Carats, Inc.; Sam Hassine; Brian Hassine

Joanne P. Freeman, Esq.
Bohm Wildish & Matsen, LLP
600 Anton Blvd.
Suite 640
Costa Mesa, CA 92626
Phone: (714) 384-6500   Fax: (714) 384-6501
Email: jfreeman@bohmwildish.com
Representing Nuggets & Carats, Inc.; Sam Hassine; Brian Hassine

Lawrence S. Eisenberg, Esq.
Law Offices of Lawrence S. Eisenberg & Associates, APC
9210 Irvine Center Dr.
Irvine, CA 92618
Phone: (949) 753-1500   Fax: (949) 753-1516
Email: lse@lselaw.com
Representing Nuggets & Carats, Inc.; Sam Hassine; Brian Hassine

Downtown Los Angeles Office ● 601 S. Figueroa Ste 3400 ● Los Angeles, CA  90017 ● (213) 223-1113 ● Fax (213) 223-1114
Sacramento Office ● 980 9th Street Suite 2200 ● Sacramento, CA  95814 ● (916) 394-8490 ● Fax (916) 394-8495
San Diego Office ● 402 W. Broadway Ste 2400 ● San Diego, CA  92101 ● (619) 814-1966 ● Fax (619) 814-1967
San Francisco Office ● 100 Pine Street Ste 1950 ● San Francisco, CA  94111 ● (415) 266-1242 ● Fax (415) 266-1243
West Los Angeles Office ● 11601 Wilshire Blvd Ste 2040 ● Los Angeles, CA  90025 ● (310) 442-2100 ● Fax (310) 442-2125

# Exhibit 5

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
West Justice Center
8141 13th Street
Westminster, CA 92683

**SHORT TITLE:** Hassine vs. Center at Rancho Niguel Site I LLC

| **CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE** | CASE NUMBER:<br>**30-2021-01185591-CU-PO-WJC** |
|---|---|

I certify that I am not a party to this cause. I certify that the following document(s), Judgment dated 05/31/23, have been transmitted electronically by Orange County Superior Court at Santa Ana, CA. The transmission originated from Orange County Superior Court email address on May 31, 2023, at 3:06:18 PM PDT. The electronically transmitted document(s) is in accordance with rule 2.251 of the California Rules of Court, addressed as shown above. The list of electronically served recipients are listed below:

EISENBERG & ASSOCIATES, APC
LSE@LSELAW.COM

EISENBERG & ASSOCIATES, APC
T.KATZ@LSELAW.COM

Clerk of the Court, by: _____

_____, Deputy

---

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

V3 1013a (June 2004)                                    Code of Civ. Procedure , § CCP1013(a)

Electronically Received by Superior Court of California, County of Orange, 05/11/2023 02:09:00 PM.
30-2021-01185591-CU-PO-WJC - ROA # 327 - DAVID H. YAMASAKI, Clerk of the Court By S. Juarez, Deputy Clerk.

1  Lawrence S. Eisenberg, Esq.
   *lse@lselaw.com*

2  **EISENBERG & ASSOCIATES, APC**
   9210 Irvine Center Drive

3  Irvine, CA 92618
   Tel: (949) 753-1500

4  Fax: (949) 753-1516

5  Attorneys for Plaintiffs SAM HASSINE, BRIAN HASSINE
   and NUGGETS & CARATS, INC.

6

7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

MAY 3 1 2023

DAVID H. YAMASAKI, Clerk of the Court

BY:_____DEPUTY

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9          **FOR THE COUNTY OF ORANGE – WEST JUSTICE CENTER**

10

| | |
|---|---|
| 11  NUGGETS & CARATS, INC., | Case No. 30-2021-01185591-CU-PO-WJC |
| 12                    Plaintiffs, | |
| 13      vs. | **[PROPOSED] JUDGMENT AGAINST DEFENSE INTERNATIONAL CORPORATION** |
| 14  DEFENSE INTERNATIONAL CORPORATION; and DOES 1 through 150, | |
| 15  *inclusive.* | |
| 16                    Defendants. | Judge:      Hon. Nathan R. Scott |
| 17 | Dept:       W02<br>Action Filed: February 22, 2021<br>Trial Date:  ~~April 25, 2023~~ None Set |
| 18 | |

19        The Honorable Nathan Scott Judge of the Orange County Superior Court issued an Order in

20  this case on or about April 20, 2023 that read in pertinent part: "The court appoints the Hon. Thierry

21  Colaw (ret.) to hear and determine all issues in this action and report a statement of decision to the

22  court within 20 days of the hearing's conclusion. (See Code Civ. Proc., § 638.)"

23        A trial between Plaintiff Nuggets & Carats, Inc. and Defendant Defense International

24  Corporation came on regularly for hearing before Court appointed Judicial Referee, Superior Court

25  Judge Thierry Patrick Colaw (Ret.), on April 25, 2023. Plaintiff was represented by Lawrence S.

26  Eisenberg, Esq. of EISENBERG & ASSOCIATES, APC and James G. Bohm, Esq. and Joanne

27  Freeman Esq. of BOHM WILDISH & MATSEN, LLP.

28

1

[PROPOSED] JUDGMENT AGAINST DEFENSE INTERNATIONAL CORPORATION

1    In the trial on that date Judge Colaw (Ret.), acting on the court's order, took oral testimony

2  under oath from live witnesses, heard and viewed video deposition testimony, and received

3  documents into evidence pursuant to the California Evidence Code. The matter was taken under

4  submission for further review and study of the evidence in preparation for the Decision.

5    On May 1, 2023, Judge Colaw signed the Statement of Decision a copy of which is attached

6  hereto as Exhibit 1 and incorporated herein by reference.  Said Statement of Decision is adopted by

7  the Court in its entirety.

8    The Hon. Thierry Colaw (ret.) found in favor of Plaintiff Nuggets & Carats, Inc. and against

9  Defendant Defense International Corporation and awarded damages in favor of Nuggets & Carats,

10 Inc. as follows:

11

| | | |
|---|---|---|
| 12 | Total Property Loss: | $2,439,444.00 |
| 13 | Less Credit for Prior Settlements: | ($275,000.00) |
| 14 | **Subtotal:** | **$2,164,444.00** |
| 15 | b.    Prejudgment Interest: | $522,234.00 |
| | c.    Recoverable Costs: | $29,689.96 |
| 16 | **TOTAL JUDGMENT:** | **$2,716,367.96** |

17

18

19    Therefore, **IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

20    Judgement is entered in favor of NUGGETS & CARATS, INC. and against DEFENSE

21 INTERNATIONAL CORPORATION, as follows:  *(see CCP § 644(a))*

22    • Total Judgment: $2,716,367.96

23

24    **IT IS SO ORDERED:**

25

26 Dated:  **MAY 3 1 2023**

27                                                   Hon. Nathan R. Scott
                                                    Judge of the Superior Court
28

[~~PROPOSED~~] JUDGMENT AGAINST DEFENSE INTERNATIONAL CORPORATION



# EXHIBIT 1

HON. THIERRY PATRICK COLAW (RET.)
Judicate West
1851 East First Street
Suite 1450
Santa Ana, CA 92705
Tel: (714) 834-1340
Fax: (714) 834-1344

Referee/Special Master

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| NUGGETS & CARATS, INC., | ) |
| | ) CASE NO. 30-2021-01185591 |
| Plaintiff, | ) STATEMENT OF DECISION |
| | ) |
| vs. | ) |
| DEFENSE INTERNATIONAL | ) (Judicate West Case No.: A302138) |
| CORPORATION, et al., | ) |
| | ) |
| Defendant. | ) |

## 1. Introduction:

This civil case concerns a burglary of a jewelry store called Nuggets & Carats, Inc., in Laguna Niguel California 25 March of 2019. The case is not a criminal case against the perpetrators of the crime, it is a negligence case against the security company, Defense International Corporation ("Defense" or "Defense International") that failed to prevent the burglary.

The Honorable Nathan Scott Judge of the Orange County Superior Court issued an Order in this case on or about 20 April 2023 that read in pertinent part:

*"The court appoints the Hon. Thierry Colaw (ret.) to hear and determine all issues in this action and report a statement of decision to the court within 20 days of the hearing's conclusion. (See Code Civ. Proc., § 638.)"*

A trial was promptly set by the Referee Superior Court Judge Thierry Patrick Colaw (Ret.) for 25 April 2023. In the trial on that date Judge Colaw (Ret.), acting on the court's order, took oral testimony under oath from live witnesses, heard and viewed video deposition testimony, and received documents into evidence pursuant to the California Evidence Code. The matter was taken under submission for further review and study of the written evidence in preparation for the Decision.

What follows herein is the Statement of Decision and Award of the Referee after considering and weighing of all of the evidence.

**2.  The Hearing Procedure:**

The evidentiary hearing took place at Judicate West's Santa Ana offices. Witnesses were called including:

    (1) Brian Hassine,

    (2) Sam Hassine,

    (3) Russell Haring, Patrol Guard/Former Employee of Defense International (via video deposition),

    (4) Scott DeFoe, an On Scene Security and Security Patrol Guard Expert,

///

///

///

(5) Ronnie Yesharim, CEO of Exotic International, Inc., a diamond and precious metal wholesaler.

The witnesses were duly sworn and examined by Mr. Lawrence S. Eisenberg, Esq., and Mr. James G. Bohm, Esq., for Plaintiff Nuggets & Carats, Inc.

The following numbered exhibits were received in evidence: Exhibits Nos. 1-8, and 10-15 (No. 9 was duplicative).

## 3. <u>Summary of the Case:</u>

This case concerns a theft at the Nuggets & Carats, Inc.'s jewelry store located at The Center at Rancho Niguel Shopping Center in Laguna Niguel, California. (See Ex. 2: Site Plan.) The Center at Rancho Niguel is owned and operated by Buie-Area M, LLC and commercially managed by Pacific West Asset Management Corporation. Defendant Defense International Corporation ("Defense") was the security guard company that provided patrol guard services at the shopping center where Plaintiff Nuggets & Carats was a tenant. Nuggets & Carats has been a tenant since 1988, which was 31 years as of the date of the theft on March 25, 2019; (and 35 years to the present time). The theft occurred when the perpetrators/burglars removed the power block (a large circuit breaker) from the exterior electrical supply cabinet behind the Nuggets & Carats store, on or about Saturday night, March 24, 2019, after the stores and restaurants at the shopping center had closed. (See Exhibit 3: Photographs of electrical storage cabinet and the power block removed.) This cut off the electrical power to the Nuggets & Carats store. The perpetrators returned about 24 hours later, on Sunday night, March 25, 2019, after the battery back-up to the security system was depleted and the security system was disabled. The perpetrators then broke into the Nuggets & Carats jewelry store through the roof. They were most

likely in the store for a number of hours between 12:00 midnight and 5:00 am, since they had to cut through a large safe in order to steal in excess of $1,800,000 in jewelry and diamonds.

4. **Factual Findings Based On The Testimony & Evidence Received:**

The following was based in part on the testimony of the highly qualified and credible Security Expert Scott DeFoe (see Ex. 11 C.V. of DeFoe), the testimony of Patrol guard Russell Haring, and Mr. Brian Hassine.

The conduct and actions of Defense International Corporation and their employee Patrol Guard, Russell Haring, were negligent and below the standard of care in the following respects:

a.    Defense signed the Service Contract with Buie-Area M, LLC (owner-operator of The Center at Rancho Niguel) on 1/17/2017 (see Ex. 4: Service Contract). Defense International did not provide a risk and vulnerability assessment regarding the shopping center premises. This was especially required regarding Nuggets & Carats, which was a high-risk target as the only jewelry store in the center. Such an assessment should have identified the electrical supply cabinet as providing the electrical power to the tenants' retail locations, which needed to be secured from tampering (see Ex. 3: Photographs).

b.    Defense International failed to train and assess patrol guards in accordance with the terms of the contract. They did not "reassess, retest or retrain" the patrol guard (Russell Haring) every 90 days as stated in Ex. A of the contract (see p. PWAM 0038). Mr. Haring testified in his deposition that this did not occur.

c.    The Patrol guard was **not** advised that he was required to provide a 15-minute foot patrol every night (See Ex. 4: Ex. A, p. 0036). He was

trained for a few days in a ride-along with another Patrol guard who did not tell him about the 15-minute foot patrol requirement. He never was given a copy of the contract or Ex. A to review. Mr. Haring testified in his deposition that he would only perform a drive through for 5-7 minutes at Site 1, where Nuggets & Carats was located (See Ex. 2: Site Plan). He would only perform a foot patrol if he was advised at the beginning of his shift that homeless vagrants were in the area or if he saw suspicious activity.

d.   Patrol guard Haring failed to notice, inspect, and discover that the electrical supply cabinet was unlocked on 3/25/2019 (or at any time prior to the break-in and theft).

e.   Patrol guard Haring failed to conduct an adequate foot-patrol in compliance with the contract and standard of care on 3/25/2019, at 2:50 a.m. when he did his patrol at Site 1, where Nuggets & Carats was located (see Daily Activity Report, Ex. 5). If the foot patrol had been done in accordance with the standard of care, a reasonable patrol guard should have seen various anomalies or clues such as rope hanging from the ceiling in the Nuggets & Carats store, debris, items scattered on the floor in the front of the store easily seen through the front plate glass windows. The view into the store was unobstructed; there were no shades, blinds, drapes, or shutters obstructing a view of the store interior. Patrol guard Haring should have then reported what would have been easily seen with his flashlight view of the interior to the Orange County Sheriff's Department who had jurisdiction over the area (see Exhibits 10 & 14: Photographs submitted in evidence).

f.   Defense did not give patrol guard Haring an adequate amount of time during his shift to perform what should have been done. The

requirement that Defense had him patrol 15 to 18 separate geographical locations each night and drive 200 miles in an 8-hour shift (from approximately 9:00/10:00 p.m. to about 5:30/6:00 a.m.) was unreasonable in scope for the time allotted and below the standard of care (see Ex. 6: Declaration of Russell Haring).

g.  The failure of Patrol guard Haring to see the perpetrators, or signs of a burglary in the Nuggets & Carats store (*i.e.*- rope hanging from the ceiling where perpetrators broke in, the destruction and access hole cut through the ceiling) when the patrol was allegedly performed at 2:50 am was negligent and below the standard of care. This was during the time period that the perpetrators were in the Nuggets & Carats store, while the burglary was in progress. The perpetrators had to be in the store for a number of hours between approximately 12 midnight and 6:00 am on 3/25/2019, since it took time to cut into the large 6 foot safe and drag the smaller safe out the back door into a waiting van or vehicle (see Exs. 10 & 14 Photographs).

h.  The failure of Patrol guard Haring to notice vehicle(s) in the rear area behind the Nuggets & Carats store during the subject patrol was negligent and below the standard of care. Patrol guard Haring testified that he thought the Ralphs grocery store was open 24 hours when it actually closed at 1:00 a.m. This would cause him to think that cars behind the stores were not suspicious but present since Ralphs was open for business and deliveries.

i.  Defense International did not provide a security radio to contact their dispatch in the event of an emergency; patrol guard Haring had to rely on a cell phone. There was no spotlight on the security vehicle (a Toyota Corolla); the patrol guard had to use his personal flashlight.

Mr. Haring testified that he would use his flashlight and look in each storefront. If he had done so, he would have seen the clues that there was a burglary in progress at Nuggets & Carats.

j.  The alleged GPS tracking on the Defense vehicles (See Ex. 4; Ex. A, p. 0036) would not verify that the patrol guard was actually performing the patrol at the specific required locations including the individual retail stores at The Center at Rancho Niguel. GPS tracking would only potentially confirm driving in the area.

k.  Defense International and Patrol guard Haring were not even aware that there had been a burglary on 3/25/2019 until well after the occurrence; this was apparently a security company that was not doing its job; they were just billing the client for sub-standard performance.

l.  Defense International did not provide a duties and responsibilities checklist to Patrol guard Haring. He should have been specifically advised that the Nuggets & Carats jewelry store was the highest risk location in the shopping center.

m.  Defense International would have Patrol guard Haring write-up his logs at the end of each shift when they returned to the Tustin, CA office (about 20 miles from The Center at Rancho Niguel). This would result in inaccurate Daily Activity Reports.

n.  The break-in and theft at Nuggets & Carats took place in two stages. On Saturday night, 3/24/2019, after the stores and restaurants had closed, the perpetrators first removed the power block (circuit breaker) from the electrical supply cabinet that provided electric power to Nuggets & Carats. The power block was clearly marked that it was for Suite 5E (Nuggets & Carats); (see Ex. 3 Photographs). The perpetrators then returned about 24 hours later, after midnight in the

early morning hours of Monday, 3/25/2019, after the battery backup to the Nuggets & Carats security system was depleted and they broke into the store through the roof. The perpetrators were on the premises over a time period spanning about 30 hours.

o.  The Patrol guard was negligent for not "maintaining constant visibility" required in Ex. A of the contract (See Ex. 4; p. PWAM 0038). This was a failure to be alert and comply with "situational awareness" which is "knowing what is going on around you." There had to be noise generated from the burglary activity in the Nuggets & Carats store when Patrol guard Haring was performing his patrol.

p.  It was clearly foreseeable that the failure to comply with the standard of care resulted in the burglary of Nuggets & Carats that took place on 3/25/2019.

q.  It is probable that the burglary of Nuggets & Carats would have been thwarted if Defense International and Patrol guard Haring had complied with the standard of care.

**Testimony Of Brian Hassine, Owner-Operator Of The Nuggets & Carats Store:**

a.  Brian Hassine, a certified gemologist, ran the Nuggets & Carats Inc. store at The Center at Rancho Niguel. Nuggets & Carats was a tenant at the Laguna Niguel, CA location since 1988. His brother, Sam Hassine, a certified gemologist, ran the second Nuggets & Carats store in Mission Viejo, CA. He was very credible.

b.  Brian Hassine knew that there was a Patrol guard that patrolled the shopping center every night. He relied on them to perform their job and keep a proper lookout of his store and the entire shopping center in general.

c. Brian Hassine knew there was an electrical supply cabinet in the area behind his store. He had no responsibility to check on it and other than a general understanding that it was part of the electrical infrastructure, he did not know the specifics of what it contained. He did not see locks on the cabinet doors until they were installed after the 3/25/2019 theft.

d. Brian Hassine had an alarm & security system installed in the Nuggets & Carats store. He and his employees followed all the security system procedures and turned on the alarm every night when they left and they locked the front and back door. He specifically turned on the security system when he closed the store on Saturday, 3/23/2019. The store was not open on Sunday, 3/24/2019. It was his custom, habit, and strictly followed procedure to always put all the jewelry, diamonds and merchandise in the two safes before they locked up each night.

e. Based on all of the documents and testimony, there was no evidence of any comparative fault attributed to Nuggets & Carats, Inc., its owners or employees regarding this matter.

## 7. Damages:

Based upon the testimony and exhibits including particularly the damage testimony of Brian Hassine, Sam Hassine, Ronnie Yesharim, and including especially the Exhibits Nos. 7, 8, 10, 12 (Calculation of Prejudgment Interest), 14, and 15 (Costs Memo), the damages are found to be as follows:

a. Total Property Loss:      $2,439,444.00

(Including merchandise [Ex. 8] and small miscellaneous diamonds and stones, $200,000 and lost profit of $400,000 confirmed by testimony of Sam Hassine)

Less Prior Settlements:   ($275,000.00)

Subtotal:                 $2,164,444.00

b. Prejudgment Interest:     $522,234.00

c. Recoverable Costs:          $29,689.96

**Total Damage Award: $2,716,367.96**

**6. Summary and Disposition:**

(a) Was Defendant Defense International Corporation negligent?

**Yes.**

(b) Was that negligence a legal cause of harm and damage to Plaintiff Nuggets & Carats, Inc.?

**Yes.**

(c) What is the total amount of damages sustained by Nuggets & Carats, Inc.?

**$2,716,367.96 (Two Million, Seven-Hundred Sixteen Thousand, Three Hundred Sixty-Seven U.S. Dollars, and Ninety-Six Cents.)**

All exhibits will be destroyed within 30 days of entry of this Award.

Date: May 1, 2023

Hon. Thierry Patrick Colaw (Retired)

Judicial Referee

## PROOF OF SERVICE

### In Re Nuggets & Carats, Inc., et al.
#### JW Case No.: A302138

I, the undersigned, an employee of Judicate West, located at 1851 E. First Street, Suite 1600, Santa Ana, CA 92705 declare under penalty of perjury that I am over the age of eighteen (18) and not a party to this matter or proceeding.

On May 1, 2023, I served the foregoing documents, described as:

### STATEMENT OF DECISION

to the following parties:

### SEE ATTACHED MAILING LIST

( x ) **BY E-MAIL** I caused the above-referenced document to be transmitted via electronic mail (e-mail) to the parties as listed on this Proof of Service

( ) **BY ELECTRONIC FILING** I caused such document to be sent via electronic service by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at www.onelegal.com.

( ) **BY FASCIMILE** I caused the above-referenced document to be transmitted via facsimile to the parties as listed on this Proof of Service. The document was transmitted by facsimile transmission and the transmission was reported as complete and without error.

( ) **BY PERSONAL SERVICE** I personally delivered the documents to the persons at the address (es): by leaving the documents at the person (s) office, in an envelope or package clearly labeled to identify the person(s) being served, with a receptionist or an individual in charge of the office.

( ) **BY UNITED STATES PARCEL SERVICE** I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit with postage thereon fully prepaid at Santa Ana, California in the ordinary course of business

(x ) **STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

( ) **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **May 1, 2023,** at Santa Ana, California

Laura Finley
Judicate West



**Santa Ana Office**
1851 East First Street
Ste 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344
**www.judicatewest.com**

## Case Contact List

as of Monday, May 1, 2023

**JW Case #: A302138**

### Case Caption: In Re Nuggets & Carats, Inc., et al.

James G. Bohm, Esq.
Bohm Wildish & Matsen, LLP
600 Anton Blvd.
Suite 640
Costa Mesa, CA 92626
Phone: (714) 384-6500   Fax: (714) 384-6501
Email: jbohm@aol.com
Representing Nuggets & Carats, Inc.; Sam Hassine; Brian Hassine

Joanne P. Freeman, Esq.
Bohm Wildish & Matsen, LLP
600 Anton Blvd.
Suite 640
Costa Mesa, CA 92626
Phone: (714) 384-6500   Fax: (714) 384-6501
Email: jfreeman@bohmwildish.com
Representing Nuggets & Carats, Inc.; Sam Hassine; Brian Hassine

Lawrence S. Eisenberg, Esq.
Law Offices of Lawrence S. Eisenberg & Associates; APC
9210 Irvine Center Dr.
Irvine, CA 92618
Phone: (949) 753-1500   Fax: (949) 753-1516
Email: lse@lselaw.com
Representing Nuggets & Carats, Inc.; Sam Hassine; Brian Hassine

Downtown Los Angeles Office ● 601 S. Figueroa Ste 3400 ● Los Angeles, CA 90017 ● (213) 223-1113 ● Fax (213) 223-1114
Sacramento Office ● 980 9th Street Suite 2200 ● Sacramento, CA 95814 ● (916) 394-8490 ● Fax (916) 394-8495
San Diego Office ● 402 W. Broadway Ste 2400 ● San Diego, CA 92101 ● (619) 814-1966 ● Fax (619) 814-1967
San Francisco Office ● 100 Pine Street Ste 1950 ● San Francisco, CA 94111 ● (415) 266-1242 ● Fax (415) 266-1243
West Los Angeles Office ● 11601 Wilshire Blvd Ste 2040 ● Los Angeles, CA 90025 ● (310) 442-2100 ● Fax (310) 442-2125

Electronically Filed by Superior Court of California, County of Orange, 12/04/2023 03:18:00 PM.
30-2023-01362256-CU-BC-CJC - ROA # 8 - DAVID H. YAMASAKI, Clerk of the Court By M. Johnson, Deputy Clerk.

**CM-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>James G. Bohm (SBN 132430); Joanne P. Freeman (SBN 140137)<br>Lawrence S. Eisenberg (SBN 114120); Richard O. Knapp (SBN 144654)<br>Bohm Wildish & Masten, LLP<br>600 Anton, Blvd., Suite 640, Costa Mesa, CA 92626 | *FOR COURT USE ONLY* |
|---|---|
|    TELEPHONE NO.: (714) 384-6500     FAX NO. *(Optional):* (714) 384-6501 | |
| EMAIL ADDRESS *(Optional):* efile@bohmwildish.com | |
| ATTORNEY FOR *(Name):* Nuggets & Carats, Inc. | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  ORANGE |
|---|
| STREET ADDRESS: 8141 13th Street |
| MAILING ADDRESS: 8141 13th Street |
| CITY AND ZIP CODE: Westminster 92683 |
| BRANCH NAME: West Justice Center |

| PLAINTIFF/PETITIONER: Nuggets & Carats, Inc.<br><br>DEFENDANT/RESPONDENT: Underwrites at Lloyd's, et al. | CASE NUMBER:<br>30-2023-01362256-CU-BC-CJC |
|---|---|
| | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Nuggets & Carats, Inc. v. Center at Rancho Niguel Site I, LLC; Defense International, et al

   b. Case number: 30-2021-01185591-CU-PO-WJC

   c. Court: [x] same as above

   [ ] other state or federal court *(name and address):*

   d. Department: 32

   e. Case type: [ ] limited civil  [ ] unlimited civil  [x] probate  [ ] family law  [ ] other *(specify):*

   f. Filing date: February 22, 2021

   g. Has this case been designated or determined as "complex?" [ ] Yes  [x] No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   [x] involves the same parties and is based on the same or similar claims.

   [x] arises from the same or substantially identical transactions, incidents, or events requiring the determination of
   the same or substantially identical questions of law or fact.

   [ ] involves claims against, title to, possession of, or damages to the same property.

   [ ] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   [ ] Additional explanation is attached in attachment 1h

   i. Status of case:

   [ ] pending

   [x] dismissed [x] with [ ] without prejudice

   [ ] disposed of by judgment

2. a. Title: Nuggets & Carats, Inc. v. Underwriters at Lloyd's, et al.

   b. Case number: 30-2023-01362256-CU-BC-CJC

   c. Court: [x] same as above

   [ ] other state or federal court *(name and address):*

   d. Department:

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courts.ca.gov* |
|---|---|---|

CM-015

| PLAINTIFF/PETITIONER: Nuggets & Carats, Inc.<br>DEFENDANT/RESPONDENT: Underwrites at Lloyd's, et al. | CASE NUMBER: |
|---|---|

2.  *(continued)*

    e.  Case type: ☐ limited civil  ☒ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

    f.  Filing date:

    g.  Has this case been designated or determined as "complex?" ☐ Yes  ☒ No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☒ involves the same parties and is based on the same or similar claims.

        ☒ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☒ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☒ Additional explanation is attached in attachment 2h

    i.  Status of case:

        ☒ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

3.  a.  Title:

    b.  Case number:

    c.  Court: ☐ same as above

        ☐ other state or federal court *(name and address):*

    d.  Department:

    e.  Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

    f.  Filing date:

    g.  Has this case been designated or determined as "complex?" ☐ Yes  ☐ No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐ Additional explanation is attached in attachment 3h

    i.  Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 11/20/2023

James G. Bohm
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

►_____
(SIGNATURE OF PARTY OR ATTORNEY)

| CM-015 [Rev. July 1, 2007] | NOTICE OF RELATED CASE | Page 2 of 3 |
|---|---|---|

**CM-015**

| | |
|---|---|
| PLAINTIFF/PETITIONER:   Nuggets & Carats, Inc.<br>DEFENDANT/RESPONDENT:   Underwrites at Lloyd's, et al. | CASE NUMBER: |

### PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the* Notice of Related Case *if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐ deposited the sealed envelope with the United States Postal Service.

   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):*

   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:

   a. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

   ☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____     _____
(TYPE OR PRINT NAME OF DECLARANT)                    (SIGNATURE OF DECLARANT)

| SHORT TITLE:  Nuggets & Carats, Inc. v. Underwriters at Lloyd's et al. | CASE NUMBER: |
|---|---|

Attachment 2h

The Second Action for Insurance Bad Faith claims, Nuggets & Carats, Inc. v. Underwriters at Lloyd's et al., arises out of the underlying case, Nuggets & Carats, Inc. v. Center at Rancho Niguel, Defense International, et al. Defendant Defense International assigned their claims against their insurance carrier (Lloyd's and Hiscox Pro). Witnesses from the underlying case are the same, and the two actions are based on the same event and transaction. It would be appropriate and conserve judicial resources for the case to be assigned to Judge Nathan Scott in Department 32.

*(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, not line numbers):*

This page may be used with any Karuk Tribal Court form or any other paper filed with the court.          Page _____

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>STREET ADDRESS: 700 W. Civic Center DRIVE<br>MAILING ADDRESS: 700 W. Civic Center Drive<br>CITY AND ZIP CODE: Santa Ana 92701<br>BRANCH NAME: Central Justice Center | **FOR COURT USE ONLY**<br>**FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE |
|---|---|
| PLANTIFF: Nuggets & Carats Inc |  |
| DEFENDANT: Underwriters at Lloyds LONDON, SYNDICATE NO. 3624 SUBSCRIBING TO POLICY NO. MPL4029619.21 | **Nov 18, 2023**<br>Clerk of the Superior Court |
| Short Title: NUGGETS & CARATS INC VS. UNDERWRITERS AT LLOYDS LONDON, SYNDICATE NO.<br> 3624 SUBSCRIBING TO POLICY NO. MPL4029619.21 |  |
| **NOTICE OF HEARING**<br>**CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>30-2023-01362256-CU-BC-CJC |

Please take notice that a(n), <u>Case Management Conference</u> has been scheduled for hearing on <u>04/22/2024</u> at <u>09:00:00 AM</u> in Department <u>C28</u> of this court, located at <u>Central Justice Center</u>.

**Plaintiff(s)/Petitioner(s) to provide notice to all defendant(s)/respondent(s). Parties who file pleadings that add new parties to the proceeding must provide notice of the Case Management Conference to the newly added parties.**

<u>IMPORTANT:</u> Prior to your hearing date, please check the Court's website for the most current instructions regarding how to appear for your hearing and access services that are available to answer your questions.
Civil Matters - https://www.occourts.org/media-relations/civil.html
Probate/Mental Health - https://www.occourts.org/media-relations/probate-mental-health.html
Appellate Division - https://www.occourts.org/media-relations/appeals-records.html

<u>IMPORTANTE:</u> Antes de la fecha de su audiencia, visite el sitio web de la Corte para saber cuáles son las instrucciones más actuales para participar en la audiencia y tener acceso a los servicios disponibles para responder a sus preguntas.
Casos Civiles - https://www.occourts.org/media-relations/civil.html
Casos de Probate y Salud Mental - https://www.occourts.org/media-relations/probate-mental-health.html
División de apelaciones - https://www.occourts.org/media-relations/appeals-records.html

<u>QUAN TRỌNG:</u> Trước ngày phiên tòa của quý vị, vui lòng kiểm tra trang mạng của tòa án để biết những hướng dẫn mới nhất về cách ra hầu phiên tòa của quý vị và tiếp cận những dịch vụ hiện có để giải đáp những thắc mắc của quý vị.
Vấn Đề Dân Sự - https://www.occourts.org/media-relations/civil.html
Thủ Tục Di Chúc/Sức Khỏe Tinh Thần - https://www.occourts.org/media-relations/probate-mental-health.html
Ban phúc thẩm - https://www.occourts.org/media-relations/appeals-records.html

Clerk of the Court,  By: *G. Ramirez* , Deputy

**NOTICE OF HEARING**

Page: 1

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**

Central Justice Center
700 W. Civic Center DRIVE
Santa Ana 92701

**SHORT TITLE:** NUGGETS & CARATS INC VS. UNDERWRITERS AT LLOYDS LONDON, SYNDICATE NO. 3624 SUBSCRIBING TO POLICY NO. MPL4029619.21

| CLERK'S CERTIFICATE OF SERVICE BY MAIL | CASE NUMBER: 30-2023-01362256-CU-BC-CJC |
|---|---|

I certify that I am not a party to this cause. I certify that a true copy of the above Notice of Hearing has been placed for collection and mailing so as to cause it to be mailed in a sealed envelope with postage fully prepaid pursuant to standard court practices and addressed as indicated below. The certification occurred at Santa Ana, California, on 11/18/2023. Following standard court practice the mailing will occur at Sacramento, California on 11/20/2023.

Clerk of the Court, by: _G. Ramirez_____ , Deputy

EISENBERG & ASSOCIATES, APC
9210 IRVINE CENTER DRIVE
IRVINE, CA 92618

KNAPP & SPURLOCK, LLP
3525 HYLAND AVENUE # 220
COSTA MESA, CA 92626

BOHM WILDISH & MATSEN, LLP
600 ANTON BOULEVARD # 640
COSTA MESA, CA 92626

---

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

Page: 2

V3 1013a (June 2004)

Code of Civil Procedure , § CCP1013(a)

69.785027. 3 of 3